UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMERICAN FAMILY INSURANCE COMPANY, | |
| Plaintiff, | CIVIL ACTION NO. |
| v. | 1:16-CV-04023-RWS |
| ABDULMOHSEN ALMASSUD, *et al.*, | |
| Defendants. | |

## **O R D E R**

In 2012, Defendant Abdulmohsen Almassud was driving near Cumming, Georgia, when his Jeep veered into oncoming traffic and struck a vehicle driven by Luisa Cruz Mezquital. As a result, Cruz's hand was severely injured. She filed a state court personal injury suit against Almassud, which went to trial and resulted in a jury verdict exceeding $30 million. The Georgia Court of Appeals has since overturned that verdict, however, and the case is en route to being re-tried. In the meantime, American Family Insurance Company ("AmFam"), the company that insured Almassud's Jeep, filed this declaratory judgment action seeking clarity about its obligations to Almassud in the underlying case. Broadly, AmFam alleges that Almassud's policy is void or rescindable because he failed to cooperate with

AmFam in defending the underlying case and provided AmFam with false and incomplete information during the application process. Presently before the Court are three motions for summary judgment: two filed by Almassud [265 & 267] and one by AmFam [284]. Also before the Court is AmFam's Motion for Sanctions against Almassud [285]. After reviewing the record, the Court enters the following Order.

## Background

### I. Factual Background

Defendant Abdulmohsen Almassud owns a 1995 Jeep Wrangler that has been modified. The Jeep, for instance, has an after-market lift kit, winch, larger-than-stock tires, and a rebuilt axle. Nearly a decade ago, AmFam sold a policy to Almassud for his Jeep. It provided up to $100,000 in liability insurance per person for bodily injuries.

During the application process, an AmFam agent took information from Almassud. Among other things, the application asked how the Jeep would be used. Out of the available options, Almassud selected "to/from work." Almassud also responded "no" to a question asking whether the Jeep "is customized or altered including alternate fuel." AmFam's agent ultimately signed the

application, recommending that AmFam issue coverage. In doing so, the agent certified, "I personally have seen the vehicle and recommend it."

The parties disagree over whether Almassud, himself, ever signed the application. But either way, AmFam issued the policy, and it took effect on September 20, 2009.

Several years later, Almassud was involved in an accident. According to Almassud, the Jeep's steering failed, causing it to veer across the center line and into oncoming traffic. The Jeep struck a vehicle driven by Defendant Luisa Cruz Mezquital. The accident left Almassud's Jeep totaled and Cruz severely injured.

Almassud promptly reported the incident to AmFam. Then, AmFam took possession of the Jeep to inspect it and assess the damage. AmFam initially valued the damage to the Jeep at $6,029.14. But after Almassud submitted receipts for aftermarket items that had been installed, AmFam increased the value.

AmFam also concluded that Almassud was not responsible for the accident. Instead, AmFam suspected that fault lay with Oh's Auto Center, where Almassud had the steering kit in his Jeep replaced eight days before the accident. Unbeknownst to AmFam, however—and supposedly key to its analysis— Almassud had also taken the Jeep to Sears Auto Center two hours after he left

Oh's. And at Sears, Almassud had an alignment performed, as well as a "complete steering, suspension evaluation."

The parties dispute certain details surrounding AmFam's investigation of the accident but agree on the general progression of things. The day after the accident, Almassud gave a recorded statement. AmFam asked Almassud what the "purpose of [his] trip" was and where he was "going" to and "coming from." Almassud responded, "We went to the mountains and we were coming back." AmFam also asked Almassud whether "any recent repair work" had been done to the vehicle. Almassud said "yes," then explained that he had the steering kit and the drag links "replaced at a shop" and said he would provide those receipts to AmFam. Finally, AmFam gave Almassud an opportunity to state anything not already discussed. Almassud, in response, mentioned that a tow truck driver at the accident scene noticed a pin missing from the steering column, which the driver believed let a bolt come loose and caused Almassud to lose control of the Jeep. AmFam later had an engineer examine the Jeep who agreed with this theory, noting he was "confident that the steering draft coming loose from pitman arm was not a result of the accident but is what caused the insured to loose [sic] steering."

Based on its investigation, AmFam concluded that it was Oh's installation of the steering kit that caused the accident, not Almassud. AmFam therefore rejected

three demands for policy limits from Cruz. As a result, Cruz filed suit against Almassud in the State Court of Fulton County.

Pursuant to the insurance policy, AmFam retained an attorney, Jim Taylor, to defend Almassud. As is common, AmFam also had its own lawyers involved. Early in the litigation, the firm representing AmFam asked Almassud for "Any maintenance records and documents showing any customizations/modifications done on the Jeep." Almassud responded with a lengthy email that included receipts for parts he had purchased for the Jeep as far back as November 2008.

Meanwhile, discovery was underway in the underlying litigation. Of note, in one interrogatory, Cruz asked Almassud, "When did you make the last inspection of the [Jeep]?" Almassud responded that he last inspected the Jeep on October 13, 2012, after Oh's performed the steering kit installation. In another interrogatory, Cruz inquired about Almassud's activities leading up to the accident. Almassud said he went to Blairsville "to go off-roading."

Some months later, Almassud sat for a deposition, and Cruz's counsel followed up on these responses. As for the inspection, Almassud explained that he personally looked at Oh's work and "didn't see anything obvious," just that the parts were installed and greased but "that's [as] far as [he] went." Cruz's counsel also asked what Almassud meant when he said he had gone "off-roading."

Almassud testified, among other things, that the terrain he had driven on was "just unpaved" and that he did not have any pictures of the Jeep off-road.

Eventually, the underlying case went to trial. During her case-in-chief, Cruz called Almassud for purposes of cross-examination. Cruz's counsel elicited testimony from Almassud about his off-roading activities, and his answers largely tracked those from his deposition. Cruz's counsel, however, proceeded to introduce a number of documents in an attempt to impeach Almassud. Those documents showed that Almassud had, in fact, used the Jeep to drive on more rugged terrains than he previously disclosed.

After the exchange, the trial judge took up the issue outside the jury's presence, and Cruz's counsel accused Almassud of perjury. Ultimately, the judge adjourned the proceedings for the day to allow Almassud to consult a criminal attorney. According to Almassud, both his lawyer, Jim Taylor, and AmFam's lawyer represented criminal defendants.

The following day, Almassud re-took the stand. But he refused to answer Cruz's questions, instead pleading the Fifth. Also that day, AmFam gave Almassud a letter advising him that AmFam would continue to provide a defense "subject to a full and complete reservation of rights." According to the letter,

AmFam was prejudiced because Almassud had "failed to cooperate" in its investigation and defense.

Ultimately, the case went to the jury. The jury determined that Almassud was 100% liable for the accident and awarded Cruz $30,485,646.29.

## II.    Procedural History

After judgment was entered in Cruz's favor, Almassud's counsel filed a motion for new trial. The trial court heard argument on that motion on December 21, 2016 and denied it. As a result, Almassud appealed the verdict.

Meanwhile, AmFam brought this declaratory judgment action seeking a determination of its obligation to provide coverage to its insured, Almassud, for the underlying case. AmFam alleges that Almassud's coverage is void due to his failure to cooperate with AmFam in the defense of the underlying case and for providing AmFam with false and incomplete information. In the alternative, AmFam seeks to rescind Almassud's policy to minimum limits based on purported misrepresentations he made during the application and renewal processes. Cruz and Almassud each filed counterclaims against AmFam asserting claims for bad faith failure to settle, among other things. On March 15, 2017, the Court entered an Order [53] dismissing, without prejudice, Almassud's failure to settle claim as premature lacking a final and non-appealable excess judgment.

On March 15, 2018, the Court of Appeals of Georgia issued an opinion in the underlying case finding that "the trial court erred in failing to instruct the jury on a substantial and vital issue presented by the pleadings and the evidence . . . ." Almassud v. Mezquital, 811 S.E.2d 110, 111 (Ga. Ct. App. 2018), reconsideration denied (Mar. 28, 2018). Cruz then appealed, but the Supreme Court of Georgia denied certiorari. The underlying case is therefore set to be re-tried.

All the while, this case was progressing and producing a flood of discovery-related issues, as well as allegations of professional misconduct. Because of these hindrances and the posture of the state court action, the Court elected to stay discovery until "the parties have briefed and the Court has considered any potentially dispositive arguments supported by the current record or until a final resolution of the underlying case." Accepting the Court's invitation, both Almassud and AmFam have moved for summary judgment. AmFam has also filed a motion for sanctions against Almassud.

## Discussion

### I.  Motions for Summary Judgment

Almassud contends—in two separate motions for summary judgment—that AmFam's declaratory judgment claim and rescission claim fail as a matter of law. AmFam, meanwhile, moves for summary judgment only on its declaratory

judgment claim, focusing on Almassud's alleged failure to cooperate in the underlying suit. The Court lays out the applicable legal standard before considering the parties' motions on the merits.

A.    Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is

such that a reasonable jury could return a verdict for the non-moving party.  Id. at 249–50.

In resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002).  But, the court is bound only to draw those inferences that are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  Anderson, 477 U.S. at 249–50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

B.    Count I – Declaratory Judgment

AmFam seeks a declaration from the Court that it is not obligated to pay the underlying judgment or defend Almassud in the underlying case.  AmFam now moves for summary judgment on that claim, as does Almassud.

Because in Georgia[1] "an insurer's duty to pay and its duty to defend are separate and independent obligations," <u>Penn-Am. Ins. Co. v. Disabled Am. Veterans, Inc.</u>, 490 S.E.2d 374, 376 (Ga. 1997), the Court analyzes them separately.

### 1.  *Duty to Indemnify*

The duty to indemnify is separate from the duty to defend and depends on whether the insured "becomes legally obligated to pay [sums] as damages because of 'bodily injury' or 'property damage.'" <u>Nationwide Mut. Fire Ins. Co. v. Somers</u>, 591 S.E.2d 430, 434 (Ga. Ct. App. 2003).  As a result, an insurer might be required to defend an insured, but at the end of the underlying lawsuit, have no duty to indemnify him.  <u>See, e.g.</u>, <u>Trizec Properties v. Biltmore Constr. Co.</u>, 767 F.2d 810, 812 (11th Cir. 1985).  Disputes related to an insurer's duty to indemnify are typically not ripe until liability is established in the underlying action.  <u>See J.B.D. Constr., Inc. v. Mid-Continent Cas. Co.</u>, 571 F. App'x 918, 927 (11th Cir. 2014) ("The duty to indemnify is dependent upon the entry of a final judgment, settlement, or a final resolution of the underlying claims."); <u>Smithers Constr., Inc. v. Bituminous Cas. Corp.</u>, 563 F. Supp. 2d 1345, 1348 (S.D. Fla. 2008) ("[A]n insurer's duty to indemnify is not ripe for adjudication in a declaratory judgment

---

[1]  It is undisputed that Georgia law applies to this coverage dispute.

action until the insured is in fact held liable in the underlying suit." (citation omitted)); see also Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc., 651 F. Supp. 2d 1367, 1373 (N.D. Ga. 2009) ("The court should not pass on questions of insurance coverage and liability for indemnification when the contingencies giving rise to them may never occur. To do so would amount to an advisory opinion." (citation omitted)); State Farm Fire & Cas. Co. v. Myrick, 206-CV-359-WKW, 2007 WL 3120262, at *2 (M.D. Ala. Oct. 23, 2007) ("Resolving the duty to indemnify before the underlying case is concluded could potentially waste resources of the court because the duty to indemnify could become moot if the insured prevails in the underlying lawsuit.").

Ripeness, as an Article III doctrine, ultimately "goes to whether [a] district court had subject matter jurisdiction to hear the case." Dig. Properties, Inc. v. City of Plantation, 121 F.3d 586, 591 (11th Cir. 1997). So, when there is an issue of ripeness, the Court is obligated to address it, even if the parties have not. See, e.g., Essex Ins. Co. v. Sega Ventures, LLC, No. CV413-253, 2015 WL 1505979, at *4 (S.D. Ga. Mar. 31, 2015) ("Here, the underlying suit is ongoing and any liability has yet to be established. Should the defendants in the underlying suit prevail, any decision by this Court on Plaintiff's duty to indemnify would necessarily be moot and a waste of judicial resources. Accordingly, although the parties do not raise

the issue, the Court shall follow the Eleventh Circuit's warning and not address the parties' arguments concerning Plaintiff's prospective duty to indemnify.") (citing Nationwide Mut. Fire Ins. Co. v. Dillard House, Inc., 651 F. Supp. 2d 1367, 1372–73 (N.D. Ga. 2009) (holding *sua sponte* that parties' duty to indemnify arguments were premature)).

Here, issues related to AmFam's obligation to pay a judgment awarded in the underlying case are not ripe for adjudication. The Court of Appeals of Georgia reversed the jury's verdict, and the state's Supreme Court denied cert. As a result, the case is set (but yet) to be re-tried. Hence, there is no final judgment. So any decision on AmFam's duty to indemnify would not be appropriate at this juncture. See Mid-Continent Cas. Co. v. Delacruz Drywall Plastering & Stucco, Inc., 766 F. App'x 768, 770–71 (11th Cir. 2019) (upholding district court's finding that insurer's duty to indemnify claim was unripe). Both motions are **DENIED, without prejudice** as to this issue.

### 2. *Duty to Defend*

Under Georgia law, "[a]n insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." Elan Pharm. Research Corp. v. Employers Ins. of Wausau, 144 F.3d 1372, 1375 (11th Cir. 1998). In deciding whether there is a duty to defend, the

Court looks to "the language of the insurance contract and the allegations of the complaint asserted against the insured." City of Atlanta v. St. Paul Fire & Marine Ins. Co., 498 S.E.2d 782, 784 (Ga. Ct. App. 1998). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." Id.

AmFam argues it is no longer obligated to provide a defense to Almassud in the underlying case because Almassud breached the insurance agreement by providing incomplete responses in his application and crippling contributions to the defense of the underlying lawsuit. Almassud, on the other hand, argues, in the first instance, that AmFam waived its coverage defense by waiting too long to reserve its rights, and alternatively, that AmFam cannot show it was prejudiced by Almassud's supposed failure to cooperate. The Court begins with the issue of waiver, then moves to the arguments concerning Almassud's duty to cooperate and his alleged concealing of information.

### a. Waiver/Estoppel

Almassud argues that AmFam waived several coverage defenses by waiting to reserve its rights until Almassud was impeached at the underlying trial. Specifically, Almassud focuses on the representations he made regarding the customization and off-road usage of his Jeep. Almassud contends that AmFam

knew he had installed numerous aftermarket products on the Jeep and used it for off-roading during the application process or, at the latest, following the subject accident. For that reason, Almassud insists that the reservation of rights was too late—in fact, nearly two years too late—because AmFam was required to raise defenses based on those facts when it first learned of them.

In Georgia, an insurer has three options when a lawsuit is pending against an insured who claims coverage: (1) "the insurer can defend the claim, thereby waiving its policy defenses and claims of non-coverage;" (2) "the insurer can deny coverage and refuse to defend, leaving policy defenses open for future litigation;" or (3) "the insurer can defend under a reservation of rights." Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 416 (Ga. 2012) (citations omitted). If an insurer assumes the defense or continues to defend its insured with actual or constructive knowledge that a defense to coverage exists, the insurer may be estopped from asserting such defense at a later date. World Harvest Church, Inc. v. GuideOne Mut. Ins. Co., 695 S.E.2d 6, 9 (Ga. 2010). "The insurer can avoid estoppel by giving timely notice of its reservation of rights which fairly informs the insured of the insurer's position." Id. at 9. "The consent of the insured to the nonwaiver notice either may be express or implied [from] the insured's tacit acquiescence in the insurer's unilateral reservation of rights; e.g., where the insured, after receiving

such notice, permits the insurer to continue defense of the suit." State Farm Mut. Auto. Ins. Co. v. Anderson, 123 S.E.2d 191, 193 (Ga. Ct. App. 1961) (internal quotations and citation omitted); accord Wellons, Inc. v. Lexington Ins. Co., 566 F. App'x 813, 822 (11th Cir. 2014); Jacore Sys., Inc. v. Cent. Mut. Ins. Co., 390 S.E.2d 876, 878 (Ga. Ct. App. 1990) ("By not objecting to the reservation of rights letter and by permitting appellee to go forward with its defense of the suit, appellant is deemed to have consented to the letter's terms.").

Here, Almassud did not object when AmFam offered him the reservation of rights letter. Instead, Almassud allowed AmFam to continue to control his defense in the underlying case, and in fact, AmFam continues to do so to date. Almassud thus implicitly consented to a defense under a reservation of rights, as well as the terms of the reservation. Those terms chronicle the ways AmFam believed, at that point, Almassud had breached the insurance policy by failing to cooperate throughout the "pre-suit claims stage and during litigation," including his representations about his use of the Jeep and modifications to it. Moreover, the letter contains a nonwaiver clause. "Under Georgia law, these nonwaiver clauses were sufficient to protect [AmFam's] rights and avoid estoppel." Wellons, 566 F. App'x at 824. The Court therefore turns its attention to the merits of AmFam's coverage defenses.

### b.     Failure to Cooperate & Concealment

The subject policy imposes a number of duties upon an insured claiming

coverage.  Among other things, the insured must:

> a.  cooperate with [AmFam] and assist [AmFam] in any matter
>     concerning a claim or suit.
>                             ***
> g.  cooperate with [AmFam] and, when asked, assist in:
>     (1) making settlements;
>     (2) securing and giving evidence; and
>     (3) getting witnesses to attend hearing and trials.
> h.  attend hearings and trials.

The policy also includes a provision entitled "Concealment or Fraud," which says

the entire policy is void if, before or after a loss, the insured: (a) "intentionally

concealed or misrepresented any material fact or circumstance;" (b) "engaged in

fraudulent conduct; or" (c) "made false statements relating to this Insurance."

In the Amended Complaint, AmFam alleges that Almassud breached these

provisions and prejudiced AmFam in a litany of ways, both during the application

and claim-handling process, as well as during the underlying litigation.

Almassud's motion for summary judgment attempts to address all of the

purportedly violative conduct.  AmFam's motion, by comparison, focuses on three

major instances: (1) concealment of the Sears inspection, (2) testifying untruthfully

at trial, and (3) pleading the Fifth.

In an attempt to best address all of the issues, the Court takes a temporal approach, focusing first on Almassud's actions before Cruz filed her lawsuit, then on Almassud's conduct at the trial of the underlying case.

### i.    Pre-suit

AmFam argues that Almassud failed to cooperate in its pre-suit investigation of the claim by withholding that Sears inspected the Jeep just two hours after Oh's replaced the steering kit. Almassud insists that he cooperated in the investigation and that, if there is blame, it lies with AmFam because its representatives did not ask specific-enough questions.

"Under Georgia law, an insurer may require its insured to abide by the terms of his policy and cooperate with the insurer's investigation as a precondition to recovery." Shan Hsu v. Safeco Ins. Co. of Indiana, 654 F. App'x 979, 980 (11th Cir. 2016) (citing Diamonds & Denims, Inc. v. First of Ga. Ins. Co., 417 S.E.2d 440, 441–42 (Ga. Ct. App. 1992). A failure "to provide *any* material information called for under . . . the policy" could, of course, constitute a breach of contract on the part of the insured. Halcome v. Cincinnati Ins. Co., 334 S.E.2d 155, 157 (Ga. 1985) (emphasis in original). But if "the insured cooperates to some degree or provides an explanation for [his] noncompliance, a fact question is presented for resolution by a jury." Diamonds & Denims, 417 S.E.2d at 442.

Here, there are questions of fact precluding a finding that Almassud breached his duty to cooperate with AmFam in its pre-suit investigation. Again, AmFam focuses primarily on Sears' inspection of the Jeep after Oh's replaced the steering kit. According to AmFam, Almassud was required to disclose the inspection because AmFam needed that information to make a defense. See H.Y. Akers & Sons, Inc. v. St. Louis Fire & Marine Ins. Co., 172 S.E.2d 355, 359 (Ga. Ct. App. 1969) ("The insured is obligated to assist in good faith in making every legitimate defense to a suit for damages.").

AmFam's point is well-taken. Without a doubt, this was material information that could have affected AmFam's handling of the case. And Almassud should have disclosed it. But AmFam was not without its own responsibilities when investigating the claim and deciding how best to move forward.

In Diamonds & Denims, the Georgia Court of Appeals explained that an insurer must "act with diligence and good faith in securing the necessary information." 417 S.E.2d at 442. There, a fire destroyed the plaintiff's warehouse, so the plaintiff made a claim under its commercial property and liability insurance policy. Id. at 441. In investigating the fire, the insurance company made generalized requests for "books and records" but did not specify which documents

it was seeking.  Id.  The plaintiff explained that the fire destroyed all of the

documents but, later in a deposition, offered to produce alternative documentation.

Id.  The insurance company, however, never followed up on this offer or tried to

obtain the referenced documents.  Id.  Indeed, "[t]he record [was] devoid of any

evidence that [the insurer] provided [the plaintiff] with detailed lists of the specific

documents it sought other than to reiterate in general language the policy

requirement for production of 'books and records,'" nor was there evidence "that

[the insurer] either followed up these generalized statements with specific requests,

sought releases from [the plaintiff] in order to obtain records from other sources, or

otherwise pursued the matter further."  Id. at 442.  The court therefore held that

summary judgment for the insurer was inappropriate because "questions of fact

remain[ed] concerning [the plaintiff's] compliance with the policy prerequisites

and [insurer's] diligence in obtaining the needed information."  Id.

    Similarly, here, during Almassud's recorded statement, AmFam's agent

asked if he "had any recent repair work done on the" Jeep.  And in response,

Almassud disclosed Oh's work, but not Sears'.  Almassud contends that he

answered the question, as it was asked.  The Court agrees.  AmFam did not inquire

about "alignments," "maintenance," or "inspections" others had performed on the

Jeep.  And AmFam never followed up with particularized questions that

necessitated disclosure of the Sears' inspection or production of the Sears' receipt. While its agent requested "paperwork for *those* repairs," "those" referred to the Oh's work, which Almassud had already discussed. Otherwise, AmFam did not request specific documents. Its agent did ask Almassud broadly if there was anything he wanted "to add or any corrections [he'd] like to make[.]" But that question was too generalized to warrant a finding that Almassud failed to act in good faith. It is telling, too, that AmFam's agent testified later that Almassud always cooperated with her when she was investigating the claim and that she never asked Almassud about inspections of his Jeep. Thus, AmFam has not proven, at this stage, that Almassud was required but failed to produce the Sears receipt during the claim-handling process.[2]

Nor does the evidence establish that Almassud purposefully concealed the Sears inspection. AmFam spins a tale of Almassud personally contriving the Oh's defense and withholding the Sears inspection to sabotage AmFam in the underlying case. But the evidence underpinning this theory is thin. And there are plenty of reasons why Almassud would seek to avoid personal liability other than subverting AmFam's defense. Namely, Almassud was cited for failure to maintain

---

[2] The Court does not mean to suggest, however, that his case is on all fours with <u>Diamonds and Denims</u>.

lane, so he might have been trying to avoid penalties associated with that ticket or incurring further criminal charges. Either way, it was entirely reasonable for Alamssud to believe, during the claim-handling process, that AmFam was only interested in information and documentation that might affect the value of the Jeep. An alignment and inspection by Sears would not. It cannot be said, then, as a matter of law, that Almassud intentionally withheld material facts from AmFam before Cruz filed her lawsuit.

ii.    Underlying Trial

AmFam also argues that Almassud failed to cooperate in the defense of the underlying case. In Georgia, to deny coverage based on an insured's non-cooperation, the insurer must establish:

> (a) that it reasonably requested the insured's cooperation in defending against the plaintiff's claim, (b) that its insured wilfully and intentionally failed to cooperate, and (c) that the insured's failure to cooperate prejudiced the insurer's defense of the claim.

Travelers Home & Marine Ins. Co. v. Castellanos, 773 S.E.2d 184, 186 (Ga. 2015) (quoting Vaughan v. ACCC Ins. Co., 725 S.E.2d 855, 858 (Ga. Ct. App. 2012). According to AmFam, Almassud failed to cooperate in three ways: (1) by concealing the Sears inspection; (2) by testifying untruthfully; and (3) by pleading the Fifth Amendment at trial.

As for the Sears inspection, there is a question as to whether and what extent AmFam was prejudiced by Almassud's failure to disclose this information once the underlying case was filed.  By that point, AmFam had already "crossed the Rubicon."  It rejected three settlement demands from Cruz and lost its opportunity to settle for policy limits.  That does not mean AmFam was foreclosed from pursuing a different settlement with Cruz or that it could not have altered its trial strategy based on the Sears inspection.  The prejudice to AmFam (assuming it did suffer prejudice) is not readily apparent.

Setting prejudice aside, however, AmFam still has not met its burden because the evidence does not establish that AmFam ever asked Almassud about maintenance performed on the Jeep during the underlying litigation.  AmFam cites to a number of questions posed to Almassud as part of discovery and his deposition.  But those questions came from *Cruz's* attorneys, not AmFam.  Likewise, AmFam cannot rely on the investigation of *Almassud's* attorneys because they were not acting as agents of AmFam.  Without this evidence, the record does not establish that Almassud intentionally withheld the Sears inspection from AmFam during the underlying case because AmFam never actually asked about it.  Cf. Georgia Farm Bureau Mut. Ins. Co. v. First Fed. Sav. & Loan Ass'n of Statesboro, 262 S.E.2d 147, 149 (Ga. Ct. App. 1979) ("An insurance company

can not assert that a factor is material to the risk about which it has neither made inquiry or apprised its prospective insured."). This conduct, then, cannot support summary judgment for AmFam.

AmFam's second argument—that it was prejudiced by Almassud's untruthful testimony—fails, too, but on the second element: It cannot be said that Almassud "wilfully and intentionally failed to cooperate" by testifying untruthfully in an attempt to avoid liability. The defense of failure to cooperate "does not include a too enthusiastic resistance of the action, the effect of which would be to relieve the insurer of liability." Nat'l Union Fire Ins. Co. v. Carmical, 107 S.E.2d 700, 705 (Ga. Ct. App. 1959). Here, assuming Almassud purposefully provided false testimony, it was—at least arguably—to benefit AmFam by attempting— albeit unsuccessfully—to evade an unfavorable judgment.[3]

Finally, the Court considers Almassud's pleading the Fifth at the underlying trial. Although this undoubtedly prejudiced AmFam's defense, the Court finds there is a question of fact as to whether Almassud intentionally failed to cooperate. Notably, the parties dispute who first recommended that Almassud contact a

---

[3] The Court finds it necessary to emphasize that providing false testimony is a serious offense. It undermines the integrity of the judicial system and is, in some instances, deserving of criminal penalties. The Court in no way condones Almassud's behavior in the underlying proceedings.

criminal defense lawyer. Assuming it was AmFam's attorney, then Almassud was only following instructions—in other words, he was attempting to cooperate with AmFam. Furthermore, while AmFam argues that Almassud could have testified, but refused to, about certain matters without incriminating himself, there is no evidence establishing that Almassud's defense counsel or anyone from AmFam ever gave Almassud detailed advice about what and what not to testify to, or that they sought to rehabilitate him on the stand. The undisputed facts, thus, do not demonstrate that Almassud failed to cooperate with AmFam by pleading the Fifth or that, assuming he did fail to cooperate, that failure was willful or intentional.

To summarize, then, the Court cannot say, as a matter of law, that Almassud's conduct either before or after Cruz filed suit constitutes a breach of the insurance policy. Critically though, in deciding whether AmFam has a duty to defend Almassud in the underlying case, the Court's inquiry is limited to whether the policy "even arguably" provides coverage. See, e.g., St. Paul Fire & Marine Ins. Co., 498 S.E.2d at 784. Because a jury *could* find in Almassud's favor—*i.e.*, that he fulfilled his duty to cooperate and did not conceal material information— Almassud is *arguably* entitled to coverage. For purposes of this analysis, that is all that is required. Thus, the Court finds that AmFam has a duty to defend Almassud

in the underlying action. Almassud's third motion for summary judgment is

**GRANTED**, solely as to this issue;[4]  AmFam's motion is **DENIED**.

C.    Count II – Rescission to Minimum Limits

AmFam asks the Court to order that the policy be rescinded to minimum

limits—that is, the minimum coverage amount required under Georgia law,

O.C.G.A. § 33-7-11(a)(1)(A).  This claim is premised on many of the allegations

that underpin AmFam's declaratory judgment claim, except that it focuses

primarily on Almassud' representations during the application process, particularly

as to the customization and off-road use of the Jeep.  According to AmFam,

Almassud "misrepresented, concealed, and failed to disclose" that he installed

aftermarket parts to the Jeep and used the Jeep for purposes other than driving to

and from work or school.

Under Georgia law,

Misrepresentations, omissions, concealment of facts, and incorrect
statements shall not prevent a recovery under the policy or contract
unless:
(1) Fraudulent;
(2) Material either to the acceptance of the risk or to the hazard
assumed by the insurer; or

---

[4]   Based on the Court's ruling, there is no need to discuss any other arguments raised in
Almassud's third motion for summary judgment; AmFam is required to defend Almassud
in the underlying case regardless.  The Court notes, however, that those arguments may
be appropriate in moving or opposing summary judgment on AmFam's duty to
indemnify, should that issue become ripe for the Court's consideration.

> (3) The insurer in good faith would either not have issued the policy or contract or would not have issued a policy or contract in as large an amount or at the premium rate as applied for or would not have provided coverage with respect to the hazard resulting in the loss if the true facts had been known to the insurer as required either by the application for the policy or contract or otherwise.

O.C.G.A. § 33-24-7(b).  Hence, an insurer may rescind a contract if "the insured makes a material misrepresentation in [the] application for insurance." Fid. & Guar. Life Ins. Co. v. Thomas, 559 F. App'x 803, 805 (11th Cir. 2014).  A misrepresentation is material if it "would influence a *prudent insurer* in determining whether or not to accept the risk, or in fixing a different amount of premium in the event of such acceptance." Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 555 F.3d 1331, 1340 (11th Cir. 2009) (internal quotation and citations omitted).   This standard is an objective one: the subjective beliefs of the insurer and insured are irrelevant; what matters is the objective falsity of the statements and the actions of a prudent insurer.  Id.  Even where a material misrepresentation is made, however, "upon discovery of the facts" an insurer seeking to avoid the contract must "at once announce" its intent to rescind the policy.  Minnesota Lawyers Mut. Ins. Co. v. Gordon, 726 S.E.2d 562, 564 (Ga. Ct. App. 2012); accord Am. Safety Indem. Co. v. Sto Corp., 802 S.E.2d 448, 456 (Ga. Ct. App. 2017).

Concerning the aftermarket work to the Jeep, "upon learning of the 'extent or significance' of the alleged misrepresentations, [AmFam] did not at once announce its intent to rescind the polic[y]." Am. Safety Indem., 802 S.E.2d at 456. As Almassud describes in his brief, the record is littered with evidence indicating that AmFam knew he had heavily customized the Jeep before completing the insurance application in September 2009. Notably, in recommending that AmFam issue coverage, the insurance agent certified, "I personally have seen the vehicle and recommend it." But, even assuming he did not see the Jeep, it is undisputed that, in 2012 AmFam learned the Jeep had been modified "48 months ago"—*i.e.*, in 2008. And in fact, when assessing the value of the Jeep, AmFam cited modifications made to the Jeep and referred to it as a "specialized off road vehicle." However, AmFam continued to treat the policy as if it were in effect by paying Almassud for damage to the Jeep and defending him in the underlying case. The Court therefore finds that, assuming Almassud's application included material misrepresentations about the customization of his Jeep, AmFam waived this defense as a matter of law.

This is not the case with Almassud's off-roading, however. The application indicates that Almassud would "use" the Jeep to travel "to/from work/school." Almassud argues that AmFam learned he had been using the Jeep for other

purposes in 2012, after the wreck.  Then, AmFam asked Almassud what the purpose of his trip was, and he responded that he had gone to the mountains. However, taking one trip to the mountains would not constitute a *material* misrepresentation because a single excursion would not likely influence a prudent insurer's decision of whether or not to issue coverage.  The type of off-roading revealed at the underlying trial, on the other hand, undoubtedly would.  Thus, the Court finds there are questions of material fact as to when AmFam first learned of the Jeep's off-road use and the extent of Almassud's off-road activities.  There are, likewise, questions of fact as to whether Almassud misrepresented his use of the Jeep in the application—*i.e.*, whether he answered the question, as it was asked, or whether he was required to disclose all the ways he would utilize the Jeep that would materially impact AmFam's risk in issuing coverage.  For these reasons, Almassud's second motion for summary judgment is **GRANTED, in part** and **DENIED, in part**.

## II.     Motion for Sanctions

### A.     Conduct at Issue

AmFam alleges that, throughout this case, Almassud has provided false and incomplete discovery responses, concealed material facts, and failed to produce

discoverable documents. AmFam cites the following conduct in support of its motion:

- Almassud failed to disclose, in response to written discovery, that he was the plaintiff in a case about enhancing his Jeep's engine.

- In response to a motion to compel, Almassud represented to AmFam and the Court that he was not withholding documents.

- Almassud's former wife later produced hundreds of pages of documents. Among them, the receipt from Sears Auto Center showing Almassud had an alignment and inspection performed on the Jeep after Oh's Auto Center replaced the steering, a video showing Almassud driving over large boulders in the Jeep, and hundreds of pages of emails and photographs pertaining to Almassud's off-roading activities.

- In January 2018, Almassud produced more documents, but omitted texts and photos showing his Jeep's winch being used during an off-roading excursion. AmFam obtained those messages, itself, through a forensic examination of Almassud's work computer, which was provided pursuant to a third-party subpoena.

- Following an Order from the Court requiring Almassud to produce all requested documents, AmFam discovered more documents in Almassud's work email.

B.    Legal Standard

AmFam asks the Court to sanction Almassud pursuant to Rules 37 and 26 of the Federal Rules of Civil Procedure and the Court's inherent power.  Rule 37 provides, in pertinent part, that the Court, in its discretion, may "impose . . . appropriate sanctions" on parties that fail to provide required disclosures or fail to supplement disclosures in a timely manner after learning a disclosure is incomplete or incorrect in some material way.  FED. R. CIV. P. 37(c)(1); see FED. R. CIV. P. 26(a), (e)(1).  Relatedly, Rule 26 allows the Court to "impose an appropriate sanction" on a party or its counsel where the Court finds that the party improperly certified its discovery disclosures.  Fed. R. Civ. P. 26(g)(3).  And finally, the Court may sanction a party pursuant to its inherent power.  See Chambers v. NASCO, Inc., 501 U.S. 32, 43–44 (1991).  The Court, however, must exercise its inherent power with "restraint and discretion" and use it only to "fashion an appropriate sanction for conduct which abuses the judicial process."  Purchasing Power, 851 F.3d at 1223 (quotation omitted).  To that end, "[t]he key to unlocking a court's inherent power is a finding of bad faith."  See Purchasing Power, LLC v. Bluestem

Brands, Inc., 851 F.3d 1218, 1223 (11th Cir. 2017). Bad faith exists when the "court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled," or if a party delays or disrupts the litigation or hampers the enforcement of a court order. Chambers, 501 U.S. at 46 (quotation omitted).

C.    Analysis

Based on Almassud's conduct, AmFam asks the Court to strike his pleadings and enter a default judgment against him. Alternatively, AmFam requests, among other things, the Court limit Almassud's potential for recovery against AmFam to $100,000.00. The Court agrees that Almassud's conduct is deserving of sanctions. The Court declines, however, to impose sanctions as harsh as those sought by AmFam. Instead, the Court finds that an appropriate sanction is to require Almassud to pay the costs and expenses AmFam incurred, including attorneys' fees, for having to conduct additional discovery to obtain documents that Almassud should have produced in the first instance. Judging solely by the number of discovery motions AmFam has filed, the Court believes this is a meaningful sanction.

**Conclusion**

As described above, Almassud's Second Motion for Summary Judgment [265] is **GRANTED, in part** and **DENIED, in part**. It is granted insofar as

AmFam bases its rescission claim on misrepresentations about modifications to the Jeep. As to all other issues, the motion is denied.

Almassud's Third Motion for Summary Judgment [267] is also **GRANTED, in part** and **DENIED, in part**, and AmFam's Motion for Summary Judgment [284] is **DENIED**. Almassud's motion is granted only as to AmFam's duty to defend; both motions are denied without prejudice on issues related to AmFam's duty to indemnify, which are not ripe for adjudication.

Finally, AmFam's Motion for Sanctions Against Almassud [285] is **GRANTED**. As a sanction, AmFam is awarded, and Almassud ordered to pay, costs and expenses incurred by AmFam, including attorneys' fees, for having to conduct additional discovery. AmFam shall file a statement of fees within 14 days of the entry of this Order. Almassud may file objections thereto within 14 days of the filing of AmFam's statement of fees. AmFam will then have 7 days to file a reply.

**SO ORDERED** this 3rd day of September, 2019.

_____
**RICHARD W. STORY**
United States District Judge