IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| AMERICAN FAMILY INSURANCE COMPANY, | |
| Plaintiff, | Civil Action No. |
| v. | 1:16-CV-4023-RWS |
| ABDULMOHSEN ALMASSUD | |
| Defendant. | |

## ORDER

This case comes before the Court on Defendant Almassud's Motion for Summary Judgment on Mootness and to Realign the Parties [Dkt. 312] and Plaintiff American Family Insurance Company's Motion to Amend the Complaint [Dkt. 318]. Having reviewed the record, the Court enters the following Order.

## BACKGROUND

These motions, originally filed after the settlement of the underlying claim, have vexed this Court for many months. In their briefs, the parties advanced competing visions of what remained of AmFam's claims post-settlement. But these competing visions were incompatible, and not just in the sense of a basic disagreement about the viability of a given claim—rather, the parties effectively

were speaking past one another, for they fundamentally disagreed about the current status of the case altogether. After a pair of conferences (separated by a lengthy COVID-driven delay) did little to bridge the gap, the Court initially set these motions down for a more direct argument with the hope of reconciling the disparate viewpoints and resolving the disagreement.

The Court has now opted to change course. Upon invitation from a party seeking additional guidance in advance of the hearing, the Court has once again returned to the record. But this time, the Court has identified what appear to be the correct legal principles governing this rather unusual dispute and now finally appreciates how the parties ought best to proceed. It is therefore the Court's hope that this Order will help the parties move forward expeditiously toward a resolution of this long-running saga.

Because this Order is primarily for the benefit of the parties and because it is intended more to provide direction forward than an ultimate resolution of these issues, the Court will not restate in full the factual and procedural background of this declaratory judgment action—that history has been outlined elsewhere. [See Dkt. 302]. It suffices to note, as already mentioned, that AmFam has settled the underlying claim between Defendant Almassud and the injured plaintiff—and from there to proceed directly into the discussion of the merits of the Motions.

## DISCUSSION

The Court has determined for several reasons that the best way to approach the pending Motions is to address, at a high level, the nature and viability of all of AmFam's claims—current or proposed—and then turn to the disposition of the Motions themselves.

So that is how the Court proceeds.

## I. Overview of AmFam's Post-Settlement Claims

### A. Framework

The best way to think about AmFam's claims is to set aside the muddled history of this case and to consider them in simple terms of the relief sought and the possible theories for obtaining that relief as of this moment.

Generally speaking, the relief sought can be divided into *three* categories of remedies: a declaration, recoupment of the costs AmFam spent defending Almassud, and recoupment of the settlement award.[1] As for the theories of recovery—again, generally speaking—there are *two*: non-coverage under the insurance policy and rescission of the policy because it is void. The Court will refer to these claims as the "No-Coverage" and "Void-Policy" theories.

---

[1] AmFam also seeks attorneys' fees for this lawsuit under O.C.G.A. § 13–6–11, but that recovery is dependent on the others.

The No-Coverage theory primarily centers on the allegation that Almassud breached his duties under the policy when he failed to cooperate with his defense, while the Void-Policy claim centers on the allegation that he misrepresented the extent of his off-roading activities when he applied for insurance on his vehicle. The former is essentially a contract claim; the latter is effectively a claim for rescission.[2] Obviously, AmFam can only prevail on one of the alternative theories.

### B.   Legal Authority

If that framework seems straightforward, much is owed to the clear thinking of judges who have paved the way, for it was not always so. In <u>Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP</u>, No. 1:13-CV-1608, the Court found a case closely resembling this one from which it could draw on the wisdom of three separate courts (plus a jury) who have opined on many of the issues here. (For reference, the list of relevant opinions is included in a footnote.[3])

---

[2] Under the No-Coverage heading, the Court can group AmFam's claim for declaratory judgment with its proposed claims for breach of contract and implied contract (and perhaps for unjust enrichment, at least as conceived by some courts). Under the Void-Policy heading, Court could group AmFam's claim for rescission with its proposed claim for unjust enrichment (as understood here).

[3] Initially, the case was under the purview of Judge Shoob. <u>See</u> <u>Twin City I</u>, 2013 WL 8368744 (motion to dismiss granted); <u>Twin City II</u>, 2014 WL 1800868 (N.D. Ga. Apr. 21, 2014) (reconsideration denied). After dismissal, the case was appealed to the Eleventh Circuit, which affirmed in part and vacated in part. <u>Twin City III</u>, 609 F. App'x 972 (11th Cir. 2015). Then, after remand, the case was eventually transferred to Judge Jones, who saw it through to trial. <u>See</u> <u>Twin City IV</u>, 2016 WL 11666504 (N.D. Ga. Mar.

Though Twin City involved a malpractice claim and the details of the settlement payment differed somewhat, it ultimately boiled down to the same kind of case as here; as a result, much of the judges' reasoning is applicable. For example, here is Judge Jones explaining the two claims:

> To the extent Plaintiff argues that Defendants' insurance claim was outside coverage, its claim depends on the terms of the policies themselves and thus is one for breach of contract, not unjust enrichment. However, to the extent that Plaintiff seeks to void the insurance policies based on its argument that it was fraudulently induced into the contracts by Defendant[s'] alleged misrepresentations, its claim is for unjust enrichment and not breach of contract.

Twin City V, 2017 WL 11497779, at *4 (N.D. Ga. Feb. 28, 2017). That, of course, is the same framework outlined above.

Rather than merely citing Twin City opinions—and other authorities derived therefrom—the Court takes this opportunity to highlight the case, because neither party relied on this authority in their briefs. The point is not to blame parties' counsel, but to set the stage for the remainder of this Order, which proceeds without the benefit of briefing for much of its analysis. The Court has endeavored to analyze and resolve these Motions in a way that will allow the parties to return

---

30, 2016) (motion for leave to amend the complaint granted); Twin City V, 2017 WL 11497779 (N.D. Ga. Feb. 28, 2017) (motion for summary judgment granted in part and denied in part). Ultimately, the jury returned a verdict for the insured.

to what the Court sees as the relevant issues with clarity and to present their

arguments accordingly.

With that in mind, the Court turns to the individual claims for relief.

### C.   Viability of Declaratory Relief

The claim for declaratory relief is now moot. The reason is quite

straightforward: as the Eleventh Circuit explains in its <u>Twin City</u> opinion, once the

insurer has *paid* the settlement to resolve the underlying case, a declaration could

no longer afford any meaningful relief to the insurer:

> Although Twin City arguably possessed standing during the brief
> period following the filing of its complaint in this action, its declaratory
> judgment claim plainly became moot as soon as Twin City paid the $10
> million settlement to the Bank later that same day. At that point, a
> declaration could not have had any bearing on the parties' future
> conduct; rather, Twin City's aim from that point forward was to recoup
> what it already had paid.

<u>Twin City III</u>, 609 F. App'x 972, 979 (11th Cir. 2015). The same is true here. In

any event, the dismissal of a claim for declaratory relief is ultimately of no

practical significance. <u>Id.</u> The real relief sought is damages.

### D.   Viability of Damages Relief for Defense Costs

Under the framework outlined above, there are two types of damages relief

(recoupment of costs and recoupment of the settlement amount) and two possible

theories of recovery (No-Coverage and Void-Policy). That presents four scenarios,

two of which are addressed in this section and two in the next. The Court begins

with AmFam's effort to recoup its defense costs.

### 1.  *Recoupment of costs under the No-Coverage theory*

The parties disagree about whether, under Georgia law, an insurer can

recover the costs of a defense. AmFam relies on <u>Illinois Union Ins. Co. v. NRI</u>

<u>Const. Inc.</u>, 846 F. Supp. 2d 1366, 1373–77 (N.D. Ga. 2012), which traced the law

in various jurisdictions and determined that Georgia law *would* allow for such a

recoupment. Almassud counters that the court in <u>Illinois Union</u> did not correctly

apply Georgia law and that it does not represent the majority rule.

In any event, though the Court remains uncertain as to whether the court's

explanation of Georgia law in <u>Illinois Union</u> is the correct one, it is ultimately

unnecessary to resolve that question. That is because the parties, especially

AmFam, overlook a critical distinction between this case and <u>Illinois Union</u>—

namely, that the court's ruling there arose when the court determined that *the*

*insurer had no duty to defend*. <u>Id.</u> at 1377 (insured "enjoyed free legal defense of

claims Illinois Union had no duty to defend"). Here, by contrast, the Court already

ruled that AmFam *did have a duty to defend* Almassud. [Dkt. 302 at 25–26].[4]

---

[4] AmFam's repeated implication that the Court's reference to remaining factual issues
somehow meant that the duty to defend remains to be adjudicated is plainly incorrect.
The standard for determining the duty to defend was whether a jury *could* find in

And in cases where the insurer has a duty to defend, regardless of the existence of a reservation of rights, it appears well-established that the insurer cannot recover its costs of defense. See Evanston Ins. Co. v. Sandersville R.R. Co., 2017 WL 3166730, at *5 (M.D. Ga. July 25, 2017) (parties agreed that insurer "cannot recoup its defense costs under a reservation of rights if it had a duty to defend"); cf. also Georgia Interlocal Risk Mgmt. Agency v. City of Sandy Springs, 788 S.E.2d 74, 79 (Ga. Ct. App. 2016) ("Because we agree that GIRMA does not have a duty to defend, we must now address GIRMA's claim that it is entitled to recover litigation costs in Flanigan's II incurred subsequent to the issuance of its revised reservation of rights letter."). This accords with the contract principle concerning pre-existing duties: namely, that "promising to do something one is already obligated to do will not provide sufficient consideration for a promise under Georgia law." Bates v. JPMorgan Chase Bank, NA, 768 F.3d 1126, 1132 (11th Cir. 2014).

AmFam has not pointed to any authority that suggests it is entitled to recover the costs for a defense that it was legally obligated to provide. Absent such authority, it is unlikely that the No-Coverage theory supports a recovery of costs.

---

Almassud's favor concerning coverage. Because factual issues remained concerning that determination, the Court determined *as a matter of law* that AmFam had a duty to defend and granted summary judgment in favor of Almassud on that claim.

### 2.   *Recoupment of costs under the Void-Policy theory*

Whether AmFam can recover its costs under the Void-Policy theory presents an entirely different question, because it does not invoke AmFam's duty to defend. In part for that reason, this Court already determined that AmFam's claim for rescission could proceed to trial, even as it ruled against AmFam concerning its duty to defend under the contract. [Dkt. 302 at 26–28]. There is no authority of which the Court is aware that suggests that AmFam could not proceed on a rescission claim in theory. And it properly alleged that it spent more on Almassud's defense than Almassud paid in premiums, causing it a financial loss. [Dkt. 263 at ¶ 75]. So, this claim appears viable.

### E.   Viability of Damages Relief for the Settlement Amount

It is perhaps unsurprising that the parties (and for a time, the Court) failed to identify authority concerning the insurer's ability to recoup the amount it paid in a settlement. After all, "in the overwhelming majority of cases in which the insurer agrees to settle a claim, insurers do not pursue recoupment." Rest. of the Law of Liability Insurance § 25, comment c (2019). But Twin City does address recoupment, and other cases offer relevant principles of Georgia law that bear on the issue.

In Twin City V, as discussed above, the court posited that the insurer could proceed on either a contract or an unjust enrichment theory. 2017 WL 11497779, at *4. In fact, though, the court's analysis largely centered on the latter. For that reason and others, in the discussion below, the Court addresses the theories in the reverse order from above: first, the Void-Policy theory; then No-Coverage.

### 1. *Recoupment of settlement amount under Void-Policy Theory*

In both Twin City II and Twin City V, the court held that the claim for recoupment of a settlement due to unjust enrichment was (generally) barred by a key principle of Georgia law: the voluntary payments doctrine. Georgia law provides that "[p]ayments of claims made . . . where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered." O.C.G.A. § 13-1-13. The statute makes an exception for payments "made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property." Id.

In Twin City II, the court posited as an alternative holding that the voluntary payments doctrine barred the claim for recoupment of the settlement. 2014 WL 1800868, at *4. After that order was vacated on procedural grounds, the court addressed the same defense in more detail in Twin City V, 2017 WL 11497779, at

*5–7. It drew a finer distinction this time around: the claim was barred to the extent that it relied upon misrepresentations known *at the time of settlement*; because some of the misrepresentations were not discovered until later, the claim could proceed on those misrepresentations. Id. at *7–*9.

The insurer also argued that its settlement, due to the urgency of the deadline, fell under the exception outlined in the statute, but the court disagreed. The Court pointed out that "Numerous cases applying Georgia law support the interpretation that settlement of a disputed claim is not the kind of duress that would bar application of the voluntary-payment doctrine." Id. at *6 (citing Sellers Bros. v. Imperial Flowers, Inc., 503 S.E.2d 573, 575 (Ga. Ct. App. 1998) (party who settled dispute due to threat of garnishment judgments made a voluntary payment and argument that the payment was made under duress was "meritless" because the party "was not under the immediate threat of seizure of property"); Crawford v. Gulf States Mortg. Co., 265 S.E.2d 327, 328 (Ga. Ct. App. 1980) (party who paid settlement of disputed claim made a voluntary payment and was not under any duress); see also Chouinard v. Chouinard, 568 F.2d 430, 435 (5th Cir. 1978) (applying Georgia law and holding that because there would be no duress where a party prosecuted a legitimate claim "there similarly is no duress where, as here, there was a settlement rather than a suit or threatened suit");

Cotton v. Med-Cor Health Info. Sols., Inc., 472 S.E.2d 92, 96 (Ga. Ct. App. 1996) (former patients' who made payments for records did so voluntarily and argument that they "otherwise risked collection action" did not "constitute an urgent necessity within meaning of voluntary payment doctrine")).

In light of the holding in Twin City and given that AmFam was well aware of the alleged misrepresentations at the time of settlement, it seems unlikely that its Void-Policy theory could support a claim for recoupment of the settlement amount.

### 2. *Recoupment of settlement amount under the No-Coverage theory*

The question of whether AmFam could recoup the settlement amount under its insurance agreement is a thornier one. It involves four key considerations: (1) Did the parties agree to such a recoupment? (2) Did AmFam waive its right to recoup the settlement award? (3) Does the voluntary payments doctrine bar recoupment? (4) And what is the effect of Almassud's potential claim against AmFam for bad faith failure to settle? Any one of those questions answered in Almassud's favor could well dispose of the claim.

*First: whether the parties agreed*. Whether the parties agreed that AmFam had a right to recoup a settlement amount is a different question than with regard to costs, because AmFam's duty to indemnify Almassud—unlike its duty to defend him—remains unresolved.

12

The starting point—at least according to the Restatement—is that there is no recoupment: "Unless otherwise stated in an insurance policy or agreed to by the insured, an insurer may not settle a legal action and thereafter demand recoupment of the settlement amount from the insured on the ground that the action was not covered." Rest. of the Law of Liability Insurance § 25(2) (2019). Of course, as the text states and the comments reiterate, no recoupment is only the default rule, and it can be superseded by an agreement between the parties, either through the insurance policy or otherwise. Thus, the question essentially becomes one of contract formation and terms.[5]

The answer is ultimately unclear. An agreement about recouping the settlement amount could be found in the insurance policy itself, but AmFam does not seem to press this point—perhaps unsurprisingly, given that such provisions are uncommon. See id. at § 25, comment c ("[I]nsurers have not developed a regular practice of inserting settlement-recoupment provisions in their policies."). Under the No-Coverage theory, there is no doubt that the insurance policy constitutes an agreement; but the policy may well not have included a term that secures this particular right.

---

[5] Because the court in Twin City V focused on the Void-Policy theory, it did not endeavor to consider whether the parties had agreed to allow for recoupment of the settlement amount.

That leaves the reservation of rights letter, and AmFam's contention that it constitutes a separate agreement between insurer and insured. Here, the question is one of formation, rather than terms, because in the letter, AmFam appears to unambiguously reserve its right to "seek reimbursement from the insured with regard to . . . any settlement." [Dkt. 1, Ex. D at 4]. But that does not establish that the letter established a separate *agreement*; it may be, as Almassud suggests, that AmFam is trying to use a "shield" as a "sword." The parties contested this point, but most of their analysis centered on the discussion of costs in Illinois Union. The question here is slightly different, so the Court at this stage declines to resolve it.[6]

*Second: whether AmFam waived its right*. Although the court in Twin City V focused on the Void-Policy theory, rather than the No-Coverage theory, it did—like its predecessor court in Twin City I and Twin City II—explain that a claim for recoupment under the contract failed because the insurer had *waived* any right it had. 2017 WL 11497779, at *4 (citing Hoover v. Maxum Indem. Co., 730 S.E.2d 413, 417 (Ga. 2012); Facility Investments LP v. Homeland Ins. Co. of N.Y., 741 S.E.2d 228 (Ga. Ct. App.2013)). That was because, although the insurer issued

---

[6] Almassud also argues that AmFam's reservation rights letter does not make sense because it refers to "portions" of the claim. In that regard, he is likely correct. In Twin City V, the Court dismissed a claim for "allocation" because it didn't fit the facts. 2017 WL 11497779 at *3.  The same is true here: either the claim is covered, or it is not. There is no "portion" of the claim to be allocated between coverage and non-coverage.

a boilerplate reservation of rights, it did not specifically reserve its right to recoup the settlement award. Id. And so the insurer could not proceed on that claim. Id.

Here, notably, when considering the question of AmFam's duty to defend, the Court previously determined that AmFam did not waive its right to recover costs, but properly reserved it. Of course, in this context, AmFam would need to have specifically reserved its right to recoup the settlement award. But it seems likely that it did so: in its letter, it stated that "AmFam expressly reserves its right to seek reimbursement from the insured with regard to . . . any settlement." [Dkt. 1, Ex. D at 4]. Thus, it appears that the question of waiver is no obstacle to recovery.

*Third: whether the voluntary payments doctrine bars recoupment*. The question remains whether the voluntary payments doctrine applied by the court in Twin City V in the Void-Policy context would also apply in the No-Coverage context. At this stage, the Court declines to speculate on that question.

*Fourth: the effect of Almassud's claim for bad faith failure to settle.* As Almassud notes in his brief, his claim for failure to settle was dismissed as being premature prior to a final judgment. Now that the underlying case has settled, however, the status of that claim remains uncertain. But, as Almassud notes further, AmFam's awareness of its potential liability for that claim undoubtedly played into its determination to settle the underlying case. It seems to go against

15

basic fairness to suggest that AmFam could, on one hand, obtain a judgment against Almassud for the amount it paid in settlement, and, on the other, avoid having to defend itself against the allegation that it caused the damage by failing to settle the underlying case in the policy limits. So, were AmFam to proceed on its claim for recoupment, it may well be that Almassud could reassert what had been previously dismissed—perhaps as an affirmative defense or as a counterclaim.

In sum, then, whether AmFam can recover the settlement amount under the policy remains unsettled; to do so, however, it would need to cross several hurdles.

## F.  Summary

At this stage, there remain some questions about the viability of the different types of damage recovery under both the No-Coverage and Void-Policy theories. As for the No-Coverage theory, despite several substantial hurdles it would need to cross, AmFam may at least theoretically have a narrow path to recover the settlement amount. However, it seems unlikely that it could recover its costs because it had a duty to pay those costs. The Void-Policy theory presents the opposite: AmFam might be able to recover its costs of defense, but it likely could not recover a voluntarily-paid settlement amount. Ultimately, because the No-Coverage theory and Void-Policy theory are alternatives (either the contract was valid, or it was not), AmFam can only prevail on one, which means it appears

16

unlikely that AmFam could recover both its costs *and* the settlement award. It may eventually have to choose.

Of course, as explained at the start, the Court does not make any conclusive findings regarding the claims for damages. The goal here is merely to establish the framework, to set the stage for the parties to be able to address those claims with additional guidance and clarity. And an important part of that goal involves establishing a clear procedural posture for the parties to proceed.

With that in mind, the Court now turns to the Motions pending here.

## II.   Almassud's Motion for Summary Judgment on Mootness and Motion to Realign The Parties [Dkt. 312]

In his Motion [Dkt. 312], Almassud asks for summary judgment, contending that all AmFam's current claims are moot. Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, the issue concerns a purely legal issue: mootness. And concerning that issue, this Motion is easily resolved in light of the discussion from Section II.C, *above*.

First, AmFam's remaining claim for declaratory judgment, along with its requests for declarations as a form of relief, are moot. See Twin City III, 609 F. App'x 972, 979 (11th Cir. 2015). Accordingly, his Motion for Summary Judgment

is **GRANTED** as to that claim and those requests for relief; they are hereby

**DISMISSED with prejudice**.

As for the claim for rescission, insofar as it seeks a recovery of costs, it is

not moot. Almassud's conteds that AmFam never pleaded special damages in its

current Complaint—a point well-taken, but ultimately of little practical

significance, given the Court's ruling on the Motion for Leave to Amend, below.

Still, because that the Court expects AmFam will amend its complaint, it is better

to proceed on a cleaner record. Accordingly, the Motion for Summary Judgment is

**GRANTED** as to the claim of rescission, but that claim is only **DISMISSED**

**without prejudice**.

Almassud also asks the Court to realign the parties so that he is listed as the

plaintiff as he proceeds on his counterclaims, which would be the only claims

remaining. But because AmFam has potentially viable claims, the Motion to

Realign is **DENIED**. AmFam will remain as Plaintiff / Counter-Defendant and

Almassud will remain as Defendant / Counterclaimant.

**III.   AmFam's Motion for Leave to Amend [Dkt. 318]**

**A. Legal Standard**

When a motion to amend is filed after the deadline from a scheduling order,

the movant is required to demonstrate good cause under Federal Rule of Civil

Procedure 16(b) before the Court may consider the amendment under Rule 15.

Sosa v. Airprint Sys., Inc., 133 F.3d 1417, 1419 (11th Cir. 1998). See also Fed. R.

Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the

judge's consent.").[7] To consider only Rule 15(a) without regard to Rule 16(b)

"would render scheduling orders meaningless and effectively would read Rule

16(b) and its good cause requirement out of the Federal Rules of Civil Procedure."

Sosa, 133 F.3d at 1419. The good cause standard "precludes modification unless

the schedule cannot be met despite the diligence of the party seeking the

extension." Id.

Once a court determines that good cause has been shown, only then may it

look to Rule 15, which provides that, "a party may amend its pleading only with

the opposing party's written consent or the court's leave." But when a party seeks

the court's leave, the "court should freely give leave when justice so requires." Id.

A court should deny leave under Rule 15 only "where there is substantial ground

for doing so, such as undue delay, bad faith or dilatory motive on the part of the

movant, repeated failure to cure deficiencies by amendments previously allowed,

undue prejudice to the opposing party by virtue of allowance of the amendment,

---

[7] AmFam's assertion that there is no deadline for the scheduling order is incorrect. The scheduling order, which incorporates the entire proposed scheduling order, includes a deadline of 30 days for amending the pleadings. [See Dkt. 43, Dkt. 42 at 12].

[and] futility of amendment." <u>Reese v. Herbert</u>, 527 F.3d 1253, 1263 (11th Cir.

2008). Ultimately, however, the decision of whether to grant leave to amend

remains in the court's discretion. <u>S. Grouts & Mortars. Inc. v. 3M Co.</u>, 575 F.3d

1235, 1240 (11th Cir. 2009).

**B. Analysis**

Almassud argues that leave should not be granted to AmFam because it

lacks good cause, because amending the complaint would prejudice him, and

because AmFam's proposed claims are futile. The Court disagrees.

First, as for Rule 16's good cause standard (and the lower threshold of undue

delay under Rule 15), the Court finds that AmFam did not unreasonably delay.

AmFam amended its complaint to include damage-related claims shortly after it

settled the underlying case. Moreover, the Court had previously ruled that some of

its claims were not ripe until the underlying case was resolved; thus, a delay until

that point was anticipated.

As for prejudice, Almassud points to the possibility of extensive discovery

and motions practice were AmFam's damage claims allowed to go forward. The

Court is sensitive to such concerns and wants to resolve this case quickly, as do the

parties. However, the Court is not convinced that additional discovery will be so

extensive as to unduly delay the case. In any event, the prospect of more discovery is not sufficient to prevent the inclusion of potentially-valid claims.

Finally, regarding futility, the Court has already evaluated the claims in Section II, above. The claims for damage relief—and the theories that support them—vary in terms of how viable they may be. However, as the Court noted repeatedly, some of the questions raised have not been fully argued by the parties. So, rather than attempt to determine which claims *would be* futile, the Court finds that the better approach is to allow AmFam to frame its claims in light of the guidance given here. Thereafter, Almassud may challenge the legal (or factual) viability of those claims in due course.

Accordingly, AmFam's Motion for Leave to Amend [Dkt. 318] is **GRANTED**. However, because AmFam's attached proposed complaint does not fully reflect the scope of this Order, it will not be adopted as the new complaint governing this case. Instead, AmFam is **ORDERED** to **FILE** an amended complaint that removes claims no longer viable, properly alleges the claims upon which it proceeds, and identifies the categories of damage relief it seeks to recover **WITHIN 21 DAYS** of this Order.[8]

---

[8] AmFam need not specify the amounts; the settlement amount remains under seal.

## CONCLUSION

For the foregoing reasons, Defendant Almassud's Motion for Summary Judgment on Mootness [Dkt. 312] is **GRANTED**. The claim for declaratory judgment is **DISMISSED with prejudice**. The claim for rescission is **DISMISSED without prejudice**. Almassud's Motion to Realign the Parties [Dkt. 312] is **DENIED**.

Plaintiff AmFam's Motion for Leave to Amend [Dkt. 318] is **GRANTED**. AmFam is **ORDERED** to **FILE** a new amended complaint in accordance with this Order **WITHIN 21 DAYS**.

The Clerk is **DIRECTED** to **TERMINATE** the hearing scheduled for argument on these motions.

**SO ORDERED** this 17th day of November, 2020.

_____
**RICHARD W. STORY**
United States District Judge