## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| AMERICAN FAMILY INSURANCE COMPANY, | |
| Plaintiff, | Civil Action No. |
| v. | 1:16-CV-4023-RWS |
| ABDULMOHSEN ALMASSUD | |
| Defendant. | |

## ORDER

This case comes before the Court on Defendant Almassud's Motion to Dismiss Plaintiff American Family Insurance Company's Second Amended Complaint [Dkt. 366].

## BACKGROUND

In this insurance dispute, what began as a declaratory judgment action has morphed into a case about recoupment. After American Family Insurance Company managed to overturn on appeal a large verdict against its insured, Mr. Almassud, but before a second trial really got underway, AmFam agreed to settle with the underlying claimant, and it paid the settlement amount. Now, the company wants its money back—from Mr. Almassud.

Mr. Almassud got into a car accident when his Jeep Wrangler crossed over the center line and struck another car, injuring the other driver. He filed the claim under his insurance, and AmFam agreed to defend him. Despite demands from the plaintiff, AmFam refused to settle, instead relying on the theory that a local repair shop was at fault because of a failure in the steering mechanism that had recently been replaced. Part of AmFam's reason for doing so was its apparent belief that Mr. Almassud had only been driving on normal roads.

That belief was wrong. In fact, Mr. Almassud had been off-roading just before the accident, and he had done so many times before. But he never told AmFam. Indeed, AmFam alleges that Mr. Almassud misrepresented the extent of his off-roading activity in his original insurance application as well as in depositions and in testimony in the underlying trial. AmFam did not learn about it until he was confronted by inculpatory evidence on cross-examination.

At that point, believing that Mr. Almassud had breached his duty to cooperate as required by the policy, AmFam issued a reservation of rights letter, explaining that it was continuing to defend Mr. Almassud subject to its right to deny coverage as well as its right to recoup any costs it expended. When the trial resumed after a short delay, and upon advice of a criminal defense attorney, Mr. Almassud pled the fifth. An unimpressed jury found him liable for $30 million.

Shortly thereafter, AmFam set out to overturn the state verdict on appeal. At the same time, it filed this declaratory action, seeking to deny coverage. AmFam was eventually successful in getting the verdict overturned, and, a retrial was set. Meanwhile, because no judgment was then pending, this Court held that the declaratory action concerning coverage was unripe.

Just as the retrial got underway, AmFam agreed to settle the underlying case with the claimant. It paid the (substantial, confidential) settlement amount.

Then, Mr. Almassud asked this Court to dismiss AmFam's declaratory claims as moot because he was no longer under threat of judgment. AmFam, however, sought leave to amend its complaint to add claims to recover damages for the amounts it spent defending Mr. Almassud and settling the case. The Court dismissed the declaratory judgment claim as moot but allowed AmFam to amend to the complaint. It did so.

Now, Mr. Almassud has moved to dismiss.

## DISCUSSION

In his Motion, Defendant Almassud contends that Plaintiff AmFam's Second Amended Complaint must be dismissed because it fails to state any cognizable claim for relief. The Court begins by setting out the legal standard for a motion to dismiss before turning to the merits of the claims.

## I. **Legal Standard**

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While this standard does not require "detailed factual allegations," neither will mere "labels and conclusions" suffice. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). Instead, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim to relief is "plausible on its face" when the facts support a "reasonable inference that the defendant is liable for the misconduct alleged." Id.; Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018).

When a party challenges a complaint under Rule 12(b)(6) for failure to state a claim, the Court must "accept the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." Gates, 884 F.3d at 1296. So construed, dismissal is proper when, "on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Allen v. USAA Cas. Ins. Co., 790 F.3d 1274, 1278 (11th Cir. 2015).

## II. **Non-Cooperation**

In Counts II, III, and IV, AmFam brings claims for Breach of Contract, Implied Contract, and Unjust Enrichment. The underlying factual basis for these

4

claims is similar: that Mr. Almassud failed to cooperate in his defense as required by his policy. For this Motion, the Court takes that allegation as true. AmFam contends that because of Mr. Almassud's breach of his duty, it is relieved of its duty to defend or indemnify him, and, as such, it can recoup as damages the amount it spent defending him as well as the amount it paid to settle.

In his Motion, Mr. Almassud contends that AmFam cannot recover its costs because the Court previously ruled that AmFam had a duty to defend. He contends that AmFam cannot recover the settlement payment under the breach of contract theory because there was no express agreement allowing recoupment. And he contends that AmFam's other theories—implied contract and unjust enrichment— do not support a recovery of a settlement payment. Additionally, he contends that the voluntary payments doctrine precludes any recovery, regardless of the theory.

AmFam argues that the Court's decision at summary judgment concerning the duty to defend relied on the wrong standard and should not apply at this stage of the proceedings. It contends that Mr. Almassud's failure to cooperate creates a valid claim for recovery of both costs and settlement under any of the theories above. Finally, AmFam argues that even if it cannot recover the costs or the settlement amount, it can recover nominal damages, and so the claim survives.

The Court addresses these different possible recoveries in turn.

## A. Defense Costs

### *1. Prior Ruling*

AmFam's claim for recoupment depends on a determination that it had no duty to defend. That is because, in cases where the insurer does have a duty to defend, regardless of the existence of a reservation of rights, it cannot recover its costs of defense. See Evanston Ins. Co. v. Sandersville R.R. Co., 2017 WL 3166730, at *5 (M.D. Ga. July 25, 2017) (parties agreed that insurer "cannot recoup its defense costs under a reservation of rights if it had a duty to defend"); cf. also Georgia Interlocal Risk Mgmt. Agency v. City of Sandy Springs, 788 S.E.2d 74, 79 (Ga. Ct. App. 2016) ("Because we agree that GIRMA does not have a duty to defend, we must now address GIRMA's claim that it is entitled to recover litigation costs in Flanigan's II incurred subsequent to the issuance of its revised reservation of rights letter.").

The problem initially faced by AmFam, as this Court recently suggested, and which Mr. Almassud points out now, is that the Court previously ruled as a matter of law that AmFam was obligated to defend Mr. Almassud. [See Dkt. 302, Am. Family Ins. Co. v. Almassud, 413 F. Supp. 3d 1292, 1301–06 (N.D. Ga. 2019)]. Having been apprised of this dilemma, AmFam asks the Court to revisit its prior

ruling, arguing that the standard applied by the Court at summary judgment was contrary to Georgia law. As explained below, the Court agrees.

In its Order granting summary judgment to Mr. Almassud, the Court set out the legal standard as follows:

> In deciding whether there is a duty to defend, the Court looks to "the language of the insurance contract and the allegations of the complaint asserted against the insured." City of Atlanta v. St. Paul Fire & Marine Ins. Co., 498 S.E.2d 782, 784 (Ga. Ct. App. 1998). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." Id.

[Id. at 1301]. But there was no dispute that the facts alleged in the underlying complaint fell within the policy. The real question—then and now—is whether Mr. Almassud failed to cooperate. The Court considered that question and determined that issues of fact precluded judgment as a matter of law. But then, the Court concluded that these issues of fact fell within the "even arguably" standard above:

> Because a jury *could* find in Almassud's favor—*i.e.*, that he fulfilled his duty to cooperate and did not conceal material information— Almassud is *arguably* entitled to coverage. For purposes of this analysis, that is all that is required.

[Id. at 1306]. Thus, the Court found that AmFam had a duty to defend him, and it granted Mr. Almassud's Motion on that point.

Upon further review, the Court agrees with AmFam that the "even arguably" standard does not apply to the non-cooperation determination. The question of

7

coverage—whether the policy "even arguably" covered the facts alleged in the underlying complaint—is distinct from the question of cooperation—whether the insured failed to cooperate and thus breached the policy himself. The latter question, as the Court noted, rested on disputed facts, and so should proceed to trial even if the claim was covered under the policy. See Nat'l Sur. Corp. v. Dunaway, 100 Ga. App. 842, 843 (1959) (issues of fact precluded judgment on the question of non-cooperation even when underlying complaint fell within policy).

Accordingly, the part of the Court's prior Order [Dkt. 302] which ruled that AmFam had a duty to defend Mr. Almassud is hereby **VACATED**.[1] Instead, the Court proceeds with the question of whether, assuming Mr. Almassud did fail to cooperate, AmFam has stated a viable claim for recoupment of defense costs.

### 2. Requirements for Recoupment

In Georgia, it remains an open question whether and under what circumstances an insurer can recoup its defenses costs when it is determined that the insurer has no duty to defend. No Georgia appellate court appears to have ruled

---

[1] Mr. Almassud argues that AmFam missed its window to file a motion for reconsideration. However, AmFam explained that it never moved for reconsideration because it interpreted the Court's prior order "as maintaining the status quo, not an order that AmFam could never recover on its failure to cooperate claim." [Dkt. 367 at 13–14]. Given AmFam's explanation of its understanding and the timing of the Order relative to the settlement, neither party is prejudiced by revisiting this question now.

on that question. See Georgia Interlocal Risk Mgmt. Agency v. City of Sandy Springs, 788 S.E.2d 74, 79 (Ga. Ct. App. 2016) (declining to decide). And federal courts applying Georgia law have reached opposite conclusions. Compare Illinois Union Ins. Co. v. NRI Const. Inc., 846 F. Supp. 2d 1366, 1373–77 (N.D. Ga. 2012) (recoupment allowed), with Illinois Union Ins. Co. v. William C. Meredith Co., 2009 WL 10669607, at *3–5 (N.D. Ga. June 5, 2009) (no recoupment).

These courts all agree that an insurer could recoup costs if the insurance policy contained a provision allowing it to do so. But when as here, no such provision exists, the authorities diverge on whether an insurer can recoup merely by issuing a valid reservation of rights. As any of the above cases illustrate, the two schools of thought are by now well-established in other jurisdictions and so need not be retraced here in detail. Id.; see also Gerdau Ameristeel US Inc. v. Phoenix Ins. Co., 2020 WL 6821323, at *2 (N.D. Ga. Oct. 2, 2020). It suffices to note that the "majority" approach allows for recoupment under a reservation of rights, applying either an implied contract or unjust enrichment theory—corresponding with AmFam's Counts III and IV—while the "minority" approach does not.[2]

---

[2] The Court puts "majority" and "minority" in quotation marks because the Restatement challenges this distinction: "Over the past few decades, the pro-recoupment cases have been viewed as stating the majority position, while anti-recoupment cases have been labeled the minority. But in recent years, several state courts, including several state high courts, have faced recoupment of defense costs as an issue of first impression and have

This Court adopts the "minority" approach. Along with the court in <u>William C Meredith Co.</u>, and the Restatement of the Law of Liability Insurance § 21 (2019), the Court finds that the rationale underlying a no-recoupment default rule makes more sense and believes that a Georgia court deciding the issue would agree. Simply put, "the insurer should not be able to unilaterally alter the terms of an insurance policy." <u>William C. Meredith Co.</u>, 2009 WL 10669607, at *3. This follows straightforwardly from the concept of a *reservation* of rights: the right must be preexisting to be reserved; otherwise an entirely new right is created.

Of course, there is "nothing wrong with the concept of recoupment." <u>Id.</u> at *5. But if a right to recoupment is a benefit that the insurer deems sufficiently important, it can easily secure that right by including it in the policy agreement. <u>Id.</u>; <u>see also</u> Rest. of the Law of Liability Insurance § 21, cmt. a ("The issue of the right to recoup the costs of defending a noncovered legal action is a known uncertainty that the insurer can address in the liability insurance contract."). And requiring the insurer bear the burden of including that provision makes sense because the insurer is in the better position to dictate the terms of the policy. <u>See</u> Rest. of the Law of Liability Insurance § 21, cmt. a.

---

rejected a right of recoupment for the insurer, unless that right is established expressly by contract." Rest. of the Law of Liability Insurance § 21, cmt. a (2019).

In adopting this position, the Court departs from the conclusion in <u>NRI Constr. Inc.</u>, 846 F. Supp. 2d at 1376–77. There the court did not attempt to ascertain the "better" position; instead, it looked to Georgia cases addressing a different issue—waiver and estoppel—and extrapolated from those cases to determine that Georgia courts would likely allow for recoupment. <u>Id.</u> (citing <u>Jacore Sys., Inc. v. Cent. Mut. Ins. Co.</u>, 390 S.E.2d 876, 878 (1990)). That is perhaps a valid approach to resolving this issue, but this Court does not follow it. That is because whether an insurance company properly reserved its right to deny coverage—a right undoubtedly included in the policy—is a different question from whether it can recoup costs it itself paid to defend a claim. As Mr. Almassud has repeatedly pressed, to extend that rule to this context would transform the insurer's shield into a sword.

That critical distinction also illustrates why AmFam's repeated references to the Court's prior ruling that Mr. Almassud is "bound" to the terms of the reservation of rights, as well as its efforts to frame the reservation of rights as a "contract," are misguided here. Like the cases cited by the court in <u>NRI Constr. Inc.</u>, the Court's prior Order addressed the question of *waiver*, not the question of *recoupment*. [<u>See</u> Dkt. 302 at 16]. So did the Georgia court that used the language of "contract" to talk about a reservation of rights. <u>See Cont'l Ins. Co. v. Weekes</u>,

232 S.E.2d 80, 81 (Ga. Ct. App. 1976). These cases do not bear on whether or how a unilateral reservation of rights can establish new rights not in the policy, and so they do not dictate the outcome here.

Accordingly, the Court holds that, absent a provision in the insurance policy—or some other express agreement—an insurer who issued an otherwise valid, unilateral reservation of rights cannot recoup its costs of defense.

In light of that holding, AmFam's claims can be disposed of without too much difficulty. The company obviously cannot recover on its implied contract or unjust enrichment claims, which reflect the approach not taken above. That leaves only AmFam's claim for breach of an express agreement, which also fails, albeit for a different reason—namely, that no such agreement exists. AmFam does not allege that the policy contained a provision allowing for recoupment. And, critically, while the reservation of rights includes a right to recoup, AmFam does not contend that it operates as a separate, *express* agreement.[3]

---

[3] AmFam argues that the reservation of rights creates its own contract, but only as an implied contract (or quasi-contract). [See Dkt. 367 at 19–21]. Similarly, the Amended Complaint alleges only that Mr. Almassud "consented," "did not object," and "implicitly consented" to the reservation of rights—language that does not invoke the sort of affirmative assent needed to establish a separate, express agreement here. And even if the letter had constituted an offer, it is undisputed that Mr. Almassud did not sign it.

In sum, AmFam's Complaint fails to state a claim for recoupment of defense costs based on Almassud's alleged non-cooperation under the policy.

## B. Settlement Payment

A similar fate befalls AmFam's non-cooperation claims with respect to the recoupment of the settlement payment.[4]

Compared with defense costs, the cases addressing a right to recoup a settlement payment are few and far between, perhaps because "in the overwhelming majority of cases in which the insurer agrees to settle a claim, insurers do not pursue recoupment." Rest. of the Law of Liability Insurance § 25, cmt. c (2019). Indeed, the "vast majority of states have not addressed this issue, perhaps because 'until recently few observers would have thought that there could be any right to recoup indemnity payments.'" Id. at § 25, reporter's note to cmt. c (citing Kenneth S. Abraham & Daniel Schwarcz, Insurance Law and Regulation 616 (6th ed. 2015)). Georgia appears to be among that vast, silent majority.

---

[4] Here, the Court takes as true the allegation that the reservation of rights letter adequately included a right to recoup a settlement payment, and so AmFam's purported claims are not subject to any defense of waiver or estoppel. But see Facility Investments, LP v. Homeland Ins. Co. of N.Y., 741 S.E.2d 228, 234 (Ga. Ct. App. 2013) (physical precedent only) (insurer could not recover a settlement payment because the reservation of rights letter did not "specifically reserv[e] its rights with regard to the uncovered loss allocation provision"); Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 2017 WL 11497779, at *4 (N.D. Ga. Feb. 28, 2017) (insurer waived allocation claim because it did not specifically reserve the right).

Of the few states that have considered the issue, no recoupment without a policy provision appears to be the leading position. Id.; see also, e.g., U.S. Fid. & Guar. Co. v. U.S. Sports Specialty Ass'n, 270 P.3d 464, 468 (Utah 2012). A small handful of states and federal courts, however, have allowed recoupment pursuant to a unilateral reservation of rights. See, e.g., Travelers Prop. Cas. Co. of Am. v. Hillerich & Bradsby Co., Inc., 598 F.3d 257, 269 (6th Cir. 2010) (applying Kentucky law); Horace Mann Ins. Co. v. Hanke, 312 P.3d 429, 434–435 (Mont. 2013). For its part, the Restatement again adopts a no recoupment rule: "Unless otherwise stated in an insurance policy or agreed to by the insured, an insurer may not settle a legal action and thereafter demand recoupment of the settlement amount from the insured on the ground that the action was not covered." Rest. of the Law of Liability Insurance § 25.

Again, the Court agrees with the Restatement and concludes that, absent a right to recoupment that is included in the policy, or absent some other express agreement addressing recoupment, the insurer cannot recoup an amount paid in settlement. The rationale is essentially the same as above: an insurer cannot unilaterally create a new right that does not exist in the policy. If the insurer wishes to retain the right to recoup, it could include that right in the policy, or, if that right was in doubt, it could enter into a separate, express agreement that granted it the

right to recoup. See Nationwide Prop. & Cas. Ins. Co. v. Renaissance Bliss, LLC, 396 F. Supp. 3d 1287, 1298 (N.D. Ga. 2019) (insurer sought "reimbursement based on the separate written agreement into which the parties entered"), aff'd, 823 F. App'x 815 (11th Cir. 2020). A unilateral reservation of rights is insufficient.

The application here mirrors that above as well. AmFam has not alleged that the insurance policy creates a right to recoupment; nor has it pointed to any express agreement between it and Almassud. All it points to is the reservation of rights, which is insufficient to support this claim.[5]

It may well be that Mr. Almassud's misconduct led to a verdict and subsequent settlement demand far above what might have otherwise been the case. That undoubtedly put AmFam in a difficult spot while it tried to assess its responsibility. But that difficulty does not reflect some manifest injustice or otherwise alter the balance of power between insurer and insured. It simply reflects a risk (of non-cooperation) that AmFam was already aware of when it created the policy. AmFam still had the right to defend, await judgment, and seek to deny

_____

[5] Because the Court finds that no agreement existed, it does not consider the applicability of the voluntary payments doctrine to the claims under the policy. Additionally, the Court declines to consider Mr. Almassud's suggestions that AmFam's attempt to recover such a large amount from its insured is a bad-faith endeavor because (1) he could not possibly pay that amount, and (2) AmFam is seeking to protect itself from liability for bad faith failure to settle. Both points go beyond the allegations of the Complaint.

coverage, however unpalatable that option might have been. But it did not have the right to settle the case and then demand repayment for doing so.

Accordingly, AmFam cannot recoup the settlement payment based on Almassud's breach of his duty to cooperate under the insurance policy.

### C. Nominal Damages

Finally, AmFam argues that, even if it cannot recover any damages for the costs or the settlement payment, it still has a viable breach of contract claim for non-cooperation and is entitled to recover nominal damages under O.C.G.A. § 13-6-6.[6] Here, the Court agrees with AmFam.

The Georgia statute provides that, "In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action." O.C.G.A. § 13-6-6. While non-cooperation with an insurance policy is a specific type of contract claim that sometimes involves additional

---

[6] AmFam mentioned nominal damages only in passing in its response, and it did not specifically pray for nominal damages in the Complaint. Perhaps because of the scant treatment, Mr. Almassud did not address AmFam's argument in his reply. Still, the Court thinks AmFam's mention is enough to properly raise the issue at this stage. Cf. Travelers Prop. Cas. Co. of Am. v. SRM Grp., Inc., 820 S.E.2d 261, 266 (Ga. Ct. App. 2018) ("Under the Civil Practice Act it is not necessary to pray specifically for general or nominal damages in order to present a question for the jury as to nominal damages." (citation omitted)), rev'd in part on other grounds, 841 S.E.2d 729 (Ga. 2020).

considerations (as with the discussions above), nothing in the plain language of the statute indicates that it should not apply here. And at least one Georgia court has allowed nominal damages in an insurance dispute. See <u>Vara v. Essex Ins. Co.</u>, 604 S.E.2d 260, 263 (Ga. Ct. App. 2004) (indemnity claim by insured against insurer), <u>abrogated on other grounds by</u> <u>World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.</u>, 695 S.E.2d 6 (Ga. 2010). Accordingly, the Court holds that AmFam can seek nominal damages under its breach of contract claim.

### D. Summary

Though AmFam has properly alleged that Mr. Almassud failed to cooperate as required under the policy, it cannot recoup either the costs it spent defending him or the amount it paid to settle its claim, because those rights did not exist in the policy, and AmFam's unilateral reservation of rights was insufficient to create those rights in the first instance. However, AmFam can proceed on its breach of contract claim and seek nominal damages.

Accordingly, Mr. Almassud's Motion is **GRANTED** as to **Counts III (Implied Contract)** and **IV (Unjust Enrichment)**. Those claims are hereby **DISMISSED**. The Motion is **GRANTED in part and DENIED in part** as to **Count II (Breach of Contract)**. That claim will proceed on the question of non-

cooperation, but AmFam's entitlement to damages for recoupment of defense costs

and the settlement payment [Dkt. 364 at ¶ 153] is hereby **DISMISSED**.

## III. Rescission

As an alternative to its non-cooperation claims, AmFam brings a claim for

rescission, arguing that that it is entitled to rescind Mr. Almassud's policy under

O.C.G.A. § 33-24-7(b).[7] According to AmFam, the policy is void because

Mr. Almassud misrepresented the use of his vehicle in the original insurance

application when he failed to disclose his off-roading activities,[8]

misrepresentations that were material to the company's decision to issue the

_____

[7] O.C.G.A. § 33-24-7(b) provides that:

> Misrepresentations, omissions, concealment of facts, and incorrect
> statements shall not prevent a recovery under the policy or contract unless:
>
> > (1) Fraudulent;
> >
> > (2) Material either to the acceptance of the risk or to the hazard assumed
> > by the insurer; or
> >
> > (3) The insurer in good faith would either not have issued the policy or
> > contract or would not have issued a policy or contract in as large an
> > amount or at the premium rate as applied for or would not have provided
> > coverage with respect to the hazard resulting in the loss if the true facts
> > had been known to the insurer as required either by the application for
> > the policy or contract or otherwise.

[8] AmFam also inadvertently included allegations about Almassud's misrepresentations
concerning customization work performed on the Jeep. In its Response, it acknowledged
that the Court previously dismissed that part of the claim. [Dkt. 367 at 13].

policy. As such, AmFam says it is entitled to reimbursement for both the costs of his defense and the amount of the settlement payment.

In his Motion, Mr. Almassud primarily contends that, under Georgia's voluntary payments doctrine, AmFam cannot recoup the settlement amount because it paid the settlement despite knowing of the alleged misrepresentations. Because the parties focus most of their efforts on that issue, the Court begins there. Again, for the purpose of this Motion, the Court treats Mr. Almassud's alleged misrepresentations as established fact.

### A. Voluntary Payments Doctrine[9]

Georgia's voluntary payments doctrine comes from O.C.G.A. § 13-1-13, which provides that "[p]ayments of claims made . . . where all the facts are known and there is no misplaced confidence and no artifice, deception, or fraudulent practice used by the other party are deemed voluntary and cannot be recovered."

---

[9] The voluntary payment doctrine is an affirmative defense that shifts the burden to the party who made the payment. Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 609 F. App'x 972, 978 (11th Cir. 2015). And "generally, the existence of an affirmative defense will not support a motion to dismiss" because the "plaintiff is not required to negate an affirmative defense in its complaint." Id. at 976 (internal citations omitted). But a complaint "may be dismissed . . . when the existence of an affirmative defense clearly appears on the face of the complaint." Id. (citation omitted). That is the case here: AmFam alleges in its Complaint that it settled the underlying case after it discovered the misrepresentations at issue. So, the Court can properly consider the issue.

Here, AmFam knew of the alleged misrepresentations at the time of the payment. Thus, on its face, the statute appears to apply.

Indeed, the only court that appears to have addressed this situation found that the doctrine precluded reimbursement for an insurer's payment made to settle a claim on behalf of its insured when the insurer argued that the policy was void. See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 2017 WL 11497779, at *7 (N.D. Ga. Feb. 28, 2017). The court held the claim was barred to the extent that it relied upon misrepresentations known at the time of settlement; because some of the misrepresentations were not discovered until later, the claim could proceed on those misrepresentations. Id. at *7–9. Of course, as AmFam notes, Twin City Fire does not bind this Court. But Mr. Almassud argues that AmFam's claim here—where all the misrepresentations were known at the time of settlement—fails for the same reasons.

AmFam counters that Twin City Fire is distinguishable, and that the voluntary payments doctrine does not apply here, for any one of three reasons: (1) because AmFam and Mr. Almassud had an agreement to reimburse—that is, the reservation of rights; (2) because the doctrine does not apply to what AmFam calls a "three-cornered transaction"; and (3) because its payment of the settlement amount was in fact not voluntary. For the reasons below, the Court disagrees.

20

### *1. Agreement to Reimburse*

AmFam initially argues that the doctrine does not apply because this case involves an agreement to reimburse. It argues that the existence of the reservation of rights distinguishes this case from Twin City Fire, and the cites cited therein, see id. at *6, and instead makes this case more like Speed Oil Co. v. Aycock, 188 Ga. 46, 48–49 (1939). Even a cursory examination of Speed Oil reveals that AmFam's attempted analogy is not particularly persuasive. And while it is true that in Twin City Fire, the insured objected to the reservation of rights—something Mr. Almassud did not do here—still, in relying on the reservation of rights to support this particular claim, AmFam misses the broader point.

Although the reservation of rights letters sits as the center of the non-cooperation claims above, here, by contrast, the rescission claim centers on the allegation that *no agreement exists* because the underlying policy is void. And if the underlying policy is void, the reservation of rights either must stand on its own as a freestanding agreement to reimburse or else lose its significance, because there would be no rights to be reserved. But the Court already held above that the reservation of rights did *not* constitute its own agreement. Thus, the only available conclusion is that, in the void-policy framework, the reservation of rights is irrelevant. Such an argument could have affected the application of the voluntary

payments doctrine with respect to the contract claims above, but AmFam's reliance on it here, as a way of distinguishing Twin City Fire, is misplaced.

### 2. Three-Cornered Transaction

AmFam next contends that the voluntary payments doctrine does not bar recovery of a payment made to a third party not involved in the litigation (a situation which AmFam calls a "three-cornered transaction"). As before, AmFam attempts to distinguish this case from Twin City Fire and call attention to other cases that it sees as more apt. As before, its comparisons are not persuasive.

It is true, as AmFam notes, that the court in Twin City Fire did not explicitly discuss the fact that the payment was made to a third party. See 2017 WL 11497779, at *6. But a review of the cases it relied upon reveals a wide range of scenarios in which the doctrine was held to bar recovery of payments by insurers. To be sure, one such case involved only two parties—an attempt to recover a payment made directly from insurer to insured—which would appear to support AmFam's distinction. See S. Mut. Church Ins. Co. v. ARS Mech., LLC, 703 S.E.2d 363, 366 (Ga. Ct. App. 2010). But others undoubtedly involved third parties. See Allianz Ins. Co. v. State Farm Fire & Cas. Co., 449 S.E.2d 5, 5–6 (Ga. Ct. App. 1994) (insurer attempting to recover against third party for payments made to insureds); Transp. Ins. Co. v. Maryland Cas. Co., 370 S.E.2d 188, 191

(Ga. Ct. App. 1988) (same). Though not factually identical—there the insurers sought recovery *from* the third party for a payment made *to* the insured—these cases broaden the scope of the doctrine's applicability.

And the case that most closely resembles this one did in fact involve an attempted recovery of a portion of a settlement payment made to an underlying claimant on behalf of the insured. See Ins. Co. of N. Am. v. Kyla, Inc., 388 S.E.2d 530 (Ga. Ct. App. 1989). In Kyla, the insurer defended its insured but initiated a declaratory judgment action over the amount of its policy limit. Id. at 530. Before that case was resolved, and after expressly agreeing with the insured that its payment would not be considered voluntary, it settled the underlying lawsuit for an amount above the policy limit it claimed. Id. at 531. While the declaratory action was pending, the insurer obtained from the defendant-insured an assignment of any claims for failure to properly procure coverage that the insured had against the agent who had negotiated the transaction. Id. Then, after the court ruled in its favor on the declaratory action, the insurer tried to recover the excess settlement payment from the agent. The agent argued that the insurer's agreement with the insured did not bind him, and so the payment to the third party was voluntary. The Court agreed and held that the insurer could not recover the payment. Id. at 532.

AmFam's attempt to distinguish Twin City Fire relies on cases that are much more distinct than Kyla. AmFam primarily draws on Hibbard v. McMillan, where the court said that the voluntary payments doctrine "generally bars the recovery of *excess* payments, not payments made to a third party who is not involved in the litigation." 645 S.E.2d 356, 360 (Ga. Ct. App. 2007) (emphasis in original). AmFam also cites Read v. Benedict—where the phrase "three-cornered transaction" appears to originate, and where the court expressly distinguished Kyla on its facts—on the same premise. 406 S.E.2d 488, 492 (1991). But these cases are clearly distinct from the scenario here. Indeed, neither involved an insurer at all.[10]

The remaining cases cited by AmFam—even those that involve insurers— center on indemnity claims brought against the parties' own agents and so do not

---

[10] In Hibbert, one former business partner sued the other over an agreement that attempted to address a default on a promissory note given in exchange for the sale of the partner's shares in the former business. 645 S.E.2d at 358. As part of the agreement, the defendant was expected to transfer a life insurance policy to the defendant but failed to do so. Id. The plaintiff made payments on the premiums to keep the policy from lapsing and so sought to recover those payments in the litigation. Id. When the court upheld the payment, it noted that the premiums "were not made to satisfy a claim" against the defendant; instead, they were made to avoid a lapse and so to preserve the intent of the agreement between the two parties. Id. at 360.

In Read, the plaintiff in a legal malpractice case contended that the defendant attorney had improperly structured a real estate deal and so allowed tax liens to attach to the property, and then advised her improperly about those liens. 406 S.E.2d at 488. Because the plaintiff paid the IRS to resolve the liens, the attorney argued that the payment was voluntary, but the court disagreed. Id. at 492.

align with the facts here. See JNJ Found. Specialists, Inc. v. D.R. Horton, Inc., 717

S.E.2d 219, 224 (Ga. Ct. App. 2011) (contractor could maintain indemnity claim

against subcontractor after settling underlying tort claim); State Nat'l Ins. Co. v.

Access Gen. Agency, Inc., 2007 WL 9701217, at *5 (N.D. Ga. June 18, 2007)

(insurance underwriter could proceed against agent for settlement paid by

insurance company); Auto-Owners Ins. Co. v. Anderson, 252 Ga. App. 361, 364,

556 S.E.2d 465, 467 (2001) (insurance company could maintain indemnity claim

against agent for fraud after settling on behalf of insured). Each of them involved

legal duties between the parties seeking indemnity. By contrast, AmFam's claim—

when stripped of the argument that the reservation of rights is its own agreement—

is premised on the idea that no duties existed between it and Almassud.

All told, none of the Georgia cases addresses an identical situation to that

faced by the court in Twin City Fire or by the Court here. But this case, like Twin

City Fire, is much closer to Kyla—where the doctrine was applied—than it is to

Read or Hibbert. Thus, the Court is persuaded that the variety of situations faced

by the Georgia courts that applied the voluntary payments doctrine precludes a

finding that the doctrine is somehow categorically inapplicable to transactions

involving payments made to third parties. And so, AmFam's endeavor to extend

the so-called "three-corned transaction" principle to this case is unavailing.

### 3. Whether Payment was Voluntary

AmFam's final argument is that Mr. Almassud cannot demonstrate that the payment was voluntary. That is so, AmFam says, for either of two reasons: because the payments were required under the settlement agreement and because Mr. Almassud is estopped from arguing that the payment was voluntary after demanding that AmFam pay the settlement. Neither argument is availing.

First, while AmFam might be in breach of the settlement agreement if it failed to pay, it *voluntarily entered into the settlement agreement*. If the insurance policy was void, AmFam was not obligated to settle the case. But it opted to do so anyway, long after it knew of Mr. Almassud's alleged wrongdoing. See Twin City Fire, 2017 WL 11497779, at *7 (insurer aware of all facts when it made the settlement payment). It cannot now refashion a voluntarily-undertaken legal duty to pay into an involuntary payment.

Second, Mr. Almassud is not estopped from arguing the payment is voluntary. Mr. Almassud's demand that AmFam settle came because of his position and belief that AmFam was obligated to do so *under the policy*. Implicit in that demand is an assertion that the policy was valid. Here, by contrast, AmFam argues that the policy was void, which Mr. Almassud obviously disputes. That dispute precludes any estoppel.

26

### *4. Summary*

None of AmFam's arguments for avoiding the voluntary payment doctrine are ultimately availing. To an extent, all the arguments are undermined by the basic premise of AmFam's rescission claim: that it owed no duty to Mr. Almassud because the policy was void. That is the fundamental difference between this claim and the claims for no coverage under the policy, a difference that the company repeatedly overlooks. If AmFam owed no legal obligation to Mr. Almassud, then the payment made on his behalf—before he was subject to any liability—was necessarily voluntary.

That was of course the conclusion of the court in Twin City Fire, 2017 WL 11497779, at *7 (insurer's "decision to pay the settlement was voluntary"). As such, the court there held that the insurer was not entitled to recover the settlement amount. Id. at *9. Indeed, even the cases relied upon by AmFam acknowledged that a voluntary payment could bar such a claim, noting that other voluntary payments cases "hold that no such claim exists where the party seeking indemnity was not legally obligated to make payment." Anderson, 556 S.E.2d at 467. The Court sees no reason to depart from that conclusion.

Accordingly, because it paid the settlement voluntarily, AmFam cannot recover the settlement payment under its claim for rescission.

## B. Adherence

By repeatedly conflating its alleged right to recoup a voluntarily paid settlement via its rescission claim with its alleged right to do so under the contract—both in its briefs and in its pleading—AmFam actually reveals another fatal flaw in its effort to rescind the policy: that by settling, it has necessarily failed to adhere to its claim of rescission as the law requires.

"Under Georgia law, an insurer seeking to rescind a policy must make an announcement of the intent to rescind the contract in a timely fashion, as soon as the facts supporting the claim for rescission are discovered." Grange Mut. Cas. Co. v. Bennett, 829 S.E.2d 834, 836–37 (Ga. Ct. App. 2019). Additionally, "after announcing its intent, the insurer *must adhere to the intent to rescind* and may waive any defense of rescission by failing to do so." Id. at 837 (emphasis added). Courts "are quick to seize upon any waiver of a forfeiture." Am. Safety Indem. Co. v. Sto Corp., 802 S.E.2d 448, 455 (Ga. Ct. App. 2017).[11]

---

[11] The insurance rule accords with the more general contract principle that a party alleging fraudulent inducement to enter a contract must either: "(1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 248 F.R.D. 298, 309 (N.D. Ga. 2008), aff'd, 555 F.3d 1331 (11th Cir. 2009) (citing Megel v. Donaldson, 654 S.E.2d 656, 661 (Ga. Ct. App. 2007)).

Georgia courts have found such a waiver when the insurer continued to act as if the policies were in force. See Grange Mut. Cas. Co., 829 S.E.2d at 836–37 (waiver when insurer denied coverage and canceled policy with a future effective date); Am. Safety Indem. Co., 802 S.E.2d at 455 (waiver when insurer denied coverage for claim at issue but covered others); Lee v. Mercury Ins. Co. of Georgia, 808 S.E.2d 116, 132 (Ga. Ct. App. 2017) (fact question on waiver when insurer renewed policy after learning about misrepresentations).

Perhaps most applicable to the case here, one court even said that an insured waived a claim for rescission when it originally sued *only* for declaratory judgment and did not add the rescission claim until it later amended the complaint for the fifth time. Minnesota Lawyers Mut. Ins. Co. v. Gordon, 726 S.E.2d 562, 564 (Ga. Ct. App. 2012). The court's rationale was that, while a declaratory judgment "affords protection from uncertainty," "rescission is not characterized by uncertainty." Id.; cf. also Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 248 F.R.D. 298, 309 (N.D. Ga. 2008), ("[A] party alleging fraudulent inducement to enter into a contract must elect the remedy they seek at the beginning of the proceedings."), aff'd, 555 F.3d 1331 (11th Cir. 2009); Megel v. Donaldson, 654 S.E.2d 656, 661 (Ga. Ct. App. 2007) (plaintiff waived rescission claim when she waited "until filing the amended complaint.").

This Court need not look back so far into the past. Regardless of the content of AmFam's original complaint,[12] what is apparent now is that the company's decision to settle the underlying claim on behalf of Mr. Almassud is fundamentally incompatible with a posture of adherence to a claim for rescission. As with the discussion above concerning the voluntary payment, this conclusion flows from the basic premise of the claim: that the policy was void. If AmFam truly believed that the policy was void (as opposed to the claim simply not being covered), it would not have settled the claim.[13]

Accordingly, by voluntarily settling the underlying claim, AmFam has forfeited its claim for rescission. Mr. Almassud's Motion is therefore **GRANTED** as to **Count I**; that claim is **DISMISSED**.[14]

---

[12] AmFam did not add a rescission claim until it amended its complaint. However, the Court granted it leave to do so then, and the Court held at summary judgment that AmFam's rescission claim was not barred for a failure to adhere. As such, this Court does not purport to hold, as did the court in Minnesota Lawyers, that AmFam's failure to include the claim in the original complaint constituted a waiver.

[13] This issue was not addressed in Twin City Fire, where the court said that "Plaintiff can proceed under both its theory that Defendants breached the contract—by asserting an insurance claim not covered by the policies—and its alternative theory that the insurance policies were void due to fraudulent inducement." 2017 WL 11497779, at *5. But that comment was dicta—the court ruled only on the claim for unjust enrichment.

[14] The Court notes that, in its previous Order [Dkt. 363], it suggested that AmFam might be able to recover defense costs under its rescission claim. However, the Court expressly declined to make such a finding. Now, with the benefit of the parties' briefing, and upon further review, it has become apparent that this claim cannot support any recovery.

## IV. __Misrepresentation__

When AmFam amended its Complaint, it added claims never previously

discussed: claims for Negligent Misrepresentation (Count V) and Intentional

Misrepresentation (Count VI). In his Motion, Mr. Almassud argues that AmFam

was not entitled to do so because it never sought leave to add those claims. But the

Court need not resolve the issue of whether adding the misrepresentation claims

was procedurally proper. That is because those claims necessarily fail on the merits

for the same reasons as does AmFam's rescission claim.

Indeed, the misrepresentation claims—which are effectively fraudulent

inducement claims—center on the same allegations as the rescission claim, and so

the analysis is effectively the same. They succumb to the voluntary payments

doctrine. See Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP, 2017 WL

11497779, at *5–9 (N.D. Ga. Feb. 28, 2017) (treating the unjust enrichment and

misrepresentation claims together and dismissing the claims based on

misrepresentations known at the time of settlement). And they fail for a lack of

adherence. See Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC, 248 F.R.D.

298, 309 (N.D. Ga. 2008), aff'd, 555 F.3d 1331 (11th Cir. 2009) (citing Megel v.

Donaldson, 654 S.E.2d 656, 661 (Ga. Ct. App. 2007) (party alleging fraudulent

inducement to enter a contract must either: "(1) affirm the contract and sue for

31

damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud" and must do so at the outset).

Accordingly, Mr. Almassud's Motion is **GRANTED** as to **Counts V and VI**. Those claims are hereby **DISMISSED**.

## V. <u>Attorney's Fees</u>

Mr. Almassud's Motion does not specifically challenge AmFam's claim for attorney's fees under O.C.G.A. § 13-6-11. Because AmFam's breach of contract claim survives, this claim does too. <u>See</u> <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1316 (11th Cir. 2004) (attorney's fees recovery requires underlying claim). Accordingly, Mr. Almassud's Motion is **DENIED** as to **Count VII**.

## VI. <u>Shotgun Pleading</u>

Finally, Mr. Almassud challenges AmFam's complaint as a shotgun pleading, primarily because each successive count incorporates all the paragraphs from prior counts. AmFam argues that its practice in adopting prior paragraphs is a commonplace convention that does not render the Complaint unclear.

To be sure, the Eleventh Circuit has clearly "condemned the incorporation of preceding paragraphs where a complaint contains several counts, each one incorporating by reference the allegations of its predecessors (i.e., predecessor counts), leading to a situation where most of the counts (i.e., all but the first)

contain irrelevant factual allegations and legal conclusions." <u>Weiland v. Palm Beach Cty. Sheriff's Office</u>, 792 F.3d 1313, 1324 (11th Cir. 2015).

That is undoubtedly what AmFam did here. And contrary to its response, doing so indeed made it more difficult than necessary for the Court to ascertain the sufficiency of its claims and allegations. That is because AmFam's claims represent alternative, mutually exclusive theories concerning similar—but not identical—underlying factual allegations. In particular, as explained in the discussion above, AmFam improperly conflated aspects of its contract claims with its rescission claim, a point that takes on particular significance given that AmFam was required to adhere to one position or another.

Nevertheless, that difficulty was not ultimately prohibitive, and, now that most of AmFam's claims have been dismissed, the Court thinks that, rather than asking AmFam to replead and restart the process, Mr. Almassud can safely answer the two remaining claims without having to address the allegations contained in dismissed counts (*i.e.*, by responding only to paragraphs 1–114, 138–52, and 194–96, and by treating the incorporations as applying only to those paragraphs).

## CONCLUSION

For the foregoing reasons, Defendant Almassud's Motion to Dismiss Plaintiff AmFam's Second Amended Complaint [Dkt. 366] is **GRANTED in part**

**and DENIED in part**. As to **Counts I, III, IV, V, and VI**, the Motion is **GRANTED**. Those claims are hereby **DISMISSED**. As to **Count II (Breach of Contract)**, the Motion is **GRANTED** as to ¶ 153 of the Complaint and **DENIED** as to the rest. As to **Count VII (Attorney's Fees)**, the motion is **DENIED**.

Mr. Almassud is **ORDERED** to **ANSWER** the remaining claims in the Complaint as required by the rules and the foregoing. Afterward, the case will proceed on AmFam's remaining claims and Mr. Almassud's counterclaims.[15]

**SO ORDERED** this 17th day of February, 2021.

_Richard W. Story_

**RICHARD W. STORY**
United States District Judge

---

[15] The Court deems that Mr. Almassud's Answer is separate from his already-existing counterclaims, so those claims need not and should not be reasserted as a matter of course in his responsive pleading. If Mr. Almassud wishes to refile or amend his counter-complaint, he must seek leave of the Court to do so.