## **ATTACHMENT B2**

A copy of Steven Plitt's report, with Exhibits 1-2, is attached.

# CAVANAGH

Steven Plitt
Phone: (602) 322-4047
Facsimile: (602) 322-4103

splitt@cavanaghlaw.com
www.cavanaghlaw.com

September 30, 2021

Seslee Smith, Esq.
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, NE
Atlanta, Georgia  30326

### EXPERT OPINION LETTER

Re:     ***American Family Insurance Company v. Almassud, et al.***
          **USDC, District of Georgia, Case No. 1:16-cv-04023**

Dear Ms. Smith:

I have reviewed the materials you have provided to me and have set forth herein my observations based upon my review of those materials.  I reserve the right to alter or change any of my opinions based upon new or additional information that may be received since this report was issued.

## I.     QUALIFICATIONS

I have attached to this report a copy of my CV (**Exhibit 1**).  I have been a licensed attorney within the state of Arizona since 1982.  I have my LL.M. in Insurance Law.  I focus my practice in the field of insurance law.  A large part of my practice has in the past involved working with claims representatives in order to allow claims to be processed consistent with the insurance policy's implied covenant of good faith and fair dealing.  I have directly managed with claim representatives insurance claim files which are under investigation, in real time, or are being processed toward resolution.

I am currently an adjunct professor of law teaching insurance law at the University of Arizona's James E. Rogers College of Law.  I previously taught the insurance law curriculum at Arizona State University's Sandra Day O'Connor College of Law.  Insurance company regulation is part of my teaching curriculum including insurance bad faith.  In my treatise on insurance law, *Arizona Liability Insurance Law,* I have devoted a chapter to insurance bad faith.  I am a contributing senior editor of the *Arizona Tort Law Handbook* where I co-authored the chapter on bad faith.  In my national treatises, *The Claim Adjuster's Automobile Liability Handbook* and my two-volume treatise entitled *Practical Tools for Handling Insurance Cases,* I devote chapters to bad faith and Unfair Claims Practices.  I am an active speaker regarding the law of bad faith and I have been a frequent lecturer within the insurance industry where I have instructed claims

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 2

departments of insurance companies on how to properly manage claims in order to be consistent with regulatory requirements as well as compliance with the implied covenant of good faith and fair dealing which is a part of every insurance policy.

I am the current senior author of COUCH ON INSURANCE 3D. My team and I are revising, editing, and re-writing the treatise. The COUCH treatise comprises 24 substantive volumes of text on insurance law and is one of the nation's leading treatises on insurance law. The COUCH treatise has been cited as an authoritative national treatise on insurance law by courts and lawyers throughout the United States. I am on the editorial board for the Insurance Litigation Reporter where I am a Senior Contributing Editor. The Insurance Litigation Reporter is a national reporter publication of significant insurance law cases that have been decided nationwide.

I have been cited by the Supreme Courts in 34 states, the Intermediate Appellate Courts in 23 states, 12 of the Federal Circuit Courts of Appeal, 60 Federal District Courts, the Federal Court of Claims, and 4 Federal Bankruptcy Courts. I have also been cited in 95 scholarly articles and the Code of Federal Regulations.

Although I cannot give a precise number within my 39 years of practice experience, I have reviewed thousands of claim files. During my practice career, I would estimate that I have reviewed and analyzed thousands of claim files from more than a hundred different insurance companies.

Over my practice career I have acquired a significant amount of practical knowledge and experience regarding industry standard, custom and practice, generalized claim handling practices within the industry, specific claim handling practices regarding different types of claim categories, claim management and oversight, and other related insurance claims activities and protocols. During my direct representation of insurance companies, as well as part of my consulting retentions, I have reviewed the claim manuals and guidelines, claim bulletins and general corporate claim documentation from many insurance companies. As an attorney, I would regularly speak directly with claim adjusters, supervisors and claim management/legal representatives regarding the processing of claims, in real time. On a regular basis, over the course of 39 years of practice, I have been in direct communication with claim professionals at all levels within the insurance company and industry during which specific claims and claim conduct were discussed and analyzed. I have also reviewed hundreds of depositions and sworn declarations of insurance claims adjusters, claim supervisors, claim legal attorneys and other claim management professionals regarding the handling of specific claims, claims handling generally and claim and underwriting operations.

As a national commentator on insurance law issues, I have reviewed thousands of published and unpublished bad faith cases which have contained within the court opinions the recitation of insurance company practices regarding the handling of specific claims as well as general claims handling practices. I have extensively studied and analyzed the NAIC Unfair Claims Settlement Practices Act and its various adopted iterations throughout the United States. I have also extensively reviewed and analyzed the state-specific regulations which often accompany a state's adoption of its variation of the Unfair Claims Settlement Practices Act.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 3

In my practice I have reviewed hundreds of expert reports from other claim handling consultants who have expressed within their reports their understandings and beliefs regarding industry standard, custom and practice. I have also reviewed hundreds of depositions from other claim handling consultants where they have testified regarding the claim handling practices of insurance companies that are specific to a particular claim as well as their overall opinions regarding industry standard, custom and practice.

I have participated in many insurance company "roundtable" discussions which are part of the overall claim adjustment and evaluation process. These "roundtable" committees are populated by claims representatives, supervisors, and other claim management personnel where the handling of claims are discussed in real time as the claims in question are being actively processed. When I have attended a "roundtable" discussion, my role has been to provide guidance and advice on claim evaluation, claim handling conduct, issues, and problems, and I have provided independent advice as well as proposed solutions regarding claim impediments that may have arisen in the claim environment on specific claims. In this specific role, or when I am acting as coverage counsel for insurance company clients, I am directly engaged within the processing of active claims in real time and, therefore, I am part of the claim adjustment process.

In my capacity as an attorney directly representing insurance companies, I have oftentimes been called upon to provide informal advice and guidance regarding the claim handling of a specific claim as well as claim handling practices and procedures. The foregoing activities, over a span of 39 years of practice, have provided me with a working practical knowledge and experience that informs me as to industry standard, custom and practice regarding claim handling practices and the operation of claim departments, in real time. Finally, I have adjusted claims for insurance companies.

This practical knowledge and experience informs me as to industry custom, standard and practice. I have participated in roundtable discussions, claim handling, and bad faith risk avoidance activities as part of my national insurance law practice.

I have been involved with the drafting of insurance policies generally, and endorsements specifically, and I have worked closely with insurance company product development committees and corporate counsel regarding the evaluation of existing policy language and possible amendments.

I have analyzed coverage issues in all 50 states; I have been retained as an expert witness in cases venued in Arizona; California; Colorado; Delaware; Florida; Georgia; Hawaii; Idaho; Indiana; Kansas; Kentucky; Louisiana; Maryland; Michigan; Minnesota; Mississippi; Missouri; Montana; Nebraska; Nevada; New Jersey; New Mexico; New York; North Carolina; North Dakota; Ohio; Oklahoma; Oregon; Pennsylvania; South Carolina; South Dakota; Tennessee; Texas; Utah; Washington; West Virginia; Wisconsin and Wyoming.

After leaving my judicial clerkship in 1983, I joined a leading insurance defense firm within the state of Arizona and began my professional career as an insurance defense lawyer. My

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 4

insurance defense practice grew exponentially. I defended thousands of cases for policyholders and insureds in that part of my practice. In addition to those cases that I handled exclusively; I also had several junior attorneys working for me on insurance defenses cases that I brought into the firm. During my insurance defense practice I tried numerous jury trials to verdict in both Arizona state and federal court.

My hourly rate structure is $450 per hour for research, case analysis, review, report, and travel, $550 per hour for depositions, hearings, and trial testimony.

## II.   DOCUMENTS PROVIDED FOR REVIEW

### Claim File
1. Claim File (AmFam 1-9677)
2. Policy (AmFam 005424-005442)
3. Claim File AmFam 002618-004919_Redacted

### Pleadings & Discovery
1. Defendant's Answer and Counterclaim to Plaintiff's Complaint for Declaratory Judgment (01/03/17)
2. Almassud's Responses to Plaintiff's First Requests for Production of Documents ("RFPs") (06/19/17)
3. Almassud's Responses to Plaintiff's First Interrogatories ("ROGs") (06/19/17)
4. AmFam's Supplemental Answers to Almassud's ROGs (06/21/17)
5. Almassud's First Supplemental Responses to AmFam's First ROGs (06/30/17)
6. First Amended Complaint for Declaratory Judgment and Rescission to Minimum Limits (9/21/17)
7. Plaintiff's Emergency Motion and Brief for Sanctions Against Defendant Abdulmohsen Almassud [with Exhibits] (01/13/18)
8. Cruz' Emergency Motion and Brief for Sanctions Against AmFam [with Exhibits] (01/13/18)
9. Almassud's Notice of Joining Cruz' Motion for Sanctions against AmFam (02/08/18)
10. Order (02/16/18)
11. Almassud's Response and Objection to Plaintiff's Emergency Motion for Sanctions (02/16/18)
12. Cruz' Response to Plaintiff's Emergency Motion for Sanctions Against Defendant Almassud (02/20/18)
13. Cruz' Reply Brief in Support of Her Emergency Motion for Sanctions Against AmFam [with Exhibits] (02/20/18)
14. Plaintiff's Response to Almassud's Notice of Joining Cruz' Motion for Sanctions [with Exhibits] (02/22/18)
15. Plaintiff's Motion and Brief for Leave to File a Supplemental Brief in Support of its Emergency Motion for Sanctions against Almassud (03/20/18)
16. Plaintiffs Response to Cruz' Emergency Motion for Sanctions Against AmFam [with Exhibits] (05/05/18)

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 5

17. Order on Motions (09/13/18)
18. Plaintiff's Motion for Sanctions against Almassud (11/14/18)
19. Almassud's Response to AmFam's Motion for Sanctions (11/28/18)
20. Cruz's Response to AmFam's Motion for Sanctions against Almassud [with Exhibits] (11/28/18)
21. Plaintiff's Reply in Support of its Motion for Sanctions Against Almassud [with Exhibits] (12/12/18)
22. Almassud's Objection to AmFam's Fee Petition [with Exhibits] (10/08/19)
23. Plaintiff's Reply in Support of its Statement of Fees [with Exhibits] (10/22/19)
24. Order Lifting Stay (11/26/19)
25. Order granting in part and denying in part [303] Motion for Attorney Fees (10/13/20)
26. Second Amended Complaint against Almassud with Jury Demand (12/08/20)
27. Order on Almassud's Motion to Dismiss (02/17/21)
28. Order denying Almassud's Motion to Reinstate a Claim and Denying Motion for Judgment on the Pleadings (05/17/21)
29. Amended Scheduling Order (06/01/21)

**Documents**
1. Jeep Forum pages
2. Transcript of Recorded Statement of Abdulmohsen Almassud (10/21/12)
3. James Taylor's Defense File FAIN000001-009665

**Depositions**
1. Abdulmohsen Almassud (04/29/15)
2. Taylor James Vol 1 (05/18/17)
3. Taylor James Vol 2 (05/24/17)
4. Matthew Valley (06/9/17)
5. Martin Hulthen (12/12/17)
6. Wilber Hane (12/12/17)
7. Michael James Reuss (12/13/17)
8. Maria Jensen (12/14/17)
9. Adam Joffe (05/19/17)
10. Brent Wilson (09/01/15)
11. Avery Wilson (09/01/15)
12. Mark Hook (02/11/16)
13. April Lyke (06/08/17)
14. Melissa Buckland (08/28/17)
15. Brett Petersen (02/16/18)

**Trial Testimony**
1. Opening Statements of Jim Taylor, Volume II of Trial Transcript
2. Trial Testimony of Abdulmohsen Almassud (Cross), Volume II of Trial Transcript
3. Trial Testimony of Abdulmohsen Almassud (Cross), Volume III of Trial Transcript

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 6

4. Closing Arguments & 5th Amendment Jury Instructions
5. Complete Trial Transcripts Volumes I-V

**Pleading Underlying Case**
1. Plaintiff's First ROGs to Defendant (08/28/14)
2. Plaintiff's First RFP to Defendant (08/28/14)
3. Rule 5.2 COS (09/26/14)
4. Defendant's First ROGs to Plaintiff (09/26/14)
5. Defendant's RFPs to Plaintiff (09/26/14)
6. Notice of Non-Party at Fault (09/26/14)
7. Consent Motion to add Oh's Auto Center and Proposed Order (10/01/14)
8. Defendant's First Responses to Plaintiffs First ROGs (10/14/14)
9. Defendant's First Responses to Plaintiff's First RFPs (10/14/14)
10. Amendment to Defendant's First Responses to Plaintiff's First ROGS (10/20/14)
11. Amended Complaint (10/20/14)
12. Plaintiff's Responses to Def First ROGs (10/28/14)
13. Defendant's RFPs to Non-Parties (medical providers) (11/10/14)
14. Plaintiff's RFPs to Non-Party Mark S. Hook, P.E. (09/14/15)
15. Pierce Entry of Appearance (11/17/15)
16. Extension of Time for Oh's to Answer (03/01/16)
17. Plaintiff's First Supplemental Responses to Defendant's First ROGs (03/09/16)
18. Plaintiff's Proposed Consolidated Pre-Trial Order (03/09/16)
19. Plaintiff's Request for Supplementation of Discovery (03/10/16)
20. Plaintiff's Motion in Limine and Brief in Support (03/10/16)
21. Oh's Answer (03/17/2016)
22. Defendant's RFPs to Non-Party Sean Alexander (03/22/16)
23. Defendant's Motion to Strike Answer of Oh's (03/24/16)
24. Defendant's Response to Plaintiff's Motions in Limine (04/14/16)
25. Plaintiff's Second RFPs to Non-Party Mark S. Hook, P.E. (05/05/16)
26. Plaintiff's Second Supplemental Responses to Almassud's First ROGs (05/11/16)
27. Additional Documents provided by Plaintiff's Counsel (05/12/16)
28. Pictures of Jeep by Sean Alexander (05/12/16)
29. Pictures of Jeep by Matthew Pridmore (05/12/16)
30. Plaintiff's Second Request for Supplementation of Discovery (08/10/16)
31. Joint Motion to Open Default (08/17/16)
32. Plaintiff's Motion for Trifurcation 08/17/16)
33. Proposed Order Opening Default (08/17/16)
34. Plaintiff's Supplemental Responses to Defendant's RFPs (08/18/16)
35. Plaintiff's Notice of Intent to Present Medical Records, or Portions Thereof, at Trial (08/18/16)
36. Plaintiff's Motion to Quash Subpoena to Plaintiff (08/19/16)
37. Plaintiffs Reply on Joint Motion to Open Default (08/19/16)
38. Plaintiff's Second Notice of Intent to Present Medical Records at Trial (08/23/16)

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 7

39. Defendant's Response to Plaintiff's Motion to Quash Subpoena (08/23/16)
40. Plaintiff's Motion in Limine to Exclude the Testimony of Defendant's Purported Expert Mark Hook PE (08/27/16)
41. Plaintiff's Motion in Limine to Exclude the Testimony of Almassud's Purported Expert, Hal Ralston (08/29/16)
42. Amended Complaint (08/29/16)
43. Defendant's Motions in Limine (08/29/16)
44. Defendant's Objections to Plaintiff's Second Notice of Intent to Present Medical Records (08/29/16)
45. Defendant's Motion for Protective Order and Brief as to Plaintiff's Notice of Deposition of Marina Valdez, Ph.D. (08/30/16)
46. Plaintiff's Supplemental Motions in Limine and Brief (08/30/16)
47. Defendant's Response to Plaintiff's Motion in Limine to Exclude the Testimony of Hal Ralston, PE (08/30/16)
48. Defendant's Response to Plaintiff's Motion in Limine to Exclude the Testimony of Mark Hook, PE (08/30/16)
49. Audio Transcription of Telephonic Proceedings (08/30/16)
50. Consolidated Pre-Trial Order (08/31/16)
51. Defendant's Response to Plaintiff's Supplemental Motions in Limine, Nos. 39 through 47 (08/31/16)
52. Motion Hearing (08/31/16)
53. Videotaped Deposition of Marina Valdez, Ph.D. (09/01/16)
54. Plaintiff's Notice of Filing Original Discovery (09/08/16)
55. Defendant's Notice of Filing Original Discovery (09/09/16)
56. Trial Transcript (09/12/16 – 09/16/16)
57. Judgment (09/19/16)
58. Plaintiff's Offer to Settle Tort Claim Pursuant to O.C.G.A § 9-11-68 (09/23/16)
59. Plaintiff's Motion for Attorneys' Fees and Motion for Oral Hearing (09/23/16)
60. Defendant's Response to Plaintiff's Request for Attorney's Fees (10/20/16)
61. Motion for New Trial (10/20/16)
62. Amendment to Motion for New Trial and Supporting Brief (11/02/16)
63. Plaintiff's Response to Almassud's Amendment to Motion for New Trial and Supporting Brief (12/06/16)
64. Affidavit of James F. Taylor, III (12/19/16)
65. Almassud's Brief in Support of Motion for New Trial (12/19/16)
66. Affidavit of Abdulmoshen Almassud (12/20/16)
67. Motion Hearing Transcript (12/21/16)
68. Plaintiff's Motion for Supersedeas Bond (01/18/17)
69. Almassud's Objection to Cruz Proposed Order on Motion for New Trial (02/01/17)
70. Order Denying Plaintiff's Motion for Attorneys' Fees pursuant to O.C.G.A. § 9-11-68 (02/16/17)
71. Defendant's Response to Plaintiff's Motion for Supersedeas Bond (02/16/17)
72. Plaintiff's Motion to Strike Defendant's Purported Pauper's Affidavit (02/28/17)

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 8

73. Underlying Trial Transcript (03/12/18)
74. Court of Appeals Order Reversing Underlying Case (03/15/18)
75. Cruz' Motion for Reconsideration Case A17A2199 (03/26/18)
76. Order Denying Cruz' Motion for Reconsideration A17A2119 (03/28/18)
77. Petition for Writ of Certiorari (04/17/18)
78. Petitioner's Reply Brief (08/08/18)
79. Almassud's Supplemental Brief in Opposition to Petition for Writ of Certiorari (09/16/18)
80. Cruz' Supplemental Brief (10/02/18)
81. Motion for Leave to Depose Dr. Marina Valdez and Identify Rebuttal Experts (02/08/19)
82. Motion for Order Requiring Plaintiff to Supplement Written Discovery Responses (02/08/19)
83. Amended Notice of Law Firm Change of Address (02/20/19)
84. Plaintiff's Stipulation to Next Available Trial Calendar (03/01/19)
85. Notice of Address Change (06/07/19)
86. Defendant's Unopposed Motion for Release of Supersedeas Bond (07/17/19)
87. Defendant's Motion for Continuance (08/15/19)
88. Plaintiff's Response to Defendant's Motion for Continuance (08/16/19)
89. Plaintiff's Rule 22 Request to Install Video and Computer Equipment at Retrial (08/20/19)
90. Order Allowing Brodhead Employees to Bring Video Equipment (08/20/19)
91. Plaintiff's Trial Brief: Voir Dire - Striking Jurors for Cause (08/20/19)
92. Plaintiff's Stipulation to May 6, 2019 Trial Calendar (04/16/19)
93. Notice of Withdrawal - Kori Miller (05/17/19)
94. Notice of Leave of Absence - Ben Brodhead (07/22/19)
95. Notice of 9-9-19 Two Week Civil Jury Trial Calendar (07/24/19)
96. Reply Brief in Support of Motion for Continuance and Pending Discovery Motions (08/22/19)
97. Entry of Appearance of Attorney Matthew D. Friedlander (08/22/19)
98. Motion for Brad W. Smith to Appear Pro Hac Vice for Defendant Almassud (08/22/19)
99. Notice of Service of Filing - Brad Smith Pro Hac Vice (08/22/19)
100. Defendant Almassud's Amended Motion for Continuance (08/22/19)
101. Order Granting Motion for Brad Smith to Appear Pro Hac Vice (08/23/19)
102. Rule Nisi - Pre-Trial Status Conference (08/23/19)
103. Plaintiff's Trial Brief: Scope of Re-Trial (08/27/19)
104. Plaintiff's Motion in Limine and Brief in Support (08/28/19)
105. Defendant's Response to Plaintiff's Trial Brief (08/29/19)
106. Defendant's Supplemental Motions in Limine (08/29/19)
107. Order Continuing Case from the September 9, 2019 Calendar (09/04/19)
108. Uniform State Court Rule 5.2 Certificate (09/09/19)
109. Amended Motion for Brad Smith to Appear PHV for Almassud (09/10/19)
110. Plaintiff's Amended Request to Install Video Equipment (09/10/19)

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 9

111.  Order Allowing Employees of Brodhead Law to Bring Video (09/10/19)
112.  Defendant's Motion for Summary Judgment ("MSJ") with Exhibits (10/01/19)
113.  Brief in Support of MSJ (10/01/19)
114.  Statement of Undisputed Facts (10/01/19)
115.  Plaintiff's Response to Defendant's MSJ (10/31/19)
116.  Plaintiff's Response to Defendant's Statement of Undisputed Facts (10/31/19)
117.  Plaintiff's Fourth Supplemental Motion in Limine and Motion to Compel Discovery (11/04/19)
118.  Rule 5.2 COS Plaintiff's 4th Supplemental Response to Almassud's RFPs (11/05/19)
119.  Plaintiff's Response to Defendant's Second Set of Supplemental Motions in Limine (11/05/19)
120.  Plaintiff's Fifth Supplemental Response to Defendant's First ROGs (11/05/19)
121.  Defendant's Reply on MSJ (11/06/19)
122.  Plaintiff's Motion for Entry of Default, Entry of Judgment, and Further Sanctions (11/10/19)
123.  Dismissal with Prejudice (12/10/19)
124.  Final Disposition Form (12/10/19)

## III.   PRIOR TESTIMONY

In the past four years, I have testified as follows: (See **Exhibit 2**).

## IV.   OVERVIEW OF CASE[1]

The American Family claim file shows that Mr. Almassud notified American Family of the accident on the day of the accident (1-4). Mr. Almassud called American Family from the accident scene on his cell phone . *See* October 21, 2012 (199). At that time he reported that "he lost steering and could not steer anymore" and that he ended up hitting the claimant's vehicle, causing the claimant's vehicle to end up in a ditch. On October 22, 2012 (1276-1283) American Family adjuster April Lyke took a recorded statement from Mr. Almassud regarding the accident. A transcription of the recorded statement shows the following:

Q.   Okay. This is April Lyke and I'm speaking from American Family Insurance. My phone number here is 1-800-692-6326, Extension 45786. I'm speaking with Abdulmohsen Aim-, Almason-(typed as spoken) regarding an auto accident that occurred on October 21st, 2012 in Cummings-(typed as spoken), Georgia. Today's date is October 22nd, 2012. It's approximately 11:30 a.m., Central Standard Time. And Abdulmohsen, what phone number are you speaking from?

A.   678-768-4854.

Q.   Thank you. And do you understand that I'm recording our conversation?

---

[1]   The American Family Insurance Company Claims File prefix "AmFam 0000#"is being shortened to "#" only from this point forward in the Report.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 10

A.   Yes.

Q.   And do I have your permission to record it?
A.   Yes.

Q.   Okay. And if you would please state your full name and spell your last name?
A.   Uh, first name is Abdulmohsen Ama-, uh, and the last name is Almassud. The spelling of the first one is A-B-D-U-L-M-O-H-S-E-N and the last name is A-L-M-A-S-S-U-D.

Q.   And what is your permanent address?
A.   364 Michael Drive, Alpharetta, Georgia, Zip Code 30009.

Q.   And your date of birth?
A.   January 20th, 1973.

Q.   Thank you. And are you married or single?
A.   Married.

Q.   And your spouse's name?
A.   Melissa.

Q.   And for your Health Insurance are you a Medicare beneficiary?
A.   No.

Q.   Okay. And I have that the accident occurred on October 21st, 2012 around 1:45 p.m. Does that sound right?
A.   Yy-, yeah, sounds right.

Q.   Okay. And that it happened on Highway 9 and Pilgrim Road in Cummings, Georgia?
A.   Yes.

Q.   And it's involving your '95 Jeep Wrangler?
A.   Yes.

Q.   Okay. Are you the registered owner of the vehicle?
A.   Yes.

Q.   And were you driving it at the time the accident occurred?
A.   Yes.

Q.   And do you require glasses or contacts to drive?
A.   No.

Q.   Okay. And were you wearing your seat belt?
A.   Yes. Thank God.

Q.   And did your vehicle seem to be operating properly prior to the accident?
A.   Yes.

Q.   Okay. And what was the weather like when the accident occurred?
A.   It was nice, sunny weather, perfect.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 11

Q.   Okay. And I have you had two passengers, Brent Elford and Avery Elford, is that... ?
A.   Yes.

Q.   Okay. And where were they seated in the vehicle?
A.   Brent was sitting in the front passenger's seat and Avery in the back.

Q.   Okay. And what was the purpose of your trip? Where were you going and where were you coming from?
A.   We went to the mountains and we were coming back.

Q.   Okay. And was there anything distracting going on inside your vehicle in the moments leading up to the accident?
A.   No.

Q.   Okay. And which road were you on?
A.   Say that question again?

Q.   Which road were you on when the accident happened?
A.   Which road?

Q.   Yeah.
A.   It's Highway 9.

Q.   You were on Highway 9?
A.   Yes.

Q.   Okay. Do you know what direction you were traveling?
A.   I think I was going south, yes.

Q.   And how many lanes, you know, how many lanes of travel are going southbound?
A.   I'm not 100% sure, but I think it's two lanes on each side.

Q.   Okay. And do you recall which lane you were in?
A.   I was on the left lane.

Q.   Okay. And do you know where-, which-, you know, which direction or where the other vehicle was headed? The other vehicle involved?
A.   In the opposite direction.

Q.   Opposite. Okay. Do you know if they would have been in-, in a right lane or left lane?
A.   No, happened so quick for me to even see them.

Q.   That's okay. That's okay. Okay. And if you would, uh, just go ahead and describe in your own words how the accident occurred.
A.   I suddenly lost steering capability, I-, essentially I couldn't steer it left or right. And it started drifting to the incoming traffic. I hit the brake as soon as I can. But everything happened after that which was blur to me.

Q.   Okay. Do you recall the-, estimated how ss-, how fast you were going, your estimated speed when you-, when you lost control of the steering?
A.   Uh, couldn't been more than 40 miles an hour.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 12

Q.   Okay. Do you know what the speed limit is there?
A.   Uhm, I think it was 55, or 50 something like that.

Q.   Okay. And where the accident occurred is it, uhm, is it level or are there hills?
A.   No, it's-, it's level.

Q.   Level. Okay. And is it straight or does the road curve?
A.   Uh, I think the area was straight.

Q.   Okay. And after your vehicle had started to drift into the oncoming, you know, traffic yy-, do you know, you know, what your vehicle did-, did-, at-, was that at the point the impact occurred?
A.   No, it, uh, it started drifting before.

Q.   Okay. So were you-, do you think that you were all the way in the other lanes of travel when-, when the impact occurred?
A.   Yeah, I was in my own lane driving and then it started drifting, I tried to, uh, steer to the-keep it on the same lane ...

Q.   Uh-huh.
A.   ... but I couldn't anymore.

Q.   Okay. Do you know where your vehicle was first impacted like what area of the vehicle?
A.   I'm gonna guess on this one, I think it's the right front corner.

Q.   Okay. Did you see the other vehicle before the impact occurred?
A.   I did-, I see it. I saw it. I-, I wish I could avoi-, couldn't avoid it.

Q.   Okay. And if you-, if you can just estimate how far away the other vehicle was when you first saw it just in like car lengths.
A.   By estimation I'm not, uh, I would say it was like, uh, 100 foot

Q.   Okay. Do you know what part of that other vehicle impacted yours?
A.   I, uh, again I'm gonna guess I think it was on the same corner as mine. 'Cause they tried to avoid me and I-, and I was ss-, still coming.

Q.   Okay.
A.   So I think they tried to drift left to avoid me so, uh, I think the impact was on the same corner.

Q.   Okay. Where did your vehicle come to rest?
A.   Uh, on the passenger's side.

Q.   Okay. So it tipped?
A.   Yeah, it flipped.

Q.   It flipped, okay.
A.   Yeah.

Q.   And where, uhm, was it still on the road or was it off of the road?
A.   On the road.

Q.   Still on the road, okay. Did the other vehicle involved flip?

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 13

A.   I didn't think it flipped, no.

Q.   Okay. And do you know where it-, where it stopped? Was it on the-, on the road as well?
A.   I think it stopped on the-, on the other direction, the one I was coming from.

Q.   Okay.
A.   On a small ditch.

Q.   Okay. Do you know how many people were in the other vehicle?
A.   Uhm, I don't know. It was a minivan so I'm guessing more than two or three people.

Q.   Okay. Did you talk to anybody in that vehicle?
A.   No.

Q.   Okay. Do you know who called the police?
A.   Uhm, bystanding, uh, couple, uh, his wife called-, called 911.

Q.   Okay. Did you or-, or either of your passengers, uh, go to the hospital by ambulance?
A.   No.

Q.   Okay. Do you know how many people in the other vehicle went?
A.   Uhm, I'm not 100% sure but I think it's one at least.

Q.   Okay. And do-, what police department came out to the scene?
A.   Cumming.

Q.   Did they give you a report number or a case number?
A.   They gave me a citation but... (inaudible). ..

Q.   Okay.
A.   ... it might. . .

Q.   What...
A.   ... include the-, include the pp-, report number.

Q.   Okay.
A.   I have it here.

Q.   Okay. Thanks.
A.   Uh, court date, I don't see a number that's report number.

Q.   Okay.
A.   There's a court date, the-, uh, citation number.

Q.   Do you know what they cited you for?
A.   Failure to maintain lane.

Q.   Okay. And before-, before this accident occurred did you have any indication or any, uhm, any problem with your vehicle that, you know, any indication that the steering was going out?
A.   Well, the second before it went out.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 14

Q.   Okay. Have you had any recent repair work done on the vehicle?
A.   Yes.

Q.   Okay. And what type of work was done?
A.   I had the steering kit uh, replaced, all the drag links, the, uh, the bars all of those things, replaced at a shop.

Q.   And when was that done?
A.   Well, the weekend before. So, uh, last weekend.

Q.   Okay. So like the 13th is a Saturday. Do you know what day on the week?
A.   Uh, yeah, it was Saturday.

Q.   Okay. And what shop did you take it to?
A.   The shop's name is Soho-(sounds like) something, uh, sh@sautocenter...(inaudible)...I'm just not...

Q.   Okay. Did . .. (inaudible)...
A.   ... at is, uh, like an, uh, @ sign like an email.

Q.   Okay. Do you still have the paperwork for those repairs?
A.   I have the receipt.

Q.   Okay.
A.   When I paid.

Q.   Okay. Were the repairs done in the same day, all done on Saturday?
A.   Yeah. Uh, ss-, same day.

Q.   Okay. And after you picked up the vehicle that same day it-, did it appear to be operating fine any... ?
A.   Yeah, it was operating fine. I didn't notice anything.

Q.   Okay. And the reason you took the vehicle into the shop for repairs that day was that the specific reason, to have the steering replaced?
A.   Yes.

Q.   Okay. Okay. Do you feel there was anything else you could have done to avoid the accident?
A.   Uh, no, there's nothing I could have done.

Q.   Okay. Do you think there was anything else that the other driver would have been able to do to avoid the accident?
A.   I doubt they could have had anything to do to avoid it.

Q.   Okay. And that's gonna cover the questions that I have regarding the accident. But at this time if there's anything that you want to add or any corrections you'd like to make, go ahead and do that at this point.
A.   Okay. Uhm, I'm gonna have to go to court for this citation. And I don't know what the proc-, I've never-, I never had a car accident in my life. This is the first time.

Q.   Okay. Yeah, I can .. .
A.   So, uh .. .

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 15

Q.     ... I can go over the, yeah . ..
A.     ... I don't know what the .. .

Q.     ... I can go over the claim process with you here after we're done with the statement. Uhm, but if. ..
A.     Okay.

Q.     ... there's anything that yy-, we didn't talk about on the statement regarding, you know, how the accident occurred. If there's anything you want me to know that we didn't talk about?
A.     Uh, there's one-, one thing that, uh, the gentleman in the place where they towed the car.

Q.     Uh-huh.
A.     Uh, he mentioned he II-, he looked at it and he said the reason I lost steering capability is there's a-, there's a bolt that came-, came loose. And his-, his thinking it came loose because, you know, some bolts they have a hole underneath them and you stick a pin and then you split the pin to keep the bolt from coming loose?

Q.     Uh-huh.
A.     He-, he said either the pin was not there or it wasn't done right. So it came loose and therefore the bolt just came loose and then the bar just came loose and I lost steering.

Q.     Okay. And is there anything else that you'd like to add?
A.     No, I think that will be all for now.

Q.     Okay. All right. Then I just have a couple questions that I need to ask so we can conclude the statement, okay?
A.     Okay.

Q.     Uhm, did you understand all the questions that I asked?
A.     Yes.

Q.     Okay. And to the best of your knowledge were all of your answers true and correct?
A.     To the best of my knowledge, yes.

Q.     Did you understand I was recording the conversation?
A.     Yes.

Q.     And did I have your permission to record it?
A.     Yes.

Q.     Okay. Thank you. Then this will conclude the interview with Abdulmohsen Almassud regarding the auto accident that occurred on October 21st, 2012. Today's date again is October 22nd, 2012. And it's now approximately 11:50 a.m., Central Standard Time.

Mr. Almassud's recorded statement was summarized into the claim file by Ms. Lyke as follows:

Abdulmohsen was driving the 1995 Jeep Wrangler when the accident occurred & had 2 passengers. The accident happened on Hwy 9 in Cummings GA on 10/21/12 at 1:45pm. He does not require glasses/contacts to drive and was wearing his seat belt. They had spent time at the mountains and were on the way back. Nothing distracting going on inside his vehicle in the moments leading up to

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 16

> the accident. Abdulmohsen was in DS, Brent Elford was in front PS and minor Avery Elford was in the back seat. The accident happened on Hwy 9. Insured thinks he was headed south. 4 lane hwy (2 in each direction). Insured was SB in the left lane. Claimant was coming NB - insured unsure which lane they were in. No hills or curves where accident happened. Insured was going straight in lane when he noticed his vehicle starting to drift to the left. He estimates his speed at that time to be around 40mph and speed limit in area is 50-55mph. At the time the insured vehicle started to drive he tried to turn the wheel but realized he had lost steering. He slammed on his brakes and tried to stop - he had no control of the wheel. He saw oncoming claimant vehicle when it was approximately 100' away. Nothing he could do to avoid the accident. He states claimant tried to swerve to the left to avoid. He thinks the initial impact between vehicles was front PS to front PS. Insured vehicle rolled and ended up on PS in opposite lanes of travel. Claimant vehicle ended up in small ditch on opposite side of the road. Insured does not think claimant vehicle rolled. Claimant was in minivan - unsure how many people inside but thinks maybe 2-3. Unknown injuries in claimant vehicle - at least 1 person went to hospital by ambulance. No one in insured vehicle was transported or treated for any injuries. Insured said claimant swerved to & avoid impact - he doesn't think anything else claimant could have done to avoid.
>
> -Insured had recent repair work done to steering on vehicle. 1 day repair done on weekend prior to accident - Saturday 10/13/12. He dropped vehicle off and picked up on same day. After repairs completed vehicle seemed to be operating properly up to the time the accident occurred. The shop replaced entire steering mechanism. He has repair receipt & paperwork and will email it to me. Vehicle went to the shop that day specifically for steering replacement. At tow lot after this accident the tow truck driver told insured that at bottom of bolt there is a hole for pin to be put in to secure the bolt. No pin was there so either they didn't put it in or wasn't put in correctly and that is what caused steering to go out & him to lose control of the vehicle.

*See* October 22, 2012 (197-198). In the recorded statement, Mr. Almassud indicates that his vehicle was operating properly prior to the accident. He had gone to the mountains and was returning home. He indicated that he suddenly lost steering capability and that he could not steer to the right or left. The Jeep began to drift into oncoming traffic. Mr. Almassud was asked if he had any recent repair work done on the vehicle. He responded that he had the steering kit replaced, including all the drag links that were replaced at the shop. After he picked up the vehicle from the shop, he noticed the Jeep was operating in a normal manner. Mr. Almassud indicated that the tow truck driver following the accident believed he lost steering capability because a bolt came loose in the steering.

The statement taken by Ms. Lyke was a standard initial recorded statement, which comports with industry standard. The claim file shows that on October 25, 2012 (194) the adjuster telephoned Oh's Auto Center ("Oh's") to discuss the situation, but the person who initially answered the phone call hung up on her. When Ms. Lyke called back she was unable to leave a message for return call. On the same day, Ms. Lyke reached out to Mr. Almassud's wife, following up on getting repair information from the shop. *See* October 25, 2012 (194). Arrangements were made to have an inspection of the Jeep, including the steering column. *See* October 29, 2012 (213). By November 7, 2012 (187), it was reported into the claim file that Mr. Almassud had the steering worked on one week before the accident and the steering was working normally, but then failed. The mechanics at Oh'S would not speak to American Family. *See* November 7, 2012 (187). The physical damage adjuster determined that the steering drag link came loose from the pitman arm, but the physical damage adjuster could not confirm if it was before or after the loss. A

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 17

recommendation was made to the adjuster to hire an expert engineer to inspect the vehicle. *See* November 15, 2012 (182-183).

On November 27, 2012 (180), the American Family adjuster retained Rimkus Consulting Group, Inc. ("Rimkus") to inspect the Jeep (180). The adjuster then called Mr. Almassud on November 28, 2012 (179-180), explaining her need to receive additional information on the parts and repairs that had been done on the steering the week prior to the loss. At that time, Mr. Almassud advised that there was only a $100 labor charge involved since the insured was the one who purchased the parts and the shop only installed them. *See* November 28, 2012 (179-180). Mr. Almassud did not take this opportunity to disclose that Sears Auto Center ("Sears") inspected the steering just after Mr. Almassud picked up the Jeep from Oh's and he did not provide American Family the Sears receipt.

A vehicle inspection was scheduled with Rimkus. *See, e.g.,* December 4, 2012 (268). Following the vehicle inspection, engineer Mark Hook with Rimkus called adjuster Lyke and reported that he was confident that the accident did not produce the disconnection of the linkage following the crash. Ms. Lyke entered the following claim note regarding the verbal report of Mr. Hook:

> Received vm from Mark Hook w/Rimkus. Message left at 3:36pm yesterday. I called him back at phn # 404-952-8308 and discussed the outcome of his inspection. He will have his report completed either today or over the weekend. He has to have it reviewed but we should receive it by this Wednesday at the latest. Based on information obtained at inspection he is confident that the steering drag coming loose from pitman arm was not a result of the accident but is what caused insured to loose steering. He could tell that parts were new & in good condition. Overall the jeep looked well maintained - had newer tires. He explained that pin was not replaced when shop installed steering components. Terminology used was more technical but his findings are that shop didn't put things together properly. I asked if off-roading with the jeep would that have effected it in any way and Mark said that off-roading would not have caused the issue. Based on his findings insured would have lost steering at some point and off-roading may have accelerated it but not caused it.
> Mark asked that I email him the shop receipt so I did.

In consultation with Rimkus, it was determined that the cause of the loss was the mechanic at Oh's who improperly installed the cotter pin. *See* December 11, 2012 (169). On the same day, engineer Hook issued his formal report. The formal report stated the following:

> On October 21, 2012, a two-vehicle collision reportedly occurred near the intersection of Dahlonega Street and Pilgrim Road, in Cummings, Georgia. A 1995 Jeep Wrangler, Georgia license BET8383, driven by Almassud Abdulmohsen, was traveling southbound on Dahlonega Street. A 2001 Mazda MPV, Georgia license 10948401, driven by Luisa Mezquital, was traveling northbound on Dahlonega Street. The Jeep reportedly lost steering control, crossed the center lane divider line, and collided with the Mazda.
>
> Rimkus Consulting Group was retained to inspect the steering components of the Jeep to determine whether the post-incident condition of the Jeep's steering components resulted from the collision or from an installation / manufacturing defect or deficiency. The Jeep was examined and photographed

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 18

by Mark S. Hook, P.E. at the Insurance Auto Auction (IAA) facility located at 125 Old Highway 138, in Loganville, Georgia on December 6, 2012.

### Conclusions

1.      The conditions of the drag link and pitman arm on the Jeep were consistent with one end of the drag link having separated from the pitman arm as a result of an installation error.

2.      The cotter pin utilized to prevent the crown nut from loosening was either never installed, or installed improperly allowing it to separate from the tie rod end and subsequently allowing the crown nut to loosen and separate from the tie rod end resulting in the tie rod separation from the pitman arm.

3.      The separation of the drag link from the pitman arm resulted in a loss of steering control by the driver of the Jeep and did not separate as a result of the collision.

### Discussion

The narrative on the Georgia Uniform Motor Vehicle Accident Report for Incident Number 2012-10-1554, authored by J. Edwards with the Cumming Police Department, indicated that: "Driver of vehicle 1 (1995 Jeep Wrangler) was traveling south on Dahlonega Street and states that vehicle lost steering and crossed center lane striking vehicle 2." Ms. April Lyke reported that that the driver of the Jeep claimed that the steering components were replaced approximately one week prior to the incident and that steering control was lost which caused the Jeep to veer into the oncoming traffic resulting in the subject collision.

A receipt from AutoAnything, dated July 14, 2012, for a Heavy Duty Tie Road and Drag Link Kit (Part Number 18050.83) for a 1995 Jeep Wrangler was purchased by Almassud Abdulmohsen. A credit card receipt from Oh's at 6704 Buford Highway, Suite G in Doraville, Georgia for an amount of $100.00, dated October 13, 2012 was reportedly paid to have the tie rod and drag link kit (ordered from AutoAnything) installed on the Jeep.

On December 6, 2012, the 1995 Jeep Wrangler was inspected and photographed at the IAA facility in Loganville, Georgia (Photograph 1). The Jeep vehicle identification number (VIN) was 1J4FY19P7SP307355. The most severe impact damage was inflicted to the left-front portion of the Jeep. The left-front wheel was bent with the top of the tire and wheel leaning inward.

The right and left forward leaf spring brackets for the front axle were broken and separated from the right and left frame rails. The front track bar was separated from the bracket at the axle end of the track bar (Photograph 2).

The bolt and nut that secured the track bar to the axle-end bracket were missing and not available for examination. The left center link (drag link) end bracket at the left steering knuckle broke and separated from the left steering knuckle (Photograph 3). The center link left end remained attached to the broken portion of the steering knuckle with the crown nut and cotter pin still intact (Photograph 4). The right-center link end remained attached to the right steering knuckle with the crown nut and cotter pin still in place.

The right tie rod end (connected to the right end of the center link) remained attached to the center link with the crown nut and cotter pin in place. The left tie rod end separated from the pitman arm (Photographs 5 and 6). The crown nut and cotter pin for the left tie rod end were missing and were not available for inspection.

The condition of the male threaded end of the left tie rod end was consistent with the crown nut loosening due to the absence of a cotter pin to prevent crown nut rotation. There were no damages to the left tie rod end or pitman arm that were cause by the subject collision. The conditions of the

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 19

> pitman arm and the left tie rod end are consistent with a separation that occurred prior to the collision as reported by the driver of the Jeep.
>
> Our report was for the exclusive use of American Family Insurance Company and was not intended for any other use. Our report was based on information made available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, the new information may have on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted.

*See* December 11, 2012 (1264-1266). Following receipt of the Rimkus report, adjuster Lyke spoke to Mr. Almassud on December 12, 2012 (168-169), discussing the engineering report. A copy of the report was emailed to Mr. Almassud (168-169). What is surprising is that Mr. Almassud did not take this opportunity to explain to American Family that there was another component to the story, which was the fact that Mr. Almassud had taken the Jeep into Sears just hours after receiving the Jeep from Oh's and had it inspected and the front end aligned. If there had been a missing cotter pin or problem with the linkage, why didn't Sears find it? A reasonable person would have raised that connection and would have reported it to the insurance company.

## A.     LITIGATION DISCOVERY

On August 28, 2014, tort claimant Luisa Cruz Mezquital ("Cruz") initiated a civil action against Mr. Almassud. That action was styled *Luisa Cruz Mezquital v. Abdulmohsen Y. Almassud*,[2] State Court of Fulton County, Civil Action File No. 14EV001930F (the "Underlying Case").

Attorney James Taylor testified that during the litigation plaintiff's counsel had requested photographs that were taken of the Jeep pre-accident. Attorney Taylor forwarded those requests to Mr. Almassud, inquiring if he had any photographs showing the Jeep pre-accident. Depo. James Taylor, May 18, 2017, pp. 65:16-67:23. Mr. Almassud did not produce the photographs that were used at trial to impeach him, nor did he produce the photographs that were ultimately produced (under threat of compulsion) later during the declaratory judgment action. Had Almassud provided these photographs, as he had a duty to do, they would have seriously called into question Mr. Almassud's use of the Jeep prior to the subject accident.

Attorney Taylor reported to American Family on October 13, 2014 (3129) that his office was in the process of preparing draft interrogatory responses on behalf of Mr. Almassud. (3129) Mr. Almassud provided the factual information for the interrogatory responses to attorney Taylor's paralegal. Buckland Depo., p. 25:16-24. According to attorney Taylor, Mr. Almassud did not want to say he was off-roading when he was not. Taylor Depo., pp. 345:4-350:23.[3] In Almassud's

---

[2]    Initially, Cruz' counsel transposed Mr. Almassud's name as "Almassud Y. Abdulmohsen." The caption was later revised to correctly name him as "Abdulmohsen Y. Almassud."

[3]    Mr. Taylor testified that he discussed with Mr. Almassud at some length the issue of "off-road," including what Mr. Almassud meant by that term, and how he used his vehicle in the past. Taylor Depo., May 24, 2017, pp. 288:24-295:20. Mr. Almassud advised that he had not been off-roading in any aggressive way and that he would typically drive the vehicle on unpaved, dirt and gravel roads, but nothing beyond that. *Id.* Regarding the day of the accident, Mr. Almassud told attorney Taylor that earlier in the day they had been

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 20


FIRST RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, in interrogatory no. 25, Mr. Almassud states the following:

> Defendant was at home and then went to Blairsville, Georgia to go off-roading. Defendant was heading back from Blairsville, Georgia, and was going to his home at the time of the collision. Defendant was approximately 10 miles away from his home at the time of the collision.

(MJB000220). Attorney Taylor reported that for the first time, as they were preparing interrogatory responses, Mr. Almassud indicated that he was on his way home from having gone off-roading. This concerned attorney Taylor because he initially thought it might have an impact on the opinions of Rimkus. Defense counsel was concerned because the opportunity to settle within limits had expired and it would be a logical assumption for a trier-of-fact to assume that because Mr. Almassud had been driving off-road prior to the accident, the accident was not caused by negligent repair work by the repair shop, but rather was caused by the off-roading activities. *See* November 7, 2014 (3420-3421).

Prior to Mr. Almassud's deposition, Mr. Almassud told attorney Taylor that he had driven the Jeep on unpaved dirt roads with bumps in them. Taylor Depo., pp. 70:13-73:14. Mr. Almassud indicated that one area he would drive was Beasley Knob. *Id.* According to Mr. Almassud, the Jeep was his daily ride and he would drive it on dirt, gravel, and unpaved roads. *Id.* Mr. Almassud described Beasley Knob to attorney Taylor as being "like a glorified picnic area." *Id.*, 71:23-25. Attorney Taylor discussed with Mr. Almassud his pre-collision activities on the day of the accident. Taylor Depo., pp. 75:11-77:20. Attorney Taylor recalls asking Mr. Almassud for clarification as to what he meant when he initially said that he went off-roading. Taylor Depo., pp. 75:11-77:20. Mr. Almassud stated that he had been driving on unpaved dirt-type roads going to look at the scenery in the north Georgia mountains. *Id.* Given the benign nature of Mr. Almassud's responses, attorney Taylor did not ask Mr. Almassud more about the nature of his traveling on unpaved roads. *Id.* Mr. Almassud told attorney Taylor that on the day prior to the collision they had the top of the Jeep off and they were traveling on no rougher terrain than dirt, unpaved roads, going to what attorney Taylor assumed was some type of park. *Id.* Attorney Taylor also discussed with Mr. Almassud if he had ever been aggressively off-roading, rock climbing, anything more than driving on dirt roads or gravel paths. *Id.*, 77:5-11. Mr. Almassud advised that he had not and that he had "never done anything like that." *Id.* Attorney Taylor believed that Mr. Almassud was an "urban cowboy" because his Jeep looked the part of a rugged off-roader, but that Mr. Almassud "didn't back it up" because he did not use the Jeep off-road. *See* Taylor

---

looking at scenery up north and had not done any aggressive off-road driving other than going on an unpaved road to a lake. *Id.* Mr. Almassud advised that he had never taken the Jeep on any type of rock crawling or anything beyond dirt or gravel roads. *Id.* Attorney Taylor specifically recalled Mr. Almassud saying words like "dirt roads" and "gravel" in the deposition preparation session. Taylor Depo., pp. 296:22-303:2. Although Mr. Almassud never said that he had not used the Jeep in an extreme off-roading way, his characterization of using the Jeep on only dirt or gravel roads implied he had done no extreme off-roading. *Id.* Attorney Taylor did not see off-roading being any type of issue after Mr. Almassud explained what he meant by that. Taylor Depo., pp. 316:8-319:8. Attorney Taylor did not believe he had any reason to go beyond what Mr. Almassud had told him about his activity with the Jeep. Taylor Depo., pp. 327:15-330:19.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 21

Depo., pp. 77:21-78:21. Attorney Taylor testified he had no evidence that Mr. Almassud was doing any extreme off-roading before the collision and after the steering kit was installed. Taylor Depo., pp. 155:15-156:15.

Ms. Cruz' counsel took Mr. Almassud's deposition on April 29, 2015. At his deposition, Mr. Almassud testified that at the time of the subject motor vehicle accident, his primary vehicle was the 1995 Jeep. Almassud Dep., pp. 19:19-21:18. He claimed the percentage of mileage he drove off-road with the Jeep was very low. Almassud Dep., pp. 21:19-22:4. He was confronted with his response to Interrogatory No. 25 at the deposition where he stated that he went to Blairsville to go off-roading. Mr. Almassud explained that to him, off-roading meant that he would go on an unpaved road to get someplace for the scenery. Almassud Dep., pp. 23:11-24:15. His Jeep was set up to be capable to go off-road to a certain extent. *Id.* However, he didn't take the Jeep on rough terrain, just unpaved areas. *Id.* Further, he testified that he had heard of the term "mudding," but the roads he took the Jeep on were not muddy. Almassud Dep., pp. 24:16-25:1. Mr. Almassud testified that he never took the Jeep mudding. *Id.* Any trails he took the Jeep on were nothing more than unpaved roads and might be designated roads for 4-wheel drive vehicles. Almassud Dep., pp. 28:14-29:13. Mr. Almassud testified that he had no pictures of the Jeep in an off-road setting. Almassud Dep., pp. 29:14-23. Regarding the day of the accident, Mr. Almassud testified that he drove to the Beasley Knob National Forest and stayed for a few minutes and then left. Almassud Dep., pp. 29:24-31:4. He and his companion stayed for approximately 15-20 minutes in the park. *Id.* The purpose of the trip was just to drive around on a nice day. *Id.* They wanted to see some nice scenery and the purpose was not to go off-roading. *Id.* Mr. Almassud could not remember the name of the camp site where they were visiting in Blairsville prior to the collision. Almassud Dep., pp. 71:7-73:13. There was a lake there, or it could have been a river, and he had been there two or three times before. *Id.* He would just buy a daily pass when he would go. *Id.* Regarding the day of the accident, it was a Sunday. They left Mr. Almassud's house around 9:00 a.m. Almassud Dep., pp. 120:23-123:19. At some point they left the paved roadway in the Jeep and drove on an unpaved road for approximately 15 to 20 minutes before they got to a scenic lookout. Almassud Dep., pp. 124:16-125:25. They parked and looked around, and they did not get back on the paved road until they were leaving. *Id.* After he picked up his Jeep from Oh's, he drove on both paved and unpaved surfaces. Almassud Dep., pp. 97:5-100:9. He further testified that he may have hit some potholes. *Id.* Mr. Almassud testified that he did not reinspect the suspension of the steering linkage after he left Oh's. Almassud Dep., pp. 56:15-57:14. He testified that he did not re-inspect the suspension because he wouldn't know what to look for. *Id.*

Mr. Almassud went to attorney Taylor's office and reviewed his deposition transcript there. Taylor Depo., p. 349:9-11. Following the review, Mr. Almassud signed the errata sheet in the presence of Mr. Taylor's secretary because she was a notary. *Id.* at pp. 345:4-350:23. Once Mr. Almassud testified at his deposition, attorney Taylor was no longer concerned about any off-roading and the trip to Beasley Knob because attorney Taylor was satisfied with Mr. Almassud' explanation for what he was doing. *Id.* at pp. 341:12-342:2. Attorney Taylor testified that just looking at the Jeep wouldn't tell you where the Jeep had been used. *Id.* at. pp. 340:17-344:21.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 22

Mr. Almassud misrepresented other critical facts, as well. In verified response to Cruz' Interrogatory No. 15, Mr. Almassud stated that "he made the last inspection of his vehicle on 10/13/12 when the mechanical work was done by Oh's Auto Center." (MJB000219). DEFENDANT'S FIRST RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, October 14, 2014. Mr. Almassud should have responded with a disclosure of the Sears inspection in response to this interrogatory. Importantly, Mr. Almassud verified his interrogatory responses were true and correct, when in fact they were not. (FAIN007999). At deposition, Mr. Almassud was asked if he had photographs of the Jeep in an "off-road setting." Almassud 4/29/2015 Depo, pp. 29:17-21. He responded untruthfully that he did not. "Maybe just pictures of me in it, but not off-road." *Id.*

### B.   TRIAL

#### 1.   September 7, 2016 Plaintiff Cruz Cross-Examination of Mr. Almassud

On September 7, 2016, attorney Brodhead called Mr. Almassud to the witness stand, out of order.

Mr. Almassud testified that the off-roading that he has done with the Jeep occurs when he goes camping. Trial Transcript ("TR"), pp. 367:10-368:18. To go camping you have to go off the pavement to get to the campsite. *Id.* The area typically is not rocky. *Id.* Sometimes you have to go through puddles of water. *Id.* Mr. Almassud told the jury that he had never used his Jeep to go "mudding." *Id.* He further testified that he did not know what the word "wheeling" meant. *Id.* He explained that he had purchased a skid plate for the Jeep and had it installed. *Id.*, pp. 368:19-369:21. He testified that he simply wanted something that was thicker than what the factory used. *Id.* He installed the skid plate because he wanted to have the Jeep appeal to people when they purchased the vehicle. *Id.* Mr. Almassud told the jury that he wanted the Jeep to be more sellable. *Id.*, 369:18-21. When asked if he would take his Jeep on "some off road tough things," Mr. Almassud reiterated his deposition testimony and testified at trial that he went off-road "[j]ust to get to the camping site," it was "[n]ot tough," and "[it]'s unpaved so that's the extent of it." *Id.*, pp. 369:22-70:11. Regarding the roads he took the Jeep off-road, they were typical truck type of dirt road with puddles not any deeper than typical puddles. *Id.* He told the jury he did not know how deep the water was when he drove through it with the Jeep, but he described it as a "mud puddle." *Id.*, pp. 371:1-4. When asked if he "ever" took the Jeep in water "deeper than any rain puddles," Mr. Almassud testified "[n]othing that deep." *Id.*, p. 370:9-11.

After this testimony, attorney Brodhead admitted Exhibits 105-107, 113, 115, 118, 119, 126, and 138—all photographs to impeach Mr. Almassud. These photographs were significant. Exhibit 105 showed mud on the center console and on the seat of the Jeep. Mr. Almassud tried to explain the presence of the mud on the interior of the vehicle by indicating that he rarely put the top up on the Jeep and explaining if he went through a mud puddle, the wheels somehow would splash mud into the inside. TR, pp. 371:23-372:18. Exhibit 106 showed mud on the speedometer. Mr. Almassud suggested that the Jeep was in the junkyard after the accident. *Id.*, pp. 372:19-25. Exhibit 107 was a photograph of mud under the dash. Mr. Almassud explained that after riding

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 23

ATVs and when entering the Jeep, the occupants would be completely muddy, resulting in mud on the dash. *Id.*, pp. 373:1-374:2. He also tried to explain that the mud under the dash could have been caused by his boots. *Id.* Exhibit 113 was a photograph of the engine compartment of the Jeep where there was dirt and mud on top of the radiator. Mr. Almassud explained that the presence of the mud and dirt was because he was driving on unpaved roads. *Id.*, pp. 373:3-374:11. With respect to Exhibit 115, which was a photograph of the end of the hood of the Jeep next to the voltage meter, there were little rocks and dirt under that area, which Mr. Almassud could not explain. *Id.*, pp. 374:12-21. Exhibit 118 was a photograph of the muffler of the Jeep, showing the exhaust pipe caked in mud. *Id.*, pp. 374:22-376:10. When asked to explain, Mr. Almassud testified that he goes camping frequently, and the mud resulted from "dust or when we do go over puddles, things like that." *Id.*. He gave the same testimony for Exhibit 126, which also showed mud and dust on the exhaust. *Id.*, pp. 376:11-14. Exhibit 119 showed mud inside the brakes on the Jeep. Mr. Almassud testified that the mud resulted from "just unpaved roads" and going through "rain puddles." *Id.*, pp. 376:15-24.

Next, attorney Brodhead showed Mr. Almassud Plaintiff's Exhibits 92, 93, and 95, which were documents from a social media "Jeep Forum" website. TR, pp. 377:17-5, 382:2-9. Plaintiff's counsel had not produced Exhibits 92, 93, or 95 in discovery, and attorney Taylor objected to them on that ground. *Id.*, p. 382:14-23. The trial court dismissed the jury to hear argument regarding the admissibility of the documents. *Id.*, p. 383:2-10. After the trial court expressed concern about the "element of surprise," the court requested attorney Brodhead explain why the documents were not produced. *Id.*, p. 385:24-386:7. Mr. Brodhead responded:

> Mr. Brodhead: Because almost every word that comes out of Mr. Abdulmohsen's mouth is an intentional lie. He is perjuring himself as we go. And he forms his stories based on what he thinks will fit at the time as he did throughout his deposition.
>
> We requested this information. It was intentionally withheld from us. Not by Mr. Taylor but by Mr. Abdulmohsen. Mr. Abdulmohsen lied consistently about this under oath. I mean the question shouldn't be a surprise. The question is does this surprise Mr. Abdulmohsen; not does it surprise Mr. Taylor. And there's no way Mr. Abdulmohsen is surprised in an improper way. He might be surprised that we found it but it should be the opposite. He should have produced it to us. I don't want that to get that put on me saying that why am I surprising somebody with somebody he knows. Not Mr. Taylor but Mr. Abdulmohsen.
>
> Mr. Abdulmohsen knows that he bashed that vehicle off road. He knows that he went bouncing around the roads. He knows -- we have got more stuff coming. We could go over it now if you would look. I would like to do it out the presence of Mr. Abdulmohsen because whatever he says is false on everything and I want to make sure that when we go through it, people know.
>
> I mean such as when he says he doesn't know the term wheeling but apparently Moshen Almassud posted on somebody's Jeep Wrangler snow wheeling saying this looks lots of fun. I've done lots of wheeling but never in snow but he doesn't know what the word is. There are many more that I would like to do that are not a surprise to Mr. Abdulmohsen that should not be. These are documents that should have produced to us by Mr. Abdulmohsen.

*Id.*, p. 386:8-387:15.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 24

Although the Judge did not immediately introduce into evidence Exhibits 92, 93, and 95, these exhibits were later admitted. Following Mr. Almassud's impeachment but before his testimony concluded, the judge suspended trial for the remainder of September 7, 2016.

## 2. In-Chambers Discussion with Judge and Trial Counsel (9/7/16)

Following Mr. Almassud's testimony on September 7, 2016, the trial attorneys met with the Court in chambers.[4] Attorney Brodhead told the Court that Mr. Almassud was well aware of the documents that were being used to impeach him and that he had not produced the photos and documents previously. Taylor Depo., May 24, 2017, pp. 443:2-444:17. At one point during the in-chambers conference, attorney Taylor asked the Court for the opportunity to speak to Mr. Almassud. *Id.* Attorney Taylor advised the Court that in light of the assertions of attorney Brodhead regarding perjury, attorney Taylor had an obligation to speak with Mr. Almassud about the situation. *Id.*

The accusation by attorney Brodhead that Mr. Almassud had committed the crime of perjury required attorney Taylor to allow Mr. Almassud to consult with criminal counsel as attorney Taylor did not feel that he could adequately advise Mr. Almassud on this issue. Attorney Taylor advised the Court that Mr. Almassud needed to consult with other counsel regarding the potential perjury. *Id.* The trial court agreed; therefore, the judge adjourned trial for the day. *Id.* According to the observation of attorney Taylor, Judge Richardson, the presiding trial judge, seemed to grasp the gravity of what had just happened. Taylor Depo., May 24, 2017, pp. 444:23-445:1.

After trial was adjourned, attorney Taylor met with Mr. Almassud in a side room. Taylor Depo., pp. 448:3-15. During that meeting, Adam Joffe joined. *Id.* Mr. Joffe had not been in chambers with the attorneys, however. *Id.*

## 3. Post In-Chambers Meeting with Attorneys Taylor and Joffe and Mr. Almassud (9/7/16)

Attorney Joffe testified that attorney Taylor brought him up to speed following the break that had been taken from trial on September 7. Joffe Depo., May 19, 2017, pp. 102:17-103:20. At that point attorney, Taylor explained that there had been an in-chambers discussion in relationship to what was happening on the witness stand. *Id.* That was the extent that attorney Taylor knew about what took place in chambers. *Id.* Attorney Taylor told attorney Joffe that during the meeting in chambers, the trial judge adjourned trial for the day so that Mr. Almassud could consult with a criminal attorney. Joffe Depo., pp. 148:10-19. Because Mr. Joffe knew the name of a criminal attorney, he gave the name of that attorney to attorney Taylor. *Id.*

---

[4] The in-chambers conference was not transcribed. However, attorney Taylor was asked about his recollections of the conference at deposition.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 25

During attorney Taylor's post-chambers conference with Mr. Almassud, he advised Mr. Almassud that there were allegations that he was lying and perjuring himself. Attorney Taylor advised Mr. Almassud that perjury was a crime and that attorney Taylor was not comfortable giving Mr. Almassud advice as to how to handle that situation. Taylor Depo., pp. 448:17-23. Attorney Taylor made a recommendation that Mr. Almassud consult with other counsel who were more familiar with criminal law. *Id.* Prior to going into the side room with Mr. Almassud, attorney Taylor testified that he did not have any discussion with Mr. Joffe about what should be done. Taylor Depo., pp. 448:24-449:3. Instead, as attorney Taylor was discussing the situation with Mr. Almassud, Mr. Joffe walked into the side room. *Id.* Attorney Taylor gave Mr. Almassud the name of a criminal lawyer, Matt Crosby, and Mr. Crosby's phone number. Taylor Depo., pp. 449:18-25. Mr. Joffe also gave attorney Taylor the name of a criminal lawyer, Michael LaScala, and Mr. LaScala's phone number. Joffe Depo., pp. 146:8-147:7. Attorney Joffe did not have any pre-contact discussions with attorney LaScala. Joffe Depo., p. 152:8-20. Attorney Joffe recalls being separated with attorney Taylor (Mr. Almassud was not present) when attorney Taylor asked Mr. Joffe if he had the name of a criminal attorney. Joffe Depo., pp. 152:8-20. Attorney Joffe had absolutely no discussions with Mr. Almassud about hiring a criminal attorney. Attorney Joffe did not have any discussions with attorney Taylor about Mr. Almassud's consideration of the assertion of the Fifth Amendment against self-incrimination. Joffe Depo., pp. 145:2-147:25. Mr. Joffe only gave Mr. Almassud the name of the criminal lawyer through attorney Taylor and did not have any discussion with Mr. Almassud regarding the events and circumstances that necessited consultation with a criminal attorney. *Id.* Attorney Joffe had no discussion with attorney Taylor regarding whether Mr. Almassud should assert the Fifth Amendment and Mr. Joffe did not provide his thoughts in that regard. Joffe Depo., pp. 153:19-154:2. To provide attorney Crosby with a "head's up," attorney Taylor called criminal defense attorney Matt Crosby, and while he does not recall speaking to Mr. Crosby, he left a message that Mr. Almassud would be calling. Taylor Depo., pp. 473:13-454:1. Attorney Taylor did not give Mr. Almassud specific instructions on how to initiate or direct the conversation with criminal defense attorney Crosby. Taylor Depo., pp. 533:6-18.

What is surprising is that when attorney Taylor told Mr. Almassud about what had taken place in chambers and how seriously it undercut the defense, Mr. Almassud responded that he did not know how the plaintiffs' lawyer got the information because he "thought [he] had deleted that stuff or that account" (referring to trial exhibits 92-99). Taylor Depo., pp. 417:5-423:11. Thus, Mr. Almassud, without telling his own lawyer about the true facts, was involved in a conscious purge of information regarding off-roading use.

### 4.    Communications with Mr. Almassud Before Trial Resumed on 9/8/16

Prior to trial resuming on September 8, 2016, neither attorney Taylor nor attorney Joffe suggested to Mr. Almassud that he needed to assert the Fifth Amendment privilege against self-incrimination. Taylor Depo., pp. 157:3-10; pp. 457:8-458:18. Mr. Almassud did consult with the criminal lawyer to the understanding of attorney Taylor. Taylor Depo., pp. 158:3-10. Attorney Taylor advised Mr. Almassud on Thursday morning, before trial reconvened, that attorney Taylor

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 26

still had information he needed to receive from Mr. Almassud while he was on the stand. Taylor Depo., pp. 457:8-458:18. However, if Mr. Almassud believed that he was going to be getting into a situation where he was going to get caught in a lie, then attorney Taylor advised that Mr. Almassud should defer to whatever the criminal lawyers had told him and what advice they had given him. Taylor Depo., pp. 457:8-458:18. Attorney Taylor advised Mr. Almassud that he did not need to assert the Fifth Amendment unless Mr. Almassud felt like he was in a position where it was necessary. *Id.* He told Mr. Almassud there were other questions that he could answer without having to invoke the Fifth Amendment. *Id.* Mr. Almassud grasped that concept. *Id. See also*, pp. 462:12-18. Mr. Almassud was advised of the ramifications for taking the Fifth Amendment in a civil case, including the assumption by the jury that he was lying and that would look bad. Taylor Depo., pp. 488:22-489:19. Attorney Taylor told Mr. Almassud that attorney Taylor would defer to what the criminal lawyers had told him to do. *Id.* Then attorney Taylor gave Mr. Almassud an index card where he wrote out how to invoke the Fifth Amendment. Taylor Depo., pp. 456:4-7. Attorney Taylor advised that Mr. Almassud did not need to raise the Fifth Amendment to every single question. Taylor Depo., pp. 464:2-11.

> **5.      Trial Resumes on 9/8/16 with Mr. Almassud still being cross-examined by attorney Broadhead.**

Trial resumed on September 8, 2016. Immediately attorney Brodhead moved for the admission of Exhibits 92 through 99. *See* TR, p. 198:16-25. Exhibit 92 was a photo and profile regarding Mr. Almassud on Jeep Forum.[5] Mr. Almassud was cross-examined about Exhibit 92, to which he responded that he was asserting his Fifth Amendment privilege. *Id.*, p. 399:1-7. Mr. Almassud then was shown Exhibit 93, which was described by counsel as being Mr. Almassud's profile picture of Mr. Almassud in his Jeep.[6] Again, Mr. Almassud asserted his Fifth Amendment privilege against self-incrimination. *Id.*, p. 199:8-12. Exhibit 94 was described by attorney Brodhead as communication threads on the Jeep Forum concerning the Jeep mirror with the doors off, the rough country suspension, the clutch replacement, and the Beasley Knob off-highway event. In response to attorney Brodhead's question about Exhibit 94, Mr. Almassud again asserted the Fifth Amendment. *Id.*, p. 399:13-20. Exhibit 96 was described as a posting made by Mr. Almassud about suspension modifications to the Jeep for off-roading.[7] Again, Mr. Almassud asserted the Fifth Amendment. *Id.*, pp. 399:21-400:20. Exhibit 97 was described by counsel as a posting made by Mr. Almassud about clutches and partaking in frequent trail

---

[5]     Plaintiff's Trial Exhibit No. 92 was a posting from "JeepForum.com." A photo posted on "Jeepspace" showed the Almassud Jeep in water ¾ up the tires. This was a far cry from the "puddles" that Mr. Almassud testified about both in his deposition and at trial.

[6]     Plaintiff's Trial Exhibit No. 93 is a blow-up of the photo of the Almassud Jeep in what appears to be a river.

[7]     Plaintiff's Trial Exhibit No. 96 was a post where Mr. Almassud expresses his desire to have a larger lift kit on the Jeep, which he stated that he could not afford. Part of the post states: "My problem is that when I am off-roading, I tend to cause the rear tires rub on the body and at some point, I am sure the tires will be ruined." The post was made on June 5, 2011.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 27

riding.[8] Mr. Almassud again asserted the Fifth Amendment in response to this exhibit. *See id.*,
pp. 400:21-402:4. Exhibit 98 was shown to Mr. Almassud. Attorney Brodhead asked if
Mr. Almassud had gone up to Beasley Knob to go off-roading.[9] Mr. Almassud responded with an
assertion of the Fifth Amendment. *Id.*, p. 402:5-10. Attorney Brodhead showed Mr. Almassud
Exhibit 99, a post by Mr. Almassud to YouTube with a photo stating that he had done "lots of
wheeling, but never in snow." Mr. Almassud asserted the Fifth Amendment.[10] *Id.*, p. 402:11-
403:6. Mr. Almassud also asserted the Fifth Amendment when asked whether he personally did
any of the work on the Jeep and whether he modified the Jeep in order to sell it. *Id.*, p. 403:7-15.
Attorney Brodhead asked whether he selected the heavy duty drag link and steering kit for Oh's
to install, and Mr. Almassud responded that he did so based "expert recommendations." *Id.*,
403:16-22. However, when asked if Almassud took responsibility for the selection of the parts that
were installed, checking them over when they arrived and taking them to Oh's, he asserted the
Fifth Amendment. *Id.*, pp. 403:16-404:19. When asked if Oh's did any additional modifications
to the heavy-duty steering system, Mr. Almassud asserted the Fifth Amendment. *Id.*, pp. 404:20-
405:10. Mr. Almassud did answer a few questions regarding: whether Oh's gave him back the old
parts (*id.*, 405:11-14); how far the distance was between to Oh's from his house (*id.*, pp. 405:11-
406:1); the time it took to drive from his home to Beasley Knob (*id.*, p. 407:7-15), being a computer
engineer (*id.*, p. 406:2-12), the time he remembered the steering failing (*id.*, 407:16-19), and that
the failure of the steering had caused the accident (*id.*, pp. 407:16-408:25). However, when asked
about inspecting the work that Oh's had done when he picked the vehicle up from Oh's, and
whether he noticed anything wrong with the steering, he invoked the Fifth Amendment. *Id.*,
pp. 406:13-407:6. When asked whether he was off-roading at Beasley Knob on the day of the
collision, he asserted the Fifth Amendment. *Id.*, pp. 406:13-407:6. When asked if it was his
personal theory that the steering linkage failed before the collision, he asserted the Fifth
Amendment. *Id.*, pp. 407:16-408:25. When asked if it was his vehicle crossing into Cruz' lane of
traffic that caused the collision, he asserted the Fifth Amendment. *Id.*, p. 409:1-8. When
questioned about whether Exhibit 16 was the owner's manual packet for the Jeep and whether he
read it, he asserted the Fifth Amendment. *Id.*, pp. 411:17-410:13. He was shown Exhibit 58
regarding the way the Jeep looked after the collision, and he admitted to that. *Id.*, pp. 410:14-

---

[8] Plaintiff's Trial Exhibit No. 97 is a May 24, 2011 post which states, in relevant part: "The clutch in my '95 Wrangler is going out and this is happening for the second time now in about 18 months. I am thinking I need some heavy duty type of clutch that can handle the trail fun and all the heat." The May 25, 2011 post continued with Mr. Almassud stating: "Yeah, I do lots of trail riding and I really don't baby my YJ."

[9] Plaintiff's Trial Exhibit No. 98 is a June 22, 2010 post where Mr. Almassud states the following:

I am thinking of going to Beasley Knob [Off Highway Vehicle] area, which I've been to a few times and I really like it. It's the kind of trail that's for all, because it ranges from very easy to extremely difficult.

It costs $5.00 to enter per vehicle and there's a very nice campsite since it's a little far (for me). I like the idea of getting there the night before and camp and drink all night long around the fire and eat something and then hit the trail the next morning.

[10] Plaintiff's Trial Exhibit 99 was a photo of the Almassud Jeep climbing snow off-road with the title "JEEP WRANGLER SNOW WHEELING."

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 28

411:8. Exhibit 17 was marked and identified as the installation instructions for the heavy duty steering kit. When asked questions about the steering kit instructions, he asserted the Fifth Amendment. *Id.*, p. 411:9-22. When asked if he understood that changing the gear ratios on the Jeep would cause the speedometer to register incorrectly, he asserted the Fifth Amendment. *Id.*, p. 411:9-22. When asked what his speed was at the time of the accident, he asserted the Fifth Amendment. *Id.*, pp. 411:23-412:2.

After attorney Brodhead completed his cross-examination of Mr. Almassud on September 8, 2016, Mr. Pierce, counsel for Oh's, then cross-examined Mr. Almassud. When Mr. Pierce asked Mr. Almassud how fast he was going and whether he was being criminally charged, he asserted the Fifth Amendment. *Id.*, pp. 414:12-415:18. When asked whether he used the Jeep for off-roading and questions about the heavy duty steering kit, he asserted the Fifth Amendment. *Id.*, pp. 114:12-115:18. Mr. Almassud did testify that he took the heavy duty tie rod and drag link kit to Oh's where he had never been before. *Id.*, pp. 416:14-417:15. He chose Oh's arbitrarily. *Id.* Mr. Almassud testified that Oh's said they could install the kit, and they did. *Id.* Then attorney Pierce questioned Mr. Almassud based on his deposition testimony. In response to sections of his deposition read before the jury, he asserted the Fifth Amendment. *Id.*, pp. 417:16-419:3. Although Mr. Almassud testified that the steering was working fine when he took the Jeep to Oh's, when asked if he went back to Oh's to complain to them about the steering, he took the Fifth Amendment. *Id.*, p. 419:4-15. When asked about the scene of the collision and his actions immediately before the collision, he invoked the Fifth Amendment. *Id.*, pp. 420:1-25. Mr. Almassud did testify that he applied his brakes prior to the collision but could not say what happened after he applied his brakes. *Id.*, p. 421:1-15.

At the conclusion of Mr. Almassud's cross-examination, attorney Taylor stated to the court that based upon Mr. Almassud's testimony, attorney Taylor did not believe he could continue to defend Mr. Almassud. *Id.*, pp. 425:6-428:1. Attorney Taylor asserted to the court that the testimony Mr. Almassud gave was contrary to everything that he relied upon to prepare the defense. *Id.* Attorney Taylor stated to the court that he was now in an ethical conflict. *Id.* Plaintiff's counsel argued that it was not an ethical conflict, but rather a tactical dilemma created by the witness. *Id.* Mr. Taylor moved for a mistrial to allow him to withdraw as counsel for Mr. Almassud. *Id.* The court denied the motion. *Id.*, pp. 430:22-431:16.

After Mr. Almassud testified on September 8, 2016, American Family transmitted to him a reservation of rights ("ROR") letter. FAIN006018-22.[11] The ROR letter stated:

---

[11]  Attorney Joffe hand delivered the ROR letter to Mr. Almassud "after his cross-examination had been concluded." Joffe Depo., pp. 182:25-184:1. *See also* Valley Depo., pp. 193:11-194:16 ("after [Mr. Almassud's] testimony was concluded there was an adjournment of the trial, and Mr. Joffe had arrived at the courthouse and he hand-delivered a copy of this letter to Mr. Almassud in the hallway outside the courtroom."). Further, while Mr. Joffe's assistant emailed a copy to Mr. Almassud, it was sent at 9:54AM, after trial had resumed. *See* TR, p. 397:21-22 ("the jury entered the courtroom at 9:37 a.m."); Doc 297-2 (9/8/2016 Email from Ms. Spath to Mr. Almassud at 9:54AM).

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 29

We have been retained by American Family Insurance Company ("AmFam") to represent AmFam in this matter. Based upon new information revealed to AmFam during your cross examination in this matter yesterday afternoon, AmFam has decided to continue your defense in this matter subject to a full and complete reservation of rights under policy number 19680799-01. It appears that you failed to cooperate during the handling of your claim and you failed to cooperate with your defense in this matter, causing great prejudice to AmFam.

AmFam is reserving its rights due to these coverage questions that include, but are not limited to, the following issues:

FACTS

This case involves an automobile accident on October 12,2012 where the steering components on your 1995 Jeep Wrangler failed, causing you to lose control of your vehicle, cross the center line and strike the Plaintiffs vehicle. Since the inception of the claim, you informed AmFam that despite a number of modification performed on the Jeep Wrangler, all modifications were performed by a licensed mechanic in an effort to make your vehicle more attractive for sale, and not for use off-road.

You informed AmFam from the inception of the claim that you did not take the vehicle off road other than to drive on gravel and dirt roads to get to camp sites. You denied having engaged in any type of moderate to significant off-roading activities. As you know, this fact was vitally important to your defense in this matter and to the manner in which AmFam handled your claim both pre-suit and during this suit. You confirmed these facts under oath and during your deposition on April 29,2015.

The trial in this matter began September 6, 2015. On the morning of September 7, 2016, your counsel, relying on your statements, recounted these same facts to the jury during his opening statement. He explained to the jury that you would take the witness stand and testify that despite the number of modifications to the Jeep, you did not engage in any heavy off-roading activities and that the evidence would show that the steering components failed as a result of your mechanic's failure to properly install the parts and not as a result of your driving activities.

After opening statements, Plaintiffs' counsel called you as their second witness for the purpose of cross examination. During that cross examination, it became apparent that you did use the Jeep for heavy off-roading activities and that your statements to AmFam, your deposition testimony and your statements to your counsel were false. Plaintiffs' counsel found a Jeep enthusiast forum where you maintained an account and had posted pictures of your extreme off-roading activities in the subject Jeep. When you were confronted with your posts about these off-roading activities, you continued to deny on the witness stand that the account was yours, that the Jeep was yours or that you made the internet postings. It also appears you posted about making modifications to the Jeep yourself while you previously testified that the modifications were performed by mechanics.

We understand that you now admit that the internet account is yours, that the pictures posted to it are of you and the Jeep involved in this accident, and that you do, in fact, take the Jeep on extreme off-roading excursions. It also appears, unbeknownst to AmFam and your defense counsel, that you attempted to delete the account to keep the evidence secret. The court then recessed during the cross examination so that you could employ a criminal defense attorney to advise you of the implication of your false testimony.

Now that it appears you have perjured yourself, you cannot cooperate in your defense in this matter or otherwise risk additional perjury allegations. Had AmFam known from the inception of this claim that you used the Jeep for extreme off-roading excursions and that you had done so only hours before this accident, it would have handled this claim in a different matter.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 30

## POLICY

AmFam issued policy no. 1968-0799-01-18-FPPA-GA to Abdulmohsen Almassud at 364 Michael Drive, Alpharetta, GA 30009-2120 (the "POLICY"). The vehicle identified by the policy is a 1995 Jeep WRGLR S/RIO GRAND/YJ vin no. 1J4FY19P7SP307355. The policy has bodily injury liability limits of $100,000 each person.

## COVERAGE ISSUES

1.      Your failure to cooperate.

In pertinent part, the POLICY requires the following:

### IF YOU HAVE AN ACCIDENT OR LOSS

If we are prejudiced by a failure to comply with the following duties, then we have no duty to provide coverage under this policy.

. . .

B. Other Duties

1.      Each person claiming any coverage of this policy must also:

a. cooperate with us and assist us in any matter concerning a claim or suit.

...

f.      give us written and recorded statements, including those recorded over the telephone, and answer questions under oath when asked by any person we name, as often as we reasonably ask, and sign copies of the answers.

g.      cooperate with us and, when asked, assist in:

(1)      making settlements;

(2)      securing and giving evidence; and

(3)      getting witnesses to attend hearing and trials.

h.      attend hearings and trials.

Here, your intentional failure to cooperate with AmFam and its defense counsel both through the pre-suit claims stage and during litigation has seriously and significantly affected AmFam's defense of this matter. Now that it appears you lied under oath, you can no longer participate in your defense. Moreover, had AmFam known that you were using the vehicle for extreme off-roading events, and it now appears you participated in this activity only hours prior to this incident, AmFam's defense of this matter at all stages of the claim handling would have been different, which is proof of the prejudice to AmFam.

## EVALUATION

Based upon the information we have at this time, it would appear that there is, or may be no coverage for any judgment rendered in this case. The investigation of these claims is ongoing, at this time this letter is simply to advise you that AmFam is making you aware of these issues with regard to your insurance coverage.

Nothing that AmFam nor its representatives have done to date, nor any of the contents of this letter, shall constitute an acknowledgment that there is or may be coverage and shall not constitute a waiver

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 31

of AmFam's right to insist upon full compliance with all of the terms and conditions contained in any policy. We will expect full compliance with each and every provision contained in any policy.

This letter is simply to give notice, of AmFam's decision to reserve its rights with regard to potential coverage issues.

AmFam expressly reserves its right to allocate the cost of defense, any settlement, any judgment, and/or any other expense incurred on behalf of the insured between those portions of any claim that are covered and those portions of any claim that are or may not be covered.

AmFam expressly reserves its right to seek reimbursement from the insured with regard to the cost of defense, any settlement, any judgment, and/or any other expense incurred on behalf of the insured with regard to those portions of any claim that are or may not be covered.

The agreement on the part of AmFam to further investigate this matter and participate in your defense is under a reservation of rights. AmFam does not concede that, merely because it agreed to participate in the defense of the lawsuit and that it will continue to provide you with a defense in this matter, that it has any coverage whatsoever for any liability in connection with the action. Further, AmFam expressly reserves the right to withdraw its defense at any point in time it becomes apparent there is no longer a duty to defend. AmFam also expressly reserves the right to contest or deny coverage based on additional grounds that become known to it.

Additionally, the reservation of rights described in this letter is not exclusive. AmFam is only setting forth those matters on which it is reserving its rights that have come to its attention to date. AmFam will continue to investigate this claim and develop more information. In the event this continuing investigation reveals any other circumstances which might defeat coverage, then AmFam expressly reserves the right to amend this reservation of rights letter. Investigation of the alleged incident is in no way a waiver of any of AmFam's rights under its policy or under any law.

We are also asking that you execute a copy of this letter indicating that you have been informed of these issues and that you authorize AmFam to continue to investigate this claim. By signing this letter, you are not waiving any rights and AmFam is not agreeing that there is or may be no coverage.

If you have any questions, please give us a call.

## 6.    Closing Arguments

Counsel for Oh's made an effective closing argument regarding Mr. Almassud's assertion of the Fifth Amendment.  In closing argument, attorney Pierce told the jury the following:

I have got to tell you also I have never seen in a civil lawsuit, a party take the stand and invoke the Fifth Amendment, the Fifth Amendment. I'm not going to answer that question because it may tend to incriminate me. Not once, not twice, over and over to the point that I'm not sure what Mr. Almassud eventually said because most of the time he spent saying I'm not going to answer it because it might incriminate me. Not that he can't remember. Not that he isn't sure. I'm just not going to answer that question. Mr. Almassud, it's simply. Did you or did you not use this vehicle for these off roading purposes, these muddying events, these wheelies or not? It's not a hard question. I'm not smart enough to ask all these questions about threads and impact points and drag links, Pittman arms, cotter pins. I'm not that smart. I just wanted the man to tell me if he used the vehicle in this off roading manner or not. I'm not going to answer that question. That might incriminate me.

Well, Mr. Almassud just tell me this: Did you check those nuts and bolts after you took it to Oh's? I'm not going to answer that question. Not because I don't remember. Not because I may or may

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 32

not have. I'm not going to answer that question for the Jury. It might incriminate me. Incriminate you.

You mean ~ the Judge is going to tell you, I believe the Judge is going to tell you that when a party does that, then you are entitled and should presume that had the question been asked when answered, it would have been unfavorable to the party who invoked the Fifth Amendment. So I'm not sure even what role the gentleman had with regard to this steering kit one way or the other.

*   *   *

[956:14-17]
Mr. Almassud, is that your signature by the technician's name who did it? I'm going to take the Fifth Amendment on that on the grounds it might incriminate me. Mr. Almassud, I just want to know if that's your sitting. I'm going to take the Fifth Amendment on that on the grounds it might incriminate me.

TR 9/9/16, pp. 954:16-955:23; 956:14-17.

## 7.      The Court Instructs the Jury on Adverse Inference

The judge gave the following adverse inference jury instruction regarding Mr. Almassud's assertion of the Fifth Amendment:

You are entitled to draw adverse inferences against Defendant Abdulmohsen Almassud when he invoked his right under the Fifth Amendment not to answer questions also known as pleading the Fifth. Specifically, you may presume that had the Defendant Abdulmohsen Almassud answered the relatives questions the answers would have been adverse to his interest. That presumption may not be applied to Defendant Guangyun Jin.

TR, 9/9/16, pp. 987:21-988:4.

## 8.      Verdict and Judgment

The jury entered a verdict in favor of the plaintiff in the Underlying Case on September 12, 2016, finding Mr. Almassud 100% at fault for causing the accident. The jury awarded a total of $30,485,646.29. The Court entered judgment against Mr. Almassud on September 22, 2016, in the amount of $30,690,703.39, adding prejudgment interest in the amount of $204,796.60.

Attorney Taylor believed that Mr. Almassud's impeachment regarding off-road use negatively impacted the defense at trial when plaintiff's counsel disproved what Mr. Almassud had been saying and what the defense was proffering. It had a ripple effect. Taylor Depo., pp. 413:16-417:4. In every case, a defense lawyer takes into consideration a party's credibility so the complete impeachment of Mr. Almassud and his assertion of Fifth Amendment undercut the facts and prejudiced the defense attorney Taylor had prepared, previewed for the jury in his opening statement and planned to present to the jury. *Id.* Such a catastrophic undermining of a witness' credibility as was done of Mr. Almassud without question prejudiced American Family.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 33

### 9. Appellate Reversal and Settlement

The Judgment was appealed. The Georgia Court of Appeals vacated the judgment and remanded the case. Plaintiff pursued a petition for certiorari to the Georgia Supreme Court. The Georgia Supreme Court denied certiorari. Then, prior to the second trial, American Family settled the Underlying Case in excess of the policy limits.

### C. Mr. Almassud's Counterclaim for Breach of Fiduciary Duty Against American Family

American Family brought a declaratory judgment action against Mr. Almassud, asserting that he breached the policy's cooperation clause by misrepresenting, omitting, and concealing relevant facts and evidence from American Family. In the declaratory judgment action, Mr. Almassud filed a counterclaim which, in Count Two, alleges that American Family breached its fiduciary duties to him. Mr. Almassud was asked an interrogatory asking him to specify the basis for his breach of fiduciary duty claim. In DEFENDANT ABDULMOHSEN ALMASSUD'S FIRST SUPPLEMENTAL RESPONSES TO PLAINTIFF'S FIRST INTERROGATORIES, Interrogatory Nos. 11 and 12, Mr. Almassud answered as follows:

11.

Describe with particularity and in detail each breach of any fiduciary duty allegedly owed to you by AmFam, as alleged in Count II of the Amended Counterclaim [Doc. 26], including the specific fiduciary duty and the manner in which you contend it was breached by AmFam. Provide the name, address, and current employer of all witnesses with knowledge supporting your response to this interrogatory and identify all documents which show that AmFam breached a fiduciary duty.

**ANSWER:** This is a contention interrogatory asking, in part, for legal conclusions. Mr. Almassud does not have the legal training to respond to this interrogatory himself, so he has relied on his attorneys to provide a response. In addition, following the meet-and-confer process, during which AmFam raised concerns about the level of detail provided, Mr. Almassud objects that this is a premature contention interrogatory, in that several AmFam witnesses remain to be deposed and AmFam has not produced all documents requested in discovery. The response is as follows:

Irrespective of any duty to settle, AmFam had a duty to give at least equal consideration to the financial interests of its policyholder, Mr Almassud, when investigating, evaluating, adjusting, settling, and defending Mr. Almassud both before and during litigation. This obligation is derived from promises made in the insurance policy and Georgia law as they relate to an insurance company's obligations to insureds when their insured is faced with clear or likely liability in excess of their policy limits amount (in this case $100,000).

AmFam had a fiduciary duty to investigate liability and damages with Mr. Almassud's interests in mind, but AmFam did so in a manner that gave greater weight to AmFam's interests in recurring costs through subrogation, and to pursue its financial interest in avoiding payment of the $100,000 policy limits. AmFam never investigated Mr. Almassud's duty to inspect the newly installed steering kit and never investigated whether the modified off-road Jeep was or was not "street legal". AmFam put up no defense to these two claims made against Mr. Almassud AmFam decided to place 100 percent blame on Oh's Automotive for its role in installing the steering kit that allegedly failed when the collision occurred. This "defense" totally ignored the duty to inspect and "illegal-Jeep" claims made against Mr. Almassud. Even with Oh's Automotive as a potential co-defendant in the case,

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 34

AmFam knew or should have known that the case against its insured was "an uphill battle." The case was an uphill battle because Mr. Almassud crossed the center-line causing a huge collision with Ms. Mesquital, who was obeying all traffic rules and not at fault in any way. AmFam knew that Ms. Mesquital was not contributorily negligent. AmFam knew that Mr. Almassud was cited by law enforcement and that traffic court found him guilty of causing the collision. AmFam did not even evaluate damages until it was too late. Nonetheless, it was always clear that Ms. Mesquital was damaged well beyond the $100,000 policy limits.   Documents include the ICS notes. Witnesses include April Lyke, Mike Reuss, other claim supervisors who are better known to AmFam, and others identified in the ICS notes making such decisions.

AmFam had a fiduciary duty to settle this case prior to suit when it was given the opportunity to do so by Ms. Mesquital's counsel. Ms. Mesquital's counsel actually gave AmFam three separate opportunities to settle before suit was filed, all of which were rejected by AmFam to the financial detriment of Mr. Almassud. Witnesses include Lyke, Reuss, other claim professionals identified in the ICS Notes, and Evan Kaine. Documents include the ICS notes and all correspondence between AmFam and Evan Kaine.

AmFam had a fiduciary duty to do what it promised. Before the lawsuit was ever filed, AmFam promised Mr. Almassud in writing as follows: "We will attempt to settle the matter within your coverage limits." (Deposition Exhibits 10, 13 and 50) AmFam broke this promise. Witnesses include April Lyke and Matt Valley.

AmFam had a fiduciary duty to advise Mr. Almassud that he would likely receive an excess judgment at least as early as when AmFam knew it. Matt Valley testified that he knew the first day he looked at the file that Mr. Almassud would receive an excess judgment, but AmFam did not advise Mr. Almassud of the fact. Matt Valley and James Taylor discussed their evaluation that the case should have been settled long before trial, but Mr. Almassud was never advised as to why it should have been settled and more importantly, that he was about to owe a lot of money to Ms. Mesquital because of an expected high verdict. Witnesses include Matt Valley and James Taylor. Documents include Deposition Exhibits 7, 11, 20 and 59

AmFam had a fiduciary duty to provide Mr. Almassud with competent defense counsel. Under the circumstances of this case (e.g., excess exposure, known aggressive and successful plaintiff's attorney, horrible injuries, medical expenses over $300,000), and in light of knowledge that Mr. Almassud faced a substantial risk of a judgment in excess of his policy limits, "competent" defense counsel meant a defense team lead by attorney(s) experienced with catastrophic claims, backed by considerable resources, possessed of confidence by AmFam staff counsel, and incentivized to put in the hours and hard work needed to defend Mr. Almassud under the difficult circumstances of this case. Before AmFam assigned Taylor to the case, AmFam knew that Matt Valley and other attorneys at AmFam had expressed little confidence in James Taylor and wanted to fire him. Nonetheless, AmFam hired and kept Taylor on to defend this "high damage" case. AmFam hired and kept Taylor on the case to save money in defense costs for AmFam. Taylor was working on a low-cost, flat-fee arrangement for much of the case and otherwise was a "low-cost" attorney, even when paid by the hour. The low-cost, flat-fee arrangement is so disincentivizing that Taylor seriously considered not taking the plaintiffs deposition before trial. Such a strategy of inaction would be unthinkable to a properly compensated attorney. The penny-pinching defense also disincentivized standard investigative work like visiting sites AmFam now alleges were important to the case, like Beasley Knob. Or simply taking the time to "google" Beasley Knob, which would have confirmed that it is a place frequented by off road Jeeps.   Employing and continuing to retain a low cost attorney was financially beneficial to AmFam, but portended to be an unreasonable risk as to Mr. Almassud's financial interests, since he would be the one to pay for a verdict over the $100,000 policy limits. When Mr Almassud expressed concern to AmFam via email over Taylor's inaction, he was assured by AmFam that he was being properly represented by Taylor and AmFam.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 35

Witnesses include James Taylor, Matt Valley, Mike Reuss, Todd Keller, and Mr. Almassud. Documents include the low-cost flat fee agreement, time sheets, and Mr. Taylor's litigation file.

AmFam had a fiduciary duty to take a sober look at the facts of the case (i.e., Mr. Almassud crossed the center line and Ms. Mezquital was blameless) its negligent installation defense, and the theories of liability against Mr. Almassud (i.e., failure to inspect and negligence per se) and choose a course of action less likely to inflame the jury.

AmFam had a fiduciary duty to consider the existence of and identify conflicts of interest and potential conflicts of interest between it and Mr. Almassud. AmFam did not timely consider or identify conflicts or properly act on them once they existed. Witnesses include Matt Valley and Mike Reuss.

Once a conflict existed, AmFam had a fiduciary duty to advise Mr. Almassud of it and to designate claim professionals who would protect solely Mr. Almassud's interests and to split the file between those professionals and professionals designated to protect AmFam's interests. AmFam did neither. Witnesses include Matt Valley and Mike Reuss.

AmFam had a fiduciary duty to not use against Mr. Almassud factual allegations AmFam had obtained improperly. During the trial, AmFam improperly obtained from Mr. Taylor allegations about Mr. Almassud's alleged actions. AmFam failed to consider the red flags raised by that situation and immediately used the allegations to its own advantage and to Mr. Almassud's detriment. Of course, if the obvious conflict of interest had been properly identified by AmFam and the file had been properly split, the situation would have never occurred.

AmFam had a fiduciary duty to refrain from giving Mr. Almassud legal "advice" that was objectively imprudent and factually false. Once there was an identified conflict, AmFam had a fiduciary duty to refrain from giving him any legal advice. AmFam breached these duties by advising Mr. Almassud to consult with criminal counsel selected by AmFam and informing Mr. Almassud, falsely, that he had committed perjury and could not longer participate in his defense. That these breaches were committed during a tense and stressful trial is particularly egregious. Witnesses include James Taylor, Adam Joffe, Matt Valley and Mr. Almassud. Documents include Deposition Exhibits 23, 25 and 26.

When it sends a reservation of rights letter, AmFam has a fiduciary duty to deal fairly and honestly with its insured. AmFam breached that duty by including falsified and highly exaggerated factual allegations in its reservation of rights letter (and allegations that it refuses to provide a factual basis for), falsely telling Mr. Almassud that he had committed the crime of perjury, and falsely advising him that he could no longer participate in his defense. Ironically, AmFam made Mr. Almassud think that he may go to jail as a result of testimony he gave in a case AmFam should have settled long ago. Mr. Almassud was instructed by AmFam to seek counsel from criminal defense attorneys because he "could no longer cooperate" or testify. Witnesses include James Taylor, Adam Joffe, Matt Valley and Mr. Almassud. Documents include Deposition Exhibits 23, 25 and 26.

AmFam had a fiduciary duty to provide counsel who would refrain from making factually false arguments that supported AmFam's theory of no coverage at the expense of Mr. Almassud's interests in preserving coverage. AmFam breached this duty during the appeal by encouraging and allowing Mr. Almassud's counsel to argue to the trial court that Mr. Almassud was - in AmFam's convenient opinion - dishonest and had not cooperated with his counsel or with AmFam.

Witnesses include unknown individuals at AmFam, defense counsel AmFam hired to handle post-trial motions. Documents include the briefs they filed.

Under these circumstances, AmFam had and continues to have a fiduciary duty to provide independent counsel to handle Mr. Almassud's state court appeal, but AmFam refuses to do so.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 36

.

> AmFam has a fiduciary duty to not meet secretly with Mr. Taylor in this litigation. Ostensibly, Mr. Taylor was paid by AmFam to represent the best interests of Mr. Almassud. Nonetheless, in this Declaratory Judgment case, AmFam's attorneys met secretly with Mr. Taylor for two hours without Mr. Almassud's consent. When Mr. Almassud's lawyers asked to meet with Mr. Taylor (which would have been perfectly appropriate since they are both supposed to be representing the best interest of the same client), Mr Taylor was instructed by AmFam to not to agree to such a meeting.

> In further response, please see the response to Interrogatory No. 9.

## V.   **SUMMARY OF OPINIONS**

When a motor vehicle accident occurs for which the insured seeks coverage, it is of vital importance that the insured candidly discuss the facts and circumstances surrounding the accident, good and bad, with the insurance company so that the insurance company can properly and reasonably assess both liability and damage elements regarding any claim brought against the insured. When speaking with insureds, it is the industry standard, custom, and practice for insurance companies to accept the representations made by the insured as being truthful, candid, and honest. Unless proven otherwise, insurance companies start the claim investigation process with the understanding that the insured is telling the truth about the circumstances leading up to and surrounding the motor vehicle accident. Such candid truthfulness is required by the insurance policy's cooperation clause, as well as the implied covenant of good faith and fair dealing. In that regard, it was reasonable for American Family to expect and believe that Mr. Almassud provided accurate, candid, and truthful information regarding the circumstances leading up to the subject motor vehicle accident, as well as the facts of the accident itself. According to Mr. Almassud, shortly before the subject motor vehicle accident, he had substantial work performed on the steering linkages of the Jeep at Oh's. Mr. Almassud told American Family that the accident occurred because he lost the ability to steer the Jeep without warning. Mr. Almassud further told American Family that a tow truck driver who towed the Jeep from the accident scene indicated that a cotter pin in the steering linkage was missing, which would have explained Mr. Almassud's loss of steering. American Family relied upon the accuracy of Mr. Almassud's statements and considered Mr. Almassud to be truthful in providing that information.

American Family asked Mr. Almassud where he was coming from at the time of the accident, to which he responded that he was coming from the mountains. Mr. Almassud chose not to be more forthright or explain to American Family that he had been off-roading in the Jeep, which could have caused the linkage problem. It is clear from Mr. Almassud's wrongful conduct that he was never going to be candid and honest with American Family about his real off-roading activities. Mr. Almassud could also have volunteered to American Family that after having the steering linkage worked on by Oh's, that he had a follow-up vehicle inspection by Sears which did not find any problems with the linkage. Instead, Mr. Almassud's description of the accident led American Family to reasonably believe that Mr. Almassud did not have any fault in causing the accident and that the culpable party was Oh's Auto Center who performed a negligent steering kit repair/replacement. In reliance upon Mr. Almassud's misrepresented version of the facts, American Family reasonably had the Jeep linkages inspected by an engineer. The engineer

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 37

concluded that the steering linkage failed because of negligent mechanical work done by Oh's Auto Center.

Later in the case, Mr. Almassud continued with his wrongful withholding of information, as well as his misdirection regarding the facts and circumstances surrounding the accident. As an example, Mr. Almassud portrayed his use of the Jeep as not involving any type of aggressive off-roading, but rather involving the mild use of the Jeep in going off paved roadways onto gravel and dirt roads. Occasionally, he might go over a bump or rut in the road and occasionally he might go through a puddle getting to and from campgrounds. In truth, Mr. Almassud was misdirecting American Family and Mr. Almassud's appointed defense counsel by providing purposeful misinformation.

Mr. Almassud also did not assist in his defense, as required by the policy's cooperation clause and implied covenant of good faith and fair dealing, when he failed to produce the Sears receipt, destroyed relevant information regarding his prior off-roading use of the Jeep  and continued to misrepresent how he used the Jeep in off-roading situations prior to the accident. In short, unbeknownst to American Family, Mr. Almassud had sabotaged his own defense by repeatedly telling American Family and Mr. Almassud's appointed defense counsel half truths about his real off-roading use of the Jeep, as well as his hiding and destroying of relevant evidence. Then, when Mr. Almassud told the same half-truths as verified answers to interrogatories and under oath at his deposition, he planted the seeds which gave root to the trial disaster that occurred when Mr. Almassud asserted the Fifth Amendment privilege against self-incrimination regarding the true facts and circumstances about his off-roading use of the Jeep, which he tried to hide from disclosure, in violation of his obligation to cooperate with his own appointed defense attorney and American Family during pretrial proceedings, as well as against his sworn oath to tell the truth at both his deposition and at trial. In my opinion, there was no way for American Family and/or attorney Taylor to know that Mr. Almassud would engage in such wrongful misconduct.

The American Family automobile liability insurance policy issued to Mr. Almassud imposed a duty of cooperation on Mr. Almassud. The policy provides that if American Family is prejudiced by a failure of Mr. Almassud to comply with the duty of cooperation, then American Family would be relieved of its duty to provide coverage under the policy. Under the policy, Mr. Almassud was obligated to "cooperate with [American Family] and assist [American Family] in any matter concerning a claim or suit. *See* IF YOU HAVE AN AUTO ACCIDENT OR LOSS Section B.1.a. (AmFam5428). The policy also imposed a duty upon Mr. Almassud to cooperate with American Family by "assist[ing] in . . . (2) securing and giving evidence," Section B.I.g.(2) (AmFam 5428). The GENERAL CONDITIONS section of the American Family policy restates the insured's obligation of cooperation in item no. 6: "Cooperation – Any person claiming any coverage under this policy must cooperate with us in the investigation, settlement and defense of any claim or lawsuit." (AmFam5434).

The American Family policy also contains an implied in law covenant of good faith and fair dealing which was reciprocal and obligated Mr. Almassud to act in good faith toward American Family in exercising candor regarding the accident facts and circumstances and required

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 38

Mr. Almassud to be forthcoming with relevant information to assist American Family in his defense.[12]

Under the GENERAL CONDITIONS section of the American Family policy there is a "Concealment Or Fraud" clause which states the following:

> Concealment Or Fraud
> With respect to all insureds, this entire policy is void if, before or after a loss, any insured has:
> a.   intentionally concealed or misrepresented any material fact or circumstance;
> b.   engaged in fraudulent conduct; or
> c.   made false statements;
> relating to this insurance.

(AmFam5434).

**A.     Based upon the foregoing and my review of the record, Mr. Almassud's conduct breached the American Family insurance policy's cooperation clause, the policy's implied covenant of good faith and fair dealing, and his conduct fell within American Family General Condition prohibiting Concealment Or Fraud provision, thereby voiding coverage in its entirety.**

It is my opinion that Mr. Almassud engaged in concealment, misrepresentation (affirmative and/or by omission), willful spoliation of evidence, and misdirection, all of which were in violation of the aforementioned policy provisions contained within the American Family automobile liability policy issued to Mr. Almassud.[13] Mr. Almassud's wrongful misconduct was pervasive and existed from the time that Mr. Almassud submitted his insurance application to American

---

[12]   Georgia law "recognizes an implied covenant of good faith and fair dealing in every contract." *Kennedy v. QBE Ins. Corp.*, No. 1:15-CV-00522-ELR, 2015 WL 11622472, at *3 (N.D. Ga. Aug. 5, 2015) (citing *Camp v. Peetluk*, 262 Ga. App. 345, 350(2), 585 S.E.2d 704 (2003) (citations omitted); *Cap. Health Mgmt. Grp., Inc. v. Hartley*, 301 Ga. App. 812, 817, 689 S.E.2d 107, 112 (2009) (same). "The implied covenant of good faith modifies, and becomes part of, the provisions of the contract itself. ..." *Kennedy*, 2015 WL 11622472, at *3 (citing *Stuart Enterprises Int'l. v. Peykan, Inc.*, 252 Ga. App. 234, 234(2), 555 S.E.2d 881 (2001)).

[13]   Ultimately, the trier-of-fact will have to decide whether Mr. Almassud's conduct was willfully deceitful, perjurious, and/or fraudulent.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 39


Family to purchase the American Family policy,[14] existed through the prosecution of the
Underlying Case, and continued to exist throughout the currently pending litigation.[15]

---

[14]   When Mr. Almassud applied for the American Family policy, he submitted a policy application dated
September 20, 2009. *See* Document 197-1, pp. 58-62. The American Family application that Mr. Almassud
signed represented to American Family that the 1995 Jeep Wrangler had not been "customized" or "altered."
Mr. Almassud also represented in the application that he intended to use the Jeep to drive to and from work
or school. As the facts would later reveal, the Jeep had previously been insured with Geico General Insurance
Co. Mr. Almassud paid additional premiums to have an endorsement added to the Geico policy insuring the
Jeep's custom parts and equipment. In fact, Mr. Almassud answered an interrogatory in the Underlying Case,
stating:

                                    38.

        Defendant states he purchased the Jeep approximately 2008-2009.

                                    39.

        Defendant purchased the Jeep from a private owner (name unknown) on Craigslist who lived ii
        dimming, Georgia.

                                    40.

        The previous owner did not make any modifications and/or customizations to the vehicle.

                                    41.

        Defendant made the following modifications and/or customizations to the vehicle after purchasing
        it:

        Lift kit lifting vehicle 4 inches

        Bigger tires

        Winch

        $5000.00 axles

        Slip yoke eliminator

        Heavy duty drive shaft

        Spare tire carrier

        Heavy duty front and rear bumper

        Thus, Mr. Almassud purchased the Jeep uncustomized and unaltered. He then did extensive alterations and
        customization to the Jeep after he purchased it and before he applied for the American Family policy.

        As the facts now reveal, prior to the date of the application and up through October 21, 2012, Mr. Almassud
        used the Jeep for off-roading activities. In fact, American Family in the declaratory judgment action filed in
        the U.S. District Court for the Northern District of Georgia, appended various photographs of the Almassud
        Jeep in off-roading conditions prior to applying for American Family Insurance. *See* Second Amended
        Complaint, ¶20, 21, 36, 37, 39.

[15]   During the declaratory judgment litigation, Mr. Almassud failed to disclose relevant and significant evidence
        regarding off-roading activity. In American Family's Motion for Sanctions against Mr. Almassud, American
        Family sets forth his numerous failures of disclosure. As an example, Mr. Almassud concealed litigation
        regarding the engine to the Jeep, and falsely represented that he had produced all documents when he had

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 40


In my opinion, Mr. Almassud breached his duty to cooperate with American Family and violated the policy's implied covenant of good faith and fair dealing. Mr. Almassud breached these obligations by doing the following: (a) withholding information regarding Sears' inspection of the 1995 Jeep Wrangler that occurred a few hours after Oh's completed the replacement of the steering kit on the Jeep; (b) providing misleading and false information regarding Mr. Almassud's pre-accident off-roading activities; (c) deleting photographs and other relevant texts and electronic media in order to hide from the plaintiff, as well as American Family, evidence regarding the true nature of Mr. Almassud's off-roading activities prior to the subject motor vehicle accident; (d) misrepresenting to defense counsel and American Family that the only type of off-roading

---

not. American Family pointed out that in mid-December 2017, Mr. Almassud's estranged wife brought to the forefront the fact that Mr. Almassud had been concealing critical documents. Only after this conduct was exposed did Mr. Almassud produce additional documents responsive to prior discovery requests which involved hundreds of pages and documents, including an off-roading video and the Sears receipt. *See* Documents 172-3, p. 7, 172-4, 172-7. Certainly a document evidencing that Mr. Almassud had the Jeep steering inspected by a qualified professional mechanic two hours after Oh's completed its work on the steering kit was relevant. Then, later in the litigation, Mr. Almassud produced an additional 350 pages of highly relevant documents, including emails and photographs evidencing various off-roading trips and identifying new, previously undisclosed witnesses. Text messages were included within this January 23, 2018 production while various emails were redacted. American Family was able to get images from Mr. Almassud's work computer, which included a text dated June 23, 2012 and which was sent while Mr. Almassud was on an off-roading trip which included a photograph of a friend's flipped Jeep and Almassud's statement that he recovered the flipped Jeep by "pull[ing] it out with my [Jeep]'s winch." Document 210-4. The court ordered Almassud to produce "all responsive documents." Mr. Almassud nevertheless defied the court's order and continued to withhold relevant discoverable documents located in his work email. Those documents had to be acquired via subpoena to the employer. Within those documents, American Family learned that Mr. Almassud had concealed evidence that he had taken his Jeep mudding, even though he denied doing so at his underlying deposition and at trial. *See* Documents 235-5, 235-7, 235-8, and Almassud Depo., pp. 24:16-25:1. Documents also showed that Mr. Almassud had worked on his Jeep personally. See Doc 285-3, pp. 19-20; Docs 235-10 – 235-14. Throughout this elongated ordeal, Mr. Almassud represented at relevant junctures that he had complied with discovery responses by indicating to the court "no documents were withheld" or "[a]ll responsive documents were produced," and "[t]here is nothing to compel." Document 144, pp. 13-14.

American Family points out in its Motion for Sanctions that the failure of Mr. Almassud to produce the Sears receipt and, thereby, disclose the fact that two hours after the work was completed by Oh's that Sears had inspected that work literally changed the trajectory of the defense. By Request for Production American Family had requested Mr. Almassud to produce all "videotapes" of the Jeep (Document 135-4 at RFP No. 7) as well as "videos" of the Jeep off-road. *See* Docket 210-1, at RFP No. 13. Mr. Almassud did not disclose the Boulder video. *See* Document 172-13, pp. 7-8. The Boulder video was produced by Mr. Almassud only after his estranged wife exposed him for concealing it. Docket 172-3, pp. 11-12. The Boulder video is evidence that Mr. Almassud testified untruthfully in the Underlying Case that his off-roading was limited to dirt roads.

The various documents that had been withheld by Mr. Almassud in the declaratory judgment litigation demonstrate the degree to which Mr. Almassud would go in not permitting truthful disclosure of his off-roading activities. In fact, when the limited evidence came to light at trial by way of impeachment regarding off-roading activities, Mr. Almassud explained to his attorney, Mr. Taylor, that he thought he had deleted all of that information. The comment made by Mr. Almassud demonstrates a conscious intent to destroy relevant evidence in order to preserve his testimonial trail of his lack of off-roading activity.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 41

activity that Mr. Almassud was engaged in prior to the accident involved traveling off paved roadways onto dirt or gravel roads; (e) improperly testifying at his deposition in a manner that could be reasonably characterized as deceptive, misrepresented by omission, knowingly inaccurate and intended to mislead regarding Mr. Almassud's off-roading activities involving the 1995 Jeep Wrangler prior to the subject motor vehicle accident and thereby injecting into the case an impeachment time bomb; (f) by providing testimony at trial which was characterized by Ms. Cruz's counsel, attorney Broadhead, as being perjurious; and (g) by providing testimony which, in turn, led to Mr. Almassud asserting the Fifth Amendment privilege against self-incrimination during trial.  This is not an exhaustive list.

### 1.      Mr. Almassud wrongfully concealed the Sears inspection.

One explanation for why Mr. Almassud concealed the Sears inspection arises from the fact that Mr. Almassud had been told by the tow truck driver at the scene of the accident that the cotter pin had come out of the linkage, which caused the accident.  Mr. Almassud already knew that Oh's was not responsible because he had the Jeep inspected at Sears.  Because Sears did not find a problem with the linkage, then Mr. Almassud, presumably, concluded that it was his off-roading that caused the problem.  By concealing the Sears inspection, Mr. Almassud could then point the finger at Oh's as the culprit, believing that he could escape fault on his part.

Mr. Almassud concealed the Sears inspection from attorney Taylor's paralegal, who sent an email to Mr. Almassud on October 11, 2014, during the litigation.  The email asked Mr. Almassud to answer specific questions which then had to be verified by notarization, swearing to the truthfulness of the responses.  When asked about any "maintenance records and documents," Mr. Almassud responded by indicating all receipts had been presented to American Family.  *See* Exhibit 35, page 1 of 2 (MJA0152).  The Sears receipt was not provided.

Mr. Almassud's concealment of the Sears inspection had a material impact on the case. First and foremost, it would have either exonerated Oh's, thereby substituting in place Sears for having missed discovering the problem; or, if the cotter pin was in place after leaving Oh's and as found during the Sears inspection, American Family may have settled the Underlying Case early for its policy limits.  Separately, plaintiff Cruz argued that the parts manufacturer, from whom Mr. Almassud purchased the steering kit, recommended two periodic inspections shortly after installation to make sure that the kit had been properly installed.  Proof of the Sears inspection would have satisfied that obligation and eliminated a substantial argument made by Ms. Cruz' counsel at trial supporting Mr. Almassud's liability.

Plaintiff Cruz served an interrogatory on Mr. Almassud asking him to identify the "last inspection" of the Jeep prior to the accident.  Mr. Almassud's response was that "the last inspection of his vehicle [was] on October 13, 2012 when the mechanical work was done by Oh's Auto Center."  *See* Exhibit 16, p. 4 (MJB000219).  This verified interrogatory response was untrue.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 42

Accordingly, American Family was prejudiced by Mr. Almassud's concealment of the Sears inspection. I agree with American Family's description of Mr. Almassud's failure to cooperate and the prejudice American Family suffered when he did so.[16]

In his recorded statement taken nine days after work was performed on the Jeep at Oh's and after the Jeep was inspected at Sears, Mr. Almassud purposely hid the fact that Sears had inspected the Jeep just two hours after Oh's had performed its work. In Mr. Almassud's recorded statement, adjuster Lyke asked Mr. Almassud if he had "paperwork" for "recent repair work" on the Jeep. Mr. Almassud disclosed Oh's paperwork, but concealed the fact that Sears had inspected Oh's work. Certainly, Mr. Almassud should have disclosed the Sears inspection as part of his answer to the following questions: "Have you had any recent repair work done on the vehicle?"; "And what type of work was done?"; "When was that done?"; "And what shop did you take it to?"; "Do you still have the paperwork for those repairs?"; "And is there anything else that you'd like to add?" Yet, at no time did Mr. Almassud voluntarily disclose to American Family that Sears had worked on and inspected the Jeep two hours after Oh's did. After the litigation began, attorney Taylor's paralegal requested from Almassud all "maintenance records" for the Jeep, to which Almassud responded by email, "I have provided all the receipts that I have to American Family . . ." *See* Exhibit 35, pp. 1-2 of American Family's Brief in Support of its Motion for Summary Judgment. Given the fact that Mr. Almassud had not provided to American Family the Sears documents, Mr. Almassud's representation to attorney Taylor and his paralegal was false. *See also*, Exhibit 9, ¶¶5-7; and Exhibit 42 to American Family's Motion for Summary Judgment.

During the litigation an interrogatory addressed to Mr. Almassud, requested that Mr. Almassud identify the "last inspection" of the Jeep prior to the accident. Mr. Almassud did not disclose the fact that Sears had inspected the vehicle. *See* Exhibit 16, p. 4 to American Family's Motion for Summary Judgment. At Mr. Almassud's deposition, he was asked when the

---

[16]     American Family describes the prejudice as follows:

> Inexplicably, Almassud failed to disclose Sears worked on the Jeep and evaluated the Jeep's steering two hours after Oh's completed replacement of that steering and failed to produce the Sears Receipt in response to any RFP. The Sears Receipt is the smoking gun in this case and is central to Almassud's defense in the Underlying Case. It proves Almassud in fact had the Jeep's steering inspected after Oh's finished its work and before the accident with Cruz occurred. Because Almassud failed to disclose the work and inspection performed by Sears, AmFam lost the opportunity to subpoena Sears' records, evaluate the results of the inspection, add Sears as a party to the Underlying Case or consider the impact of Sears' work on the Jeep when evaluating pre- and post-suit settlement. Had Almassud provided AmFam with the Sears Receipt in 2012, AmFam's evaluation of the claim, its settlement decisions, and the defense provided to Almassud (which centered on Oh's work only on the Jeep's steering) would have changed. Almassud's failure to disclose the Sears Receipt clearly violated his duty to cooperate with AmFam in its handling of the claim and defense of Cruz' lawsuit. By concealing the Sears Receipt again in the Dec Action after representing there was nothing left to produce, Almassud engaged in a cover up to prevent discovery of this damaging non-cooperation evidence, which necessitates the entry of the most severe sanctions.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 43

last time was that he inspected the Jeep prior to the accident. Mr. Almassud offered misdirected testimony that he personally inspected the Jeep ("I looked at it."), which was the final inspection. *See* Almassud Depo., pp. 54:4-55:2. Through all these instances, an insured fulfilling his duty to cooperate with his insurer and a reasonable and thoughtful litigant would have disclosed the fact that a highly professional automotive service organization like Sears had inspected the Jeep after Oh's replaced the steering kit and found nothing wrong with it. However, that evidence would not have supported Mr. Almassud's apparent theory to defend himself by pointing to Oh's as the responsible party at fault for causing the accident.

2.      **Mr. Almassud misrepresented his off-roading activities to his own defense lawyer and thereby misled his defense lawyer into believing the case as defensible.**

Initially, attorney Taylor was concerned about Mr. Almassud's acknowledgment that he was engaged in off-roading activity prior to the subject motor vehicle accident. However, attorney Taylor discussed this issue with Mr. Almassud at or about the time of the interrogatory responses and prior to Mr. Almassud's deposition taking place. When Mr. Almassud confirmed what he had already told attorney Taylor about his lack of off-roading activity through his sworn deposition testimony, attorney Taylor reasonably concluded that any off-roading issues were not significant and did not change the opinions of engineer Hook. Mr. Almassud intentionally misled Attorney Taylor by providing inaccurate and misrepresented interrogatory responses (which Mr. Almassud verified) and by providing sworn testimony that was false. More importantly, Mr. Almassud was given an opportunity to review his sworn deposition testimony and to make any changes by way of errata if they were necessary. Mr. Almassud acknowledged that he went into attorney Taylor's office and reviewed his deposition testimony. He did not change the prior inaccurate and misrepresented answers. Such conduct was clearly a violation of Mr. Almassud's obligation of cooperation and the policy's implied covenant of good faith and fair dealing.

3.      **Mr. Almassud concealed and misrepresented the true nature of his off-roading activity in verified answers to interrogatories and also misrepresented his lack of photographs and videos of the Jeep and concealed the inspection performed by Sears.**

Attorney Taylor relied upon the verified answers to interrogatories provided by Mr. Almassud in formulating his defense strategy. Mr. Almassud's misconduct regarding his verified answers to interrogatories violated the policy's cooperation clause and the policy's implied covenant of good faith and fair dealing.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 44

4.  **The various misrepresentations made by Mr. Almassud during his sworn deposition testimony violated the policy's cooperation clause, the implied covenant of good faith and fair dealing, and raised the specter of perjury.**

In Mr. Almassud's sworn deposition testimony, he provided inaccurate, misrepresented, and false testimony regarding the nature and extent of his off-roading activities, including the following: the fact that he did not have any photographs of the Jeep before the subject motor vehicle accident in any type of off-road setting; the fact that the last vehicle inspection occurred at the time of the Oh's replacement of the steering kit, thereby concealing the inspection by Sears; and the nature of the specific trip to Beasley Knob before the subject motor vehicle accident, among others.

5.  **Mr. Almassud wrongfully refused to correct the inaccuracies and misrepresentations set forth in his deposition testimony when he signed his deposition errata sheet.**

After Mr. Almassud gave his deposition testimony in the Underlying Case, he went to attorney Taylor's office and reviewed that transcript there. Taylor Depo., p. 349:9-11. Following his review, Mr. Almassud signed the errata sheet in the presence of Mr. Taylor's secretary because she was a notary. *Id.* at pp. 345:4-350:23. Mr. Almassud did not correct inaccuracies or misrepresentations given during his deposition in the Underlying Case. For example, Cruz' counsel asked Mr. Almassud if he had photographs of the Jeep in an "off-road setting." Almassud 4/29/2015 Depo, pp. 29:17-21. He responded untruthfully that he did not. "Maybe just pictures of me in it, but not off-road." *Id.* As noted above, there were numerous instances where Mr. Almassud provide incorrect, inaccurate, misleading and false testimony during his deposition in the Underlying Case but failed to make corrections when given the opportunity to do so.

6.  **Mr. Almassud engaged in willful spoliation of relevant evidence involving photographs of the Jeep in off-road settings, as well as texts that established his extensive off-roading activities prior to the subject motor vehicle accident.**

As noted above, following attorney Taylor's in chambers meeting with the trial judge and attorney Brodhead on 09/07/16 during the trial of the Underlying Case, attorney Taylor told Mr. Almassud about what had taken place and the seriousness of the perjury accusation attorney Brodhead had made against him and how seriously the specter that Mr. Almassud had perjured himself undercut his defense. Taylor Depo., pp. 417:5-423:11. Surprisingly, Mr. Almassud responded that he did not know how the plaintiffs' lawyer got the information because he "thought [he] had deleted that stuff or that account" (referring to trial exhibits 92-99). *Id.* Thus, Mr. Almassud, without telling his own lawyer about the true facts, was involved in a conscious purge of information regarding off-roading use.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 45

> 7.   **Collectively, the wrongful conduct of Mr. Almassud leading up to and including his assertion of the Fifth Amendment privilege against self-incrimination during trial clearly violated American Family policy's cooperation clause, as well as the implied covenant of good faith and fair dealing.  Such misconduct produced actual prejudice to American Family.**

Based upon the foregoing, the assertions by attorney Brodhead that Mr. Almassud had perjured himself and otherwise materially misrepresented significant facts regarding Mr. Almassud's off-roading activities were well-taken and supported by the record. Mr. Almassud's under oath testimony at both his deposition and during trial was dramatically inconsistent with what was portrayed in the impeachment exhibits used against Mr. Almassud at trial.  The misconduct of Mr. Almassud created the opportunity for a devastating impeachment of Mr. Almassud's credibility.  It would be reasonable for any juror to conclude that Mr. Almassud had lied.  Then Mr. Almassud asserted the Fifth Amendment privilege against self-incrimination after his impeachment.  The thorough impeachment of Mr. Almassud, followed by his assertion of the Fifth Amendment was so devastating, in my opinion, that the defense story of what occurred was eviscerated and the credibility of defense counsel and Mr. Almassud was completely lost.

The Fifth Amendment, by its express wording, provides only that "no person . . . shall be compelled in any criminal case to be a witness against himself."  In the criminal context, courts will instruct criminal juries that the assertion of the Fifth Amendment is not to be considered as an admission of culpability.  However, in the civil context, the assertion of the Fifth Amendment frequently is followed by a negative inference instruction wherein the civil jury is advised that because a party has raised the Fifth Amendment, the jury is "entitled to draw adverse inferences against" the party asserting the Fifth Amendment.  In this case, as indicated above, the civil jury was instructed by the court that it was "entitled to draw adverse inferences against defendant Abdulmohsen Almassud when he invoked his right under the Fifth Amendment not to answer questions . . ." and that the jury was entitled to "presume that had . . . [Mr. Almasssud] answered [the questions to which he asserted the Fifth Amendment privilege to] . . . the answers would have been adverse to his interest."  The assertion of the Fifth Amendment privilege allowed plaintiff's counsel, as well as Oh's counsel, to have free reign to ask any question relative to Mr. Almassud's off-roading activities as being true.  Thus, counsel for the parties were able to construct their questions in such a manner as to allow the jury to believe that each question was true, despite Almassud's Fifth Amendment assertion, as if each question were proven fact.

The combination of Mr. Almassud's deposition testimony in the underlying Cruz case, coupled with the dramatic impeachment, which was then followed by his repeated assertion of the Fifth Amendment, destroyed Mr. Almassud's ability to defend himself.  In turn, American Family was substantially prejudiced because it relied upon the truthfulness of Mr. Almassud in deciding to defend Mr. Almassud, as opposed to settling the underlying case.  After Mr. Almassud's complete impeachment, followed by the assertion of the Fifth Amendment, Mr. Almassud could not be rehabilitated, in my opinion.  Any attempt to rehabilitate Mr. Almassud would have

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 46

inflamed the jury more, as reflected by the excessive verdict that was clearly the product of the Almassud's untruthfulness and assertion of the privilege that unfolded in front of the jury.

The foregoing demonstrates that Mr. Almassud was engaged in an intentional attempt to conceal relevant evidence, destroy relevant evidence, and misrepresent the nature and extent of his off-roading activities in an obvious attempt to avoid liability. Presumably, Mr. Almassud recognized that because Sears did not find any problem with the steering linkage when it inspected the steering two hours after the vehicle was released to Mr. Almassud by Oh's that the only explanation for why the accident occurred would have been the intervening off-roading activities of Mr. Almassud. In order to avoid that result, Mr. Almassud appears to have concocted a web of misrepresentations in order to personally avoid liability exposure. Ironically, Mr. Almassud now counterclaims against American Family for what he purports is a breach of American Family's fiduciary duty to Mr. Almassud without taking into consideration his outrageous misconduct.

**B.      Based upon the foregoing and the record that I have reviewed, it is my opinion that Mr. Almassud prejudiced American Family by failing to cooperate in the investigation and evaluation of the claim and thereafter by failing to cooperate in his defense, including the taking of the Fifth Amendment during the trial of the Underlying Case.**

Each of the items identified in Opinion A above resulted in direct and actual prejudice to American Family. Had American Family been accurately briefed on the circumstances by Mr. Almassud, it could have attempted to resolve the claim early while there was still an opportunity to settle within policy limits. Alternatively, after the window to settle for policy limits had closed, Mr. Almassud's defense counsel could have adopted a different defense strategy. Attorney Taylor would have known to investigate what had occurred at Sears. If the evidence showed that Sears did, in fact, inspect the steering linkage and found it to be in good working order, then defense counsel would have understood that the claim against Oh's was not well taken. Given the fact that Sears had found no problems with the steering mechanism, defense counsel could have used that fact to support why Mr. Almassud believed his vehicle was good to drive. That type of evidence would have eliminated a main theory of liability brought by plaintiff Cruz to the effect that Mr. Almassud should have inspected the vehicle after the steering kit had been installed. Sears inspection would have eliminated that argument. Although there still would be potential liability on the part of Mr. Almassud, the verdict would have been much less and not the product of passion and prejudice as a result of the jury's visceral response to Mr. Almassud's lying and then asserting the Fifth Amendment. On the other hand, there would still be the argument that Sears overlooked the missing cotter pin and that it was Sears' fault that the steering mechanism failed. Any of these alternatives would have been beneficial to Mr. Almassud, vis-à-vis the $30 million verdict that was actually rendered.

More importantly, as a veteran insurance defense trial lawyer, who has tried defense cases, the impeachment of Mr. Almassud was devastating to his defense. Mr. Almassud was caught in big lies. The nature of those lies impugned the credibility of defense counsel who, in opening

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 47

statement, portrayed Mr. Almassud as an urban cowboy type off-roader.[17]  When Mr. Almassud decided to assert the Fifth Amendment privilege against self-incrimination, the defense was fatally wounded.  In my opinion there was no recovery from that set of circumstances.  The extremely large verdict was, in my opinion, the product of passion and prejudice driven by anger on the part of the jury regarding Mr. Almassud's misconduct.

Mr. Almassud's misconduct led the trial court to issue a negative inference jury instruction. In our system of justice there is a pervading presumption that juries follow the instructions given to them by the courts.  Although the negative inference instruction given by the trial judge here was couched in permissive terms, the courts of Georgia have recognized how devastating that type of instruction is.[18]

---

[17]     Given the verified interrogatory answers and sworn deposition testimony in the underlying Cruz case by Mr. Almassud, attorney Taylor told the jury in opening statement that Mr. Almassud had never done anything more than drive on dirt roads or gravel roads.  Taylor Depo., pp. 78:22-80:4.

[18]     The significant prejudice that arises from an adverse jury instruction is illustrated by court rulings in George involving adverse inference jury instructions.  In the context of spoliation of evidence, the Georgia courts have expressed great concern over the impact of adverse inference jury instructions.

   **a. Supreme Court of Georgia**

   An adverse spoliation jury instruction is, according to the Georgia Supreme Court, "an extreme sanction" that as a general rule requires a finding of "intentionality, bad faith, or incurable prejudice." Anthem Companies, Inc. v. Wills, 305 Ga. 313, 316, 823 S.E.2d 781, 785 (2019), reconsideration denied (Mar. 4, 2019). If the trial court imposes such an extreme sanction without this requisite finding, the jury instruction may be erroneous and an abuse of discretion by the trial court. Id.  In Wills, the Georgia Supreme Court reversed the trial court's order awarding spoliation sanctions. Id.

   It should also be noted that this Court has held that a rebuttable presumption or adverse inference jury instruction such as the one requested in this case is to be given as a remedy for spoliation of evidence "only in exceptional cases," that "the greatest caution must be exercised in its application," and that "[e]ach case must stand upon its own particular facts." Cotton States Fertilizer Co. v. Childs, 179 Ga. 23, 31, 174 S.E. 708 (1934). And, the Court of Appeals has explained that in considering the giving of such an instruction, the trial court should consider both prejudice to the party seeking the charge and "whether the party who destroyed the evidence acted in good or bad faith."

   *Phillips v. Harmon*, 297 Ga. 386, 398, 774 S.E.2d 596, 606 (2015).

   **b. Georgia Court of Appeals**

   A charge unauthorized by the evidence, which injects into the case issues not made by the pleadings or evidence, is presumed to be harmful to the losing party, and such a charge is grounds for new trial unless it is apparent that the jury could not have been misled by it." (Citation and punctuation omitted.) Boston Men's Health Ctr., Inc. v. Howard, 311 Ga. App. 217, 222 (1), 715 S.E.2d 704 (2011). Because there is insufficient evidence in the record to support a finding of spoliation, and the erroneous jury instruction likely prejudiced MARTA's case, we agree that the trial court committed reversible error and remand the case for a new trial. American Multi-Cinema, Inc. v. Walker, 270 Ga. App. 314, 314, 605 S.E.2d 850 (2004) (case remanded for new

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 48

American Family was prejudiced by Mr. Almassud's impeachment and the negative inference jury instruction.

**C.      Based upon the foregoing and my review of the record, it is my opinion that American Family did not breach any fiduciary duty owed to Mr. Almassud.**

Before discussing the specific allegations of Mr. Almassud in which he alleges American Family breached a fiduciary duty to him, the obvious must be restated: the reason that there was a devastating trial result against Mr. Almassud was because of his wrongful conduct and false sworn statements.  Throughout the handling of the Cruz claim and Mr. Almassud's defense, he has provided purposefully inadequate, incorrect, and misrepresented (affirmatively and by omission) information to American Family and his defense counsel.  Mr. Almassud's wrongful misconduct caught up with him when he took the stand at trial and was impeached.

**1.      American Family gave equal consideration to the financial interests of Mr. Almassud.**

Unfortunately, because Mr. Almassud provided purposefully inaccurate information coupled with misrepresented facts (affirmative and by omission), American Family believed that the cause of the subject motor vehicle accident was the negligence of Oh's in failing to properly install the steering kit on Mr. Almassud's Jeep.   This conclusion is strengthened by the misrepresentation Mr. Almassud made about his lack of off-roading activity.   The physical evidence demonstrated that a cotter pin was missing from the steering linkage.  An expert engineer concluded that the accident was not the cause of the missing cotter pin.  That expert's engineering analysis, coupled with the misrepresented information provided by Mr. Almassud, falsely led American Family into believing that the cause of the accident was not Mr. Almassud.   One explanation for Mr. Almassud's wrongful conduct can be seen as arising from the tow truck driver's observation that the cause of the accident and steering linkage failure was a missing pin.  Only Mr. Almassud knew the true cause for the missing pin, i.e., his off-roading activity.  The fact that Sears inspected the steering linkage two hours after the vehicle was released from Oh's would have informed Mr. Almassud that the steering linkage was in good working order prior to his off-roading activities at Beasley Knob.  That would have also informed Mr. Almassud that it was his off-roading that caused the mechanical breakdown, which meant that he would be responsible for the accident.  Because of that scenario, Mr. Almassud apparently hatched his plan to lay fault at

---

trial based on errors in jury charge); see also Taylor v. Haygood, 113 Ga. App. 30, 31-33 (2), 147 S.E.2d 48 (1966).

*Metro. Atlanta Rapid Transit Auth. v. Tyler,* 860 S.E.2d 224, 228 (Ga. Ct. App. 2021), reconsideration denied (July 14, 2021).

The above cases demonstrate how impactful adverse inference jury instructions can be to the defense of a case.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 49

the doorstep of Oh's. The only way to make that argument fly was to hide and conceal the Sears inspection.

When American Family learned that Mr. Almassud was involved in some type of off-roading activity, it immediately accepted the recommendation of defense counsel Taylor and offered its policy limits. *See, e.g.,* January 27, 2015 (3061). Those policy limits were then rejected by Ms. Cruz' counsel.

It is my opinion that the conduct of American Family in investigating the claim and its reliance upon the misrepresented information provided by Mr. Almassud complied with the obligation of equal consideration under the circumstances.

> **2.      Mr. Almassud claims that American Family did not investigate Mr. Almassud's duty to inspect the newly installed steering kit. I disagree.**

What Mr. Almassud tries to forget is that the steering kit was inspected by Sears and that Mr. Almassud concealed that information from American Family. The Sears records would have established that the vehicle steering kit had been inspected and, presumably, had passed inspection. If it had not passed inspection, there would be a claim of liability against Sears.

> **3.      Mr. Almassud is critical of American Family for placing 100% blame on Oh's Automotive Center for its role in installing the steering kit that failed.**

The reason American Family defended Mr. Almassud on the basis of Oh's Automotive Center's negligence is because of the misrepresentations and concealments of relevant evidence on the part of Mr. Almassud.

> **4.      Mr. Almassud alleges that American Family breached its fiduciary duty by failing to advise Mr. Almassud about his excess exposure.**

The record demonstrates that an excess letter was sent to Mr. Almassud on December 12, 2012. (AmFam1263). The adjuster for American Family also called Mr. Almassud and discussed the excess situation with him. *See* December 12, 2012 (168-169). This was consistent with insurance industry standards and practices.

> **5.      Mr. Almassud alleges American Family breached its fiduciary duty by providing an incompetent defense counsel.**

It is insurance industry standard and practice to retain panel counsel with experience in defending insureds who are being sued. Mr. Taylor was retained consistent with this practice. What Mr. Almassud ignores is that defense counsel must rely upon the good faith participation from the client. In that regard Mr. Almassud purposefully and intentionally concealed and

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 50

misrepresented facts from defense counsel which resulted in the catastrophic excess verdict that was ultimately rendered against Mr. Almassud.   Mr. Almassud, in my opinion, is solely responsible for that adverse outcome.

The defense file for Mr. Almassud contains all of the standard type of activity that you would expect from competent defense counsel.  There is no indication from the defense file that the defense was incompetent or inadequate beyond problems created at trial by Mr. Almassud's concealments, misrepresentations, and lack of candor.

> **6.     Mr. Almassud believes American Family breached its fiduciary duty by failing to take "a sober look at the facts of the case."**

It is clear insurance industry standard, custom, and practice to rely on the insured to provide candid and true information relevant to the facts and circumstances surrounding the liability event. Consistent with this industry practice, American Family assumed Mr. Almassud was being candid and truthful in providing information and testimony about the facts leading up to and surrounding the MVA.

Unfortunately, Mr. Almassud's intentional concealment and misrepresentation of facts precluded American Family from being able to accurately assess the true facts that would be proven at trial and thereby assess the exposures presented in a fair and thoughtful manner.

> **7.     Mr. Almassud claims that American Family breached its fiduciary duty by failing to "consider the existence of and identify conflicts of interest and potential conflicts of interest."  I disagree.**

The first time a potential conflict of interest arose was during trial when Mr. Almassud lied on the stand.  The following day American Family issued a reservation of rights letter.  The immediate issuance of the reservation of rights letter not only was compliant with industry standard, custom, and practice, but was also compliant with the law that requires the insured to be apprised, as soon as practicable, of any reservation of rights.  The timing of the ROR letter was appropriate because Mr. Almassud needed to understand the significance of the prior day's trial events and how he should avoid committing perjury on a going forward basis during the continuation of the cross-examination by attorney Brodhead.

Thereafter, American Family made the proper and reasonable decision to split the claim file.  It takes time to make that type of determination.  The decision to split the claim file occurred within a week to ten days following the issuance of the ROR letter.  Dep. Matthew E. Valley, June 9, 2017, pp. 154:17-155:5.  There is no indication that in the intervening timeframe of one week to ten days that there was any prejudicial impact to Mr. Almassud.  It is my opinion that American Family's decision to split the claim file complied with industry standard, custom, and practice, including the amount of time that transpired from the initial issuance of the ROR letter and the actual file splitting.

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 51

It is not industry standard, custom, and practice to advise the insured of a file splitting. American Family reasonably complied with industry standard, custom, and practice under the circumstances by immediately issuing its ROR letter to Mr. Almassud.

> **8.      Mr. Almassud alleges that American Family breached its fiduciary duty by failing to "refrain from giving Mr. Almassud legal 'advice' that was objectively imprudent and factually false."**

First, American Family provided no such legal advice. While it is true that Mr. Joffe provided the name of a criminal defense attorney to attorney Taylor with the understanding that information would be, in turn, provided to Mr. Almassud, such conduct is not legal advice. On the other hand, attorney Taylor was Mr. Almassud's attorney of record. The advice given to Mr. Almassud by attorney Taylor was reasonable and appropriate. While I recognize that Mr. Almassud's current counsel wants to downplay the concern regarding Mr. Almassud's potential perjury, any reasonable review of the record would demonstrate that the question of perjury was real, especially when joined with the additional information regarding spoliation of evidence and how pervasive the off-roading conduct was, which was the central focus of the potential perjury. Perjury is extremely serious. Any lawyer who takes a client's potential perjury as anything but extremely serious is not, in my opinion, adequately representing the client.

In my opinion, attorney Taylor acted reasonably and within the confines of his obligations as an insurance defense attorney representing a client who obviously had concealed and misrepresented key evidence and facts under oath. It was appropriate to provide Mr. Almassud with the best representation regarding attorney Brodhead's assertion that Mr. Almassud had committed perjury by providing the names of available criminal defense lawyers for Mr. Almassud to consult with. It is truly unfortunate that Mr. Almassud's current counsel does not see things that way and, apparently, would have blown off the seriousness of what had occurred as something of no significance. Attorney Taylor gave Mr. Almassud appropriate advice upon his return to the courtroom the following day. Mr. Almassud was told that there were additional questions that attorney Taylor wanted to ask him that he could answer if he felt comfortable with the subject matter. On the other hand, if Mr. Almassud believed he was going to lie and continue to conceal or misrepresent, then it would be better if he simply asserted the Fifth Amendment privilege. Those decisions were appropriately left to Mr. Almassud to make in the moment, in real time. In fact, Mr. Almassud took the advice of Mr. Taylor and did answer a few questions without asserting the privilege.

How a lawyer deals with accusations of perjury when there is, in fact, a basis to establish that the under oath witness concealed, misrepresented and falsely provided facts under oath, coupled with the admission of the witness/client that they have willfully and intentionally destroyed evidence (which would likely be considered as an aggravating factor), is a matter of professional judgment. I would hope that every lawyer exercises that judgment to the best interest

Seslee Smith, Esq.
Re: *American Family v. Almassud*
September 30, 2021
Page 52


of the client in avoiding criminal penalties.  I believe that attorney Taylor acted as a reasonable professional insurance defense attorney under the circumstances presented to him.

Based upon the foregoing and my review of the record, it is my opinion that American Family did not breach its fiduciary duty to Mr. Almassud as he alleges.  In my review of the record I did not find support for any breach of fiduciary duty on the part of American Family.

I reserve the right to alter or change any of my opinions based upon new or additional information that may be received since this report was issued.

Very truly yours,

Steven Plitt
For the Firm


SP/mcw
Enclosures (CV, Testimony List)

# EXHIBIT 1

### INSURANCE CONSULTANT ON INSURANCE COVERAGE,
### CLAIM HANDLING PRACTICES/STANDARDS
### AND INSURANCE BAD FAITH

**STEVEN PLITT**

THE CAVANAGH LAW FIRM
*A Professional Association*
1850 NORTH CENTRAL AVENUE, SUITE 2400
PHOENIX, AZ  85004-4579
TELEPHONE:  602-322-4000
FACSIMILE:  602-322-4100
E-MAIL:  **splitt@cavanaghlaw.com**
WEBSITES:  **www.cavanaghlaw.com** and
**www.insuranceexpertplitt.com**



During his 38+ year practice career, Mr. Plitt managed a large litigation practice where he represented policyholders and insureds in litigation, as well as acting as coverage counsel for insurance companies. Since 2001, Mr. Plitt's practice has almost exclusively involved the handling of complex insurance coverage and insurance bad faith cases for insurance companies or as an expert consultant for both insurance companies and insureds.  He has extensive trial and litigation experience.  He is a veteran of numerous cases tried to jury verdict.

Mr. Plitt is the current senior author of the widely recognized and authoritative insurance coverage treatise series titled COUCH ON INSURANCE 3D.  Mr. Plitt and his team are rewriting and revising the treatise series. This treatise series comprises 27 volumes of substantive texts covering all aspects of insurance.  He is the author of ARIZONA LIABILITY INSURANCE LAW which is a treatise on Arizona insurance coverage.  He is also an author of the national treatises THE CLAIM ADJUSTER'S AUTOMOBILE LIABILITY HANDBOOK and PRACTICAL TOOLS FOR HANDLING INSURANCE CASES.  He is a Senior Contributing Editor and Editorial Board Member of the nationally recognized INSURANCE LITIGATION REPORTER.  He was on the Editorial Board for Claims Journal.

Mr. Plitt has been cited by the Supreme Courts in 34 states, the Intermediate Appellate Courts in 23 states, 12 of the Federal Circuit Courts of Appeal, 60 Federal District Courts, the Federal Court of Claims, and 4 Federal Bankruptcy Courts.  Mr. Plitt has also been cited in 95 scholarly articles and the Code of Federal Regulations.

Mr. Plitt is currently teaching insurance law at the University of Arizona's College of Law.  He is a former adjunct professor of law at Arizona State University's College of Law where he taught the insurance law curriculum.  He has been a licensed insurance broker since 1974.  Mr. Plitt is listed as one of THE BEST LAWYERS IN AMERICA® in the field of insurance law.  He was identified as one of PHOENIX'S TOP LAWYERS by PHOENIX MAGAZINE®.  He was selected as a SOUTHWEST SUPER LAWYER® and chosen by SUPER LAWYERS® and his peers as one of the Top 50 Lawyers in Arizona.  Mr. Plitt was named Lawyer of the Year for Litigation – Insurance – Phoenix by BEST LAWYERS® (2020) and in 2012 and 2017 he was selected as the Insurance Lawyer of the Year – Phoenix by BEST LAWYERS®.  Mr. Plitt is ranked as a Band 1 Insurance Lawyer for Arizona by CHAMBERS AND PARTNERS USA.  He is a Fellow of the American College of Coverage Counsel.

During his practice career, Mr. Plitt estimates that he has reviewed and analyzed thousands of claim files from more than a hundred different insurance companies.  This practical knowledge and experience informs him as to industry custom, standard and practice.  He has participated in roundtable discussions, claim handling, and bad faith risk avoidance activities as part of his national insurance law practice.  During his direct representation, as well as his consulting retentions, Mr. Plitt has been able to review the claim manuals, claim

bulletins and general corporate claim documentation (where those materials had been available) for many insurance companies. He has also reviewed the depositions of insurance claim adjusters, claim supervisors, other claim management personnel, and insurance company representatives ((30)(b)(6) persons most knowledgeable) regarding the handling of specific claims, claims handling generally and claim operations. Mr. Plitt has participated in many insurance company "roundtable" discussions which are part of the overall claim adjustment and evaluation process. When he has attended a "roundtable" discussion his role was to provide guidance and advice on claim valuation, claim handling issues and problems, and he provided advice and solutions regarding impediments that may have arisen in the claim environment on specific claims. Additionally, in Mr. Plitt's capacity as an attorney directly representing insurance companies, he had oftentimes been called upon to provide informal advice and guidance regarding claim handling practices and procedures and possible revisions thereto. These discussions would take place with claim management professionals including in-house counsel.

Mr. Plitt has been invited to conduct in-house training seminars on claim handling, bad faith and insurance regulations (including the NAIC Model Unfair Claims Settlement Practices Act and specific state iterations of the Act) for 22 different insurance companies with adjusting staffs in 13 different states. As part of those training sessions, he would provide advice for specific claims as well as advice for general claim handling practices. Mr. Plitt recently developed an on-line course for claim adjusters regarding Unfair Claims Settlement Practices statutes and accompanying state regulations. Adjusters who take the course will be eligible for continuing education credits. Through the innumerable dealings Mr. Plitt has had with claim adjusters, supervisors and claim management personnel and through his experience as an attorney directly representing insurance companies as well as a consultant over the last 33 years, he has observed industry standards, customs and practices regarding claim handling and processing issues.

Mr. Plitt has been qualified as a claims handling expert in both state and federal courts. Over the years Mr. Plitt has analyzed coverage issues in all 50 states and has been an expert witness consultant in matters venued in 32 states. He has been an expert consultant for policyholders/insureds and insurance companies in hundreds of matters in the following venues: Arizona, California, Connecticut, Colorado, Delaware, Florida, Hawaii, Idaho, Indiana, Kansas, Kentucky, Louisiana, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Utah, Washington, West Virginia, Wisconsin and Wyoming.

Mr. Plitt has been involved with drafting of insurance policies generally, and endorsements specifically, and has worked closely with insurance company product development committees and/or corporate counsel regarding the evaluation of existing policy language and possible amendments.

Mr. Plitt is available to consult in cases involving insurance coverage, claims handling, underwriting, insurance company practice and procedure, insurance company compliance with principles of good faith and fair dealing. Additionally, because Mr. Plitt has held his insurance broker's license since 1974, he is available to consult on insurance agent E&O cases.

**TEACHING:**

UNIVERSITY OF ARIZONA, JAMES E. ROGERS COLLEGE OF LAW
(Adjunct Assistant Professor of Law, 2010-Present) (Class taught: Insurance Law)

ARIZONA SUMMIT LAW SCHOOL
(Adjunct Professor of Insurance Law, 2014, 2015) (Class taught: Insurance Law)

ARIZONA STATE UNIVERSITY, SANDRA DAY O'CONNOR COLLEGE OF LAW
(former Adjunct Professor of Insurance Law, 2000-2005) (Classes taught: Insurance Law & Regulation; Liability Insurance; Advanced Coverage Research and Analysis)

INDUSTRY TEACHING
- Direct Instruction to Insurance Companies
  Provided in-house training seminars on claim handling, bad faith, insurance regulations, Unfair Claims Settlement Practices Act, and Advice of Counsel to 22 insurance companies with adjusters attending from 11 different states)
- **CLAIM LITIGATION MANAGEMENT ALLIANCE (CLM)**
  (1)  Developed an online, continuing education compliant course for claim adjusters on the NAIC Model Unfair Claims Settlement Practices Act, state-specific UCSPAs, and accompanying insurance department regulations;
  (2) Faculty Instructor, CLM Claim College, Extra-Contractual School (Subject: Insurance Company Claim Handling Regulations and Practices).

## EDUCATION and SCHOLASTIC ACTIVITIES:

UNIVERSITY OF CONNECTICUT:  LL.M., Insurance Law, 2012
- Graduated "With Honors"
- CALI Award of Excellence – Workers' Compensation
- Recipient 2012 Insurance Law Center LL.M. Award (Awarded to the outstanding LL.M. graduating student)
- Honors Thesis – A Practical Exploration Into The Policy Architecture Of Directors & Officers Insurance Coverage

UNIVERSITY OF ARIZONA:  J.D. With Distinction, 1982
- Recipient, Best Oral Advocate Award, Second Year Moot Court Competition
- Member, U of A National Moot Court Team
- Editor, Second Year Moot Court Board
- National Order of Barristers

ARIZONA STATE UNIVERSITY:  B.S. Political Science, 1978
- Barrett Honors College Graduate
- Graduated *Summa Cum Laude* and "With Honors"
- Honors Thesis – The Panama Canal:  A Question of Sovereignty

## JUDICIAL LAW CLERKSHIPS, INTERNSHIPS, BOARDS and CERTIFICATIONS

- Law Clerk to Judge Robert J. Corcoran, Arizona Court of Appeals, 1982-1983
- Legislative Intern to the Chairman of the Committee on Banking and Insurance, House of Representatives, Arizona State Legislature, 1979
- Senior Contributing Editor and Editorial Board Member– INSURANCE LITIGATION REPORTER (2006-Present)
- CLAIMS JOURNAL, Editorial and Advisory Board Member (2012-2014)
- Certified Litigation Management Professional (CLMP), Claims Litigation Management Alliance (CLM)
- Executive Council CLM Claim College, Extra-Contractual School

## AMERICAN LAW INSTITUTE

Mr. Plitt has been elected to the American Law Institute.  The American Law Institute is the leading independent organization in the United States producing scholarly work to clarify, modernize, and otherwise improve the law.  The Institute is made up of distinguished lawyers, judges and law professors.

The Institute publishes RESTATEMENTS of the law, model statutes, and principals of law that are influential in courts and legislatures, as well as in legal scholarship and education.

- Principles of the Law of Liability Insurance (Members Consultive Group)
- Restatement of the Law of Liability Insurance (Members Consultive Group)

## AMERICAN COLLEGE OF COVERAGE COUNSEL

Mr. Plitt has been elected to the American College of Coverage Counsel (ACCC). ACCC is comprised of preeminent coverage counsel in the United States and Canada. ACCC is equally divided between policyholder counsel and insurer counsel.

## ARIZONA INSURANCE INSTITUTE

Mr. Plitt is the Director of the Arizona State Bar sponsored Annual Insurance Institute.

## PROFESSIONAL RECOGNITION:

- Ranked by "*CHAMBERS & PARTNERS (USA)*" as Band 1 for Insurance Law for 2019* and 2020 (*inaugural year for insurance law in Arizona). *CHAMBERS* wrote: "Steven Plitt is "*very well known across the country*" for his expertise in insurance law, sources report, adding that he is "*very knowledgeable*." Interviewees further acknowledge him as an "*important lawyer in insurance practice in Arizona and nationwide*."
- Recipient of "*MARQUIS WHO'S WHO*" *2018 Albert Nelson Marquis Lifetime Achievement Award*
- Profiled as a legal "trendsetter" in "*AZ BUSINESS MAGAZINE*" (January/February 2018)
- Listed in "*THE BEST LAWYERS IN AMERICA®*" (2007*–2020) *First year insurance law was considered for inclusion within Arizona
- Named Lawyer of the Year for Litigation – Insurance in Phoenix, *"THE BEST LAWYERS IN AMERICA®"* (2020)
- Named Phoenix Insurance Lawyer of the Year (2012* and 2017) by *BEST LAWYERS®* *First year awarded in Arizona
- Listed in *"SOUTHWEST SUPER LAWYERS®"* (2007*–2020) *inaugural year
- Top 50 Lawyers in Arizona, "*SOUTHWEST SUPER LAWYERS®"* (2007*-2020) *inaugural year. Continuously on Top 50 list for each year list has been in existence.
- Listed in "*CORPORATE COUNSEL ALMANAC*" as one of the top lawyers in the field of insurance law in the United States
- Top 10 Lawyers in Arizona (Category: Employee Benefits & Insurance), "*AZ BUSINESS MAGAZINE*"
- Top 100 Lawyers in Arizona (for all categories) 2014*-2020 *inaugural year of All Category 100 Top Lawyer List "*AZ BUSINESS MAGAZINE*"
- Listed in *"ARIZONA'S FINEST LAWYERS®"*
- AV Preeminent Rated with Martindale-Hubbell®
- Legal Leaders – Top Rated Lawyers–Insurance Law (Top 5% of AV Preeminent Lawyers)
- American Society Of Legal Advocates (Top 100 Litigation Lawyers in Arizona)
- *"AZ BUSINESS MAGAZINE"* – (Industry Leader edition) Listed as one of Arizona's Industry Leaders (Top 5 Most Influential Leaders in Insurance Law) (2014-2020)
- Listed in "*PHOENIX MAGAZINE®*" as one of Phoenix's Top Lawyers (November 2006)
- Recipient, Outstanding Contribution to Continuing Legal Education Award, Arizona State Bar Association, 1999
- Listed in "*Who's Who* in American Law" (5th Edition)
- Listed in "*Who's Who* Among Students in American Universities and Colleges" (1978-1979).

## LICENSED INSURANCE BROKER

Mr. Plitt has been a licensed insurance broker in Arizona since 1974 to present (Property and Casualty; Accident and Health; Life)

## PUBLICATIONS:

### BOOKS PUBLISHED

1. Senior Author, COUCH ON INSURANCE 3D. (re-writing and revising entire treatise)

2. PRACTICAL TOOLS FOR HANDLING INSURANCE CASES. (1777 pages) (2 Volumes, Thomson Reuters 2011)
   • 2020 Annual Cumulative Supplement (1343 pages)

3. THE CLAIM ADJUSTER'S AUTOMOBILE LIABILITY HANDBOOK. (West Publishing 2009)
   • 2016 Annual Cumulative Supplement (267 pages)

4. CATASTROPHE CLAIMS: INSURANCE COVERAGE FOR NATURAL AND MAN-MADE DISASTERS (fka CAT CLAIMS). (Thomson West 2008)

5. ARIZONA LIABILITY INSURANCE LAW (705 pages), the State Bar of Arizona (1998)
   • 2006 Cumulative Supplement (426 pages)

6. Senior Contributing Editor, ARIZONA TORT LAW HANDBOOK, the State Bar of Arizona (2012)

7. *Construction Defects: Claims and Coverage:* "Progressive Losses—Triggers of Coverage, Numbering of Occurrences and Allocation Among Successive Policies" (DRI Defense Library Series) (Ch. 3, Part II)

### ACADEMIC JOURNALS AND LAW REVIEWS

1. *A Jurisprudential Survey of the Tort of Spoliation of Evidence: Resolving Third-Party Insurance Company Automobile Spoliation Claims.* CONN. INS. L.J., Vol. 24.1, p. 63 (2017-2018)

2. *How Far Is Too Far?  Exploring The Contoured Nuances of Damron and Morris Agreement And The Emergence of Helme/Peaton Agreements.* 10 Ariz. Summit L. Rev. 1 (Fall 2016)

3. *Federal Reverse Preemption Of Uninsured And Underinsured Motorist Coverage Offering In The Digital Age:  E-Sign And UETA Have Not Had A Significant Impact On State Offering Or Rejection Requirements.* KY. L.J., Vol. 104, No. 3 (2015-2016)

4. *Quihuis v. State Farm Mutual Automotive Insurance Company:  A Potpourri Of Insurance Issues Resolved?* 9 ARIZ. SUMMIT L. REV., Issue 1 (Spring 2016)

5. *The Battle To Define The Scope Of Attorney-Client Privilege In The Context Of Insurance Company Bad Faith: A Judicial War Zone.* U.N.H. L. REV., Vol. 14, No. 1 (January 2016)

6. *Evaluating The Relationship Between Independent Insurance Adjusters And Insureds:  The Case Against Imposing An Independent Duty Of Care.* CREIGHTON L. REV., Vol. 48, No. 2 (March 2015)

7. *Delay, Manipulation, and Controversy:  The Impact Of The 2012 Amendments To 28 U.S.C. § 1446 On The Battles For Removal Of Cases To Federal Court.* PHOENIX L. REV., Vol. 6, No. 2 (Spring 2013)

8. *When Constitutional Challenges To State Cancellation Moratoriums Enacted After Catastrophic Hurricanes Fail: A Call For A New Federal Insurance Program.* BYU J. OF PUB. LAW, Vol. 27, No. 1 (Fall 2012)

9.  *A Jurisprudential Survey Of Bad Faith Claims In The Workers' Compensation Context And A Call For A Unified Statutory Remedy.* CONN. INS. L.J., Vol. 18.2, p. 451 (2011-2012)

10. *Are State Court Garnishment Actions An Effectual Impediment To Federal Declaratory Judgment Jurisdictions: Is Timing Everything.* CONN. INS. L.J., Vol. 15.1 (2008-2009)

11. *Prohibiting De Facto Insurance Redlining: Will Hurricane Katrina Draw A Discriminatory Redline In The Gulf Coast Sands Prohibiting Access To Home Ownership?* 14 WASH.& LEE J. CIVIL RTS. & SOC. JUST. 199 (Spring 2008)

12. *The Practical Ramifications of Dual Sovereignty In Prosecuting Declaratory Judgment Actions Against State And Federal Governments.* CONN. INS. L.J., Vol. 14.2, p. 445 (2007-2008)

13. *Charting A Course For Federal Removal Through The Abstention Doctrine: A Titanic Experience In The Sargasso Sea Of Jurisdictional Manipulation.* 56 DEPAUL L. REV. 107 (Fall 2006)

14. *The Punitive Damages Lottery Chase Is Over: Is There A Regulatory Alternative To The Tort Of Common Law Bad Faith And Does It Provide An Alternative Deterrent?* 37 ARIZ. ST. L.J. 1221 (Winter 2005)

15. *Judicial Abstinence: Ninth Circuit Jurisdictional Celibacy For Claims Brought Under The Federal Declaratory Judgment Act.* 27 SEATTLE U. L. REV. 751 (Issue 3, Spring 2004)

16. *The Evolving Boundaries Of Damron/Morris Agreements: A Search For The Missing Link, A Judicial Determination Of The Length Of A Reasonable Person's Arm, And Other Progressive Issues.* 35 ARIZ. ST. L.J. 1331 (2003)

17. *The Elastic Contours Of Attorney-Client Privilege And Waiver In The Context Of Insurance Company Bad Faith: There's A Chill In The Air.* 34 SETON HALL L. REV. 513 (2003)

18. *Disability Under A Judicial Microscope: The Struggle To Define The Rights And Remedies For Claims Brought Under The Rehabilitation Act.* 47 N.Y.L. SCH. L. REV. 269 (2003)

19. *Board Of Trustees Of The University Of Alabama vs. Garrett: Is Constitutional Authority For Sale And Is State Sovereign Immunity The Purchase Price?* 13 GEO. MASON. U. CIV. RTS. L.J. 151 (Spring 2003)

20. *The Changing Face Of Global Terrorism And A New Look Of War: An Analysis Of The War-Risk* Exclusion *In The Wake Of The Anniversary Of September 11, And Beyond.* 39 WILLAMETTE L. REV. 31 (Winter 2003)

21. *The Changing Landscape Of The Eleventh Amendment Immunity In The Context Of The Americans With Disabilities Act And The Rehabilitation Act After Garrett: Are Arizona School Districts Beyond Suit?* 34 ARIZ. ST. L.J. 873 (Fall 2002)

## OTHER PROFESSIONAL PUBLICATIONS

1.  *One Good Deed Deserves Another: Occupancy Status and the Good Samaritan*, Westlaw Journal Insurance Coverage, Vol. 28, No. 20, February 23, 2018

2.  *Washington Court Rules On Discoverability Of Insurer's Claim File By Third Parties*, Claims Journal (February 21, 2018)

3.  *Disparagement is not "Patent Pending"*, Claims Journal (February 15, 2018)

4.  *"Neither Snow Nor Rain Nor Heat Nor Gloom of Night . . ." : Cancellation by Mail*, Claims Journal (February 13, 2018)

5.  *Occupying or not Occupying, That is the Question*, West Journal Insurance Coverage, Vol. 28, No. 18, February 9, 2018

6. *Termite Damage Is Not The Functional Equivalent Of Building Collapse For Purposes Of First-Party Property Coverage*, Claims Journal (January 23, 2018)

7. *Insured Must Obtain Settlement Consent Where Policies Require It*, Claims Journal (January 18, 2018)

8. *Taxable Cost Award Capped by Insurance Policy Limits According to the Minnesota Supreme Court*, Claims Journal (December 27, 2017)

9. *Controlling the Defense in Massachusetts*, Claims Journal (December 20, 2017)

10. *Good Samaritan Who Exits Vehicle To Assist Injured Person Still Occupies The Insured Vehicle For Um Purposes*, Claims Journal (December 13, 2017)

11. *Failure To Keep IME Doctor Updated On Plaintiff's Condition Can Foreclose Application Of Genuine Dispute Doctrine For MSJ Purposes*, Claims Journal (December 11, 2017)

12. *Being Drunk Is No Legal Excuse For Excluded Intentional Misconduct*, Westlaw Journal Insurance Coverage, Vol. 28, No. 8 (December 1, 2017)

13. *Minnesota Supreme Court Rules that Statutory Attorney's Fees are Capped by the Policy Limit*, Claims Journal (November 13, 2017)

14. *Rhode Island Supreme Court Enforces Suit Limitation Provision in Policy*, Claims Journal (November 9, 2017)

15. *Failing to Initiate Settlement Negotiations is Risky Business*, Claims Journal (November 7, 2017)

16. *7th Circuit Addresses Boundaries of Ghandi Agreements in Texas*, Westlaw Journal Insurance Coverage, Vol. 28, No. 4 (November 3, 2017)

17. *Smooth Sailing For A Pollution Exclusion?*, Claims Journal (October 16, 2017)

18. *Colorado Court Of Appeals Analyzes A Spectrum Of Bad Faith Issues*, West Journal Insurance Coverage, Vol. 13, No. 11 (September 27, 2017)

19. *Oregon Supreme Court Decides the Meaning of 'Recovery' for Claims Under ORS §742.061*, Claims Journal (September 20, 2017)

20. *Investigation Of Property Loss Does Not Establish Estoppel In Oregon*, Claims Journal (September 11, 2017)

21. *Stepping Outside the Box of Claims-Handling Can Have Unintended Consequences,* Westlaw Journal Insurance Coverage, Vol. 27, No. 38 (June 30, 2017)

22. *Maine Supreme Court Discusses Allocating Between Covered and Uncovered Claims*, Claims Journal (June 22, 2017)

23. *Massachusetts Bad Faith Statute Does Not Include Pre-Judgment Interest In The Multiplier*, Claims Journal (June 17, 2017)

24. *Use of Employer's Vehicle While Intoxicated Did Not Exceed Scope of Permissive Use*, Claims Journal (June 16, 2017)

25. *Michigan Court Draws a Fine Line of Exclusion Between Professional and Nonprofessional Related Services*, Westlaw Journal Insurance Coverage, Vol. 27, No. 36 (June 16, 2017)

26. *South Dakota High Court Permits Bad Faith Cause of Action Against Workers' Comp Insurer*, Claims Journal (June 12, 2017)

27. *Delineating Regular Use Under California Auto Insurance Law*, Westlaw Journal Insurance Coverage, Vol. 27, No. 35 (June 9, 2017)

28.   *Kentucky Supreme Court Finds No Bad Faith as a Matter of Law*, Claims Journal (June 7, 2017)

29.   *Reverse Engineering Insurance Bad Faith Set-Ups*, Litigation Management, Vol. 7, Issue 1 (Winter 2017)

30.   *Defense Counsel's Duty of Loyalty To The Insured In An ROR Context*.  The Voice, Vol 16, Issue 5 (February 8, 2017)

31.   *Insurers Cannot Seek Reimbursement Of Fees In ROR Situations In Alaska*.  Claims Journal (January 12, 2017)

32.   *Washington Court Further Clarifies Defense Counsel's Role In ROR Defense.*  Claims Journal (January 10, 2017)

33.   *Montana Courts Finds That Falling Boulders Constitute 'Earth Movement' For Purposes of Policy's 'Earth Movement" Exclusion*.  Claims Journal (December 29, 2016)

34.   *8th Circuit Holds Insured's Voluntary Mold Cleanup Costs Are Not Covered*.  Westlaw Journal Insurance Coverage 2, Vol. 27, No. 11 (December 23, 2016)

35.   *No Exceptions:  Wisconsin Supreme Court Upholds Four Corners Rule.*  Claims Journal (December 22, 2016)

36.   *Liquidated Judgment Not Necessary For Equitable Subrogation*.  Claims Journal (December 20, 2016)

37.   *Washington Court Further Delineates Defense Counsel's Role In ROR Situations*.  Westlaw Journal Insurance Coverage 2, Vol. 27, No. 10 (December 15, 2016)

38.   *Set-Up On Failure To Defend Rejected In Florida*.  Claims Journal (December 12, 2016)

39.   *Failure To Re-Evaluate Is Bad Faith.*  Claims Journal (December 7, 2016)\

40.   *Pro Rata Allocation Comes To Louisiana.*  Claims Journal (November 22, 2016)

41.   *Notice-Prejudice Rule Adopted In Wyoming.*  Claims Journal (November 16, 2016)

42.   *Is Advertising Injury In The Bag?* Claims Journal (November 10, 2016)

43.   *Alaska Law Bans Insurer Reimbursement For Defense Of Uncovered Claims.*  Westlaw Journal Insurance Coverage 1, Vol. 27, No. 3 (October 28, 2016)

44.   *Florida High Court Clarifies Uninsured Motorist Bad Faith Principles.*  Claims Journal (October 21, 2016)

45.   *Beyond A Reasonable Doubt Is Key For Application To Criminal Acts Exclusion.*  Claims Journal (October 18, 2016)

46.   *Offensive Orders Are Pollution And Excluded Under Homeowners Policy:  No Exception.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 50 (September 22, 2016)

47.   *Determining When A Criminal Act Exclusion Applies To The Duty To Defend*.  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 49 (September 16, 2016)

48.   *Offensive Odors Are Pollutants According To South Carolina Court*.  Claims Journal (September 12, 2016)

49.   *Oregon Supreme Court Says Covenants Not To Execute In Insurance Disputes Are Not Releases.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 45 (August 19, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 12 (October12, 2016)

50.   *Stacking UIM Coverages Under Missouri Law.*  Claims Journal (August 9, 2016)

51. *Kentucky Court Finds Tort Accrual Trigger For UM Claims Reasonable.* Claims Journal (August 5, 2016)

52. *The "Inferred Intent" Doctrine And Emotional-Distress Claims Arising From Housing Discrimination.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 42 (July 28, 2016)

53. *Determining Accrual Date For Minnesota UM/UIM Claims: Recent Case Decision.* Claims Journal (July 20, 2016)

54. *Ohio High Court Rejects Inferred-Intent Doctrine In Fair Housing Discrimination Case.* Claims Journal (July 15, 2016)

55. *Does Parental Discipline Suspend The Automobile "Regular Use" Exclusion?* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 40 (July 14, 2016)

56. *Washington Supreme Court Determines Test For Vehicle Use In UIM Context*. Westlaw Journal Insurance Coverage 1, Vol. 26, No. 38 (June 30, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 6 (July 20, 2016)

57. Is A Foreign Exchange Student A "Ward" For Purposes Of UM/UIM And Medical Payments Coverage?  Claims Journal (June 28, 2016)

58. *Passing The Duty To Defend To The Excess Carrier.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 37 (June 24, 2016)

59. *Plaintiff's Prayer For Coverage Is Answered In Illinois.* Claims Journal (June 1, 2016).

60. *Primary Insurer Must Exhaust Policy Via Payment To Pass Defense Obligation To Excess Insurer In New Hampshire.* Claims Journal (May 23, 2016)

61. *New York Case Is Assault And Battery Plain And Simple.* Claims Journal (May 18, 2016)

62. *Cracking The Known-Loss Doctrine*. Westlaw Journal Insurance Coverage 1, Vol. 26, No. 31 (May 13, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 3 (June 8, 2016)

63. *Settling Without Insurer Consent While Being Defended Under A Reservation Of Rights In Pennsylvania*. Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 1 (May 11, 2016)

64. *A Practical Approach To Pollution Exclusions.* Claims Journal (May 10, 2016)

65. *Strict Statutory Compliance Required To Enforce Named Insured Exclusion In Connecticut.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 30 (May 5, 2015) and Westlaw Journal Insurance Bad Faith 2, Vol. 12, No. 2 (May 25, 2016)

66. *Publicizing DNA Results Does Not Fall Within TCPA Exclusion.* Claims Journal (May 3, 2016)

67. *Eleventh Circuit Criticizes District Court For Focusing On Bad Faith Set-Up Conduct.* Claims Journal (April 29, 2016)

68. *Strict Statutory Compliance Required To Enforce Named Insured Exclusion In Connecticut.* Claims Journal (April 27, 2016)

69. *Insurer's Controlled Substance Exclusion Didn't Relieve Obligation To Defend Methadone Intoxication Death Case.* Claims Journal (April 18, 2016)

70. *Intentional And Criminal Acts Or Omissions Bar Coverage.* Westlaw Journal Insurance Coverage 1, Vol. 26, No. 26 (April 7, 2016)

71. *What's In A Name?  Insurance Coverage?* Claims Journal (April 4, 2016)

72.   *Some Knowledge Isn't Enough To Trigger Known-Loss Exclusion.*   Claims Journal (March 29, 2015)

73.   *Massachusetts Court Adopts Standard For Business Pursuits Exclusion.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 24 (March 24, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 25 (April 13, 2016)

74.   *Oregon Supreme Court Finds Covenants Not To Execute Are Not Releases.*  Claims Journal (March 23, 2016)

75.   *Washington High Court Decides What Constitutes "Use" For UIM Coverage Attachment.*  Claims Journal (March 15, 2016)

76.   *Getting The Lead Out Of The Pollution Exclusion.*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 16 (January 28, 2016) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 21 (February 17, 2016)

77.   *Covering The Disgorgement Of Legal Fees.*  Claims Journal (January 27, 2016)

78.   *Alternate Intentional Loss Exclusion Defeats Coverage for Wrongful Death From A Single, Criminal Blow.*  Claims Journal (January 21, 2016)

79.   *Eleventh Circuit Predicts Florida Will Reject Manifestation Trigger.*   2016 Windstorm Conference for Claims Journal (2016)

80.   *Assigning Breach Of Contract Claim In Florida Doesn't Violate Policy's Anti-Assignment, Loss Payment Provisions.*  Claims Journal (December 16, 2015)

81.   *When Is A Claim For Reimbursement Of Defense Costs Ripe?*  Claims Journal (December 14, 2015)

82.   *Florida High Court:  Citizens Property Insurance Immune From First Party Bad Faith Claims.*  Claims Journal (December 8, 2015)

83.   *Can An Insurer Seek Reimbursement For Uncovered Defense Costs Directly From Cumis Counsel?*  Claims Journal (December 1, 2015)

84.   *Punitive Damages In A Bad-Faith, Failure-To-Settle Case:  Are They Recoverable?*  Westlaw Journal Insurance Coverage 1, Vol. 26, No. 6 (November 12, 2015)

85.   *Hawaii High Court Adopts Equitable Subrogation In The Primary/Excess Insurance Context.*  Claims Journal (November 3, 2015)

86.   *Louisiana High Court Addresses Insurance Spoliation Issue.*  Claims Journal (October 21, 2015)

87.   *10th Circuit Finds Oklahoma Law Doesn't Require Excess Insurer To Proactively Seek Settlement.*  Claims Journal (October 15, 2015)

88.   *Rejection Of Adjuster Negligence Claims Affirmed.*  Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 12 (October 14, 2015)

89.   *Texas Supreme Court Upholds Anti-Concurrent-Causation Clauses In Property Policies.*  Claims Journal (October 8, 2015)

90.   *Louisiana's Anti-Annulment Statute Doesn't Prohibit Agreement Eliminating Insurer's Obligation To Defend.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 52 (October 1, 2015)

91.   *Colorado's Highest Court Says Notice-Prejudice Rule Doesn't Apply To Claims-Made Policies.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 51 (September 25, 2015) and Westlaw Journal Insurance Bad Faith 3, Vol. 11, No. 14 (November 11, 2015)

92. *Ninth Circuit Finds Anti-Concurrent-Causation Clauses Unenforceable In Arizona.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 50 (September 17, 2015)

93. *Insurer's Reliance On Unpublished Appellate Decision Constitutes Fair Debatability, New Jersey High Court Rules.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 48 (September 3, 2015)

94. *Pleading A Lost-Policy Case:  1st Circuit Ruling Offers Guidance*. Westlaw Journal Insurance Coverage 1, Vol. 25, No. 47 (August 28, 2015) and Westlaw Insurance Journal Bad Faith 2, Vol. 11, No. 10 (September 16, 2015)

95. *Oklahoma Determines That Anti-Annulment Statute Applies To Claims-Made Policies.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 46 (August 20, 2015)

96. *Fifth Circuit Predicts Texas Law Will Validate Wasting Limit Policies.*  Claims Journal (August 18, 2015)

97. *Rejection Of Adjuster Negligence Claims Affirmed.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 45 (August 14, 2015)

98. *Sixth Circuit Court Predicts Kentucky Will Reject The Adoption Of Reverse Bad Faith.* Claims Journal (August 12, 2015)

99. *California Court Finds That Fire Caused By Vagrant On Premises Is Not Excluded.*  Claims Journal (July 30, 2015)

100. *A Homeowner Policy's Vacancy Exclusion Includes Arson In Florida.*  Claims Journal (July 27, 2015)

101. *Sexual Assault On The Job:  The Duty Of Insurers To Defend Employees Under California Law.*  Westlaw Journal Insurance Coverage 1, Vol. 25, No. 42 (July 23, 2015) and Westlaw Journal Insurance Bad Faith 2, Vol. 11, No. 8 (August 19, 2015)

102. *Virginia Attorney Seeks Coverage For Accident Because He Was Thinking About Work.* Claims Journal (July 23, 2015)

103. *Montana Supreme Court Adopts Notice-Prejudice Rule*.  Claims Journal (July 21, 2015)

104. *Does Policy Provision Stating The Insurer Will Not Withhold Its Consent To Settle Unreasonably Vitiate The Consent To Settlement Requirement?*  Claims Journal (July 17, 2015)

105. *An Overview Of What Constitutes Collapse For Purposes Of Property Insurance Coverage Involving Hidden Decay.*  Ins. Lit. Rptr., Vol. 37, No. 10 (July 9, 2015)

106. *Independent Insurance Adjuster Liability To Insureds:  The Majority And Minority Views.* Ins. Lit. Rptr., Vol. 37, No. 9 (June 26, 2015)

107. *New Jersey High Court Finds That Res Judicata Barred Plaintiff's UM Bad Faith Claim, Not The Entire Controversy Doctrine.*  Claims Journal (June 25, 2015)

108. *District Court Finds Policy Required Matching Color For Replacement Panels That Were Damaged.*  Claims Journal (June 23, 2015)

109. *Right To Intervention Upheld By Montana Supreme Court.*  Claims Journal (June 17, 2015)

110. *Employee Exclusion Applies To Both Actual And Statutory Employees Under Florida Law.* Claims Journal (June 10, 2015)

111. *Amplifying Louisiana's Anti-Annulment Statute.*  Claims Journal (June 5, 2015)

112. *Defaming A Former Law Partner May Not Be Covered.*  Claims Journal (June 1, 2015)

113. *Named Insured's Decision To Reject Higher UM Limits Was Not Binding On An Additional Insured.* Claims Journal (May 27, 2015)

114. *Severance Of Bad-Faith Claims Under Texas Law When Coverage Issues Are Unresolved.* Westlaw Journal Insurance Bad Faith 1, Vol. 11, No. 2 (May 27, 2015) and Westlaw Journal Insurance Bad Faith 1, Vol. 11, No. 2 (May 27, 2015)

115. *Innocent Insured Doctrine Doesn't Preclude Policy Rescission For Misrepresentation In The Application.* Claims Journal (April 15, 2015)

116. *Fair Debatability Defense Can Be Supported By Unpublished Court Decisions.* Claims Journal (April 7, 2015)

117. *Texas Court Draws The Line On Allowing Broad Discovery Of Other Claims In Bad Faith Litigation.* Westlaw Journal Insurance Bad Faith 1, Vol. 10, No. 24 (April 1, 2015)

118. *Workers' Compensation Exclusive Remedy Bars Bad Faith Claim In North Carolina.* Claims Journal (March 24, 2015)

119. *Number of Courts Rejecting Insurance Adjuster Negligence Claims Grows.* Claims Journal (March 20, 2015)

120. *Standard Mortgage Clause Effects on Vacancy Restrictions In Homeowner Policies Under Minnesota Law.* Claims Journal (March 13, 2015)

121. *Supplementing The NAIC's Model Unfair Claims Settlement Practices Act: Accompanying State Regulations.* Ins. Lit. Rptr., Vol. 37, No. 3 (March 11, 2015)

122. *New Hampshire Court Finds Illegal Drug Activity Inherently Dangerous, Harmful Thus Liability Can't Constitute A Covered Occurrence.* Claims Journal (March 5, 2015)

123. *Offsetting Third Party Recoveries Against UIM Benefits.* Claims Journal (February 25, 2015)

124. *Notifying Additional Insureds Of Coverage Denials Under New York Law.* Claims Journal (February 25, 2015)

125. *Texas High Court Finds No Direct Action Rule Can Apply to Declaratory Judgment Actions Brought Against Insurers In Some Cases.* Claims Journal (February 13, 2015)

126. *A Jurisprudential Survey Of UM/UIM Statutes of Limitation.* Ins. Lit. Rptr., Vol. 37, No. 1 (February 5, 2015)

127. *Ohio Supreme Court Ruling: Context Is Everything.* Claims Journal (February 3, 2015)

128. *Reimbursing Defense Costs Under Alaska Law: A Request For Clarity.* Claims Journal (January 29, 2015)

129. *8th Circuit Reaffirms Missouri's Cause Test, Rejects "Time And Space" Test For Determining Number of Occurrences.* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 10 (December 12, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 19 (January 22, 2015)

130. *South Carolina Court Rules "Your Work" Exclusion Applies To Costs To Remove And Rebuild Brick Wall To Meet Contract Compliance.* Claims Journal (January 8, 2015)

131. *New Jersey High Court Finds That Res Judicata Barred Plaintiff's UM Bad Faith Claim, Not the Entire Controversy Doctrine.* 2015 Windstorm Conference Claims Journal, Claims Journal (2015)

132. *Arkansas Faulty Workmanship Statute Does Not Have Retroactive Application.* Claims Journal (December 11, 2014)

133. *Florida Appeals Court Provides Guidance On When An Insured's Bad Faith Lawsuit Is Ripe.* Claims Journal (December 5, 2014)

134. *Choosing Your Punishment May Foreclose UM (UIM) Coverage.* Claims Journal (December 1, 2014)

135. *Defending Against Bad Faith: A Nuts And Bolts Review Of The Fair Debatability Doctrine And California's Genuine Dispute Doctrine.* Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

136. *Towing The Line On "Expected And Intended."* Westlaw Journal Insurance Coverage 1, Vol. 25, No. 4 (October 31, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 10, No. 15 (November 26, 2014)

137. *Public Policy Prevents Family Step-Down Clauses In South Carolina Auto Policies.* Claims Journal (October 28, 2014)

138. *Louisiana's Direct Action Statute Doesn't Substantively Modify Claims-Made Policy Notice Provisions.* Claims Journal (October 22, 2014)

139. *Extricating Injured Passenger From A Crashed Auto Constitutes Use Of That Auto.* Claims Journal (October 21, 2014)

140. *Demanding Arbitration Is No Excuse For Bad Faith Conduct.* Claims Journal (October 17, 2014)

141. *The Pitfalls Of Rejecting A Defense Under Texas "Same Facts" Test.* Claims Journal (October 14, 2014)

142. *Arizona Courts Are Grappling With Fixing The Correct Punitive Damages Ratio: A State Specific Measure Of Due Process.* Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

143. *Known Loss Exclusion Trumps Common-Law Known Loss Doctrine.* Claims Journal (October 9, 2014)

144. *Conspiracy To Abduct Not Covered.* Claims Journal (October 8, 2014)

145. *A Review Of Insurance Broker Duties Under California Law.* Insurance Journal Magazine, Vol. 92, No. 19 (October 6, 2014)

146. *Product Disparagement Claims Do Not Include "Close Enough" Or "Better Than" Assertions.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 52 (October 3, 2014); West Law Journal Insurance Bad Faith 2, Vol. 10, No. 13 (October 29, 2014)

147. *When Does Directing Traffic Constitute Vehicle Use?* Claims Journal Magazine, Vol. 3, No. 4 (Fall 2014)

148. *Adjuster Negligence Claim Rejected By Vermont Supreme Court.* Claims Journal (September 29, 2014)

149. *New York Strict Timelines Standard Doesn't Apply To Environmental Claims.* Claims Journal (September 24, 2014)

150. *Objecting To The Golden Rule During Trial.* Claims Journal (September 19, 2014)

151. *Proving The Content Of Lost Insurance Policies.* Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

152. *A Little Knowledge Goes A Long Way Against Defense And Indemnity Reimbursement.* Claims Journal (September 15, 2014)

153. *When Considering A Prior Publication Exclusion, Does "Close Enough" Count?* Claims Journal (September 12, 2014)

154. *Insurance Experts: Does It Really Take One To Know One?* Insurance Journal Magazine, Vol. 92, No. 17 (September 8, 2014)

155. *Indiana Supreme Court Considers Enforceability Of Workers' Compensation Setoff Provisions In UIM Context.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 48 (September 5, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 10, No. 11 (October 1, 2014)

156. *Indiana Supreme Court Affirms Importance Of Reading Policy.* Insurance Journal (August 26, 2014)

157. *The Effect Of No-Contest Pleas On D&O Coverage Exclusions.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 46 (August 22, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 10 (September 17, 2014)

158. *Court Holds That Companies Do Not Need To Disclose Use Of In-House Counsel To Defend Insureds At The Time Of Insurance Purchase.* The Voice, Vol. 13, No. 33 (August 20, 2014)

159. *It's A Fine Line: Interpreting Status-Based Exclusions.* Claims Journal (August 18, 2014)

160. *Payment of Prior Claims May Not Estop Denial Of Future Claims.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 44 (August 8, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 10, No. 9 (September 3, 2014)

161. *New York Court of Appeals' Stunning K2 About Face.* Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

162. *California Court Finds That Bad Cooking Odors Did Not Result In Property Damage.* Claims Journal (July 31, 2014)

163. *South Dakota High Court Rules That Continuous And Progressive Damage Exclusion Does Not Violate Public Policy.* Claims Journal (July 28, 2014)

164. *The Meaning Of "Incurred" In The Medical Payments Coverage Context.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 40 (July 11, 2014)

165. *When In Doubt – Consider An IME.* Claims Journal (July 1, 2014)

166. *What Constitutes Collapse For Purposes Of Property Insurance Coverage.* Claims Journal Magazine, Vol. 3, No. 3 (Summer 2014)

167. *Landlord Beware: Criminal Acts Causing Property Damage Are Not Covered By Homeowner Policy.* Claims Journal (May 22, 2014)

168. *Cleveland Indians Baseball vs. New Hampshire Insurance: An Agent's Duty To Additional Insureds.* Insurance Journal Magazine, Vol. 92, No. 10 (May 19, 2014)

169. *Theft Alone Is Not A Publication For Personal Injury Coverage.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 32 (May 16, 2014)

170. *Seventh Circuit Court: Alcoholic Energy Drinks Excluded From Coverage.* Claims Journal Magazine (April 28, 2014)

171. *Historical Tour Of The Contra Preferentem Doctrine.* Claims Journal Magazine, Vol. 3, No. 1 (Spring 2014)

172. *The Potential Liability Rule Inapplicable In A Priest Molestation Case.* Claims Journal (April 16, 2014)

173. *Odor From Hog Farms Is Not A Pollutant.* Claims Journal (April 8, 2014)

174. *Washington Follows Qualcomm.* Westlaw Journal Insurance Coverage 1, Vol. 24, No. 26 (April 4, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 26 (April 30, 2014)

175.   *North Dakota Law Upholds Insureds Step-Down Clauses.*  Claims Journal (April 1, 2014)

176.   *Do Insurers Have To Disclose Their Investigative File Before An EUO?*  Claims Journal (March 26, 2014)

177.   *Analyzing Concurrent Causation:  Independence Is The Key*.  Claims Journal (March 24, 2014)

178.   *Excluding Stigma Damages In The Underinsured Motorist Context*.  Claims Journal (March 19, 2014)

179.   *Determining The Number Of Occurrences From Carbon Monoxide Poisoning.*  Claims Journal (March 13, 2014)

180.   *Ruling In Dog-Bite Case Opens The Door To Expanded Insurance Coverage*.  Westlaw Journal Insurance Coverage 1, Vol. 24, No. 22 (March 7, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 10 (May 14, 2014)

181.   *When Does The Obligation To Pay Cumis Counsel End?*  Westlaw Journal Insurance Coverage 1, Vol. 24, No. 20 (February 21, 2014) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 22 (March 5, 2014)

182.   *Wisconsin Supreme Court Redefined The Boundary Lines Of Occurrences.*  Claims Journal Magazine, Vol. 3, No. 1 (Winter 2014)

183.   *Are UM/UIM Insurers Obligated To Advance To Their Insureds Undisputed Partial Payments Before Total Claim Value Is Determined?*  Ins. Lit. Rptr., Vol. 36, No. 2 (February 18, 2014)

184.   *Pennsylvania Court Rejects UM Claim Because Of Delay.*  Claims Journal (February 13, 2014)

185.   *Stipulations And Concessions That Forged The Framework Of Arbitrability Of Class Actions Under The Federal Arbitration Act*.  Westlaw Journal Insurance Coverage 1, Vol. 24, No. 18 (February 7, 2014) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 22 (March 5, 2014)

186.   *Connecticut Embraces The Make Whole Doctrine.*  Claims Journal (January 30, 2014)

187.   *Montana Weighs In On The Obligation To Provide Co-Counsel To Assist Another Insurer Defending Mutual Insureds.*  Claims Journal (January 27, 2014)

188.   *Insureds' Agreement To Read Insurance Policy (What Is An Insurance Agent To Do?).*  Insurance Journal (January 23, 2014).

189.   *Colorado Court Requires Insurer To Prove Prejudice To Raise Voluntary Payment Defense.*  Claims Journal (January 15, 2014)

190.   *When Is A Sexually Molested Hotel Guest Within The Care, Custody And Control Of The Hotel*.  Claims Journal (December 23, 2013)

191.   *Rhode Island High Court Establishes Statue Of Limitations For UM/UIM Claims.*  Claims Journal (December 19, 2013)

192.   *Methamphetamine Is Not A Narcotic For Purposes Of Accidental Death Coverage (South Carolina—Accidental Death Coverage/Exclusion For Narcotics)*.  DRI, Covered Events Newsletter, 2013, Issue 11 (December 5, 2013)

193.   *Excess Insurance And Equitable Subrogation:  Oklahoma Clarifies Its Equitable Subrogation Rule.*  Claims Journal (December 3, 2013)

194. *The Mutual Mistake Doctrine And The Purchase Of Insurance*.  Insurance Journal Magazine, Vol. 91, No. 23 (December 2, 2013)

195. *Paying For Rescission.*  The Voice, Vol. 12, No. 46 (November 20, 2013)

196. *Is Negligent Misrepresentation A Covered "Occurrence"?*  Claims Journal (November 13, 2013)

197. *Is A Coinsurance Penalty Based Upon ACV Or RCV?*  Claims Journal (November 4, 2013)

198. *Florida Supreme Court Says That Replacement Cost Includes Profit And Overhead.*  Claims Journal (October 30, 2013)

199. *Florida Court Reaffirms Extrinsic Evidence Is Not Permitted To Resolve Ambiguity In An Insurance Contract.*  Claims Journal (October 24, 2013)

200. *Negligent Infliction Of Emotional Distress Claims And Uninsured Motorists/Under Insured Motorists Coverage.*  Claims Journal Magazine, Vol. 2, No. 4 (Fall 2013)

201. *Seeking Reimbursement Of Defense Costs In The Context Of Reservation Of Rights:  The Washington Supreme Court Weighs In.*  Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

202. *Is The Risk Of Relapse Into Substance Abuse Enough To Constitute A Current Disability For Doctors?*  The Voice, Vol. 12, No. 36 (September 11, 2013); DRI Today (September 17, 2013)

203. *State And Federal Courts Continue To Fill The Gap On The Question Of Whether The Lack Of Exhaustion Of Primary Insurance Can Trigger Excess Coverage.*  Ins. Lit. Rptr., Vol. 35, No. 15 (September 9, 2013)

204. *Insurance Coverage for Discounting the Price of Goods for Sale?*  Insurance Journal Magazine, Vol. 91, No. 17 (September 9, 2013)

205. *In Alaska, A Claim Of Self-Defense Was Unavailing Where Insured Entered Inconsistent 'No Contest' Plea.*  Westlaw Journal Insurance Coverage 2, Vol. 23, No. 48 (September 6, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 14 (November 7, 2013)

206. *5th Circuit Affirms Matador Decision.*  Westlaw Journal Insurance Coverage 1, Vol. 23, No. 46 (August 23, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 15 (November 21, 2013)

207. *Two Essential Discussions That Should Be Used In All Reservation Of Rights Letters.*  In-House Defense Quarterly (Summer 2013)

208. *The Kentucky Supreme Court Utilizes The Integral Parts Test In Hit-And-Run UM Cases.*  Claims Journal (August 13, 2013)

209. *High-Stakes Poker In New York Over Insurer's Decision Not To Defend Its Insured.*  Westlaw Journal Insurance Coverage 1, Vol. 23, No. 44 (August 9, 2013) and Westlaw Journal Insurance Bad Faith 2, Vol. 9, No. 9 (August 29, 2013)

210. *Notifying Excess Insurers For Additional Insureds.*  Insurance Journal (August 9, 2013)

211. *Does Uninsured Motorist Coverage Apply To Negligent Infliction Of Emotional Distress Claims*?  Ins. Lit. Rptr., Vol. 35, No. 12 (July 23, 2013)

212. *The Selective Tender Rule Rejected In The Workers' Compensation Context*.  Claims Journal Magazine, Vol. 2, No. 3 (Summer 2013)

213. *Rhode Island Court's Ruling On Self-Insured Retentions In Med-Mal Policies*.  Insurance Journal (July 23, 2013)

214. *Intervention Nuances Under California Law*.  Claims Journal (July 22, 2013)

215. *No Bad Faith In The Workers' Compensation Context:  Texas Supreme Court Puts An Exclamation Point On Its Prior Case*.  Claims Journal (July 15, 2013)

216. *Washington Law Reverse-Preempts The Federal Arbitration Act In The Insurance Context.*  Westlaw Journal Insurance Coverage 2, Vol. 23, No. 40 (July 12, 2013)

217. *Enforcement Of UIM Exhaustion Clauses:  The Utah Supreme Court Weighs In.*  Ins. Lit. Rptr., Vol. 35, No. 10 (June 26, 2013)

218. *Voluntary Payment Clauses.* Claims Journal (June 26, 2013)

219. *Denying Coverage And Reserving Rights Simultaneously:  Georgia Supreme Court Says Insurer Can't Have Its Cake And Eat It Too.*  Claims Journal (June 24, 2013)

220. *Insurers Aren't Required To Tell Insureds That They Filed A Claim Under The Wrong Policy.*  Claims Journal (June 20, 2013)

221. *Utilizing The "Place Of Injury" Test Regarding Territorial Limitation Clauses In Insurance Policies.*  Claims Journal (June 17, 2013)

222. *Washington Supreme Court Limits Insurers' Right To Jury Trial In Bad-Faith and Coverage Cases.*  Westlaw Journal Insurance Bad Faith 1, Vol. 9, No. 3 (June 11, 2013)

223. *Reasonable Expectation Doctrine Trumps Insured's Duty To Read Insurance Policy.*  Claims Journal (June 10, 2013)

224. *All-Risk Coverage For Stigma Claims Involving Real Property*.  Ins. Lit. Rptr., Vol. 35, No. 9 (June 5, 2013)

225. *Direct Physical Loss In All-Risk Policies:  The Modern Trend Does Not Require Specific Physical Damage, Alteration*.  Claims Journal Magazine, Vol. 2, No. 2 (Spring 2013)

226. *Providing Notification To Insureds Of The Opportunity To Purchase UM/UIM Insurance:  Is "English Only" Enough?*  Ins. Lit. Rptr., Vol. 35, No. 7 (May 1, 2013)

227. *Application Of The Equality Of Consideration Test In Coverage Disputes.*  Common Defense (Spring 2013)

228. *The Ongoing Debate Over Bad Faith And Workers' Compensation.*  Westlaw Journal Insurance Bad Faith, Vol. 8, No. 25 (April 16, 2013)

229. *Taking Level 3 Communications To The Next Level:  Polishing The 'Insured Vs. Insured' Exclusion.*  Westlaw Journal Insurance Coverage 1, Vol. 23, No. 26 (April 5, 2013) and Westlaw Journal Insurance Bad Faith 3, Vol. 9, No. 16 (December 5, 2013)

230. *The Inherent Tension Between Professional Ethics Regarding Mistakes And Insurance Policy Liability Admission Clauses*.  The Voice, Vol. 12, No. 13 (April 3, 2013)

231. *Legislation Regulating Coverage For Faulty Workmanship Cannot Be Applied Retroactively.*  Claims Journal (April 1, 2013)

232. *Insurer's Obligation To Notify The Insured Of The Need For Allocated Verdicts And Settlements.*  Claims Journal (March 28, 2013)

233. *Pollution Exclusions In Indiana Require List Of Specific Substances, State Supreme Court Says.*  Westlaw Journal Insurance Coverage 1, Vol. 23, No. 22 (March 8, 2013) and Westlaw Journal Insurance Bad Faith 2, Vol. 8, No. 24 (April 2, 2013)

234. *Analyzing Recent Cases Involving Bad Faith Set-Ups.*  Ins. Lit. Rptr.,  Vol. 35,  No. 3 (March 4, 2013)

235. *When Using Colossus Independent Judgment Is A Must*.  Claims Journal Magazine, Vol. 2, No. 1 (Winter 2013); Claims Journal (May 9, 2013)

236.  *Can An Excess Insurer Sue A Primary Insurer's Defense Counsel For Malpractice?* Claims Journal (February 26, 2013)

237.  *Is There A Right To Pre-Litigation Independent Counsel?* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 20 (February 22, 2013)

238.  *Excess Insurers Prejudiced When There is No Notice of Underlying Suit.* Claims Journal (February 21, 2013)

239.  *Insuring Contractual Liability.* Ins. Lit. Rptr., Vol. 35, No. 2 (February 19, 2013)

240.  *New York Court's Latest Take On Insured's Duty To Read Policy.* Insurance Journal (February 19, 2013)

241.  *New Twist On The Question Of An Insurer's Duty To Defend Criminal Proceedings.* Claims Journal (February 11, 2013)

242.  *Can An Unborn Fetus Qualify As A "Resident of Household" For Coverage Determinations*? Claims Journal (January 23, 2013)

243.  *Can An Insured Restrict The Insurer's Right To Use Pre-Litigation IMEs?* Claims Journal (January 15, 2013)

244.  *Sexual Assaults In Taxicabs And Application Of The Automobile Exclusion In CGL Policies.* Ins. Lit. Rptr., Vol. 34, No. 20 (December 7, 2012)

245.  *Application Of The 'Insured vs. Insured' Exclusion To Federal Takeovers Of Financial Institutions.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 7 (November 21, 2012)

246.  *Determining Insured Status On Auto Liability Coverage.* Claims Journal Magazine, Vol. 1, No. 4 (Fall 2012)

247.  *The Risk Landscape of Cyberspace.* Insurance Journal Magazine, Vol. 90, No. 21 (November 2012)

248.  *Insurers Finally Get Right To Jury Trial In New Jersey.* Westlaw Journal Insurance Coverage 1, Vol. 23, No. 4 (November 2, 2012) and Westlaw Journal Insurance Bad Faith 3, Vol. 8, No. 16 (December 11, 2012)

249.  *When Does the Filing of a Declaratory Judgment Action Constitute Bad Faith*? Ins. Lit. Rptr., Vol. 34, No. 17 (October 8, 2012)

250.  *Is Texas Turning The Corner By Allowing Exceptions To The Strict '8-Corners' Rule?* Westlaw Journal Insurance Coverage 1, Vol. 22, No. 51 (September 28, 2012) and Westlaw Journal Insurance Bad Faith 2, Vol. 8, No. 21 (February 19, 2013)

251.  *Florida Public Adjuster Waiting Period Deemed Unconstitutional.* Claims Journal (October 1, 2012)

252.  *The Arizona Court of Appeal Moves Close To A One-To One Ratio in Punitive Damage Bad Faith Cases.* Common Defense (Fall 2012)

253.  *Determining Insurance Coverage For Sexual Misconduct Under Arizona Law: A Microcosm Of The National Debate.* Ins. Lit. Rptr., Vol. 34, No. 15 (September 13, 2012)

254.  *Challenging Fraudulent Joinder, The Clock Is Ticking.* The Voice, Vol. 11, No. 36 (September 12, 2012)

255.  *Coverage For Diminished Value Following Post-Crash Repairs Debate.* Claims Journal (August 28, 2012)

256.  *Stepping Outside Of UM Coverage: Assaults By An Insured Outside A Vehicle.* Claims Journal (August 22, 2012)

257. *Do Insurance Brokers Have An Obligation To Offer The Cheapest Coverage Available?* Insurance Journal Magazine, Vol. 90, No. 15 (August 2012)

258. *Ninth Circuit Court Of Appeals Expands Insurer's Duty To Settle Under California Law.* Claims Journal (July 31, 2012)

259. *Minnesota High Court Blurs Line Between Coverage Determination And Amount Of Loss In Appraisal.* Claims Journal (July 17, 2012)

260. *Telephone Consumer Protection Act And Violations of Seclusion.* Claims Journal Magazine, Vol. 1, No. 3 (Summer 2012)

261. *Evaluating Medical Payment Coverage Questions.* Claims Journal (May 7, 2012)

262. *Understanding the Right of Reimbursement For Defense Costs When Reserving Rights.* Claims Journal (May 1, 2012)

263. *Policy Buyback Limitations.* Claims Journal (April 23, 2012)

264. *Examinations Under Oath.* Claims Journal Magazine, Vol. 1, No. 2 (Spring 2012)

265. *Incomplete Claim Investigations May Create Coverage Where No Coverage Exists.* Claims Journal (March 12, 2012)

266. *To Sue Or Not To Sue: Allowing Private Litigation Over Insurer Bad Faith In The Workers' Compensation Context.* Claims Journal Magazine, Vol. 1, No. 1 (Winter 2012)

267. *Vandalism, Vacancy And The Absence Of Property Coverage.* Ins. Lit. Rptr., Vol. 33, No. 18 (November 4, 2011)

268. *A Framework Of Adjusting Medical Claims Involving Possible Experimental Treatment.* Claims Journal (October 27, 2011)

269. *Interpreting Immunity: Why It's Wise To Use Caution With Insurance Fraud Cases.* SIU Today, Vol. 25, No. 3 (Fall 2011)

270. *The Extension Of Insurance To Cover The Plaintiff's Financial Risk Of Litigation: "Bodily Injury" "Property Damage" And "Attorney's Fees" Caused By An Occurrence?* Common Defense (Fall 2011)

271. *Be Careful What You Say When Issuing A Binder.* Insurance Journal Magazine, Vol. 89, No. 17 (September 2011)

272. *Read The Policy.* Insurance Journal Magazine, Vol. 89, No. 15 (August 2011)

273. *Exploring Experimental Treatment Exclusions.* Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

274. *A Review Of ISO's Fungi And Bacteria Exclusion.* Ins. Lit. Rptr., Vol. 33, No. 8 (May 23, 2011)

275. *Bad-Faith Cases: Preserving Affirmative Defenses.* DRI For the Defense, Vol. 53, No. 5 (May 2011)

276. *Communicable And Transmission Of Disease Exclusions.* Ins. Lit. Rptr., Vol. 33, No. 7 (May 6, 2011)

277. *Why Bragging May Create A Greater Legal Duty Of Care.* Insurance Journal Magazine, Vol. 89, No. 9 (May 2011)

278. *Implied Consent To Representation Is Not Enough.* Common Defense (Spring 2011)

279. *The Perils Of Testing The Contours And Boundaries Of Morris Agreements.* Common Defense (Spring 2011)

280. *Vigilance Guards Against Short Fuse, Third-Party, Bad Faith Set-Ups.* Claims Journal (April 7, 2011)

281. *Agency E&O Liability For Failing To Procure Coverage.* Insurance Journal Magazine, Vol. 89, No. 6 (March 2011)

282. *Voluntary Intoxication And The Application Of Intentional Act Exclusions.* Ins. Lit. Rptr., Vol. 33, No. 3 (March 7, 2011)

283. *A Roadmap For NAIC's Unfair Claims Settlement Practices Act.* Claims Journal (March 3, 2011)

284. *What Every Claim Adjuster Should Know About Bad Faith.* Claims Journal (February 3, 2011)

285. *Do Standard Automobile Liability Insurance Policies Cover Drive-By Shootings?* Ins. Lit. Rptr., Vol. 31, No. 21 (December 17, 2010)

286. *Are You Crazy?: Determining Mental Capacity As A Pre-Requisite To The Attachment of an Intentional Act Exclusion.* Ins. Lit. Rptr., Vol. 32, No. 20 (December 3, 2010)

287. *Annulment Of Liability Policies Post-loss (Policy Buy-Back/Release).* Ins. Lit. Rptr., Vol. 32, No. 19 (November 15, 2010)

288. *A Requiem For Ingenix.* Ins. Lit. Rptr., Vol. 32, No. 15 (September 15, 2010)

289. *A Critical Review Of The Practice Of Setting Up Insurance Companies For Bad Faith.* Ins. Lit. Rptr., Vol. 32, No. 10 (July 1, 2010)

290. *A Recent Challenge To UM/UIM Offering Requirements For Excess And Umbrella Coverage Has Revived An Old Debate.* Ins. Lit. Rptr., Vol. 32, No. 7 (May 10, 2010)

291. *Splitting Claim Files: Managing The Concern For Conflicts Of Interest Through Use Of Insurance Company Conflict Screens.* Ins. Lit. Rptr., Vol. 32, No. 6 (April 26, 2010)

292. *Mortgage Demands For Homeowner Coverage: When The Insured Property Has Been Stripped During Foreclosure.* In-House Defense Quarterly (Winter 2010)

293. *Wrap-Ups And Agent E&O Exposures.* Claims Journal (December 22, 2009)

294. *Shifting Attorneys' Fees To The Losing Party: Is It Covered Under The Policy?* Ins. Lit. Rptr., Vol. 31, No. 20 (November 2009)

295. *Determining Permissive User Status In Automobile Liability.* Claims Journal (November 16, 2009)

296. *A Basic Understanding Of Lloyd's Of London Which Every Insurance Lawyer Should Have.* Common Defense (Fall 2009)

297. *A Timely Reminder On Managing Agency E&O Risk.* Claims Journal (November 10, 2009) and Insurance Journal (November 11, 2009)

298. *It's Time To Review Essential Procedures For Managing E&O: Systems, Checklists, Guidelines, Manuals Among Tools Useful In Reducing Agency Errors.* Insurance Journal Magazine, Vol. 87, No. 21 (November 2, 2009)

299. *Insuring The Emerging Markets In Bio And Nanotechnology.* Ins. Lit. Rptr., Vol. 31, No. 17 (October 13, 2009)

300. *Timely Claims Reporting: A Serious Obligation For Agencies.* Insurance Journal Magazine, Vol. 87, No. 18 (September 21, 2009)

301. *Understanding Basic Principles Of Biomechanical Engineering In Low Speed Rear-End Collision Scenarios.* Claims Journal (September 10, 2009)

302. *Coverage Issues Associated With Federal Clean Water Act Violations For Discharging Land Fill Into Waterways.* Ins. Lit. Rptr., Vol. 31, No. 13 (August 12, 2009)

303. *A Proportional Methodology For Determining Covered Damages Where Continuous And Progressive Injury Is Involved.* Ins. Lit. Rptr., Vol. 31, No. 11 (July 13, 2009)

304. *Compendium Of References To Insurance Company Bad Faith Set Up Situations.* Ins. Lit. Rptr., Vol. 31, No. 11 (July 13, 2009)

305. *The Fifth Amendment To The U.S. Constitution Is No Bully To A Carriers' Right To An Examination Under Oath.* IASIU, SIU Today, Vol. 23, No. 2 (Summer 2009)

306. *Counting The Number Of "Occurrences" Where The Predicate Tort Involves A Pattern Of Conduct Or Interrelated Process.* Ins. Lit. Rptr., Vol. 31, No. 7 (May 4, 2009)

307. *The Discoverability Of Reserve Information In Bad Faith Cases.* Ins. Lit. Rptr., Vol. 31, No. 3 (March 1, 2009)

308. *How to Avoid Agency Errors And Omission Claims: Advising Clients On Specific Dollar Values Of Coverages They Need To Consider May Create Unnecessary Exposures.* Insurance Journal Magazine, Vol. 87, No. 3 (February 2009)

309. *A Jurisprudential Survey Regarding Submission Of Coverage Questions To Appraisal In The Homeowner Policy Context.* Ins. Lit. Rptr., Vol. 30, No. 21 (December 15, 2008)

310. *The Pedigree of USAA v. Morris: How To Answer Clients When They Call To See If The Morris Decision Can Be Challenged.* e-Common Defense (November 2008)

311. *Triggering Coverage in Construction Defect Cases.* e-Common Defense (November 2008)

312. *Strategic Planning For An Increasing Direct Writer Marketplace.* Insurance Journal Magazine, Vol. 86, No. 22 (November 2008)

313. *Claim Investigation When The Insured Raises The Fifth Amendment Privilege.* Claims Journal (November 3, 2008)

314. *The Inherent Tension Between The Fifth Amendment Right Against Self-Incrimination And The Insurance Company's Contractual Right To Cooperation: Can A Jurisprudential Balance Be Achieved?* Ins. Lit. Rptr., Vol. 30, No. 18 (October 10, 2008)

315. *A Survey Of Ingenix As An Evaluative Tool In Assessing Usual, Customary And Reasonable Medical Charges For Insurance Companies.* Ins. Lit. Rptr., Vol. 30, No. 17 (October 1, 2008)

316. *The Modernization Of Arizona's UM/UIM Written Offer Requirement.* e-Common Defense (September 2008)

317. *Lennar Corp. v. Auto-Owners Insurance Co., Expanding Coverage For Faulty Workmanship Claims.* e-Common Defense (September 2008)

318. *The Impact Of Certificates Of Insurance in Determining The Availability Of Coverage For Additional Insureds.* Ins. Lit. Rptr., Vol. 30, No. 14 (August 5, 2008)

319. *Advertising Injury Coverage For Fax Blasting And Lantham Act Claims.* Ins. Lit. Rptr., Vol. 30, No. 13 (July 20, 2008)

320. *Effectively Using E-Sign To Underwrite UM/UIM Coverage.* Claims Journal (July 1, 2008)

321. *Analyzing The Innocent Co-Insured Exception To Intentional Acts In Community Property States.* Claims Journal (June 10, 2008)

322. *Limiting Bad-Faith Exposure: Blindly Accept Colossus Recommendations At Your Own Risk.* Claims Magazine, Vol. 56, No. 6 (June 2008)

323.  *Is The Race Really On?  Application Of Racing Exclusions Within Standard Automobile Liability Policies*.  Ins. Lit. Rptr., Vol. 30, No. 9 (May 30, 2008)

324.  *A Different Perspective On Payment Of Profit And Overhead When Insureds Do Repairs.* Claims Journal (May 5, 2008)

325.  *Federal Preemption Of State Statutory Requirements:  Written Offers/Rejections Of UM/UIM Coverage In The Modern Age.*  DRI For The Defense, Vol. 50, No. 5 (May 2008)

326.  *Reasonable Expectations For Agents' E&O*.  Insurance Journal-National, West Region, Vol. 86, No. 6 (March 2008)

327.  *Use Of Independent Medical Examinations:  Analyzing Bad Faith Exposures Arising In First-Party Coverage Determinations*.  In-House Defense Quarterly, Vol. 3, No. 2 (Spring 2008)

328.  *The Justicability Of Increased Insurance Premium Claims:  A Uniformity Of Dismissal?*  Ins. Lit. Rptr., Vol. 30, No. 2 (January 31, 2008)

329.  *Understanding Federal Bankruptcy Court Stays And How To Procedurally Reach Available Insurance Coverage Of The Bankruptcy Debtor.*  Ins. Lit. Rptr., Vol. 29, No. 21 (December 15, 2007)

330.  *Directors And Officers Entitlement To D&O Policy Benefits When The Corporation They Served Files Bankruptcy.*  Ins. Lit. Rptr., Vol. 29, No. 20 (December 1, 2007)

331.  *Attorney's Fees And Declaratory Judgment Actions In Arizona.*  DRI National State-by-State Compendium Regarding the Awardability of Attorney's Fees in Declaratory Judgment Actions (December 2007)

332.  *A Survey Of Professional Liability Coverage For Claims Brought Under The Federal False Claims Act.*  Ins. Lit. Rptr., Vol. 29, No. 17 (October 5, 2007)

333.  *A Developing Body Of Law:  Daubert And The Insurance Bad Faith Expert.*  In-House Defense Quarterly, Vol. 2, No. 3 (Summer 2007)

334.  *Colossus Under Attack:  The Legal Efficacy Of Computerized Evaluation Of Bodily Injury Claims.*  Ins. Lit. Rptr., Vol. 29, No. 8 (May 22, 2007)

335.  *Bad Faith Cases: A General Overview Of The Advice Of Counsel Defense.*  In-House Defense Quarterly, Vol. 2, No. 2 (Spring 2007)

336.  *Claims For Embezzlement Of Client Funds.*  DRI For The Defense, Vol. 49, No. 3 (March 2007)

337.  *Regulating Insurance Company Claim Handling Practices: Rethinking The Unthinkable (Abandonment of the Common Law Tort of Bad Faith).*  Ins. Lit. Rptr., Vol. 29, No. 1 (January 25, 2007)

338.  *Discipline Without Assumptions? A Systematic Approach To Coverage Analysis.*  In-House Defense Quarterly, Vol. 2, No.1 (Winter 2006)

339.  *A Methodical Approach To Analyzing The Application Of The Absolute Pollution Exclusion.* Ins. Lit. Rptr., Vol. 28, No. 19 (November 1, 2006)

340.  *Medical Payments Coverage: A Policy Inside A Policy.*  Ins. Lit. Rptr., Vol. 28, No. 14 (August 23, 2006)

341.  *Building A General Understanding Of Directors & Officers Insurance Policy Architecture*. DRI For the Defense, Vol. 48, No. 5 (May 2006)

342.  *All Things Being Considered Equal:  Third Party Bad Faith In Arizona*.  Arizona Attorney, Vol. 27, No. 6 (1991)

343. *Darner's Neglected Tenant: Abandonment Of Ambiguity Doctrine*. Arizona Attorney, Vol. 27, No. 4 (1990)

344. *Does* Your *Insurance Stack Up? Multiple Coverage Problems And The Standard Automobile Liability Insurance Policy.* Arizona Attorney, Vol. 26, No. 5 (1990)

345. *Guaranteeing Personal Injury Recoveries: A Practical Guide To Arizona's Property And* Casualty *Insurance Guaranty Fund.* Arizona Attorney, Vol. 26, No. 2 (1989)

346. *Insuring Against An Evil Mind: Punitive Damages Awards And The Uninsured And Underinsured Motorist.* Arizona Attorney, Vol. 25, No. 9 (1989)

347. *Let's Make A Deal: A Requiem for Reservation Of Rights Defenses In Arizona*. Arizona Bar Journal, Vol. 23, No. 6 (1988)

348. *When Is A Standardized Insurance Contract Binding: The Development Of The Reasonable Expectation Doctrine In Arizona.* Arizona Bar Journal, Vol. 23, No. 5 (1988)

349. *The Mode Of Operation Rule: A Slippery Issue For The Arizona Trial Bar.* Arizona Bar Journal, Vol. 21, No. 4 (1986) (republished by West Publishing Company, Westlaw National Text and Periodicals —Torts Database, 1986)

## PUBLISHED CASE REVIEWS

1. *Somnus Mattress Corp. v. Hilson,* (Ala.) (Agents & Brokers), Ins. Lit. Rptr., Vol. 41, No. 3, March 1, 2019

2. *American Family Mutual Insurance Co. v. Vein Centers for Excellence, Inc.,* (8th Cir.) (Notice/Renewals), Ins. Lit. Rptr., Vol. 41, No. 3, March 1, 2019

3. *Farmers Texas County Mutual Insurance Co. v. Zuniga,* (Texas) (Liability Insurance/Punitive Damages), Ins. Lit. Rptr., Vol. 40, No. 2, February 15, 2018.

4. *Travelers Indemnity Co. v. Rogers Cartage Co.*, (Illinois) (Lost Policies) Ins. Lit. Rptr., Vol. 40, No. 2, February 15, 2018

5. *Venture v. Preferred Mutual Insurance Co.*, (New York) (Bad Faith/Discovery) Ins. Lit. Rptr., Vol. 39, No. 21, December 15, 2017

6. *Hughes v. First Acceptance Insurance Co. of Georgia, Inc.*, (Georgia) (Bad Faith/Duty to Settle) Ins. Lit. Rptr., Vol. 39, No. 21, December 15, 2017

7. *Hendricks v. Novae Corporate Underwriting Ltd.*, (7th Cir., Ill.) (Duty to Settle/Assignments) Ins. Lit. Rptr., Vol. 39, No. 17 (October 5, 2017)

8. *Mount Vernon Fire Ins. Co. v. Visionaid, Inc*., (Massachusetts) (Duty to Defend) Ins. Lit. Rptr., Vol. 39, No. 15 (September 1, 2017)

9. *State ex rel Universal Underwriters Ins. Co. v. Wilson,* (West Virginia) (Bad Faith/Duty to Defend) Ins. Lit. Rptr., Vol. 39, No. 14 (August 21, 2017)

10. *State Farm Fire & Casualty Co. v. Justus,* (Washington) (Discovery) Ins. Lit. Rptr., Vol. 39, No. 12 (July 24, 2017)

11. *Spearman v. Progressive Classic Ins. Co.*, (Oregon) (Bad Faith/Attorney Fees) Ins. Lit. Rptr., Vol. 39, No. 12 (July 24, 2017)

12. *Caira v. Zurich American Ins. Co.* (Massachusetts) (Bad Faith/Duty to Settle) Ins. Lit. Rptr., Vol. 39, No. 9 (June 22, 2017)

13. *Pella Corp. v. Liberty Mutual Insurance Co.* (Iowa) (Policy Limits/Occurrence) Ins. Lit. Rptr., Vol. 39, No. 9 (June 22, 2017)

14.   *Walsh Construction Company v. Zurich*, (Indiana) (Self-Insured Retention) Ins. Lit. Rptr., Vol. 39, No. 7 (May 8, 2017)

15.   *Meeks v. Guaranty Insurance Company*, (Oklahoma) (Workers Compensation Bad Faith) Ins. Lit. Rptr., Vol. 39, No. 7 (May 8, 2017)

16.   *Century Surety Co. v. Jim Hipner, LLC* (Wyoming) (Liability Insurance/Notice-Prejudice Rule)  Ins. Lit. Rptr., Vol. 38, No. 16 (October 4, 2016)

17.   *Arceneaux, et al. v. Amstar Corp.* (Louisiana) (Allocation/Defense Costs)  Ins. Lit. Rptr., Vol. 38, No. 16 (October 4, 2016)

18.   *American Family Mutual Ins. Co. v. Hansen* (Colorado) (Policy Interpretation)  Ins. Lit. Rptr., Vol. 38, No. 12 (July 26, 2016)

19.   *Bamford v. Regent Insurance Co.* (8th Cir., Nebraska) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 38, No. 12 (July 26, 2016)

20.   *Country Mutual Ins. Co. v. Dahms* (Illinois) (Criminal Acts Exclusion)  Ins. Lit. Rptr., Vol. 38, No. 10 (July 1, 2016)

21.   *Arden v. Forsberg & Umlauf* (Washington) (Insurance Counsel/Conflict Of Interest)  Ins. Lit. Rptr., Vol. 38, No. 10 (July 1, 2016)

22.   *Hegseth v. American Family Mutual Ins. Group* (Minnesota) (UM/UIM Time Limits)  Ins. Lit. Rptr., Vol. 38, No. 6 (April 20, 2016)

23.   *State Farm Mutual Auto. Ins. Co. v. Riggs*  (Kentucky) (UM/UIM Time Limits)  Ins. Lit. Rptr., Vol. 38, No. 6 (April 20, 2016)

24.   *Moore v. GEICO General Ins. Co.* (11th Cir., Florida)  (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 38, No. 4 (March 20, 2016)

25.   *Dairyland Ins. Co. v. Mitchell* (Connecticut) (Auto Insurance/Exclusions)  Ins. Lit. Rptr., Vol. 38, No. 4 (March 20, 2016)

26.   *Christy v. Travelers Indemnity Co. of America* (10th Cir., New Mexico) (Reformation/Rescission)  Ins. Lit. Rptr., Vol. 38, No. 2 (February 17, 2016)

27.   *Martin v. Auto Owners Ins. Co.,* (Missouri) (Automobile Insurance/Stacking)  Ins. Lit. Rptr., Vol. 38, No. 2 (February 17, 2016)

28.   *Rent-A-Roofer, Inc. v. Farm Bureau Property & Casualty Ins. Co.* (Nebraska) (Notice-Prejudice/Voluntary Payments)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

29.   *Mesa v. Clarendon National Ins. Co.* (11th Cir., Florida) (Duty to Settle/Multiple Claims)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

30.   *Fidelity National Title Ins. Co. v. Centerpoint Mechanic Liens Claims, LLC* (Arizona) (Duty to Settle/Control of Settlement)  Ins. Lit. Rptr., Vol. 37, No. 16 (October 6, 2015)

31.   *SRM, Inc. v. Great American Ins. Co.* (10th Cir., Oklahoma) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 14 (September 11, 2015)

32.   *Garcia v. GEICO General Ins. Co.* (11th Cir., Florida) (Bad Faith)  Ins. Lit. Rptr., Vol. 37, No. 14 (September 11, 2015)

33.   *One Call Property Services, Inc. v. Security First Ins. Co.* (Florida) (Property Insurance/ Post-Loss Assignments)  Ins. Lit. Rptr., Vol. 37, No. 13 (August 24, 2015)

34.   *Purscell v. TICO Ins. Co.* (8th Cir., Missouri) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 13 (August 24, 2015)

35.   *Atlantic Casualty Ins. Co. v. Greytak* (Montana) (Liability Insurance/Notice)  Ins. Lit. Rptr., Vol. 37, No. 12 (August 14, 2015)

36.   *C. Brewer and Co., Ltd. v. Marine Indemnity Ins. Co. of America* (Hawaii) (Liability Insurance/Designated Premises Endorsement)  Ins. Lit. Rptr., Vol. 37, No. 7 (May 8, 2015)

37.   *BankInsure, Inc. v. Highland Bank* (8th Cir., Minnesota) (Fidelity Insurance/Causation)  Ins. Lit. Rptr., Vol. 37, No. 7 (May 8, 2015)

38.   *Lodholtz v. York Risk Services Group, Inc.* (Indiana) (Adjuster Liability)   Ins. Lit. Rptr., Vol. 37, No. 4 (March 11, 2015)

39.   *Badiali v. New Jersey Mfrs. Ins. Group* (New Jersey) (Bad Faith/Fairly Debatable Claims)  Ins. Lit. Rptr., Vol. 37, No. 4 (March 11, 2015)

40.   *Illinois Tool Works, Inc., et al. v. Travelers Cas. and Sur. Co.* (Illinois) (Duty to Defend)  Ins. Lit. Rptr., Vol. 37, No. 2 (February 19, 2015)

41.   *Everest Indemnity Ins. Co. v. Rea* (Arizona) (Bad Faith/Advice of Counsel Defense)  Ins. Lit. Rptr., Vol. 37, No. 2 (February 19, 2015)

42.   *Quihuis v. State Farm Mutual Auto. Ins. Co.* (Arizona) (Bad Faith/Duty to Settle)  Ins. Lit. Rptr., Vol. 37, No. 1 (February 5, 2015)

43.   *In re Allstate County Mutual Ins. Co.* (Texas) (Bad Faith)  Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

44.   *RSUI Indemnity Co. v. American States Ins. Co.* (Louisiana) (Bad Faith/Excess Insurance)  Ins. Lit. Rptr., Vol. 36, No. 19 (November 13, 2014)

45.   *Williams v. Government Employees Ins. Co.* (South Carolina) (Auto Insurance/Policy Limits)  Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

46.   *Cammarata v. State Farm Florida Ins. Co.* (Florida) (Bad Faith)  Ins. Lit. Rptr., Vol. 36, No. 17 (October 13, 2014)

47.   *Indiana Ins. Co. v. Kopetsky* (Indiana) (Liability Insurance/Known Loss-Claim)  Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

48.   *Murphy v. Patriot Ins. Co.* (Vermont) (Adjusters)   Ins. Lit. Rptr., Vol. 36, No. 15 (September 10, 2014)

49.   *Fellowship of Christian Athletes v. AXIS Ins. Co.* (Missouri) (Liability Insurance/Policy Limits)  Ins. Lit. Rptr., Vol. 36, No. 14 (August 20, 2014)

50.   *Howe v. MMG Ins. Co.* (Maine) (Duty to Defend/Dog Bites)  Ins. Lit. Rptr., Vol. 36, No. 14 (August 20, 2014)

51.   *Springer v. Erie Ins. Exchange* (Maryland) (Liability Insurance/Business Pursuits Exclusion)  Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

52.   *Expedia, Inc. v. Steadfast Ins. Co.* (Washington) (Duty to Defend/Extrinsic Evidence)  Ins. Lit. Rptr., Vol. 36, No. 13 (August 8, 2014)

53.   *KeySpan Gas East Corp. v. Munich Reinsurance America, Inc.* (New York) (Denial of Coverage/Time Limits)  Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

54.   *Cich v. National Life Ins. Co.* (Minnesota) (Disability Insurance)  Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

55.   *Metropolitan Property & Cas.* Ins. Co. v. McCarthy (Maine) (Liability Insurance/Sexual Misconduct Exclusion)  Ins. Lit. Rptr., Vol. 36, No. 11 (July 9, 2014)

56.     *Groce v. American Family Mut. Ins. Co.* (Indiana) (Agent & Brokers/Statute of Limitations) Ins. Lit. Rptr., Vol. 36, No. 8 (May 21, 2014)

57.     *Neighborhood Investments, LLC v. Kentucky Farm Bureau Mut. Ins. Co.* (Kentucky) (Property Insurance/Criminal Acts Exclusion) Ins. Lit. Rptr., Vol. 36, No. 8 (May 21, 2014)

58.     *Nodak Mutual Ins. Co. v. Bahr-Renner* (North Dakota) (Auto Insurance/"Step Down" Endorsement) Ins. Lit. Rptr., Vol. 36, No. 4 (March 21, 2014)

59.     *Wright v. Turner* (Oregon) (UIM/Policy Limits/Number of Accidents) Ins. Lit. Rptr., Vol. 36, No. 4 (March 21, 2014)

60.     *AAA Mid-Atlantic Ins. Co. v. Ryan* (Pennsylvania) (Underinsured Motorist Coverage) Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

61.     *City Center West, LP v. American Modern Home Ins. Co.* (Colorado) (Property Insurance/Assignments) Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

62.     *Maddox v. Florida Farm Bureau General Ins. Co.* (Florida) (Policy Limits/Per Occurrence) Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

63.     *Country-Wide Ins. Co. v. Preferred Trucking Services Corp.* (New York) (Liability Insurance/Duty to Cooperate) Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

64.     *United Services Automobile Ass'n v. Speed* (Washington) (Liability Insurance/Accident) Ins. Lit. Rptr., Vol. 36, No. 3 (March 4, 2014)

65.     *Deeter v. Indiana Farmers Mut. Ins. Co.* (Indiana) (Property Insurance/Intentional Acts) Ins. Lit. Rptr., Vol. 36, No. 1 (February 3, 2014)

66.     *Corn v. Farmers Ins. Co.* (Arkansas) (UIM/Trigger of Coverage). Ins. Lit. Rptr., Vol. 36, No. 1 (February 3, 2014)

67.     *State Farm Fire and Casualty Co. v. Brechbill* (Alabama) (Bad Faith). Ins. Lit. Rptr., Vol. 35, No. 18 (October 18, 2013)

68.     *Bardsley v. Government Employees Ins. Co.* (South Carolina) (Policy Interpretation/Other Insurance). Ins. Lit. Rptr., Vol. 35, No. 18 (October 18, 2013)

69.     *State Farm Fire and Casualty Co. v. Schwan* (Montana) (Duty to Defend). Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

70.     *Caron v. Horace Mann Ins. Co.* (Massachusetts) (Policy Interpretation/Reformation). Ins. Lit. Rptr., Vol. 35, No. 17 (October 1, 2013)

71.     *Tweton v. Country Preferred Ins. Co.* (North Dakota) (UIM/Stacking). Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

72.     *American States Ins. Co. v. LaFlam* (Rhode Island) (UM/UIM/Contractual Time Limits). Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

73.     *De Smet Farm Mutual Ins. Co. of South Dakota v. Busskohl* (South Dakota) (Rescission). Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

74.     *Starr Indemnity & Liability Co. v. SGS Petroleum Service Corp.* (Texas) (Excess Insurance/Notice-Prejudice). Ins. Lit. Rptr., Vol. 35, No. 14 (August 20, 2013)

75.     *Colony Ins. Co. v. Human Ensemble, LLC* (Utah) (Bad Faith/Duty to Advise). Ins. Lit. Rptr., Vol. 35, No. 9 (June 5, 2013)

76.     *O&G Industries, Inc. v. Aon Risk Services Northeast, Inc.* (Connecticut) (Agents & Brokers). Ins. Lit. Rptr., Vol. 35, No. 4 (March 18, 2013)

77.  *Fedderson v. Columbia Ins. Group* (South Dakota) (Property Insurance/Innocent Co-Insureds). Ins. Lit. Rptr., Vol. 35, No. 1 (February 4, 2013)

78.  *Pistalo v. Progressive Casualty Ins. Co.* (Indiana) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 35, No. 1 (February 4, 2013)

79.  *American Building Supply Corp. v. Petrocelli Group, Inc.* (New York) (Agents & Brokers). Ins. Lit. Rptr., Vol. 34, No. 21 (December 23, 2012)

80.  *Prest v. Louisiana Citizens Property Ins. Corp.* (Louisiana) (Agents & Brokers).  Ins. Lit. Rptr., Vol. 34, No. 21 (December 23, 2012)

81.  *Jones v. Farmers Ins. Exchange* (Utah) (Bad Faith).  Ins. Lit. Rptr.,  Vol. 34,  No. 18 (October 26, 2012)

82.  *Bannister v. State Farm Mut. Auto. Ins. Co.*, (10th Cir. [Oklahoma]) (Bad Faith/Failure to Investigate/Causation).  Ins. Lit. Rptr., Vol. 34, No. 18 (October 26, 2012)

83.  *Stancil v. ACE USA* (New Jersey) (Bad Faith/Workers' Compensation). Ins. Lit. Rptr., Vol. 34, No. 18 (October 26, 2012)

84.  *Continental Cas. Co. v. North American Capacity Ins. Co.* (5th Cir. 2012 [Texas]) (Contribution/Defense Costs).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

85.  *Pedicini v. Life Ins. Co. of Alabama* (6th Cir. 2012 [Kentucky]) (Bad Faith/Narrow Policy Interpretation).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

86.  *Hoover v. Maxum Indemnity Co.*, (Georgia) (Estoppel/Duty to Defend).  Ins. Lit. Rptr., Vol. 34, No. 13 (August 13, 2012)

87.  *In re XL Specialty Ins. Co.* (Texas) (Bad Faith/Discovery).  Ins. Lit. Rptr., Vol. 34, No. 12 (July 30, 2012)

88.  *Goheagan v. American Vehicle Ins. Co.* (Florida) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

89.  *Yan Fang Du v. Allstate Ins. Co.* (California) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

90.  *Amerex Group, Inc. v. Lexington Ins. Co.* (New York) (Appraisal).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

91.  *Quade v. Secura Insurance* (Minnesota) (Appraisal).  Ins. Lit. Rptr., Vol. 34, No. 10 (July 9, 2012)

92.  *Illinois Union Ins. Co. v. NRI Construction, Inc*. (Georgia) (Liability Insurance/ Reimbursement).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

93.  *Vision One LLC v. Philadelphia Indem. Ins. Co.* (Washington) (Property Insurance/Ensuing Loss).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

94.  *Sprague v. Safeco Ins. Co. of America* (Washington) (Property Insurance/Ensuing Loss).  Ins. Lit. Rptr., Vol. 34, No. 8 (June 11, 2012)

95.  *Ennen v. Integon Indemnity Corp., GMAC*, (Alaska) (Bad Faith/Standing).  Ins. Lit. Rptr., Vol. 34, No. 6 (April 16, 2012)

96.  *Universal Underwriters Inc. Co. v. LKQ Smart Parts, Inc.,* (Illinois) (Liability Insurance/Spoliation of Evidence).  Ins. Lit. Rptr., Vol. 34, No. 2 (February 17, 2012)

97.  *Rogue v. Allstate Ins. Co.*, (Colorado) (Automobile Insurance/Road Rage).  Ins. Lit. Rptr., Vol. 34, No. 2 (February 17, 2012)

98.  *Employers Mutual Cas. Co. v. Holman Building Co., LLC*, (Alabama) (Procedure/Intervention).  Ins. Lit. Rptr., Vol. 34, No. 1 (February 3, 2012)

99.  *Emerson Electric Co. v. Marsh & McLennan Companies,* (Missouri) (Agents & Brokers/Fiduciary Duty).  Ins. Lit. Rptr., Vol. 33, No. 18 (November 4, 2011)

100.  *Remodeling Dimensions, Inc. v. Integrity Mutual Ins. Co.,* (Minnesota) (Insurance Defense Counsel).  Ins. Lit. Rptr., Vol. 33, No. 14 (September 9, 2011)

101.  *Weingarten Realty Management Co. v. Liberty Mutual Fire Ins. Co.,* (Texas) (Duty to Defend).  Ins. Lit. Rptr., Vol. 33, No. 12 (August 12, 2011)

102.  *Stuart v. Pittman* (Oregon) (Agents and Brokers).  Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

103.  *Wood v. New Jersey Manufacturers Ins. Co.,* (New Jersey) (Bad Faith/Procedure).  Ins. Lit. Rptr., Vol. 33, No. 10 (July 8, 2011)

104.  *Lennar Corp. v. Transamerica Insurance Co*. (Arizona) (Bad Faith/Defenses).  Ins. Lit. Rptr., Vol. 33, No. 8 (May 23, 2011)

105.  *Allstate Ins. Co. v. Herron* (Alaska) (Bad Faith/Duty to Settle).  Ins. Lit. Rptr., Vol. 33, No. 6 (April 22, 2011)

106.  *Langwith v. American National General Ins. Co.* (Iowa) (Agents and Brokers).  Ins. Lit. Rptr., Vol. 33, No. 4 (March 25, 2011)

107.  *Westport Ins. Corp. v. VN Hotel Group, LLC* (Florida) (Liability Insurance/Legionnaires Disease).  Ins. Lit. Rptr., Vol. 33, No. 4 (March 25, 2011)

108.  *Ballesteros v. American Standard Ins. Co. of Washington* (Arizona) (UIM/UIM).  Ins. Lit. Rptr., Vol. 33, No. 3 (March 7, 2011)

## SPEAKER/PRESENTATIONS:

1.  "2020 Insurance Law Institute" (August 27-28, 2020, Phoenix, AZ) (Topics: "Contemporary Problems with Damron/Morris and Peaton Agreements;" "Complex Coverage Analysis;" and "Directors and Officers Coverage")  Sponsored by the State Bar of Arizona.

2.  "2018 Insurance Law Institute" (February 1-2, 2018, Phoenix, AZ) (Topic: Coverage Analysis) Sponsored by the State Bar of Arizona.

3.  "Reverse Engineering Short-Fuse Bad Faith Set-Ups" (December 13, 2017, Phoenix, AZ) Sponsored by the Arizona Association of Defense Counsel.

4.  Fourth Annual "Insurance Law Institute" (June 7-8, 2017) (Panelist/Moderator for Mediation of Coverage and Bad Faith Claims) Sponsored by the State Bar of Arizona.

5.  "Working Effectively With Your Insurance Bad Faith Expert" (June 2, 2017, Scottsdale, AZ) (Panel Member) Arizona Association of Defense Counsel Annual Meeting.

6.  "2016 Claims College: School of Extra-Contractual Claims" (September 7-9, 2016, Baltimore, MD) (Teaching Topic:  Insurance Claim Handling Regulations, Statutes and Unfair Claims Settlement Practices Acts)  Sponsored by CLM/Claims & Litigation Management Alliance.

7.  "Extra-Contractual & Bad Faith Liability" (June 2-3, 2016, New York, NY) (Topic: Creative Bad Faith Set Ups: Preventative Strategies and Techniques with Regard to Open Limits, Policy Limit Demands and Time Limit Demand Letters)  Sponsored by American Conference Institute.

8.  Third Annual "Insurance Law Institute" (February 4-5, 2016) (Panelist/*Damron* and *Morris* Agreements)  Sponsored by the State Bar of Arizona.

9. "ACI's 32nd National Forum on Bad Faith Claims & Litigation" (November 19-20, 2015, Miami, FL) (Topic: Bad Faith Set-Ups)  Sponsored by American Conference Institute.

10. "Complex Insurance Coverage Analysis & Interpretation, A Systematic Approach" (March 24, 2015)  Sponsored by Thomson Reuters.

11. "ACI's 30th National Forum on Bad Faith Claims & Litigation" (March 16-17, 2015, Philadelphia, PA) (Topic: Claims Management Best Practices and Bad Faith Avoidance)  Sponsored by American Conference Institute.

12. Second Annual "Insurance Law Institute" (January 29-30, 2015) (Panelist/Moderator for Bad Faith Panel Discussion)  Sponsored by the State Bar of Arizona.

13. "28th National Advanced Forum On Bad Faith Claims & Litigation" (July 29, 2014, San Francisco, CA) (Topics: Removal Issue in Bad Faith Cases; Adjuster Negligence; Aiding & Abetting Claims)  Sponsored by American Conference Institute.

14. "Annual CLE Meeting" (May 8, 2014, Salt Lake City, UT) (Topic: Discipline Without Assumptions: A Systematic Approach To Insurance Coverage Analysis)  Sponsored by the Utah Defense Lawyers Association.

15. "27th National Advanced Forum On Bad Faith Litigation" (March 31, 2014, Philadelphia, PA) (Topics: Federal Removal Challenges In Bad Faith Litigation; Claim Adjuster Negligence)  Sponsored by American Conference Institute.

16. First Annual "Insurance Law Institute" (January 30-31, 2014) (Topics: Building a General Understanding of Directors & Officers Insurance Policy Architecture and *Damron/Morris* Agreements; Panelist/Moderator for Judges Panel, *Damron/Morris* Panel, and Mediators Panel)  Sponsored by the State Bar of Arizona.

17. "Arizona Tort Law Handbook Seminar" (August 27, 2013) (Topic: Product Liability/Product Liability Exclusions in CGL Policy)  Sponsored by the State Bar of Arizona.

18. "25th National Advanced Forum On Bad Faith Litigation" (July 30-31, 2013, San Francisco, CA) (Topic: Bad Faith Set Ups)  Sponsored by American Conference Institute.

19. "Effective Strategies For Avoiding Federal Court Removal In Insurance Cases" (May 21, 2013)  Sponsored by Thomson Reuters.

20. "Discipline Without Assumptions: An Essential Exploration Into Coverage Analysis" (April 23, 2013) (Topic: Systematic Insurance Coverage Analysis)  Sponsored by Thomson Reuters.

21. "Texas 20th Annual Insurance Symposium," (April 5, 2013, Dallas, TX) (Topic: Problems with Complex Coverage Analysis)  Sponsored by Cooper & Scully as approved by Texas State Bar and Texas Department of Insurance.

22. "Arizona Tort Law Handbook Seminar," (February 1, 2013) (Topic: Dram Shop/Assault & Battery Exclusion/Intoxication Exclusion)  Sponsored by the State Bar of Arizona.

23. "2013 Arizona Insurance Law," Chairperson/Speaker (January 31, 2013) (Topic: 2012 Amendments to 28 USCA § 1446)  Sponsored by the State Bar of Arizona.

24. "Bad Faith Insurance Law," Chairperson (August 30, 2012) (Topic: Panel Member)  Sponsored by the State Bar of Arizona.

25. "2012 Annual Convention," Speaker for Bad Faith Insurance Litigation Group/Insurance Law Section (July 28-August 1, 2012, Chicago, IL) (Topic: Effective Strategies for Avoiding Federal Court Removal in Insurance Cases)  Sponsored by the American Association for Justice.

26.    "22nd Annual CLE by the Sea," (July 18, 2012, San Diego, CA)  (Topic: Witness Issues Arising in Civil Cases—Experts)  Sponsored by the State Bar of Arizona.

27.    "Litigation Basics II CLE" (April 26, 2012)  (Topic:  A Young Associate's Guide to Preparing for Bad Faith Litigation)   Sponsored by Arizona Association of Defense Counsel, Young Lawyers Division.

28.    "Arizona Insurance Law" (January 27, 2012)  (Topic: Directors & Officers Coverage)  Sponsored by the State Bar of Arizona.

29.    The Medical Protective Company, National Claim Department Annual Conference (July 21, 2011, Fort Wayne, IN)  (Topics:  Bad Faith; Claim Handling).

30.    "21st Annual CLE by the Sea," Chairperson/Speaker (July 14-16, 2011, San Diego, CA)  (Topic: Settlement Agreements)  Sponsored by the State Bar Arizona.

31.    "Arizona Insurance Law" (January 27, 2011)  (Topic: Insurance Coverage – Analysis & Interpretation)  Sponsored by the State Bar of Arizona.

32.    "Insurance Coverage Litigation" (October 11, 2010)  (Topics: Interpreting Coverage Under the Insurance Contract and Bad Faith Litigation)  Sponsored by the National Business Institute.

33.    "Arizona Insurance Law" (January 22, 2010)   (Topic: Automobile Liability Coverage)  Sponsored by the State Bar of Arizona.

34.    "Insurance Coverage Litigation" (October 12, 2009)  (Topic: Common Types of Insurance Coverage Disputes)  Sponsored by the National Business Institute.

35.    "American Conference Institute's 19th National Advanced Forum on Bad Faith Litigation," Compendium Of References To Insurance Company Bad Faith Set Up Situations (April 29-30, 2009, San Francisco, CA)  (Topic: Manufactured Claims:  Strategically Avoiding and Properly Defending Against "Bad Faith Set-Ups")  Sponsored by American Conference Institute.

36.    "Arizona Insurance Law" (January 23, 2009)  (Topic: Third-Party Bad Faith in Arizona)  Sponsored by the State Bar of Arizona.

37.    "Litigation Basics for the Civil Defense Associate" (December 2, 2008) (Topic: Fundamentals of Insurance Coverage Analysis)  Sponsored by Arizona Association of Defense Counsel, Young Lawyers Division.

38.    Guest Lecturer (March 6, 2008)  (Topic: Discovery Issues in Bad Faith Litigation)  Arizona State University College of Law (LAW 691).

39.    "Arizona Insurance Coverage" (January 25, 2008)   (Topic: Complex Coverage Analysis)  Sponsored by the State Bar of Arizona.

40.    "Insurance Coverage and Claims Institute" (April 11-13, 2007, Chicago, Illinois)  (Topic: Expert witnesses and Insurance coverage litigation)  Sponsored by DRI.

41.    "*Daubert* and Use of Expert Witnesses in the Insurance Bad Faith Content" (April 4, 2007)  Sponsored by Arizona Association of Defense Counsel.

42.    "Arizona Insurance Coverage" (January 25, 2007)  (Topics:  Complex Insurance Coverage Analysis and Directors & Officers Coverage)  Sponsored by the State Bar of Arizona.

43.    "Insurance Coverage and Practice Symposium" (December 7-8, 2006, New York, NY) (Topic: Dirty Sox and Clean Directors:  The Impact of Enron on D&O Issues)  Sponsored by DRI.

44.    "Western Regional Claims Counsel Conference" (October 25, 2006, San Diego, CA)  (Topic: Effective Use of "Colossus" Injury Analysis and Advice of Counsel to Avoid Bad Faith Liability Exposures)  Sponsored by Progressive Insurance Group.

45. "Complex Insurance Coverage Analysis" (September 20, 2006, Hartford, CT)  Sponsored by Thomson/West Publishing.

46. "Federalizing Catastrophic Insurance Losses" and "The Evolution of Disclosure Obligations Regarding Disseminating Health Information to Applicants by Life, Health & Disability Insurance Companies" (September 20, 2006, Hartford, CT)  Sponsored by Thomson/West Publishing.

47. "2005 NDDLA/SBAND Seminar" (September 23, 2005, Fargo, ND)  (Topic: Discipline Without Assumptions, A Systematic Approach To Coverage Analysis)  Sponsored by State Bar Association of North Dakota.

48. "Insurance Coverage Topics" (February 9, 2005)  (Topic: Use of Demonstrative Exhibits for Bad Faith Trials)  Sponsored by Arizona Association of Defense Counsel.

49. "Arizona Liability Insurance Coverage" (May 14, 2004)  (Topic: Analyzing and Litigating Insurance Coverage Cases)  Sponsored by the State Bar of Arizona.

50. "Learn at Lunch" (January 14, 2004)  (Topic: Waiver of Attorney Client Privilege and Advice of Counsel in the Context of Insurance Bad Faith)  Sponsored by Arizona Association of Defense Counsel.

51. "Tort Law" (December 5, 2003) (Topic: Insurance Bad Faith Analysis and Litigation) Sponsored by State Bar of Arizona.

52. "The Nuts and Bolts of Litigating Insurance Coverage Questions" (January 8, 2003) (Topic: Discipline Without Assumptions, A Systemic Approach to Coverage Analysis)  Sponsored by Arizona Association of Defense Counsel.

53. "Arizona Liability Insurance Coverage" (September 20, 2001)  (Topics:  *Damron/Morris* Agreements and Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

54. "Insurance Litigation in Arizona" (October 20, 2000)  (Topic: *Morris* Agreements and Third-Party Bad Faith)  Sponsored by Lorman Education Services.

55. "Advanced Litigation Techniques Seminar" (December 10, 1999)  (Topic: Bad Faith and Coverage Issues)  Sponsored by the Arizona Association of Defense Counsel.

56. "The Most Advanced Insurance Seminar of the Year" (October 1, 1999)  (Topic: *Morris/Damron* Agreements – How to Avoid the Often Subtle and Serious Pitfalls) Sponsored by the Arizona Trial Lawyers Association.

57. "Arizona Liability Insurance Coverage" (April 30, 1999) (Topic: Insurance: Developments in Judicial Rulings on Reservation of Rights Defenses and *Morris* Agreements)  Sponsored by the State Bar of Arizona.

58. "The Phoenix Mini-Bar" (June 19, 1998)  (Topic: How to Understand and Litigate Insurance Coverage in Arizona)  Sponsored by Continuing Legal Education Options (CLE-Ops).

59. "The Law of Insurance Bad Faith:  A Balanced Perspective" (April 24, 1998-Tucson; May 1, 1998-Phoenix)  (Topic: Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

60. "Sing a Song of Six Torts" (April 18, 1997)  (Topic: First Party Bad Faith)  Sponsored by the State Bar of Arizona.

61. "Recent Developments in Insurance Coverage Litigation:  Environmental Coverage, Common Negligence and Bad Faith" (June 13, 1996)  (Topic: Bad Faith)  Sponsored by the Arizona Association of Defense Counsel.

62.   "Essentials in Insurance and Bad Faith" (March 31, 1995)  (Topic: Insurance Bad Faith from the Defense Perspective)  Presented at the Arizona Statewide Minority Lawyers Bar Convention.

63.   "Law of Insurance Bad Faith: A Beginning, but Not the End" (March 10, 1995) (Topic: Third Party Bad Faith)  Sponsored by the State Bar of Arizona.

64.   "Tort Reform:  The November 8 Vote, What's Law? What's Not" (November 10, 1994) (Topic: Insurance Bad Faith, the Defense Perspective)  Sponsored by the Arizona Association of Defense Counsel.

65.   "Insurance Coverage Issues" (March 1, 1994)  (Topic: Reservation of Rights Defenses and *Morris* Agreements)  Sponsored by the Arizona Association of Defense Counsel.

66.   "Insurance Coverage Litigation:  An Overview of Key Areas of Concern to Lawyers" (November 18, 1993)  (Topic: The Concurrent Causation Doctrine and the Standard Automobile Liability Policy)  Sponsored by the State Bar of Arizona.

67.   "Auto Insurance" (November 15, 1991)  (Topic: Arizona's Property and Casualty Insurance Guaranty Fund)  Sponsored by Arizona Trial Lawyers Association.

68.   "Insurance Coverage Litigation:  An Overview of Key Areas of Concern to Lawyers" (March 9, 1990—Phoenix; April 20, 1990—Tucson) (Topic: Multiple Coverage Problems and the Standard Automobile Liability Insurance Policy; Arizona's Property and Casualty Insurance Guaranty Fund)  Sponsored by the State Bar of Arizona.

69.   "Arizona Bad Faith Insurance Law:  What Every Practitioner Should Know" (December 14, 1990)  (Topic: Third-Party Bad Faith)  Sponsored by the State Bar of Arizona.

70.   "Contemporary Problems in Insurance Related Litigation" (May 5, 1989)   (Topic: Developments in the Law Regarding Uninsured and Underinsured Automobile Liability Insurance Policies)  Sponsored by the State Bar of Arizona.

## PROFESSIONAL ACTIVITIES:

- Admitted to the State Bar of Arizona, 1982; U.S. District Court (Arizona), 1982; Ninth Circuit Court of Appeals, 1983; U.S. Court of Appeals (D.C. Circuit), 1989; U.S. Supreme Court, 2002; Tenth Circuit Court of Appeals, 2004.
- Licensed Insurance Broker, Arizona, 1974 to present (Property and Casualty; Accident and Health; Life).
- Chairman, CLE Committee, Young Lawyers Division, Arizona State Bar Association, 1990-1992.
- Member, Arizona State Bar Association, CLE Committee, 1990-1993; 2001-2004.

# EXHIBIT 2

**Rule 26 LIST OF STEVEN PLITT  (Last 4 years)**

| | CASE NAME | COURT INFORMATION | FORM OF TESTIMONY | DATE OF TESTIMONY |
|---|---|---|---|---|
| 1. | Nast v. Certain Underwriters at Lloyd's of London | Circuit Court of City of St. Louis, 1522-CC09864 | Depo | 09/07/17 |
| 2. | Sunflower Condominium Association, Inc. v. Owners Insurance Company | USDC, District of Colorado, 16:CV-02946-WJM-NYW | Depo | 10/05/17 |
| 3. | Wortham v. Western Mutual Insurance Company | USDC, District of Nevada 2:16-cv-02988-JCM-CWH | Depo | 10/24/17 |
| 4. | Buccheri v. GEICO Insurance Company | USDC, District of New Mexico 1:17-CV-00490-LF-KK | Depo | 11/09/17 |
| 5. | Tyler v. American General | USDC, District of Arizona 2:16-cv-00939-GMS | Depo | 12/20/17 |
| 6. | Endurance American Specialty Insurance Company v. Admiral Insurance Company | Superior Court, California, San Diego County, Central Division 37-2015-00028446-CU-IC-CTL | Depo | 04/11/18 |
| 7. | Hogg v. Automobile Club Inter-Insurance Exchange | Circuit Court, Jackson County, Missouri 1616-CV28347 | Depo | 04/26/18 |
| 8. | Wunderlich v. National General Insurance Online, Inc. | Circuit Court, Jackson County, Missouri 1716-CV12514 | Depo | 05/01/18 |
| 9. | Masciotra v. American Family Mutual Insurance Company, et al. | District Court, Clark County, Nevada A-14-695837-C | Depo | 05/15/18 |
| 10. | Whitlock v. Nevada Capital | District Court, Clark County, Nevada A-13-681608-C | Depo | 06/13/18 |
| 11. | Rossman v. Farmers Insurance Exchange | Fourth Judicial District, Ada County, Idaho CV01-17-11405 | Depo | 06/15/18 |
| 12. | Wei v. Warrick | Circuit Court, St. Louis County, Missouri 17SL-CC00724 | Trial | 06/27/18 |
| 13. | Labertew, et al. v. Chartis Property Casualty Company, et al. | USDC, District of Arizona CV-13-01785-PHX-DGC | Depo | 09/04/18 |
| 14. | Cheney v. American General Life Insurance Company, et al. | USDC, District of Arizona 2:17-CV-00004-PHX-DGC | Depo | 09/13/18 |
| 15. | OR&L Construction, L.P. v. Mountain States Mutual Casualty Company, et al. | Third Judicial District, Dona Ana County, New Mexico D-307-CV-2016-01075 | Depo | 09/25/18 |
| 16. | Lobato v. Travelers | USDC, District of Colorado 1:18-cv-00504 REB-MEH | Depo | 01/04/19 |
| 17. | Fremont v. Rocky Mountain Hospital | JAMS Arbitration No. 1260004507 | Depo | 01/29/19 |
| 18. | Raygarr v. EMC Insurance Companies | USDC, District of Arizona 4:18-cv-00246-RM | Depo | 05/14/19 |
| 19. | Enloe v. Atlantic Specialty Insurance Company, et al. | First Judicial District, Los Alamos County, New Mexico C-132-CV-2015-00082 | Depo | 06/28/19 |
| 20. | Biliack v. The Paul Revere Life Insurance Company, et al. | USDC, District of Arizona 2:16-cv-03631-DJH | Depo | 07/03/19 |
| 21. | Shackelford v. American Income Life Insurance Company | USDC, Western District of Oklahoma 18-cv-456-HE | Depo | 07/23/19 |
| 22. | Buyers v. United States Life Insurance Company | New York Supreme Court, County of Erie Index No. 806586/2015 | Depo | 08/29/19 |
| 23. | Maloney v. Benchmark Insurance Company | Circuit Court, Cass County, Missouri 18CA-CC00025 | Depo | 09/12/19 |
| 24. | McElmurry v. USAA | Third Judicial District, Doña Ana County, New Mexico D-307-CV-2017-03687 | Trial | 10/04/19 |

**Rule 26 LIST OF STEVEN PLITT  (Last 4 years)**

| | CASE NAME | COURT INFORMATION | FORM OF TESTIMONY | DATE OF TESTIMONY |
|---|---|---|---|---|
| 25. | Rue v. USAA | Twelfth Judicial District, Otero County, New Mexico D-1215-CV-2016-00035 | Depo | 10/15/19 |
| 26. | Maloney v. Benchmark Insurance Company | Circuit Court, Cass County, Missouri 18CA-CC00025 | Trial | 10/25/19 |
| 27. | Stryker Corporation v. XL Insurance America, Inc. | USDC, Western District of Michigan, Southern Division 1:17-CV-00066 | Depo | 11/05/19 |
| 28. | The Olga J. Nowak Irrevocable Trust v. Voya Financial, Inc.; Security Life of Denver Insurance Company | Superior Court, State of Delaware N17C-05-254 FWW | Depo | 02/28/20 |
| 29. | Stryker Corporation, et al. v. XL Insurance America, Inc. | USDC, Western District of Michigan, Southern Division Case No.: 1:17-cv-00066-PLM-PJG | Trial Depo | 08/06/20 |
| 30. | Zurich American Insurance Company v. Covil Corporation, et al. | USDC, Middle District of North Carolina, Civil No. 1:18-cv-932 | Depo | 08/13/20 |
| 31. | Oscar Frias and Zenna Frias Acosta v. Auto Owners Insurance Company | USDC, District of Colorado Civil No. 1:10-cv-00903-WJM-SKC | Depo | 09/23/20 |
| 32. | Albert Perry v. Auto-Owners Insurance Company | USDC, District of Colorado Civil No. 1:19-cv-03116-WJM-SKC | Depo | 09/30/20 |
| 33. | Conduent State Healthcare, LLC v. AIG Specialty Insurance Company, et al. | Superior Court, State of Delaware N18C-12-MMJ [CCLD] | Depo | 11/24/20 |
| 34. | McShane v. HMSA, et al. | Circuit Court of the First Circuit, Hawaii 17-1-1234-07 DEO | Depo | 12/18/20 |
| 35. | T.H.E. Insurance Company v. Robert Fisher, et al. | USDC, District of Maryland GLR-18-03402 | Depo | 01/07/21 |
| 36. | Muratori v. Skyview Auto Sales, LLC, et al. | Second Judicial District Court, Bernalillo County, New Mexico | Depo | 02/24/21 |
| 37. | Continental Casualty Company, et al. v. Platinum Training, LLC, et al. | USDC, District of Arizona 2:19-CV-05163-PHX-DJH | Depo | 03/19/21 |
| 38. | Starr Surplus Lines Ins. Co. v. Prime Holdings Insurance Services, Inc., et al. | Arbitration Maricopa County, Arizona | Depo | 05/13/21 |
| 39. | Perez v. Indian Harbor Insurance Company | USDC, Northern District of California 19-cv-07288-YGR | Depo | 07/08/21 |
| 40. | Stein v. Farmers Insurance Company of Arizona and Farmers Group, Inc. | USDC, Southern District of California 19-cv-0410-DMS (AHG) | Trial | 08/02/21 |
| 41. | Steadfast Insurance Company, et al. v. Community Health Systems, Inc., et al. | Superior Court, State of Delaware N18C-11-127 EMD | Depo | 09/07/21 |