**Erin Finn**
**Erin Finn Consulting, LLC**
**6820 Wisconsin Ave, Unit 5002**
**Bethesda, Maryland 20815**
**erin@erinfinnconsulting.com**

September 30, 2021

Rich Dolder
Slappey & Sadd
352 Sandy Springs Circle, Suite 100
Atlanta, Georgia 30328

Re: *American Family Insurance Company v. Abdulmohsen Almassud and Luisa Cruz Mezquital*

Dear Mr. Dolder,

I have been retained by Slappey & Sadd in the above matter as an expert and to provide you with an opinion on whether American Family Insurance Company ("AmFam") breached its fiduciary duty to its insured, Abdulmohsen Almassud ("MJ") in the underlying automobile matter of *Luisa Cruz Mezquital v Abdulmohsen Almassud, Case No. 14EV001930F (Ga. St. Ct. Fulton County)*.

As part of my engagement, I reviewed the materials set forth in Exhibit A to this opinion. I will be compensated for my professional services and rendering my opinion at the hourly rate of $200 for file review and written opinion and $250.00 for deposition and trial work, plus expenses. Any payment under this retention will not affect my independent and unbiased analysis.

## QUALIFICATIONS

My expertise is in the field of insurance, specifically, insurance claims handling, and is derived from over 25 years of experience at various technical claims handling and management positions within the insurance industry.

After graduating from law school at DePaul University College of Law in Chicago, Illinois in May, 1992, I began my career at a litigation boutique firm in downtown Chicago handling a wide range of matters from slip and fall cases, motor vehicle accidents, defamation, as well as professional liability. In November 1993, I was offered an opportunity to join the Environmental Mass Tort claim team at CNA Insurance Companies ("CNA"), where I began my career as a claim analyst. My job duties at the time included review of coverage, investigate claims, resolve claims as appropriate and make timely claim payments. The focus of my work was on claims arising under liability policies and dealing with the insurer's duties to settle, defend and otherwise protect insureds.

In the fall of 1995, I was asked by Senior Claim Executives at CNA to join a team of individuals that would manage cases that had been filed against CNA alleging bad faith, negligent failure to settle or other claim-handling failures. My duties included managing cases across all lines of business of the company, including motor vehicle accidents, general liability, professional liability, and property claims. My primary role during this time was to evaluate the claim handling of these cases to determine if CNA had a viable defense, i.e., whether the claim had been appropriately evaluated by the claim adjuster and whether the claim adjuster gave the proper level of attention to the interests of the insured.

In the fall of 1997, I was asked by Senior Executives at CNA to move to Los Angeles to oversee the claim department for the Entertainment Coalition, a joint venture between CNA and Aon. The reason for my appointment to the claim department in Los Angeles was due to a relatively large amount of bad faith cases arising out of that group of claims as well as some large settlements and verdicts. One of my job responsibilities at the outset was to assess the competency of the claim staff and management and make any changes to the staff I felt was necessary. I placed claim adjusters who failed to meet minimum standards for claim handling on "Performance Action Plans."

In 2000, I was then asked by Senior Claim Executives at CNA to take over the Real Estate E&O claim program. The office was located in Chevy Chase, Maryland. My role was to assess the competency of the claim staff and management and make any changes to the staff I felt was necessary. I placed claim adjusters who failed to meet minimum standards for claim handling on "Performance Action Plans." I closed down the offices in several states, streamlined the reporting process to management, and hired additional claim staff in Chevy Chase, Maryland.

In 2002, after making significant changes to the CNA Real Estate E&O operation as well as mentoring my successor to take over the claim management of that claim operation, I was asked by Senior Executives at CNA to return to Corporate Claims and assist with mitigation of bad faith claims primarily through claim audits and claim training. I oversaw matters across all lines of business at CNA, including automobile claims, general liability claims, professional liability claims, as well as property claims. I also audited claim files and placed claim adjusters who failed to meet minimum standards for claim handling on "Performance Action Plans." Those employees who failed to meet claim standards expected of claim professionals were terminated. I was also tasked with interviewing claim candidates to fill open positions.

In 2005 I was asked to join a newly formed group at CNA called "CLEM" – Claim Legal Expense Management, under the direction of Davis Carr, Vice President. The role of this group was to identify significant claims that the Company should take to trial and identify claims that should be settled prior to trial. The claims I was tasked with review and monitoring included Professional Lines Errors & Omission (E&O) claims for Real Estate, Architects & Engineers, and Not-for-Profit claims. This role entailed preparing claim matters for settlement, attending mediations and trials, and selecting appropriate defense counsel on each matter, particularly for those matters headed for trial.

In 2008, I was asked to create a new unit as part of CNA's Law Department that originally focused solely on bad faith mitigation and claim training. This role included oversight of every claim unit across the country, including all P&C Operations as well as Professional Lines (also known as "Specialty Lines" at CNA), Maritime claims, and claims handled by third party entities such as Boat U.S. This unit expanded over the subsequent 10 years to include development of claim training materials, oversight of regulatory and compliance matters related to claim, working with SIU on denial of claims that had a fraud element attached, as well as to interact with various State Insurance Departments across the country on claim related issues. As the role and my staff expanded, I remained involved in all Specialty Lines matters, which included Healthpro claims, while my staff managed General Liability and Property Claims. As part of this role, I conducted annual claim training to all claim staff members which included training on good faith claims handling.

Every year while employed at CNA from 1993-2018, I attended regular insurance conferences including the annual DRI conference regarding Coverage, Bad Faith as well as the DRI annual meeting. In addition, in February 2013, I was a speaker at a CLM event in Orlando, Florida where I was a panelist discussing bad faith claims and how to mitigate exposures from a technical claim handling perspective.

In March 2018, after leaving CNA, I formed my own consulting company *Erin Finn Consulting, LLC* where I provide claim training and audit services to insurance entities including Risk Retention Groups, such as United Educators. I also provide consulting services and expert advice to Insurers, Plaintiffs and Defendant Insureds on a wide range of issues, but particularly with regard to claim handling and litigation management.

In April 2021, I joined a Risk Retention Group, United Educators, located in Bethesda, Maryland as an Associate Vice President and Associate General Counsel. United Educators provides insurance services to schools, colleges and universities throughout the United States. I currently supervise a staff of 20 technical claim analysts and managers who do work similar to that of claim professionals working at insurance companies. I provide hands on training with respect to all aspects of a claim from notice, investigation, coverage, defense and settlement.

I have a bachelor's degree from Boston College (1989) and a Juris Doctor degree from DePaul University College of Law (1992). I received my Senior Claims Law Associate (SCLA) designation in 1996 and my Associate in Risk Management (ARM) in 1997.

My law license was issued in Illinois in 1992 and has been active continuously to the present date. A true and correct copy of my resume is attached hereto as Exhibit B. I have not authored any publications in the previous 10 years.

## SCOPE OF REVIEW & BASIS OF OPINION

As noted above, I have been retained by Slappey & Sadd in the above matter as an expert and to provide an opinion on whether American Family Insurance Company ("AmFam") breached its fiduciary duty to its insured, Abdulmohsen Almassud ("MJ"), in the underlying automobile claim and subsequent litigation involving Mr. Almassud, *Luisa Cruz Mezquital v Abdulmohsen Almassud, Case No. 14EV001930F (Ga. St. Ct. Fulton County.*

The opinions expressed herein are based on my insurance training, education, knowledge, skill and experience in the field of insurance, specifically insurance claim handling practices. My experience is derived from over 25 years of experience at various technical claim handling and management positions for all lines of business within the Property & Casualty Insurance Industry. This experience includes a role as Vice President tasked with the review and approval of all claim handling guidelines, claim training as well as bad faith prevention for all lines of business, for both personal and commercial lines. As such, I am familiar with industry standards, customs and practices involved in claim adjusting as well as claim training which includes evaluation, investigation, negotiation, and resolution of claims.

My opinion is also based on my review of the materials and documents set forth in Exhibit A. I reserve the right to update this report based on additional information as it becomes available.

## FACTUAL SUMMARY

1. On September 20, 2009, AmFam issued an auto policy to MJ for his 1995 Jeep Wrangler with $100,000 in liability limits per person for bodily injury. An AmFam agent took information from MJ. AmFam's agent signed the application and certified, "I personally have seen the vehicle and recommend it."

2. On October 13, 2012, approximately eight days prior to the accident at issue in the underlying case, MJ had the steering kit replaced in his Jeep at Oh's Auto Center. After having the lift kit installed, MJ took the Jeep to Sears to have the vehicle aligned.

3. On October 21, 2012, MJ was driving south on Route 9 in Cummings, Georgia when he lost control of steering, veered into oncoming traffic and collided with the Plaintiff in the underlying matter, Luisa Cruz Mezquital ("Cruz").

4. The accident left MJ's Jeep totaled and Cruz was severely injured. At the time of the accident, Cruz was a twenty-nine year old single mother of three children and she suffered a horrific degloving injury to her dominant left hand, lost one finger, and had a severe open fracture and multiple broken bones in her hand. Her total medical bills were approximately $380,000.

5. Prior to the accident, MJ had been at Beasley Knob.

6. MJ promptly reported the accident to AmFam. AmFam took possession of the Jeep to inspect it and assess the damage. A representative from AmFam, adjuster April Lyke ("Lyke"), contacted MJ shortly after the accident and took his recorded statement. MJ explained in the recorded statement that he had the steering kit and the drag links replaced at a shop and said he would provide those receipts to AmFam. MJ further explained how the tow truck driver noticed a pin missing from the steering column.

7. On November 7, 2012, Dana Laufenberg with AmFam sent a legal question to Michael Reuss ("Reuss") asking him whether AmFam should deny the third-party liability claim "or do we [AmFam] pay the claimant and subrogate the mechanic." [sic] The request also specifically advised Reuss that the garage was not cooperating in the investigation.

8. On November 15, 2012, Reuss responded to this request and advised that the AmFam adjuster should reject the settlement demand, "If the [expert] report opines the accident was a result of the negligent repairs, then you may deny the claim." This advice was provided even though he was informed that the garage where the repairs were done was not cooperating in the investigation.

9. On November 27, 2012, approximately five weeks after the accident, the BI adjuster Lyke retained Rimkus to perform an analysis of the steering malfunction.

10. On November 28, 2012, Mark Hook ("Hook") with Rimkus contacted AmFam regarding the Jeep inspection. Pursuant to the contemporaneous claim notes, Hook expressed concern that AmFam did not know what parts were replaced by the shop. The note states, "If he goes out he may be able to tell that yes steering went out before accident but if we don't know which parts shop replaced we will have a hard time putting shop at fault. I told him I would call our insured in attempt to get additional info on repairs." [sic]

11. On November 30, 2012, MJ e-mailed Lykes receipts showing which parts had been installed by Oh's Auto Center on October 13, 2012.

12. On December 3, 2012, AmFam resolved the property damage claim for the Jeep in the amount of $6735.34. MJ disputed the value because he had after-market parts which he felt increased the value of his Jeep. The property adjuster indicated that he could not reimburse him for the after-market parts and described MJ's vehicle as a "specialized off road vehicle."

13. The property damage adjuster sent the file to AmFam's subrogation department to recover the amount paid in property damage from Oh's Auto Center ("Oh's"). Oh's closed its doors shortly after receiving the property damage subrogation demand.

14. Cruz hired an attorney to recover damages due to her injuries. On December 3, 2012, her attorney submitted a demand for policy limits in the amount of $100,000 with a deadline to respond by December 24, 2012. The demand outlined Plaintiff's medical bills which at that time exceeded $330,000.

15. On December 6, 2012, Hook inspected the Jeep. On December 7, 2012, Hook and adjuster Lyke discussed his inspection. The claim file notes documents the conversation as follows:

> "Based on information obtained at inspection he is confident that the steering drag coming loose from pitman arm was not a result of the accident but is what caused insured to loose steering. He could tell that parts were new & in good condition. Overall the Jeep looked well maintained - had newer tires. He explained that pin was not replaced when shop installed steering components. Terminology used was more technical then I could understand but his findings are that shop didn't put things together properly. I asked if off roading with the Jeep would that have effected it in any way and Mark said that off roading would not have caused the issue. Based on his findings insured would have lost steering at some point and ***off roading may have accelerated it but not caused it.***" [sic] [emphasis added]

16. On December 11, 2012, Dana Laufenberg reached out to attorney Reuss once again to discuss the demand for policy limits and the recent report from Rimkus. Reuss instructed the adjuster that they could reject the demand based on the Rimkus report. Lyke was also instructed to send the insured an "excess letter."

17. On December 12, 2012, AmFam rejected the demand to settle the case for $100,000. It also sent MJ an "excess letter" on the same date and Lykes documents in the claim file notes that she discussed the letter with him so that he would not be "alarmed". This letter stated, "We will attempt to settle the matter within your coverage limits."

18. While AmFam sent MJ an excess letter saying it was going to attempt settlement, it did not send him a reservation of rights letter. MJ was not advised that there may not be coverage for this claim nor was he advised at this time he had the right to seek the advice of independent counsel.

19. On December 14, 2012, AmFam assigned the property damage claim to the subrogation department to attempt to recoup the $6735.34 it paid to its insured from Oh's Auto Center. The claim file notation indicted that the recovery potential was "Good".

20. On December 20, 2012, Plaintiff's counsel extended the deadline to accept the policy limit demand until January 3, 2013. Plaintiff explained that the value of the claim was approximately $1,600,000 and even a small percentage of fault attributed to MJ could result in an excess exposure. Plaintiff's counsel instructed AmFam to provide a copy of the letter to their insured MJ.

21. On January 7, 2013, adjuster Lyke had another discussion regarding this matter with AmFam in-house attorney Reuss. Lyke expressed concern about forwarding MJ a copy of the demand letter from Plaintiff's counsel. According to Lyke's note, "[Reuss] said to try and ease the insureds

mind as attorney trying to be intimidating. He said to reassure insured that based on our investigation he did nothing wrong and is not liable. He said if they file a lawsuit amfam will retain an attorney pursuant his policy." [sic]

22. On March 20, 2013, an attorney contacted the AmFam subro adjuster and confirmed that there was no insurance coverage for Oh's Auto Center.

23. On May 22, 2013, counsel hired to represent Oh's Auto Center indicated to the AmFam subro adjuster that his client was facing a significant bodily injury claim with little funds. AmFam continued to pursue the subrogation to recover a portion of its $6735.34 paid on the property damage portion of the claim.

24. On May 31, 2013, the attorney for Oh's Auto Center contacted the subro department again and indicated his client was uninsured, closed down the shop and could no longer be contacted. The attorney indicated he would be withdrawing from representing Oh's.

25. On June 3, 2013, adjuster Lyke issued a check to MJ in the amount of $500 for his collision deductible because Oh's was uninsured.

26. On July 24, 2013, adjuster Lyke reached out to Plaintiff's counsel asking if AmFam still needed to preserve the vehicle. For the following nine months, the claim file entries only deal with issues surrounding storage and salvage of the Jeep.

27. On April 4, 2014, Plaintiff's counsel gave AmFam one final chance to protect its insured and settle the claim for $100,000. This demand letter was a very detailed 10-page demand letter and outlined Cruz's injuries and the fact that her medical bills were approximately $380,000. AmFam once again denied liability for this matter and sent a rejection of the demand to Plaintiff's attorney on April 14, 2014.

28. On June 9, 2014, attorney Ben Broadhead advised AmFam he was associating in as Plaintiff's counsel. AmFam once again denied liability.

29. On August 28, 2014, Plaintiff filed suit against AmFam's insured, MJ.

30. AmFam retained attorney James Taylor ("Taylor") to defend MJ. AmFam also wrote a letter to MJ advising him that they retained this attorney to defend him and also assured him that, "Jim [Taylor] and I will work to get you dismissed from the lawsuit as quickly as possible." No reservation of rights was issued to MJ warning him there could be a coverage issue.

31. In the e-mail Will Hane, an attorney from AmFam, sent to Taylor on September 16, 2014, he indicated that they assessed liability against MJ at 0% and Oh's 100% and noted that, "Subrogation was involved but Oh's Auto Center closed down after we started pursuing them for this incident."

32. Attorney Taylor advised MJ he had the right to retain his own attorney to defend him but neither attorney Taylor nor anyone at AmFam explained to MJ why he might want to retain his own attorney in this matter.

33. Attorney Taylor was an insurance defense attorney and AmFam was one of his biggest clients. He testified that over half of his practice was dedicated to defending AmFam policyholders and he

also testified that he did some coverage work. While his hourly rate was typically $145/hour, he charged AmFam a flat rate of $5500 to handle auto claims up until trial.

34. Taylor testified that he had an initial brief call with MJ that was "routine" and just advised him not to be concerned about the lawsuit.

35. On November 7, 2014, Taylor reported to AmFam that Oh's was a "one man operation" that closed shop after the accident, and it was likely it would take a default judgment in the case.

36. In the same November 7, 2014 letter, Taylor reported to AmFam that MJ had been off-roading immediately before the accident and expressed concerns that the jury could come to the conclusion that off-roading was the cause of his steering failure rather than the negligence of the garage.

37. On November 14, 2014, Taylor reported to AmFam that there was less than a 50% chance of settling the case for AmFam's policy limit of $100,000.

38. Discovery began and Taylor instructed his paralegal to call MJ to review the interrogatory requests. As part of the responses to his Answers to Interrogatories, MJ responded that he had gone to Blairsville "to go off-roading."

39. AmFam did not reserve its rights under the auto policy after learning that MJ had gone off-roading.

40. As the discovery continued, attorney Taylor recognized there was a risk of an adverse verdict against MJ and reported this to AmFam. However, MJ was not advised of the risk of an adverse verdict nor was he advised to seek independent counsel due to this risk.

41. Mathew Valley ("Valley"), the supervising staff attorney at AmFam who had primary responsibility for this matter at AmFam in November 2014, testified that he knew the defense of MJ was an uphill battle as these were difficult facts to defend the case. Mr. Valley testified, "When I first looked at this file, I thought there was significant risk that Mr. Almassud would be apportioned fault by the jury."

42. On December 17, 2014, Valley increased the reserve to $100,000 because he indicates that AmFam only recently learned that the insured had been off-roading just prior to the accident and that could be a cause of the steering malfunction.

43. On December 17, 2014, Valley puts a note in the legal file which states, "I agree that our defense that the 'cotton pin' was negligently placed by the mechanic shortly before the accident will be disbelieved if a jury hears that the insured was 'off roading' immediately prior t the accident. The likelihood that the 'off roading' was a significant factor in contributing to the loss is great. I am going to recommend that we try to settle within the policy limit."

44. On February 9, 2015, AmFam offered the $100,000 policy limits for the first time.

45. On April 14, 2015, Cruz's attorney filed an offer of judgment to settle in the amount of $1,000,000 which was rejected by AmFam on May 14, 2015. AmFam continued to rely upon the notion that Oh's was 100% at fault, even though AmFam had been advised that Oh's likely would file a default and there continued to be a risk that MJ would be found to be partially at fault for

the accident, which could present substantial personal exposure to MJ.

46. Plaintiff Cruz suffered a horrific degloving injury to her dominant left hand, lost her middle finger, and had medical bills of approximately $380,000.

47. AmFam rejected the $1,000,000 demand but did not advise MJ of the demand, did not advise him that he may face substantial personal exposure in the case, did not advise him to seek the advice of independent counsel, and AmFam did not issue a reservation of rights under the policy.

48. On May 31, 2015, Plaintiff demanded $2,500,000 which was rejected by AmFam. Again, MJ was kept in the dark as to the demands to settle the case and the personal risk he faced if the case went to trial.

49. On March 11, 2016, Taylor wrote to AmFam attorney Valley, "For the record- you and I both agreed during my meeting up in Madison that this is a case where the $100k policy limits should have been tendered in response to the pre-suit Holt demand if for no other reason than the severity of the injury and lack of any contributory negligence on the part of Plaintiff."

50. On August 16, 2016, Valley's file notes indicates that trial has been set for September 6, 2016 and that, "The jury will make an award to the plaintiff which will most likely be in excess of $1,000,000."

51. As the trial date approached, MJ's defense counsel was aware that there was a risk there could be an adverse verdict. He testified that he was under a lot of pressure from AmFam, and that AmFam was asking for a lot of information and documents when he was trying to prepare for trial.

52. Valley, the attorney at AmFam directly managing the litigation against MJ testified that the first time he ever spoke to MJ was on the first day of trial.

53. On September 2, 2016, in an e-mail exchange with expert Hook, attorney Taylor stated, "[T]he sh*t has hit the fan with American Family."

54. The matter proceeded to trial. During cross examination of MJ, he was asked about his crossroad activities. MJ attempted to downplay his off-road activities. During cross examination, Plaintiff's counsel was able to impeach MJ with photographs from an off-roading website. The trial was then recessed. MJ was advised by defense counsel Taylor to seek advice of a criminal attorney and was provided two names of criminal defense attorneys. When trial resumed the following day, defense counsel Taylor provided MJ with a script of what to say and how to plead the 5th Amendment. When trial resumed, MJ pled the 5th Amendment. Defense counsel Taylor made no attempt to rehabilitate MJ during the trial.

55. AmFam, after not reserving rights under the policy throughout the matter, issued a reservation of rights letter on September 8, 2016, during trial. Adam Joffe ("Joffe"), the coverage attorney AmFam hired to represent it in the litigation drafted the reservation of rights letter and handed it to MJ at some point during the trial the following morning.

56. A jury returned a verdict in favor of Cruz and against MJ in the amount of $30 million. The jury found MJ to be 100% liable for the incident and Oh's 0% responsible.

57. The verdict was overturned on appeal and AmFam settled Plaintiff's claims for ▮▮▮▮ in December 2019.

58. AmFam continues to pursue claims against MJ for breach of contract and fraud and filed a declaratory action against MJ as well as Cruz.

**OPINION**

*AmFam, as the first party auto carrier for its policyholder MJ, has a fiduciary obligation to MJ to protect him from legal liability and the risks attendant to lawsuits, including undue stress and financial harm.*

1. Individuals purchase insurance for protection and peace of mind. When an accident occurs, the policyholder expects that the insurance company will, at the very least, treat the insured's interests equal to its own. A common notion in insurance is a "duty of good faith and fair dealing". Therefore, a policyholder has a reasonable expectation of security and protection from their insurance carrier. The best way for an insurance company to honor its obligation to the policyholder is to properly investigate and settle claims as appropriate.

2. AmFam failed to properly investigate and settle MJ's claims as appropriate.

3. It was a breach of AmFam's fiduciary obligation to MJ to not settle the bodily injury claims when it had the opportunity to do so.

*The first three instances of AmFam's breach of fiduciary duty to MJ involved AmFam's rejection of the three demands to settle for policy limits prior to suit being filed.*

4. AmFam had an opportunity to protect its insured on a number of occasions. The first instance of AmFam's breach of fiduciary duty occurred when AmFam rejected the demand to settle the claim for the policy limits on December 3, 2012. The adjuster sought legal advice from an in-house attorney at AmFam, Michael Reuss. Reuss indicated that it was appropriate to deny a high exposure bodily injury claim against its insured based solely on the Rimkus report. This "legal advice" was erroneous, did not take into consideration MJ's personal exposure, and put MJ at significant risk of an excess judgment.

5. On December 20, 2012, Plaintiff's counsel provided AmFam with an extension of time to respond to the $100,000 demand through early January 2013. In this demand, Plaintiff's counsel instructed AmFam to provide its insured with a copy of the demand. AmFam provided MJ with a copy of the demand but advised him to not be "alarmed" and that AmFam "will attempt to settle the matter within your coverage limits." This statement by AmFam was not truthful because at no time prior to suit being filed did AmFam attempt to settle the case within MJ's coverage limits.

6. AmFam had yet another settlement opportunity to resolve the claim for its policy limits. On April 4, 2014. Plaintiff provided AmFam with a detailed 10-page explanation why it needed to settle the case and protect its insured. AmFam ignored the correct analysis in this letter and once again placed its insured's financial well-being at risk when it rejected this demand 10 days later on April 14, 2014.

7. An insurance company has an obligation to explain the risks of exposure to its insured for its failure to settle a case within policy limits. AmFam failed to do this which was a breach of its fiduciary obligation to MJ.

8. AmFam did advise MJ early in the claim that he had a right to retain his own counsel, but never explained to MJ why he may need to retain personal counsel. This failure to fully inform its insured is a breach of its obligations to its insured.

9. AmFam continued to reject policy limits, yet continued to tell MJ that it was going to attempt to settle the case within his policy limits – yet never offered the policy limits until after suit was filed. This is egregious conduct on the part of AmFam and a breach of its fiduciary obligation to its insured.

10. While AmFam had developed a theory of liability against a third party, Oh's Auto Center, this was just a theory and AmFam never should have risked personal exposure to MJ at any time during this matter by rejecting the offer to settle.

11. The rejections of the policy limit demands is so egregious, particularly the third and final attempt at settlement in April 2014, because at that time, AmFam was well aware that there was little likelihood that Oh's Auto Center would contribute to a settlement because it had closed its door and the owner could not be located. Further, Oh's did not have insurance coverage for this claim.

12. AmFam had an obligation to eliminate any financial risk or financial exposure to its insured in excess of the $100,000 policy limits and failed to do so. All AmFam had to do in this instance was settle with Plaintiff for $100,000, and if it felt confident in its theory against Oh's, it was AmFam's responsibility to pursue the garage pursuant to its rights of subrogation which is typical in every insurance policy.

13. Pursuing subrogation in matters such as the underlying matter are routine in the insurance industry, and this is what AmFam did with respect to the property damage portion of the claim.

***AmFam specifically advised MJ that even though he had been sued, they were going to resolve the claims against him, yet they failed to do so.***

14. AmFam represented to MJ that they were going to resolve the claim. There was no reason for MJ to think that AmFam would do anything different other than resolve his claim.

15. AmFam had not issued a reservation of rights letter advising him that there was a risk there would not be coverage for the claim even after AmFam was aware that (1) he had modified the vehicle; and (2) when he provided more detailed information in his Answers to Interrogatories when he stated he had used the Jeep for off roading. In fact, the adjuster specifically asked the Rimkus expert if off-roading would impact his analysis of the cause of the steering failure.

16. MJ had every right to expect AmFam to live up to its obligations and to protect him. MJ relied upon AmFam's promises as the case proceeded through the court system and then up to trial. MJ was never advised his personal assets were at risk, never apprised of the true risk going forward, and while he was apprised of his right to seek independent counsel, AmFam never explained to him why he had this right or why he should invoke this right. Failure to fully

inform its policyholder was a breach of AmFam's fiduciary obligation to its insured.

17. The staff attorney handling the litigation for AmFam, Matthew Valley, testified that he knew the defense of MJ was an uphill battle, that it was likely the jury was going to apportion fault to MJ, and he was aware that the verdict likely would be in excess of the $100,000 policy limit. Yet AmFam proceeded to take this matter to trial without advising MJ of the risks AmFam knew to exist.

18. AmFam lulled its policyholder into believing it was going to do the right thing in this case, when in fact it had no intentions of doing so, in breach of its fiduciary obligations.

***AmFam breached its fiduciary obligation to its policyholder by entering into a "flat fee" arrangement with defense counsel that multiple attorneys at AmFam did not view favorably.***

19. James Taylor testified that the bulk of his practice was dedicated to defending AmFam insureds or assisting AmFam on coverage matters. Taylor testified that his normal hourly rate was $145/hour but he accepted this assignment for a flat fee of $5500.00 Therefore, if Taylor spent in excess of 40 hours on the case, he was, in theory, losing money for himself and his law firm. The incentive, therefore, is for attorneys to do the "bare minimum" in defending their clients. An example of this is having a paralegal handle work that is more appropriate for an attorney in a case like this.

20. In addition, Taylor testified that AmFam requested that any legal research should be conducted by AmFam attorneys and not his firm. AmFam, through this practice of flat fee, no legal research, controlling of experts, etc. incentivized defense counsel to cut corners in a case. In fact, this arrangement clearly had a detrimental effect on the defense of MJ in this case.

21. Taylor testified that AmFam representatives were "on his case" as the matter proceeded forward. AmFam representatives knew Mr. Taylor was not a top tier attorney and they had even ranked him low, yet had been sending 2-3 files to his firm per week knowing that he did not do a good job. Mr. Taylor testified that he was handling approximately 50 AmFam files during the time he was handling MJ's highly contentious, catastrophic-injury case involving multiple experts.

22. Valley testified that AmFam had criticism of Taylor's handling other matters that included Taylor's failure to properly defend damage portion of claims and Valley admitted he questioned Taylor's overall judgment on cases.

23. Valley also testified that he had a duty to provide MJ "with the best defense". Yet he kept Taylor on as defense counsel in MJ's case, even though he knew there had been prior issues with Taylor and that he questioned his judgment on matters. Hiring a sub-par defense attorney for a nominal flat fee in a case like this is not providing an insured "with the best defense."

24. Valley testified that he evaluated Taylor's handling of MJ's case "unfavorably". He also testified that he recommended that AmFam replace Taylor as defense counsel in the underlying matter, but his supervisor Reuss refused. Reuss is the in-house attorney that the claim adjuster sought legal advice from when AmFam had the opportunity to resolve the case for policy limits, yet Reuss instructed the adjuster to deny the claim.

25. AmFam clearly breached its fiduciary duty to its policyholder by not only hiring Taylor as defense counsel for a flat fee, but also in not replacing him with competent counsel as recommended by Valley, the supervising attorney at AmFam as the trial approached.

26. Taylor testified that he did not provide written status reports to his client, MJ, during this case. Not one status report. Taylor only provided a detailed status report to AmFam as the trial date approached. Taylor stated that he did not provide MJ with a copy of the report. AmFam did not provide MJ with a copy of the status report. MJ was kept completely in the dark about the case. Valley testified the first time he spoke with MJ was when the jury was being impaneled on the first day of trial. Lack of communication (in this case no communication), is a breach of AmFam's fiduciary duty to its insured, MJ.

27. Valley also felt that Taylor inappropriately shared with Valley and Adam Joffe, an attorney hired specifically to protect AmFam and not MJ, information during trial which was detrimental to MJ and was improper. This is yet another breach of AmFam's fiduciary obligation to its insured.

**AmFam representatives kept their own insured in the dark about the exposure in the case and failed to appropriately communicate with him during this matter.**

28. The inhouse attorney who was managing the litigation against MJ, Valley, testified that *the only time* he spoke to MJ was during jury selection. This admission is unbelievable, particularly in a third-party matter. Failing to communicate with your own insured until the time of trial, knowing that the case presented a significant risk to MJ, with defense counsel you thought was sub-par at best, is a clear breach of AmFam's fiduciary obligation to its insured.

29. AmFam told MJ they would protect him by settlement of the claim. Valley recognized the "uphill battle" and "significant risk" this matter posed to MJ, yet did nothing to resolve the claim and protect AmFam's insured, and did not speak with him until trial began with jury selection.

30. The lack of communication is an indication that they were not concerned about their insured, but rather were only concerned about themselves and moving the case towards "no coverage" at any opportunity they could.

**AmFam held its own interests over and above the interests of its policyholder.**

31. The AmFam file is replete with evidence of AmFam treating its own interests over and above that of its policyholder, MJ. The first clear examples are the failures to secure a settlement for policy limits when AmFam had an opportunity to do so, knowing that the exposure to MJ clearly exceeded his policy limits.

32. Once the property damage adjuster at AmFam settled the property damage portion of the claim with MJ, it sent the file to the subrogation team to recover the $6735.34 it paid to MJ from Oh's. At that juncture, AmFam was aware that there was little to no money available from Oh's in order to properly reimburse the underlying Plaintiff for her injuries, yet they continued to pursue subrogation. While this point may seem minor, it shows how AmFam proceeded to put its interests over and above MJ's, even for a nominal amount of $6735.34 to recover the property damage portion of the claim it did pay. At a minimum, what this also shows is that

AmFam was aware that Oh's had no money and no insurance to respond to Plaintiff's claims, a significant risk to its insured, yet it continued to deny liability and failed to settle the case for $100,000.

33. Even though AmFam may have recognized its mistake in not settling the matter pre-suit for policy limits, it still refused to settle for any amount in excess of policy limits even though it was well aware that there could be a substantial verdict entered against its insured for an amount well in excess of $100,000. AmFam made absolutely no attempt to resolve the case prior to trial once the opportunity to settle the case for $100,000 had passed. This frankly does not make logical sense why preventative steps were not taken to protect their insured during this stage of the litigation and save him from potential financial ruin.

34. AmFam had at least two additional opportunities to settle this case prior to trial. The first was on April 14, 2015 when Cruz's attorney filed an offer of judgment in the amount of $1,000,000 and the second opportunity was on May 31, 2015 when the demand was $2,500,000. AmFam never attempted to negotiate a settlement once these demands were made. Instead, it retained "extra-contractual" counsel Joffe to protect AmFam's interest, leaving MJ to believe that he was being protected, when in fact AmFam was not protecting him at all.

35. Further, as the trial approached, defense counsel Taylor testified that AmFam was "bugging" him for additional information when he should have been focused on trial preparation. The Friday before trial, Valley was inundating Taylor with request for information.

36. Neither AmFam or the defense counsel it appointed to defend MJ ever properly investigated Plaintiff's theories of liability and never explored defenses to the two claims made against MJ. Instead, AmFam recklessly proceeded with the theory that a closed down garage, Oh's Auto Center, with no known liability insurance and an owner that disappeared, was solely responsible for the accident. Anyone viewing this matter objectively could not reasonably believe that AmFam would be able to contain a verdict against its insured for an amount at or below his insurance policy limit of $100,000. Yet AmFam did nothing to control the damage it was about to cause its insured.

***Assessing 0% liability on its insured and 100% liability on Oh's Auto Center was an unrealistic assessment of the case and AmFam never reevaluated this analysis until after suit was filed.***

37. A basic notion in claims handling is you must analyze the evidence objectively and keep an open mind as facts are developed. Liability and damage analysis must be re-evaluated and updated as additional information is received. AmFam's claim file does not reflect that any of the AmFam adjusters reassessed both liability and damages as it received additional information.

38. Within months of investigating the claim, AmFam was aware that Oh's Auto Center had closed shop, its owner could not be found, and there was no applicable liability policy. Yet, multiple AmFam adjusters failed to reevaluate the claim based on this information which was critical to an objective analysis of the claim.

39. Anyone who has been in the insurance business knows there is no such thing as 0% liability when you have a claim where the insured crossed the center line and the claimant did absolutely nothing wrong and your insured strikes the claimant vehicle. AmFam breached its fiduciary duty to its insured with its failure to objectively review all of the facts in the case,

and failed to reevaluate liability as new information was provided.

40. Furthermore, it was egregious for AmFam to take a no liability or 0% liability position when its own expert reported to adjuster Lyke on December 7, 2012 that off-roading "may have accelerated" the steering failure. This information alone clearly indicated that AmFam could not maintain a 0% liability position in this case based on the expert's advice. This information was also provided to AmFam during the *first* policy limit demand timeframe and yet another reason why AmFam should have accepted the demand to settle for $100,000.

41. The above illustrates the lengths AmFam went to only analyze evidence that was favorable to AmFam and ignored the catastrophic impact its subjective analysis could have on its insured.

*Even when AmFam executives realized that its claim staff made an error in not resolving the case for policy limits on three separate occasions, and recognized that the case presented an exposure to its policyholder in excess of his $100,000 policy limits, AmFam representatives did nothing to attempt to resolve the case for a reasonable amount.*

42. As egregious as it was in failing to settle the claim before litigation was filed, an AmFam in-house attorney recognized the "uphill battle" and "significant risk" of excess exposure this matter presented for its insured, yet AmFam never made a real attempt at settlement of the case prior to verdict.

43. After refusing to resolve the matter on three separate occasions for $100,000, AmFam later recognized its mistake. Yet, when it was presented with another reasonable opportunity to resolve the case for $1,000,000 on April 14, 2015, it failed to settle the case and once again failed to advise its insured of the risk going forward.

44. At each settlement overture, AmFam had a duty to advise its insured of the settlement offer, explain to the insured the financial impact rejecting the demand might have, and advising him of his right to independent counsel. AmFam then needed to allow its insured time to retain independent counsel prior to rejecting the demand. At no point in time did AmFam provide MJ with the critical information he needed in order to make an informed decision about retaining independent counsel.

45. Even though AmFam may claim in the coverage action that it did advise MJ of his right to independent counsel, it never explained to him *why* he needed independent counsel. Nor did AmFam give MJ an opportunity to seek the advice of independent counsel prior to rejecting the demands. This was a clear breach of its fiduciary duty to its insured.

46. The case clearly presented a substantial risk in excess of the $100,000 policy limit. It had what may be termed a "perfect storm" of events in that (1) it was known that Plaintiff was not at fault in the accident; (2) Plaintiff had a horrific injury, lost a finger, had plates installed in her arm, suffered permanent scarring and disfigurement with medical bills of approximately $380,000; (3) a low rated (by AmFam) defense attorney who was only paid $5500 to defend the case; and (4) a well-known successful Plaintiff attorney who had substantial trial experience and numerous 7 figure results for clients.

47. Even in light of the above, AmFam did nothing to resolve this matter for a reasonable amount, (even if it was above its policy limits), which it was obligated to do due to its failure to settle

for policy limits when it had the opportunity to do so.

48. At a minimum, if AmFam was so confident in its "no liability" position against its insured, why didn't it enter into a high/low agreement with Plaintiff whereby it could have at least protected the top end of any judgment, even if it was in excess of the policy limit?

49. The egregiousness of AmFam's actions should be measured against what they put their insured through. If they had settled the case when it was appropriate to do so, none of the following events would have occurred:
    a. MJ would not have had to go through the litigation process at all;
    b. MJ would not have had to retain a criminal attorney during the trial;
    c. MJ would not have had to seek the advice of bankruptcy counsel due to a $30 million verdict against him;
    d. MJ would not have public records outlining this case in detail and harming his reputation;
    e. MJ would not have had to spend the past TEN YEARS litigating issues surrounding this matter;
    f. MJ would not have had to spend THREE YEARS worried about the judgment with no offer of protection from AmFam until AmFam settled the underlying case in December 2020 for ▮Redacted▮

***AmFam executives allowed one individual at AmFam who made the critical decision not to settle the underlying matter to remain in charge of the litigation even though he clearly displayed bad judgment throughout the matter and was unable to objectively see the risks this matter posed.***

50. Individuals at insurance companies make mistakes all the time for various reasons. This is why it is critical to have an internal checks and balances where individuals objectively review the errors that have been made.

51. Unfortunately for MJ, AmFam did not have this structure internally and one person appears to have been involved in every bad decision in this matter which resulted in a multi-million dollar award against its insured.

52. Let's outline the errors of judgment Michael Reuss made in this matter:
    a. Reuss made the decision not to settle the underlying auto claim and to force Cruz and her attorneys to go after the garage that made repairs. However, it was known prior to trial in the underlying case that the garage had closed shop and there was no liability policy that responded to Plaintiff's injuries.
    b. Reuss instructed the adjusters to reject the opportunities to resolve the case for the $100,000 policy limit.
    c. Reuss made the decision to retain the lowly rated attorney (according to multiple attorneys at AmFam) James Taylor under a very low flat fee arrangement knowing that Plaintiff suffered a permanent and catastrophic injury to her dominant left hand.
    d. Reuss did not allow Matthew Valley to "split the file" when it was recognized the matter displayed an inherent conflict due to the extra-contractual exposure due to AmFam's failure to settle the underlying claim prior to suit being filed.
    e. Reuss made the decision not to replace Taylor as defense counsel when Matthew Valley recommended AmFam do so.
    f. Reuss made the decision to hire extracontractual counsel, yet failed to offer any amount in excess of $100,000 when there was a "substantial risk" of an excess verdict against its

policyholder.

53. It is human nature to defend incorrect or incompetent decisions rather than to look at a situation objectively. Therefore, it is difficult to understand how executives at AmFam allowed Reuss to remain involved in a case where he was primarily responsible for the debacle that followed. AmFam's failure to view the underlying matter objectively, and take the necessary steps to protect its insured, was a breach of fiduciary duty to its insured, MJ.

54. The ongoing debacle frankly continues in the current litigation with AmFam trying to defend its actions in the underlying matter, continuing to cause harm to its insured.

**AmFam resorted to drastic measures – recommending its policyholder hire criminal defense counsel – after its insured was impeached during cross examination at trial.**

55. In my 25 years of experience handling claims and supervising litigation in thousands of matters, there were many cases where a witness may have been impeached during cross examination. However, never have I seen a case where the individual was asked to retain criminal defense counsel nor have a seen a case where the individual was prosecuted for perjury.

56. The typical course of action in a matter where a witness or insured is impeached during cross examination is to have defense counsel rehabilitate the witness to the best of his/her abilities.

57. Further, in this matter, it was entirely inappropriate for Adam Joffe, the attorney representing the interests of AmFam and reporting to AmFam, to recommend criminal defense counsel to MJ. It was also inappropriate and a breach of AmFam's fiduciary obligation to have its attorney, Joffe, have discussions about MJ's case outside the presence of MJ.

58. It was also entirely inappropriate for AmFam to allow defense counsel Taylor to share information with both Valley and Joffe at trial. Valley in his testimony also expressed concern that Taylor should not have been sharing this information with them. Yet, no one advised MJ what was happening and how he could best protect himself. AmFam was only interested in protecting its own interest.

**AmFam failed to protect its insured and none of its employees were treating MJ's interests equal to AmFam's.**

59. Matthew Valley testified that he recognized a potential conflict existed between AmFam and its insured MJ at or around April 2015 when Plaintiff made a demand of $1,000,000. Valley asked his supervisor, Reuss, if the file should be split (between coverage and defense) at that time. Valley said his request to split the file at the time was denied.

60. Shortly thereafter, AmFam hired extracontractual counsel Adam Joffe to represent the interest of AmFam. Yet, Mr. Joffe was reporting to Valley. It is entirely inappropriate to have counsel representing the interests of AmFam report to the same in-house attorney who is supposed to be protecting MJ, the policyholder.

61. Based on the AmFam claim file and litigation file, no one was managing the MJ claim in the best interest of MJ.

62. AmFam's attorney Adam Joffe was also present at trial. He and Valley had multiple discussions regarding coverage issues on the Wednesday of trial, the day MJ was impeached during cross examination. The file had not been split and Joffe, acting in the interest of AmFam, was reporting to Valley, who was supposed to be acting in the best interest of AmFam's insured, MJ. This reporting structure does not make sense and was done at the detriment to AmFam's insured.

63. Valley testified that the underlying claim file was only separated between defense and coverage after trial when AmFam "split the file." However, this should have been done immediately after AmFam realized there was extracontractual exposure in this case.

64. Valley testified that he never developed, nor did he have an opinion on whether MJ breached the cooperation clause in the policy, yet he was the supervising attorney handling the claim. The letters to MJ regarding the breach of the cooperation clause came from Adam Joffe, AmFam's extra-contractual attorney who was reporting to Valley. This is entirely inappropriate for AmFam to be crossing the lines here regarding its obligations to protect its insured on the one hand, and finding whatever information it could to use against its insured at the last minute when they were well aware that it was a substantial likelihood there would be an excess exposure against its insured.

***After trial, AmFam continued to breach its fiduciary duty to its insured by baselessly claiming that MJ misrepresented and/or concealed facts prior to trial in court documents.***

59. AmFam, through its counsel, attacked its insured through legal documents by claiming that MJ misrepresented and/or concealed facts prior to trial when the evidence is to the contrary.

60. AmFam tries to make the argument that MJ failed to disclose he was off-roading in his initial statement. First, he was never asked if he was off-roading. In the initial recorded statements, MJ said he went to Beasley Knob, which is a well-known area for off-roading. By mentioning he was at Beasley Knobb, he clearly was not concealing his activities prior to the accident.

61. Further, at some point the adjuster Lyke knew MJ had been off-roading because she specifically asked Hook, the expert AmFam hired to inspect the vehicle, whether off-roading would impact his analysis in this matter. As documented in the claim file notes ***before suit is filed***, when asked if off-roading could have been the cause of the steering failure, Hook responded, that "off-roading may have accelerated it but not cause it," referring to the accident.

62. The other important issue to note about this comment by the expert is that it shows at this stage, when AmFam still had the opportunity to settle the case for policy limits, that there was risk to MJ. AmFam failed to protect its insured even in light of this risk.

63. Shortly after the underlying suit is filed, Taylor's paralegal reached out to MJ to go over the interrogatory requests and to assist in the preparation of responses. In response to interrogatory requests, MJ indicated that he had been off-roading prior to the accident. Taylor was made aware of this statement, and alerted AmFam of this statement.

64. MJ explaining he was at Beasley Knob and that he was off-roading when asked, is not someone who is trying to misrepresent or conceal facts in a case. For AmFam to continue this false dialogue is an ongoing breach of its fiduciary duty to its insured.

***AmFam continued to breach its fiduciary duty to its insured by its litigation tactics in its post-trial conduct and litigation conduct in the coverage action.***

65. AmFam conveniently set up its policyholder due to AmFam's own failure in not settling the case prior to trial. Multiple AmFam representatives were well aware MJ was using his Jeep to go off-roading and knew MJ was off-roading prior to the accident.

66. AmFam attorney Valley documented his concerns in a file note where he expressed concern if Plaintiff became aware of the extent of MJ's off-roading activities, this fact would be detrimental to the defense. Defense counsel Taylor then tried to minimize MJ's off-roading activities in his opening statement. MJ followed suit when he testified, and he also tried to minimize his off-roading activities (something that the AmFam attorney wanted to happen).

67. After MJ's testimony, AmFam and attorney Joffe, who represented AmFam, then held discussions with MJ's defense counsel outside the presence of MJ. Defense counsel provided information to Valley and Joffe that was detrimental to MJ and this information was used by AmFam to improperly deny coverage for the claim.

68. AmFam had a continuing duty to provide MJ with independent counsel, counsel that would in fact provide MJ with unbiased legal advice, not an attorney who was more concerned about preserving his relationship with AmFam. Taylor seemed more concerned about protecting his relationship with AmFam than protecting his client.

69. Furthermore, in the present coverage action, MJ's counsel Taylor refused to meet with MJ's attorneys in this matter. However, Taylor had no problem meeting for several hours with AmFam's counsel. This is entirely inappropriate and is an example of the lengths AmFam is willing to go to harm its policyholder.

***An insurer has an obligation to fully explain to an insured what a time limit policy demand is, what the ramifications are to the insured if rejected, as well as to fully inform the insured of his or her right to independent counsel.***

70. An insurer must fully explain the risk an insured faces during a claim as well as during litigation. This does not just entail issuing a timely reservation of rights letter, but it also includes explaining to the insured what the ramifications are if the insurer rejects a policy limit demand.

71. In the underlying matter, AmFam failed to explain to MJ that by rejecting the policy limit demand, there may not be an opportunity to resolve the case in the future for policy limits and what this might mean financially for MJ.

72. AmFam also failed to fully explain to MJ that while suit may be filed and while AmFam would hire counsel, there still remained the chance that MJ would be found to be at fault. Continuously advising MJ that he was 0% at fault, was just wrong. This position could not be sustained and any reasonable person reviewing the matter should have been aware that 0% liability was not only unlikely but impossible.

73. This impossible 0% liability assessment by AmFam adjusters carried through the claim pre-suit even though Oh's Auto Center was out of business and did not have liability insurance. It also carried through the claim pre-suit even though Hook, the expert AmFam hired, explained that off-

roading potentially could accelerated the steering failure. This blind liability analysis by AmFam adjusters, supervisors, and in-house attorneys was a breach of its fiduciary duty to its insured.

***AmFam eventually paid Plaintiff*** █Redacted█ ***to settle the Cruz litigation.***

74. AmFam eventually settled the Cruz litigation at the end of 2019 for █Redacted█. This amount is shocking considering that AmFam had, at a minimum, 5 opportunities to settle this matter prior to verdict, including 3 opportunities to resolve the case for MJ's $100,000 policy limits.

75. Paying █Redacted█ for an insurance company is a staggering amount. AmFam clearly recognized its multiple errors of judgment in handling the underlying case based on this settlement amount and recognized that it should have resolved the case when it had multiple opportunities to do so prior to verdict.

***AmFam continues to smear the reputation of its insured in order to minimize its own failures in the handling of the claim.***

76. AmFam has woven a tale of wrongdoing against MJ in order to protect its own employee failures. These failures continue to add up but start with the failure to properly investigate the underlying claim; failure to properly assess liability and damages; failure to properly explain to MJ repercussions of rejecting a policy limit demand; failure to accept reasonable settlement demands (5 in total); failed to engage in any meaningful settlement dialogue even though AmFam advised MJ it would settle his claim; failed to split the file; failed to pay extra-contractual damages; failed to hire adequate counsel to defend him; failed to adequately reassess information as it became available. Even in light of the litany of failures by AmFam, it continues to spin a tale of egregious behavior on the part of MJ in public court documents.

77. AmFam continues to breach its fiduciary duty to its insured by spinning the evidence against MJ and going so far as conducting a forensic examination of MJ's work computer pursuant to a third party subpoena. This entire saga has been extraordinarily detrimental to MJ, which all could have been avoided multiple times in the underlying matter if AmFam had just done the right thing and settle the underlying claim when it had the opportunity to do so.

### Conclusion

It is my opinion, based on over 25 years of experience in the Insurance industry with the last 10 years involved in catastrophic claims and bad faith prevention for a major Property & Casualty Insurance Company, American Family Insurance Company's handling of the underlying matter was so egregious it is a textbook example of how not to handle a third-party automobile claim.

AmFam breached its fiduciary duty to its insured, Abdulmohsen Almassud, on a number of occasions throughout the pendency of the underlying matter by failing to protect him as promised; failing to settle the claim against him when it had a reasonable demand for policy limits (on three separate occasions); hired a "low rated" attorney based on its own evaluations on a low flat fee scale, knowing full well defense counsel's shortcomings; interfered in the litigation by instructing counsel that legal research would be conducted by AmFam and cut corners in effectively managing the litigation strategy and responding to underlying Plaintiff's experts; failed to settle the claim just prior to trial and then during litigation for an amount in excess of the policy limit but still within a reasonable settlement range; failed to properly advise him of the risks going forward in trial; failed to advise him he had the right to seek

advice from independent counsel due to the risks presented; failed to advise him timely and appropriately of the time limited demands to settle; failed to rehabilitate him after cross-examination and steered him to criminal counsel; failed to protect him while a $30 million judgment loomed over his head while it appealed the underlying judgment; and failed MJ by contriving a reason to decline coverage even though AmFam was well aware of its own mistakes early on in the case.

AmFam failed its policyholder in this matter over and over, yet continues to litigate these issues in the court. AmFam knew it had failed its insured and was aware of the risks going forward and did not properly warn its insured and proceeded on a path that had dire results and then pointed the finger at MJ, never owning up to its own mistakes. AmFam has continued in this litigation to smear the reputation of its insured in order to conceal its own mistakes.

I reserve the right to amend my opinion based on additional information provided.

Sincerely,

Erin M. Finn

## Materials Reviewed by Erin Finn

- Doc 1, Complaint for Declaratory Judgment;

- Doc 1-4, Exhibit D to Complaint for Declaratory Judgment;

- Doc 13, Almassud's Answer and Counterclaim;

- Doc 53, Order;

- Doc 302, Order;

- Doc 359, Order;

- Doc 363, Order;

- Doc 364, AmFam's Second Amended Complaint;

- Doc 370, Order;

- Doc 379, Order;

- AmFam's Claim Diary;

- The transcript of the deposition of Abdulmohsen "MJ" Almassud (and executed errata sheet) in the declaratory judgment action;

- The transcripts of the deposition of James Taylor (volumes I & II);

- Almassud's recorded statement;

- Almassud's written discovery responses in the declaratory judgment action regarding AmFam's fiduciary duty;

- The transcript of the deposition of Matthew E. Valley;

- Deposition exhibits 1-143;

FINN 1289

- A compilation of video clips from Almassud's deposition in the declaratory judgment action showing his lack of understanding;

- The transcript of the deposition of Michael Reuss;

- www.law.com January 16, 2020 article, "Errant Filing Spills Beans on $11 million American Family Insurance Settlement"; and

- www.law.com July 21, 2021 article, "Case that Generated $11 million Settlement Sparks New Lawsuit"

# EXHIBIT B

## Erin M. Finn

erin@erinfinnconsulting.com

---

Experienced insurance executive and attorney with over 25 years of experience in the insurance industry and previously with one of the largest commercial insurers in the U.S. with assets over $45 billion. Oversight of large exposure litigated matters as well as matters that posed extra-contractual exposure. Oversight of coverage and litigation across all lines of business and across the U.S. Developed extra-contractual prevention program which significantly reduced bad faith exposure as well as reduced legal spend and claim payments. Oversight of claim regulatory and compliance matters. Developed best practice materials as well as trained hundreds of claim adjusters and claim managers on "good faith" claim practices. Consulting work expanded on prior in-house experience and includes training, directing audits, and providing expert opinion regarding claim handling. Currently working at a Risk Retention Group for charter schools, private schools, colleges and universities at United Educators.

---

## EXPERIENCE

**United Educators**                                                 **Bethesda, MD**
*AVP & Associate General Counsel*                                    *April 2021 - Present*
Supervise claim staff of 20 experienced claim analysts and attorneys in the management and resolution of claims involving educational institutions such as charter schools, private schools, colleges and universities. Member owned organization. Provide guidance on claim investigation, independent analysis, coverage and resolution. Assist with claim training and development of good faith claim practices.

**Erin Finn Consulting, LLC**                                        **Bethesda, MD**
*Owner*                                                              *March 2018-Present*
Provide consultation to Insurers, Plaintiffs and Defendant Insureds regarding various issues including coverage, litigation strategy, demands, and bad faith. Provide expert opinion on both "good faith" and "bad faith" claim handling. Conduct "good faith claim training" to carriers upon request. Assist with audits, claim file reviews, as well as review of claim manuals and procedures. Make recommendations to Insurers on ways to improve claim process and bottom-line results.

**CNA Insurance Companies**                                          **Washington, DC**
*Vice President & Associate General Counsel*                         *September 2008-March 2018*
Developed bad faith prevention program for a major commercial carrier resulting in savings in excess of $20 million. Assisted with file reviews, developed litigation strategies, provided settlement recommendations, and drafted letters to Plaintiffs and Insureds as necessary. Worked on multiple business lines, including medical malpractice, lawyer and accountant malpractice, director & officers, general liability, property and auto claims. Reviewed all Department of Insurance inquiries and Executive Complaints, including supervision of responses. Assisted in the development of claim guidelines for each business segment. Approved internal claim audit guidelines, questions and protocols to evaluate an adjuster's performance.

Provided legal guidance and advice to Compliance and Regulatory teams. Developed compliance protocols as they related to the claim department. Supervised attorney who was responsible for responding to all compliance and regulatory complaints. Reviewed all regulatory responses prior to

responding, including market conduct inquiries. Supervised attorney responsible for review of all contracts related to claim vendors.  Reviewed and approved marketing and educational materials both internal and external.

Assisted Special Investigations Unit (SIU) regarding best practices. Reviewed suspected fraud matters prior to denial to ensure compliance with good faith requirements and sufficiency of grounds to deny a claim. Reviewed all matters related to material misrepresentation and was the one source of approval at the Company in order for Claim to move forward to rescind a policy. Participated in regulatory audits and assisted in preparing responses to inquiries related to fraud data as it related to SIU team.

**CNA Insurance Companies**                                    *Chevy Chase, MD*
**National Litigation Counsel**                          *October 2002-September 2008*
Provided strategic oversight and guidance on high stakes litigation across all lines of business countrywide. Managed defense counsel, provided coverage oversight where necessary, and attended mediations and trials across the U.S. Assisted with the development of panel counsel as well as selection of trial counsel for National Trial Counsel teams for various claim units.

**CNA Insurance Companies**                                    *Chevy Chase, MD*
**Assistant Vice President, Real Estate Claim**          *September 1999-October 2002*
Supervised Errors & Omissions claims on a national basis with offices in 20 States. Turned an unprofitable book of business profitable in less than 2 years. Overhauled the claim team as well as panel defense counsel. Mentored individual who replaced me upon my promotion and she remained in charge of this book, which remained profitable, for over 15 years prior to her retirement.

**Entertainment Coalition**                                    *Universal City, CA*
**Director, Claim**                                      *September 1997-September 1999*
Joint venture between CNA Insurance Companies and Aon Corporation. Managed multi-line claim and litigation teams, handling high profile matters involving actors, writers, producers and singer/songwriters. While majority of matters involved copyright infringement cases, also dealt with production delays, bond issues as well as various claim issues presented under individual shell corporations including auto and property claims. Was able to successfully manage clientele ranging from brokers, agents, major studio representatives, award winning actors, producers, musicians as well as their attorneys.

**CNA Insurance Companies**                                    *Chicago, IL*
**Senior Counsel, Corporate Claim**                     *November 1993-September 1997*
Was part of initial team hired to handle bad faith/extra-contractual litigation filed against the Company. Managed a litigation budget in excess of $20 million annually. Developed guidelines for the reporting of all suits filed against the Company and then directed selection and oversight of external counsel. Developed initial training for Company on good faith claim handling and trained hundreds of claim adjusters across all lines of business.

---

**EDUCATION**

**DePaul University College of Law**                            *Chicago, IL*
*Juris Doctorate*                                              *May 1992*

**Boston College**                                         *Chestnut Hill, MA*
*Bachelor of Arts, Political Science*                         *May 1989*

## CERTIFICATIONS

**Illinois Bar**
*Member since 1993*

**Insurance Institute of America, Inc.**
*Philadelphia, PA*
*Associate in Risk Management (ARM)* *January 1997*

**American Educational Institute, Inc.**
*Philadelphia, PA*
*Senior Claim Law Associate (SCLA)* *September 1996*

# EXHIBIT C

### Prior Expert Opinion & Testimony

*Manuel Gamallo, as assignee o Tincy R. Harris v Liberty Mutual Fire Insurance Company,* Northern District of Georgia, CAF No: 1:19-cv-01142-ODE. Expert for Plaintiff, Manuel Gamallo. Case settled.

*Ironshore Specialty Insurance Company v. Conemaugh Health Systems, Inc., et al,* Case No. 3:18-cv-153. United States District Court for the Western District of Pennsylvania. Expert for Plaintiff Ironshore Specialty Insurance Company. Matter pending. ***Protective Order in Place.***

*Steadfast Insurance Company v Community Health Systems, Inc., et al.,* Case No. N18C-11-127, Delaware Superior Court. Expert for Plaintiff Steadfast Insurance Company. Matter pending. ***Protective Order in Place.***

*Ronnie Heath v Pennsylvania Lumbermn's Mutual, Case No 16-CI-00089, Commonwealth of Kentucky, Graves Circuit Court.* Expert for Defendant Pennsylvania Lumbermen's Mutual.