**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

|  |  |  |
|---|---|---|
| AMERICAN FAMILY | : | |
| INSURANCE COMPANY, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. |
| | : | 1:16-cv-4023-RWS |
| v. | : | |
| | : | |
| ABDULMOHSEN ALMASSUD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## <u>ORDER</u>

This case comes before the Court on Plaintiff American Family Insurance Company's ("AmFam") Motion for Summary Judgment on Almassud's ("MJ") Counterclaims [Dkt. 396]. For the reasons set out below, the Court grants AmFam's motion in part.

## BACKGROUND

This insurance coverage dispute began as a declaratory judgment action and is now a case about recoupment. After AmFam managed to overturn on appeal a large verdict against its insured, MJ, but before the second trial began, AmFam agreed to

settle with the underlying claimant and paid the settlement amount. Now, the company wants its money back from MJ.

On October 13, 2012, MJ hired Oh's Auto Center ("Oh's") to install a new steering kit on his Jeep (the "Jeep"). [Dkt. 284-2, at 92:2-12]. On October 21, 2012, MJ was driving his Jeep in Cumming, Georgia when he suddenly lost steering, veered into oncoming traffic, and struck a vehicle driven by Luisa Cruz Mezquital (the "Accident"). [Dkt. 284-5, at 3]; [Dkt. 7-3, at 3-4].

MJ's Jeep was insured by AmFam at the time of the accident. [See generally Dkt. 1-1]. The automobile liability insurance policy ("the Policy") provided $100,000 per person in bodily injury liability limits. [Id. at 2]. The policy also stated:

> [AmFam] may not be sued unless all the terms of this policy are complied with. [AmFam] may not be sued under the liability coverage until the obligation of a person we insure to pay is finally determined either by judgment against that person at the actual trial or by written agreement of that person, the claimant and us.

[Id. at 11].

After the Accident, MJ promptly reported the incident to AmFam. [Dkt. 217-5, at 31]. AmFam then assigned adjuster April Lyke to handle the liability portion

of the claim. [<u>Id.</u> at 27, 30]. On October 22nd, 2012, MJ gave his recorded statement to AmFam. [<u>See</u> Dkt. 284-5, at 7]. Lyke ultimately determined that Cruz was blameless for the Accident. [Dkt. 217-1, at 106:8-15].

After taking the recorded statement, AmFam began adjusting MJ's claim for property damage to his Jeep. [Dkt. 217-5, at 25]. AmFam also hired Rimkus, an expert engineering firm, to inspect the Jeep and determine what caused the steering to give out. [Dkt. 284-11, at 1-2]. Rimkus eventually determined that Oh's negligence caused the Jeep's steering to fail. [<u>Id.</u>] Upon receiving the Rimkus report, the AmFam claims department requested legal advice from AmFam's attorney, Michael Reuss ("Reuss"). Reuss opined that, "based on the investigation, the mechanic caused the loss by improperly installing the cotter pin. We do not see any negligence on our insured." [Dkt. 217-5, at 1].

On December 3, 2012, attorney Evan Kaine sent to AmFam a demand for MJ's $100,000 policy limits ("First Demand") on Cruz's behalf. [Dkt. 217-12]. The First Demand included medical bills of $338,707.54, more than three times MJ's policy limits. [<u>Id.</u> at 2]. The theory of liability in the First Demand was that MJ crossed the center line and struck Cruz's vehicle. [<u>Id.</u>] On December 12, 2012, AmFam rejected the First Demand, stating that Oh's Auto Center was responsible

for the accident due to the allegedly negligent installation of a new steering mechanism. [Dkt. 217-15].

On December 12, 2012, AmFam wrote to MJ as follows: "With the continued handling of this claim, it appears the damages Louisa Cruz Mezquital is claiming may possibly exceed [your] coverage limits." [Dkt. 396-2]. The same letter also stated that "[w]e will attempt to settle the matter within your coverage limits; however, we cannot guarantee that we will be successful in that effort." [Id.]

On December 20, 2012, Kaine provided AmFam an opportunity to reconsider and settle ("Second Demand"). [Dkt. 217-16, at 2]. Kaine explained that, even if MJ were only found to be comparatively negligent, the value of Cruz's claim would still exceed the policy limits. [Dkt. 217-16, at 1] Kaine further claimed that MJ could also be held liable for "operating faulty equipment." [Dkt. 217-16, at 2]. On December 31, 2012, AmFam rejected the Second Demand. [Dkt. 217-17].

On April 4, 2014, Kaine sent a third offer to settle ("Third Demand"). [Dkt. 217-18]. The Third Demand repeated the reasons why MJ would be held liable in excess of his policy limits. [Id. at 2-3]. In this offer, Kaine listed an additional theory of liability based on MJ's duty to inspect and repair the Jeep and/or return

4

the vehicle to Oh's to have it inspected. [Id. at 3]. On April 14, 2014, AmFam rejected Cruz's Third Demand. [Dkt. 217-19].

In August of 2014, Cruz sued MJ in the state court of DeKalb County (the "Underlying Litigation"). [Dkt. 142-3]. AmFam originally assigned its in-house counsel Wil Hane ("Hane") to supervise a defense. [Dkt. 226, at 31:1-5]. Hane then hired Jim Taylor ("Taylor") to defend MJ for a flat fee of $5,500. [Dkt. 221, at 28:1-4]. AmFam knew Taylor because they had hired him to represent insureds in the past. [See Dkt. 223, at 207:21-208:13].

Taylor's hiring arrangement included an option for him to switch to hourly billing should the value of his services exceed the flat fee. [Dkt. 221, at 132:2-8]. Taylor was to be responsible for selecting witnesses, taking depositions, conducting research, and otherwise preparing for trial. [See Dkt. 202, at 3]; [see also Dkt. 133-6].

On September 16, 2014, AmFam attorney Wil Hane sent an email to MJ stating: "Jim [Taylor] and I will work to get you dismissed from this lawsuit as quickly as possible." [Dkt. 121-7]. Later, AmFam attorney Matt Valley ("Valley") copied MJ on an email in which he stated: "[t]herefore, it is still our opinion that

this case should result in summary judgment in favor of [MJ]." [Dkt. 7-14, at 1-2].

On October 9, 2014, Hane emailed MJ and said:

> While I do not want to unnecessarily alarm you, I must point out that
> should a judgment be rendered in this case in excess of your policy
> limits, you will be personally liable for the amount in excess of your
> policy limits. If, because of the possibility of damages in excess of
> your coverage, you wish to employ your own additional personal
> attorney to defend you, please feel free to do so, but you must pay for
> that attorney yourself."

[Dkt. 133-2, at 1-2].

When responding to interrogatories in the Underlying Litigation, MJ told Taylor that he had been off-roading with the Jeep before the accident. [See Dkt. 217-20]. Taylor then sent a letter to Hane expressing his "great concern" upon learning this information. [Dkt. 402-3]. Taylor warned AmFam that "[a] logical assumption can be made, and will be argued by plaintiff's counsel, that it was not negligent repair work by the repair shop, but rather [MJ's] off-road activities which ultimately led to the steering failure." [Id. at 2]. In the same letter, Taylor predicted that MJ would face "significant personal exposure for this incident." [Id.]

6

In response, Hane asked Taylor if it would be possible to settle; Taylor responded that the chances were "less than 50/50." [Dkt. 402-4]. MJ's file was then transferred to Valley on November 18, 2014. [Dkt. 284-40]. Valley testified that, when he first reviewed MJ's claim, he thought there was a substantial likelihood of a judgment in excess of MJ's policy limits. [Dkt. 217-24, at 66:14-69:5].

On March 29, 2016, Taylor emailed AmFam to request the file "be shifted from a flat fee to a straight hourly matter." [Dkt. 396-2, at 2]. AmFam's in-house counsel, Reuss, approved the change in fee structure on the same day and Taylor began hourly billing on April 1, 2016. [Dkt. 220, at 370:1-2].

In the late Spring of 2016, Valley became concerned with the quality of Taylor's representation and handling of MJ's case. [Dkt. 223, at 206:15-207:17]. Several AmFam attorneys shared Valley's opinions and some even communicated their disapproval to Taylor. [See id. at 207:21-208:13]. Valley was concerned partly because Taylor failed to keep AmFam updated on MJ's case and Taylor never filed a motion for summary judgment that he said he would file. [Id. at 207:13-209:11]. Valley ended up asking management to replace Taylor before the first trial, but AmFam decided to keep Taylor on the case. [Id. at 209:3-9].

7

Throughout the Underlying Litigation, Taylor defended MJ based on the theory that Oh's faulty work caused the Accident. [Dkt. 202, at 3]; [Dkt. 284-11, at 1-2]. During trial, however, opposing counsel accused MJ of perjury, claiming that MJ hid that he went off-roading with the Jeep on the day of the Accident. [Dkt. 218-1, at 386:8-10]. In a chambers conference, the judge appeared to agree with Taylor's conclusion that,

> [I]n light of the suggestion or perjury allegations... I had an obligation to counsel [MJ] as my client, but that was outside of my area of expertise . . . and I did not feel that I could adequately counsel [him] on that particular situation and that I believed... that it was something that [he] needed to consult with other counsel about.

[Dkt. 220, at 444:1-12]. After the chambers conference, Taylor asked AmFam's outside counsel Adam Joffe ("Joffe") for the name of a criminal lawyer to pass along to MJ, and Joffe provided one name. [Dkt. 227, at 148:18- 23]. Joffe never spoke directly to MJ about hiring criminal counsel. [Id. at 147:1-2]. Taylor then gave MJ a list of criminal attorneys to contact. [Dkt. 217-35]. After this incident, Taylor did not attempt to rehabilitate MJ at trial. [Dkt. 217-13, at 476:7-18].

After MJ was impeached, AmFam issued a reservation of rights ("ROR") letter, explaining that it was continuing to defend MJ subject to its right to deny coverage as well as its right to recoup any costs it expended. [Dkt. 1-4]. The jury ultimately found MJ liable for $30 million in damages to Ms. Cruz.  [Dkt. 1-5]. Shortly thereafter, AmFam set out to overturn the state verdict on appeal. AmFam succeeded in getting the verdict overturned, and a retrial was set. Just as the retrial got underway, AmFam agreed to settle the case with Cruz.

Around the same time, AmFam filed a declaratory action, seeking to deny coverage to MJ. [See Dkt. 1]. In MJ's Amended Answer, he raised various counterclaims, including a claim for breach of fiduciary duty ("BOFD"). [Dkt. 26]. MJ also asked this Court to dismiss AmFam's declaratory claims as moot because he was no longer under threat of judgment. [Dkt. 312]. AmFam then sought leave to amend its complaint to add claims to recover damages for the amounts it spent defending MJ and settling the case. [Dkt. 318]. The Court dismissed the declaratory judgment claim as moot but allowed AmFam to amend the complaint. [Dkt. 363]. AmFam did so. Now, AmFam has moved for summary judgment on MJ's BOFD counterclaim. [Dkt. 396-1].

## DISCUSSION

### I.    Legal Standard

The standard for summary judgment is well-established. FED. R. CIV. P. 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

> The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'

Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2514 (1986). The applicable substantive law identifies which facts are material. Id. at 2510. A fact is not material if a dispute over that fact will not affect the outcome of

10

the case under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Id.

To resolve a motion for summary judgment, the court will "consider the record and draw all reasonable inferences in the light most favorable to the non-moving party." Blue v. Lopez, 901 F.3d 1352, 1357 (11th Cir. 2018). But the court is bound only to draw those inferences which are reasonable. "Where the records taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted).

## II.  Analysis

For the reasons set out below, the Court finds that AmFam is entitled to summary judgment on most, but not all, of MJ's BOFD claims. AmFam argues that MJ's BOFD claim fails as a matter of law due to:

> (1) his failure to comply with the no-action provision of his applicable
> AmFam issued insurance policy, (2) his lack of any admissible
> evidence of duty or breach for his BOFD claim because his purported
> expert's testimony should be excluded under Daubert and its progeny,
> (3) his failure to plead specific BOFD allegations cognizable under

11

Georgia law, and (4) his claims for attorneys' fees and punitive

damages are derivative of his failed BOFD claim.

[Dkt. 396, at 1-2].

In response, MJ argues that the no-action clause does not bar his claims

because insurer's fiduciary duties arise outside of the insurance contract. [See Dkt.

402, at 3-5]. MJ further asserts that his BOFD allegations do not need expert

testimony to survive. [Id. at 5]. Finally, MJ argues that his claim is cognizable

under Georgia law because insurers have fiduciary duties and, "[g]ven the

extraordinary facts of this case, a jury must hear witnesses, view documents and

weigh credibility to determine if AmFam breached its fiduciary duty to MJ." [Id. at

1, 6-7].

## A. The No-Action Clause

The Court cannot definitively rule on whether the Policy's no-action

provision bars MJ's BOFD claim because a jury must decide whether MJ breached

the Policy. AmFam argues that the no-action provision bars MJ's claim because the

Court already held that MJ did not fulfill a condition precedent to suing under the

liability coverage. [Dkt. 396-1, at 8 (citing [Dkt. 379, at 8])]. MJ responds that the

no-action clause and the Court's previous holding do not foreclose his claim

because AmFam's fiduciary duties arise outside of the Policy's liability coverage. [See Dkt. 402, at 3-5].

In Georgia, insurers may use contracts to cabin their liability in tort. Game Truck Georgia, LLC v. Atl. Specialty Ins. Co., 849 F. App'x 233, 236 (11th Cir. 2021). No-action provisions can also impose conditions precedent to the insured suing their insurer. See Piedmont Off. Realty Tr., Inc. v. XL Specialty Ins. Co., 771 S.E.2d 864, 866 (Ga. 2015). Here, the Policy's no-action section contains two separate bars to bringing suit. The first reads: "[AmFam] may not be sued unless all the terms of this policy are complied with." [Dkt. 1-1, at 13]. The second clause states,

> [AmFam] may not be sued under the liability coverage until the obligation of a person we insure to pay is finally determined either by judgment against that person at the actual trial or by written agreement of that person, the claimant and us.

Id. at 13.

MJ's BOFD claim is not fully barred by the no-action provision or the Court's previous holding because most of his allegations do not concern the Policy's liability coverage. When a policy provision is susceptible to more than one

13

meaning, even if both meanings are reasonable, the provision is ambiguous and will be construed in favor of the insured. Georgia Farm Bureau Mut. Ins. Co. v. Smith, 784 S.E.2d 422, 424-425 (Ga. 2016). Here, the phrase "liability coverage" could be interpreted to mean the insurance contract as a whole or to mean the amount an insurer will pay to cover "compensatory damages an insured person is legally liable for because of bodily injury or property damage as a result of an auto accident . . . ." [See Dkt. 1-1, Ex. A, at 8].

The Court adopts the latter interpretation of "liability coverage." If AmFam meant for "liability coverage" to mean the entire insurance contract, it is reasonable to assume it would have repeated the word used to describe the contract in the previous sentence.[1] [See id. at 13]. To find otherwise would cut against the plain language of the no-action provision when read as a whole. [See id.] If AmFam meant for "liability coverage" to mean the entire Policy, it is also unclear why it required MJ to wait to sue until a final judgment was made or the coverage amount was set by a written settlement agreement. [See id.] Finally, the Court's

---

[1] In the previous sentence, AmFam referred to the entire insurance contract as "the Policy." [See Dkt. 1-1, at 13].

14

interpretation aligns with the structure of the insurance policy, as only one (1) of the three (3) sections addresses MJ's "liability coverage." [See id.]

This interpretation of "liability coverage" aligns with the Court's previous holding on a similar issue. In an earlier order, the Court found that the no-action provision barred MJ's negligent failure to settle claim because he failed to satisfy the condition precedent set out in the second no-action clause. [Dkt. 379, at 6-8.] The Court based its holding on the second clause because the failure to settle claim concerned the liability coverage. [See id. at 6.] This ruling extends to any of MJ's current allegations that concern the liability coverage, which the Court addresses in more detail below.

The Court is now faced with a question regarding MJ's allegations that do not involve the liability coverage: If MJ failed to satisfy the condition set out in the second clause, did this constitute a breach of the Policy so that the first clause[2] bars his entire claim? The Court answers in the negative. First, MJ did not "breach" the Policy when he opted not to sign the settlement agreement because he was never

_____

[2] The first sentence reads: "[AmFam] may not be sued unless all the terms of this policy are complied with." [Dkt. 1-1, at 13].

15

contractually obligated to sign the agreement. [See Dkt. 1-1, Ex. A, 7, 12-13]. 23

WILLISTON ON CONTRACTS § 63:6 (4th ed. 2007) states that,

> Nonperformance of a condition precedent is not a breach of
>
> contract since the purpose of the condition is merely to qualify the
>
> duty to perform immediately. However, failure to perform
>
> a condition precedent will be deemed as a breach of contract, where
>
> the . . . party then *promises or undertakes* that the condition will occur
>
> . . . .

(footnotes omitted) (emphasis added); see also Patel v. Burt Dev. Co., 582 S.E.2d

495, 498 (Ga. Ct. App. 2003) (distinguishing between a failure of condition

precedent and a breach of contract). As MJ never promised to sign the settlement

agreement, his failure to do so was not a breach and only constituted a failed

condition to suing under the liability coverage. [See Dkt. 1-1, Ex. A, 7, 12-13].

Georgia case law supports the Court's interpretation and application of the

no-action provision. Several courts have held that a no-action clause barred claims

when the insured breached a condition that was *mandated* by contract. For example,

the Georgia Supreme Court held in Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.

that a policy's no-action provision barred an insured's failure to settle claim

because the no-action section stated that the insured could not file suit unless all of [the policy] terms have been complied with." See 679 S.E.2d 10, 11-12 (2009). In Trinity, the insured settled a claim without the insurer's written consent in direct violation of a policy provision. Id. at 584-585. The court thus found that the no-action clause barred the insured's claim because the insured *breached the policy*, not because they failed to satisfy a condition precedent. See id. at 585-587; cf. Piedmont Office, 771 S.E.2d at 866 (same).

For the above reasons, the Court finds that AmFam failed to show that MJ breached the Policy by not signing the settlement agreement. AmFam's pleadings only prove that MJ did not satisfy a condition precedent to suing under the liability coverage. As most of MJ's allegations do not concern the liability coverage, the failed condition does not completely foreclose his BOFD claim. [See generally Dkt. 402]. MJ should not be penalized for violating a contractual condition that, by its own language, does not apply to most of his allegations. [Dkt. 1-1, Ex. A, at 13].

Finally, the Court notes that the first clause in the no-action provision could still bar MJ's claim. [See Dkt. 1-1, Ex. A, at 13]. However, the Court cannot resolve this issue because (1) AmFam failed to show that MJ breached the Policy when he declined to sign the settlement agreement; and (2) AmFam's other breach

17

of contract claim must be decided by a jury.[3] If the jury finds that MJ violated the Policy's Cooperation Clause, the first no-action clause will bar MJ's BOFD counterclaim in its entirety. [See id.]

As MJ's claims cannot be completely foreclosed by the no-action provision, the Court will proceed to evaluate his allegations under Georgia law.

**B. AmFam's Fiduciary Duties to MJ Under Georgia Law**

AmFam is entitled to summary judgment on the majority of MJ's BOFD allegations. AmFam argues that MJ's claim fails as a matter of law because insurers generally do not have fiduciary duties to insureds and MJ's allegations fall outside any exception to the rule. [Dkt. 396-1, at 11-14]. MJ responds that insurers can incur fiduciary duties beyond the general exceptions if they caused insureds to "sustain damages other than damages covered by the insurance contract . . . ." See Delancy v. St. Paul Fure & Marine Ins. Co., 947 F.2d 1536, 1545-1546 (11th Cir. 1991) (applying Georgia law); [Dkt. 402, at 7]. MJ further argues that a jury could find AmFam breached these additional duties because it formed a

---

[3] The Court's forthcoming Order on MJ's Motion for Partial Summary Judgment Regarding No Breach of the Cooperation Clause [Dkt. 395] will provide a full analysis and explanation for this ruling.

confidential relationship with him but failed to protect his interests throughout the Underlying Litigation. [Dkt. 402, at 9].

Georgia courts generally find that the insurer-insured relationship does not impose fiduciary responsibilities upon the insurer. See Nash v. Oh. Nat. Life Ins. Co., 597 S.E.2d 512, 518 (Ga. Ct. App. 2004); Walsh v. Campbell, 202 S.E.2d 657, 661 (Ga. Ct. App. 1973). In Georgia, the insured-insurer relationship is typically governed by the insurance contract. See Cone Fin. Grp., Inc. v. Emps. Ins. Co. of Wausau, 2010 WL 3221831, at *1–2 (M.D. Ga. Aug. 13, 2010), aff'd, 476 F. App'x 834 (11th Cir. 2012).

However, insureds can sue for breach of fiduciary duty if their insurer causes them to "sustain[] damages other than damages covered by the insurance contract." Delancy, 947 F.2d at 1546. To illustrate, Georgia courts have found that damages in the form of an excess verdict could support a BOFD claim. See id. at 1551 (citing Shaw v. Caldwell, 189 S.E.2d 684, 687 (Ga. 1972)). The Delancy court also acknowledged that emotional and economic damages could support a BOFD claim so long as the insured "show[s] that he has suffered actual injury proximately caused by the insurer's [bad faith]." Id. at 1551-1552 (discussing Davis v. Cincinnati Insurance Co., 288 S.E.2d 233, 238 (Ga. 1982); Smoot, 299 F.2d at

19

529; and <u>McCall v. Allstate Ins. Co.</u>, 310 S.E.2d 513, 515 (Ga. 1984)). Once the insured sustains the required damages, Georgia allows it to sue the insurer for violating its fiduciary duty of good faith while defending or settling a third-party claim on the insured's behalf. <u>See</u> <u>Prime</u>, 2007 WL 4592099, at *5.

MJ alleged that AmFam breached its fiduciary duty to him in several ways. Thus, the Court will address MJ's claims in chronological order.

### 1. AmFam's Duty to Settle

AmFam is entitled to summary judgment on MJ's claim that it violated its duty to settle in good faith. AmFam first argues that MJ's claim fails under the no-action clause because he failed to satisfy a condition precedent to suing under the liability coverage. [Dkt. 396-1, at 10-11]. AmFam also argues that the Court's dismissal of MJ's negligent failure to settle claim forecloses his current claim because they rest on the same facts and legal duty. [<u>See</u> <u>id.</u>] MJ responds that his claim is not barred by the no-action clause because it falls outside of the Policy's liability coverage. [Dkt. 402, at 4-5]. MJ also asserts that the Court's previous ruling does not prevent him from raising a BOFD claim because AmFam's failure to settle can support multiple causes of action. [<u>See</u> <u>id.</u> at 9-10].

20

Insurers have a fiduciary duty to give equal consideration to an insured's financial interests when engaging in settlement discussions. <u>S. Gen. Ins. Co. v. Holt</u>, 416 S.E.2d 274, 276 (Ga. 1992). However, insurers may also cabin their tort liability through the insurance contract so long as it does not violate public policy. <u>Game Truck</u>, 849 F. App'x at 236. Here, the second clause in the no-action provision reads: "[AmFam] may not be sued under the liability coverage until the obligation of a person we insure to pay is finally determined either by judgment against that person at the actual trial or by written agreement of that person, the claimant and us." [Dkt. 1-1, at 13].

The second clause bars MJ's claim that AmFam breached its fiduciary duty to settle when it rejected Cruz's settlement offers. [<u>See</u> Dkt. 144-1, at 12-13]. First, MJ's claim falls under the "liability coverage" because it concerns AmFam's attempts to avoid tendering the Policy's liability coverage amount. [<u>See</u> Dkt. 402, at 10]. Second, the Court already held that MJ did not fulfill the condition precedent to suing under the liability coverage. [<u>See</u> Dkt. 379, at 7]. Finally, the Court already dismissed MJ's related failure to settle claim under the no-action clause. [<u>See</u> Dkt. 379]. Although allegations can generally support more than one cause of action, MJ's settlement claims both arise from insurer's fiduciary duty to equally consider

21

insured's interests when negotiating settlements. See Holt, 416 S.E.2d at 276. For these reasons, AmFam is entitled to summary judgment on MJ's bad faith failure to settle allegations.

### 2. AmFam's Failure to Investigate Theories of Liability

AmFam is entitled to summary judgment on MJ's claim that it breached a fiduciary duty by failing to fully investigate Cruz's claims. MJ alleges that AmFam breached a duty by failing to equally consider his financial interests while conducting its pre-suit investigation. [See Dkt. 144-1, at 11, 14]. MJ also accuses AmFam of pursuing evidence and paths of inquiry that would allow it to recover from Oh's any damages paid to Cruz or to avoid paying the policy limits altogether. [See id.] Finally, MJ claims that AmFam's failure to investigate other potential bases for liability caused it not to settle with Cruz before trial. [See id. at 11]. AmFam responds that MJ's allegations fail as a matter of law because it did not owe him a fiduciary duty "in connection with a pre-suit investigation." [Dkt. 396-1, at 21-22].

The Court dismisses MJ's pre-suit investigation claim under the no-action clause. When ruling on a similar claim, the court in Hallmark Ins. Co. v. Fanin held that "insurer's duty of care to its insured includes 'conducting a

reasonable investigation to discover the relevant facts.'" 2019 WL 3526504, at *6 (N.D. Ga. June 24, 2019) (citation omitted). <u>Hallmark</u> shows that AmFam's duty to investigate pre-suit, if at all, arose under its fiduciary duty to settle. <u>See</u> 747 S.E.2d at 6. The Court already held that MJ is barred from recovering under the duty to settle because he failed to satisfy the no-action clause. Thus, MJ's allegations regarding AmFam's pre-suit investigation fail as a matter of law.

AmFam is also entitled to summary judgment on MJ's post-suit investigation claims. MJ failed to cite any law showing that insurers have an independent duty to investigate post-suit. [<u>See</u> Dkt. 402, at 11-12]. In <u>Cone</u>, the insured also alleged that their insurer breached fiduciary duties "by failing to properly investigate claims . . . and by placing [its] financial interests above those of [insured]." 2010 WL 3221831 at *1. The court dismissed the claim, stating that,

> [t]he only time Georgia courts allow an insured to bring an action for breach of fiduciary duties against his insurer is when there are allegations of the violation of the insurer's fiduciary duties of good faith when defending or settling a third-party tort claim on behalf of the insured.

23

See id. at *2. The Court follows Cone and dismisses MJ's claim as a matter of law because insurers do not have a fiduciary duty to investigate post-suit.

### 3.  AmFam's Failure to Warn MJ of an Excess Verdict

AmFam is entitled to summary judgment on MJ's claim that it breached a fiduciary duty when it failed to advise him of the likelihood and significance of the excess verdict. [Dkt. 144-1, at 13]; [Dkt. 402, at 14-15]. AmFam responds that MJ's claim fails as a matter of law because he did not identify any law requiring AmFam to warn of an excess verdict and there is no issue of material fact that AmFam did warn him. [Dkt. 396-1, at 14].

The Court need not address whether AmFam had a duty to warn because there is no issue of material fact as to whether AmFam adequately warned MJ about the excess verdict. The undisputed facts show that, before Cruz filed suit, AmFam's adjuster told MJ that "it appears the damages [Cruz] is claiming may possibly exceed [your] coverage limits." [Dkt. 396-2]. Post-suit, AmFam's in-house counsel told MJ that,

> I do not want to unnecessarily alarm you, [but] I must point out that
>
> should a judgment be rendered in this case in excess of your policy
>
> limits, you will be personally liable for the amount in excess of your

24

> policy limits. If, because of the possibility of damages in excess of
> your coverage, you wish to employ your own additional personal
> attorney to defend you, please feel free to do so, but you must pay for
> that attorney yourself.

[Dkt. 133-2, at 1-2].

These alleged facts could not support a jury finding that AmFam failed to warn MJ of the potential for an excess verdict. AmFam's employees told MJ several times that the verdict could exceed his liability coverage. [See Dkt. 133-2, 1-2]; [see also Dkt. 396-2]. MJ does not point to any law showing that AmFam had a duty to give more detail or notice than what it provided in the communications. [See Dkt. 402, at 16]. If MJ wanted more details about the anticipated judgment amount, he was free to ask for clarification. For these reasons, AmFam is entitled to judgment as a matter of law on MJ's allegations involving the failure to warn of an excess verdict.

### 4.  False Statements by AmFam Employees

AmFam is not entitled to summary judgment on MJ's claim that AmFam breached a fiduciary duty when its employees made "false statements" to him. MJ alleges that AmFam breached a duty to him when (1) its in-house counsel

25

suggested that he would "work to get [MJ] dismissed" from the Underlying Lawsuit; (2) another attorney copied MJ on an email opining that he would win on summary judgment; and (3) an adjuster told MJ that "[w]e will attempt to settle the matter within your coverage limits.". [See Dkt. 402, at 11, 14 (citing [Dkt. 121-7]; [Dkt. 7-14]; [Dkt. 396-2])]. MJ claims that these statements are misleading because AmFam declined Cruz's settlement offers [Dkt. 402, at 12], "did nothing to get MJ dismissed[,] and never saw to it that a motion for summary judgment was filed." [See id. at 14]. AmFam did not respond to MJ's allegations. [Dkt. 396-1]; [Dkt. 408].

AmFam's liability, if at all, arises from its agency relationship with its employees. Pursuant to Georgia's agency law, "[e]very person shall be liable for torts committed by . . . his servant by his command or in the prosecution and within the scope of his business, whether the same are committed by negligence or voluntarily." GA. CODE ANN. § 51-2-2 (West); see Ga. Messenger Svc. v. Bradley, 715 S.E.2d 699 (Ga. Ct. App. 2011). Employers can also be held liable for their employee's fraudulent acts in the transaction of the employer's business, even if the employer did not authorize the intentional tort. See GA. CODE ANN. § 10-6-60

(rendering the principal liable for "the care, diligence, and fidelity of his agent in his business.").

The Court finds that MJ's allegations and evidence, taken together, could support a jury finding that AmFam's employees breached a duty to MJ by making "false statements." This is a threshold requirement to holding AmFam liable for its employee's actions. See GA. CODE ANN. § 51-2-2 (West). In the Response [Dkt. 402], MJ cited to evidence suggesting that AmFam's employees intentionally or negligently misled him. For example, AmFam's adjuster told MJ that "[w]e will attempt to settle the matter within your coverage limits" (Dkt. 396-2), but then AmFam failed to accept any of Cruz's offers to settle. [See Dkts. 217-16, 18]. AmFam's Rule 30(b)(6) designee also testified that AmFam would have accepted Cruz's settlement offer if it knew that MJ took the Jeep off-roading. Yet, MJ put forth evidence suggesting that AmFam *did* know about the off-roading before Cruz's offer, raising a question of whether AmFam ever intended to settle. [See Dkt. 402, at 12-13].

A jury could further find that AmFam's attorneys misled MJ when they sent emails implying that he would be dismissed from the case or prevail on summary judgment. [See Dkt. 7-14]; [Dkt. 121-7]. A reasonable juror could find the emails

27

misleading because there is no evidence that AmFam tried to get MJ dismissed

from the case and "AmFam . . . never saw to it that a motion for summary judgment

was filed." [See Dkt. 402, at 14]. Finally, AmFam did not put forth any evidence in

response to MJ's allegations. Thus, a jury must decide whether AmFam's

employees breached a duty to MJ.

AmFam is also not entitled to summary judgment because a jury could find

that its employees acted within the scope of their agency authority when they made

the "false statements". Georgia courts have held employers liable for employee's

torts if the act is "in any sense warranted by the express or implied authority

conferred upon him, considering the nature of the services required, the instructions

given, and the circumstances under which the act is done. . . ." Dawson Motor Co.

v. Petty, 186 S.E. 877, 878 (Ga. Ct. App. 1936). Another court stated,

> "[i]n the scope of his business," "in the scope of his employment," and
>
> similar expressions, have sometimes been given too narrow a meaning.
>
> If the act done by the employee is done in the prosecution of the
>
> business of the employer, that is, if the employee is at the time of the
>
> commission of the wrongful act engaged in serving his employer, the

wrongful act is done "in the prosecution and within the scope of" the

employer's business.

Andrews v. Norvell, 15 S.E.2d 808, 810 (Ga. Ct. App. 1941).

On one hand, a jury could find that AmFam's employees exceeded their

agency authority because there is no evidence that AmFam authorized them to lie.

However, a jury could also find that the employees made the statements as part of

their implied authority to communicate about claims and litigation with AmFam's

insureds. Accordingly, the Court cannot find as a matter of law that AmFam's

employees acted outside the scope of their agency authority when they made the

"false statements."

### 5.  Flat Fee

AmFam did not breach a fiduciary duty to MJ by paying Taylor a flat fee. MJ

claims that AmFam breached its fiduciary duty to him when it paid Taylor a flat fee

because it caused MJ to receive a "bare bones" defense in a case with "clear

liability and high damages . . . ." [Dkt. 402, at 16]. In its summary judgment motion

[Dkt. 396-1], AmFam asks the Court to dismiss MJ's claim because (1) he failed to

identify any law stating that insurers cannot hire attorneys on a flat fee; (2) "Taylor

knew that he could convert to hourly if the scope of work exceeded a typical flat fee

29

case . . . .”; and (3) “[MJ] theorizes without evidence that Taylor’s flat fee disincentivized him from ‘put[ting] in the hours and hard work needed to defend Mr. Almassud.’” [Dkt. 396-1, at 16 (citing [Dkt. 144-1, at 14])].

MJ failed to show that AmFam had a duty to pay Taylor an hourly salary. The Court is unaware of any Georgia law that forbids insurers from paying a flat fee to attorneys hired to represent insureds. See 3 LAW AND PRAC. OF INS. COVERAGE LITIG. § 33:17 (implying that Georgia permits flat fees but noting that insurers should ensure “that the compensation to be paid to defense counsel [] be adequate relative to the time and effort spent on the defense of cases.”). MJ did not cite any law to the contrary. [See Dkt. 402, at 16-17].

It is possible, however, that AmFam had a duty to adequately compensate Taylor as part of its duty to defend in good faith. To illustrate, the Court in Smoot v. State Farm Mut. Auto. Ins. Co. found that the duty to defend includes retaining competent counsel, which this Court interprets to include compensating the counsel in an appropriate manner. See 299 F.2d 525 (5th Cir. 1962) (finding that the duty to defend includes and extends beyond hiring competent counsel); see also 14A COUCH ON INS. § 202:17 (“An insurer’s duty to defend is generally a duty to provide services, which includes the hiring of competent counsel . . . .”).

30

Yet, even if AmFam had a duty to adequately compensate Taylor, there is no issue of material fact as to whether AmFam offered Taylor proper compensation. MJ put forth no evidence showing that Taylor's flat fee incentivized him to cut corners or forego tasks necessary to properly defending MJ. [See Dkt. 402, at 16-17]. AmFam, on the other hand, cited to testimony showing that it allowed Taylor to request a switch to hourly billing if he thought that the value of his services exceeded the flat fee. [See Dkt. 396-1, at 16 (citing [Dkt. 221, at 132:2-8])]. It is also undisputed that AmFam approved Taylor's request to switch billing types six months before trial. [Dkt. 396-3, at 1-2]. As MJ failed to put forth any other evidence showing that AmFam breached a fiduciary duty by paying Taylor a flat fee, his allegations fail as a matter of law.

### 6. **Splitting the File**

The Court grants AmFam summary judgment on MJ's claim that it breached a fiduciary duty by waiting to split his file. AmFam argues that MJ's allegations fail as a matter of law because insurers are not required to split files in Georgia [Dkt. 396-1, at 17] and MJ failed to allege facts showing that AmFam had a duty under the circumstances. [Dkt. 408, at 14]. MJ responds that AmFam had a duty to split his file earlier in the Underlying Litigation because the undisputed facts show that it

31

had "conflicts of interest and potential conflicts of interest." [See Dkt. 402, at 21];
[Dkt. 144-1, at 15-16].

In Georgia, insurers do not have a duty to automatically split an insured's
file. It is not necessarily "bad faith" for an adjuster to handle the claim file for the
defense and the coverage file, although insurers do commonly "split the file" in
such situations. GA. PROP. & LIAB. INS. LAW § 12:15; see State Farm Fire & Cas.
Co. v. King Sports, Inc., 489 F. App'x 306, 313 (11th Cir. 2012) (rejecting the
insured's claim that the insurer had a duty to split the file and noting that the
insured cited no authority to support its claim).

The Court will grant AmFam summary judgment on MJ's claim because
there is no evidence that it had a duty to split the file earlier in the case. To
illustrate, AmFam cited to evidence showing that it split the file as soon as Reuss[4]
decided there was a conflict of interest. [Dkt. 223, at 164:8-19]. Although Valley
admitted that he would have preferred to split the file pre-suit, this was because
Cruz's damages exceeded MJ's policy limits and not because he thought AmFam
had a conflict of interest at the time. [See id. at 165:19 – 166:9]. Valley also

_____

[4] Valley's supervisor.

32

testified that, despite knowing the risk of a conflict, he "continue[d] in [his] role of protecting the insured" up until AmFam split the file. [Id. at 166:22].

MJ failed to respond with any evidence suggesting that AmFam had a duty to split his file at an earlier time. Specifically, MJ did not show that Valley ever shared privileged information with AmFam or that AmFam's failure to split the file caused Valley or Taylor to violate their duty to act in MJ's best interests. [See Dkt. 402, at 21-22]; see also King Sports, Inc., 489 Fed. App'x. at 313. Accordingly, the Court finds that MJ failed to show that AmFam had a duty to split the file as a matter of law.

### 7. Joffe's Referral to Criminal Counsel

AmFam is not liable for BOFD based on Joffe's[5] actions because he did not give MJ legal advice. MJ asserts that AmFam breached its fiduciary duty to him when Joffe, AmFam's agent, gave Taylor a criminal attorney's number after MJ was impeached at trial. [See Dkt. 402, at 19-20]. MJ claims that Joffe incurred a fiduciary duty to him when he provided the contact because the referral was tantamount to giving legal advice. [See id.]. AmFam asserts that it is entitled to

---

[5] Joffe was AmFam's outside counsel.

summary judgment on these allegations because (1) Joffe did not advise MJ to consult a criminal lawyer; (2) Joffe only provided the referral when Taylor asked; and (3) MJ failed to identify any law suggesting that providing a referral constitutes legal advice. [See Dkt. 396-1, at 18-19].

Joffe did not incur a fiduciary duty to MJ when he gave the contact to Taylor because the referral was not legal advice. Under certain circumstances, lawyers can incur fiduciary duties to a non-client by providing legal advice. See Guillebeau v. Jenkins, 385 S.E.2d 453, 457 (Ga. Ct. App. 1987). One Georgia court defined legal advice as advice that "requires the use of any degree of legal knowledge or skill." Gazan v. Heery, 183 Ga. 30, 38 (1936). To discern between business and legal advice with respect to attorney-client privilege, another court stated that "the trial court should consider the totality of the circumstances . . . relevant factors generally include . . . the nature and purpose of the communication and how and to whom the communication was made. S. Guar. Ins. Co. of Georgia v. Ash, 383 S.E.2d 579, 583 (Ga. Ct. App. 1989).

Joffe's referral did not constitute legal advice under either of these standards. First, the undisputed facts show that Joffe did not act on his own accord: he only provided the contact after Taylor decided that he was obligated to advise MJ to

34

consult criminal counsel and then asked Joffe for names. [See Dkt. 396-1, at 18-19]; [Dkt. 227, at 148:18-23]. Joffe's referral also did not constitute legal advice because it did not require specialized legal knowledge or skill. See Heery, 183 Ga. at 38. To illustrate, Taylor did not ask Joffe his opinion on *whether* MJ should consult a criminal lawyer. Taylor only asked Joffe "for the name of a criminal lawyer that [he] could pass along to[MJ] . . . ." [Dkt. 227, at 148:18-23]. Finally, Joffe testified that he did not provide the contact directly to MJ and never even spoke to him. [Dkt. 227, at 147:1-2.]; [Dkt. 396-1, at 18-19].

MJ did not identify any other law or facts suggesting that Joffe's referral constituted legal advice. The Court thus finds that Joffe did not incur a duty to MJ under the circumstances. Accordingly, AmFam is not liable for BOFD based on Joffe's actions.

### 8. AmFam's Duty to Retain a Competent Attorney

A jury could find that AmFam breached a fiduciary duty to MJ by failing to provide him with a competent attorney. MJ claims that AmFam breached a duty to him because it knew that Taylor was professionally incompetent but chose not to replace him. [See Dkt. 402, at 16-17, 23]; [see also Dkt. 144-1, at 13-14]. AmFam

responds that it is not liable for Taylor's alleged negligence because it did not authorize, control, or approve Taylor's actions. [Dkt. 396-1, at 15-16].

AmFam had a duty to defend MJ in good faith. See Prime, 2007 WL 4592099 at *5. Under Smoot, insurer's duty to defend includes hiring a competent attorney to represent its insured. See 299 F.2d at 530 (noting that the duty to defend extends beyond hiring competent counsel); see also § 14A COUCH ON INS. § 202:17 ("An insurer's duty to defend is generally a duty to provide services, which includes the hiring of competent counsel . . . ."). The Court thus finds that AmFam had an obligation to hire competent counsel to represent MJ as part of its fiduciary duty to defend.

A reasonable jury could find that AmFam breached this fiduciary duty because it doubted Taylor's competence but failed to replace him with a more skilled attorney. MJ cited to testimony showing that Valley, AmFam's supervising attorney, was so concerned about Taylor's handling of the case that he asked to replace Taylor before trial. [Dkt. 223, at 207:13-209:11]. Valley's manager rejected his request for unknown reasons. [See id. at 209:7-9]. MJ also cited to evidence showing that several AmFam attorneys thought unfavorably of Taylor's legal skills well before MJ's trial. [See id. at 207:21-208:13]. Finally, AmFam put forth no

36

evidence showing that it made a good faith attempt to remedy Taylor's perceived incompetence before or during the Underlying Litigation. [See Dkt. 408, at 12-13].

Taken together, MJ's evidence could support a finding that AmFam breached its duty to defend MJ when it questioned Taylor's competence but kept him on the case. Accordingly, AmFam is not entitled to summary judgment on this aspect of MJ's BOFD claim.

### 9. AmFam's Liability for Taylor's Negligence

The Court finds that MJ put forth sufficient evidence to support a jury finding that AmFam ratified, but not controlled, Taylor's conduct. MJ alleges that AmFam is liable for Taylor's alleged negligence because there is evidence that AmFam controlled and ratified Taylor's actions. [Dkt. 402, at 22]. AmFam responds that MJ's claim fails as a matter of law because the Court already found that Taylor controlled the defense and there is no evidence that AmFam ratified Taylor's actions. [Dkt. 408, at 12].

"Georgia courts have repeatedly and consistently held that the insurer-insured relationship does not itself impose fiduciary responsibilities upon the insurer." Prime, 2007 WL 4592099 at *5. However, the Prime court also held that an insured may "sue for breach of fiduciary duty [] if he sustains damages other

than damages covered by the insurance contract." Id. The Court in Skinner v. Progressive Mountain Ins. Co. built upon this exception when it found that, if a plaintiff could "show that the insurance company directed or controlled the [negligent or bad faith] acts of the attorney" representing the insured or "authorized, knew of, or approved of any breaches of fiduciary duty by counsel, it might be possible to hold the company liable." 2013 WL 12073464, at *3 (N.D. Ga. Nov. 14, 2013).

As a threshold matter, the Court notes that it cannot definitively rule on MJ's claim because a jury must first decide whether Taylor breached a duty to MJ. If Taylor was not negligent, AmFam cannot be liable for his actions as a matter of law. See Skinner, 2013 WL 12073464 at *3. In MJ's response to AmFam's interrogatories, he alleged that Taylor was negligent for the following reasons:[6] (1) he did not properly prepare for or adequately defend MJ against Cruz's theories of liability; (2) he failed to perform "standard investigative work" that was necessary to provide MJ with a competent defense; (3) he failed to advise MJ of the

---

[6] This list is not intended to be exclusive.

likelihood and consequences of an excess verdict; and (4) he let the flat fee disincentivize him from properly preparing for trial. [See Dkt. 144-1, at 11-14].

Despite raising these allegations in earlier pleadings, MJ did not address whether Taylor was negligent in his Response to AmFam's motion. [See Dkt. 402]. AmFam also did not argue whether Taylor was negligent. [Dkt. 396-1]; [Dkt. 408]. Instead, both parties focused on whether AmFam controlled or ratified Taylor's actions. Accordingly, the Court will only rule on whether AmFam could be held vicariously liable if a jury found that Taylor breached his duty to MJ.

Even if Taylor was negligent, AmFam cannot be held liable on the basis that it controlled Taylor's actions. When ruling on similar allegations, the Court held that Taylor's deposition was sufficient to prove that he exercised exclusive control over MJ's defense in the Underlying Litigation. [Dkt. 202, at 3 (rejecting MJ's argument that AmFam "exercise[d] a sort of veto power over... Taylor")]. The Court specifically relied on Taylor's testimony that he was the one responsible for selecting witnesses, taking depositions, conducting research, and otherwise preparing for trial. [See id.] The Court will follow its prior ruling because it was based on record evidence. Accordingly, AmFam is entitled to summary judgment on the issue of whether it controlled Taylor's actions.

39

However, there remain issues of material fact as to whether AmFam ratified Taylor's conduct. Courts generally find that ratification occurs "'when a principal, with full knowledge of all the material facts, accepts the benefits of an unauthorized act by their agent or retains a benefit after discovering the material facts.'" Woodstone Townhouses, LLC v. Southern Fiber Worx, LLC, 855 S.E.2d 719, 736 (Ga. Ct. App. 2021) (citation omitted). A principal may also ratify its agent's unauthorized act if it knows the material facts and fails to repudiate the conduct or make any objections. See 17 GA. JUR. § 17:19 (citing Georgia cases showing that "when the agent's unauthorized act is done in the execution of power conferred, but in excess or misuse thereof, a presumption of ratification readily arises from slight acts of confirmation or mere silence . . . .").

Taylor was AmFam's agent because AmFam hired him to defend MJ. See Smoot, 299 F.2d at 530. The undisputed facts could also support a jury finding that AmFam knew the material facts of Taylor's conduct. [See Dkt. 402, at 22-23]. MJ cited to several pieces of evidence showing that AmFam kept tabs on Taylor's defense strategies. [See id. (listing citations to AmFam's communications with Taylor about his defense strategy)].

40

A jury could further find that AmFam ratified Taylor's alleged negligence when it questioned his professional competence but chose not to replace him. Whether a principal ratified its agent's unauthorized act is generally a jury question. Am. Computer Tech., Inc. v. Hardwick, 616 S.E.2d 838, 842 (Ga. Ct. App. 2005) (citation omitted). Here, MJ put forth evidence proving that several AmFam attorneys "questioned [Taylor's] judgment" and viewed his legal skills unfavorably. [See Dkt. 223, at 207:13-209:11]. MJ also cited to testimony showing that Valley was so concerned about Taylor's competence that he asked to replace Taylor before trial. [See id.] Finally, MJ showed that AmFam disagreed with Taylor's legal strategy at several points throughout the Underlying Litigation. [See Dkt. 402, at 22-23 (collecting cites of AmFam's communications with Taylor about legal strategies)].

Admittedly, these facts could support a jury finding that AmFam tried to repudiate Taylor's actions and thus did not ratify his negligence. However, a jury could also find that AmFam ratified Taylor's conduct because it knew he was providing MJ with subpar representation but never replaced him with a more competent attorney. For these reasons, the Court will not dismiss MJ's BOFD claim.

41

### 10. Reservation of Rights

The Court finds that AmFam did not breach a fiduciary duty when it sent MJ the ROR. MJ claims that AmFam breached its duty to "deal fairly and honestly" with him when it sent an ROR that included "falsified and highly exaggerated factual allegations . . . falsely [told] [MJ] that he had committed the crime of perjury, and falsely [advised] him that he could no longer participate in his defense." [Dkt. 144-1, at 17]; [Dkt. 402, at 20-21]. AmFam argues that MJ's allegations fail as a matter of law because he did not show that AmFam owed him a fiduciary duty in drafting and sending the ROR. [Dkt. 396-1, at 19-20].

AmFam is entitled to summary judgment on MJ's allegations because it did not have a fiduciary duty to MJ in this context. To start, the Court is unaware of any Georgia law stating that insurers have a fiduciary duty when drafting and issuing RORs. MJ attempts to sidestep this gap in the law and appears to claim that AmFam violated its fiduciary duty of good faith and fair dealing when it drafted and sent the ROR. [See Dkt. 144-1, at 17].

In Georgia, "[e]very contract implies a covenant of good faith and fair dealing in the contract's performance and enforcement. The implied covenant modifies and becomes a part of the provisions of the contract . . . ." Onbrand Media

v.Codex Consulting, Inc., 687 S.E.2d 168, 174 (Ga. Ct. App. 2009) (citation omitted). Thus, all Georgia insurers owe a general duty of good faith and fair dealing towards insureds. See Piedmont Office, 771 S.E.2d at 866-867. However, this duty cannot support BOFD claims that arise outside of the insurance contract because "[the duty] cannot be breached apart from the contract provisions it modifies . . . ." Onbrand Media, 687 S.E.2d at 174 (citation omitted).

Here, MJ alleges that AmFam breached its implied duty of good faith and fair dealing but fails to connect his claim to the Policy. [See Dkt. 402, at 20-21]; [Dkt. 144-1 at 17]. Therefore, MJ's claim is not actionable under Georgia law and AmFam is entitled to summary judgment on the allegations.

## 11. Breach of Fiduciary Duty in This Litigation

The Court will grant AmFam summary judgment on MJ's claim that it breached a fiduciary duty to him during this litigation. MJ claims that AmFam breached a duty to him when it held a "secret prep session" with Taylor before Taylor testified in this action. [Dkt. 144, at 18]; [Dkt. 402, at 17]. AmFam responds that it does not owe MJ, or any opposing party, a fiduciary duty during litigation. [Dkt. 408, at 15].

MJ's claim fails as a matter of law because adverse parties generally cannot sue each other for BOFD based on actions taken in the same litigation. See XL Ins. Am., Inc. v. Sto Corp., 2008 WL 11407266, at *1 (N.D. Ga. Feb. 25, 2008). The Court in Sto reached a similar conclusion when an insured claimed that its insurer breached a fiduciary duty during the same litigation when it publicly filed the insured's confidential information. 2008 WL 11407266, at *6. The Court dismissed the insured's claim, finding that it failed to identify "authority suggest[ing] that conduct during the pendency of a litigation, including the disclosure of confidential information, can form the basis of an independent breach of the duty of good faith claim in the same litigation." Id.

For the same reasons, the Court finds that MJ cannot sue AmFam for BOFD in *this* litigation for bad acts committed while pursuing this case. Moreover, MJ failed to identify any laws prohibiting AmFam from meeting with Taylor before his deposition. There is also no evidence that AmFam asked Taylor to disclose MJ's privileged information or encouraged him to give false testimony. [See Dkt. 402, at 17]. For these reasons, MJ cannot recover for BOFD simply because AmFam met with Taylor before his deposition in this litigation.

44

### 12. Independent Counsel Claim

AmFam is entitled to summary judgment on MJ's claim that it breached a fiduciary duty by not paying for MJ to have independent counsel. [Dkt. 144-1, at 18]. AmFam argues that MJ's claim fails as a matter of law because his Response does not address AmFam's defenses. [Dkt. 408, at 15]; [see Dkt. 402]. AmFam further asserts that insurers are not required to obtain independent counsel for insureds and that MJ never asked it to pay for independent counsel. [Dkt. 396-1, at 20-21].

The Court will accept AmFam's arguments as admitted because MJ did not respond to AmFam's defense. See Callahan v. Emory Healthcare, Inc., 2021 WL 4461587, at *1 (11th Cir. 2021). "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." Solutia, Inc. v. McWane, Inc., 672 F.3d 1230, 1239 (11th Cir. 2012) (quoting Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 598 (11th Cir. 1995)). Once AmFam challenged MJ's claim that it breached a fiduciary duty by failing to provide independent counsel, it was "incumbent upon [MJ] to respond by . . . raising in [his] opposition papers any and all arguments or defenses [he] felt precluded

judgment in [his] favor." Case v. Eslinger, 555 F.3d 1317, 1329 (11th Cir. 2009) (internal quotation marks omitted and alterations adopted).

The Court's ruling also stands on the merits. AmFam is correct in that Georgia does not require insurers to provide independent counsel by statute or common law. Further, the Georgia Court of Appeals appeared to reject a rule requiring insurers to provide independent counsel in Mead Corp. v. Liberty Mut. Ins. Co. 129 S.E.2d 162 (Ga. Ct. App. 1962) (judgment rev'd on other grounds). The court justified its decision by citing to insurance defense counsel's ethical obligations to insureds. See id. As MJ did not cite any law contradicting Mead, his claim fails as a matter of law.

### 13. Appellate Counsel Claim

For similar reasons, the Court dismisses MJ's claim that AmFam breached a duty to him when it hired appellate counsel who made "factually false arguments that supported AmFam's theory of no coverage at the expense of [MJ's] interests in preserving coverage." [Dkt. 144-1, at 17]. AmFam argues that it is entitled to summary judgment on MJ's allegations because he did not respond to their arguments and he failed to show that AmFam controlled or ratified the attorney's statements. [Dkt. 396-1, at 20]; [see Dkt. 402].

46

AmFam is entitled to summary judgment on MJ's claim. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." <u>Solutia</u>, 672 F.3d at 1239. The Court may also accept as admitted any of AmFam's factual arguments that have not been specifically controverted with citations to the record by the opposing party. <u>See</u> LR 56.1(B)(2)(a)(2), NDGa; <u>see also</u> FED. R. CIV. P. 56(e)(1). MJ did not respond to AmFam's defenses or cite to any evidence suggesting that AmFam controlled or ratified the appellate counsel's conduct. Therefore, the Court will grant AmFam summary judgment on MJ's claim.

### 14. Attorneys' Fees and Punitive Damages

The Court will not rule on MJ's remaining claims for attorneys' fees and punitive damages because MJ's surviving BOFD claims must be decided by a jury.

### C. Expert Testimony Dispute

To support his BOFD claim, MJ cites to Erin Finn's ("Finn") expert testimony. [Dkt. 401-1]; [<u>see</u> Dkt. 397-2]. AmFam argues that MJ's claim fails as a matter of law because his claim rests on Finn's opinions and Finn's testimony should be excluded. [Dkt. 396-1, at 9-10]. MJ responds that, even if the Court excludes Finn's testimony, his BOFD claim can survive under Georgia law. [Dkt.

47

402, at 5-6]. MJ further argues that, while expert testimony may be useful in this case, it is not necessary because other witnesses can provide "competent factual testimony . . . that will allow the jury to understand the role of insurers and their duties to insureds." [See id.]

MJ bears the burden of establishing the existence of a fiduciary or confidential relationship. See O'Neal v. Home Town Bank of Villa Rica, 514 S.E.2d 669, 675 (Ga. Ct. App. 1999). If MJ fails to provide evidence showing AmFam had a duty, the Court must grant AmFam summary judgment on the BOFD claim. See Burns v. Dees, 557 S.E.2d 32, 39 (Ga. Ct. App. 2001) ("[plaintiff] points to no evidence [] of... a fiduciary relationship).

The Court finds that MJ's remaining claims do not need Finn's testimony to survive summary judgment. First, Georgia law does not require expert testimony to support a BOFD claim. Baker v. Eichholz, 2009 WL 62266, at *3 (S.D. Ga. Jan. 9, 2009) (emphasis in original). Second, each of MJ's surviving claims has adequate support in the record and applicable law. Accordingly, AmFam is not entitled to summary judgment on these grounds. The Court reserves its final ruling on AmFam's Motion to Exclude the Purported Expert Opinions of Erin Finn [Dkt. 397] for a separate order.

## CONCLUSION

For the reasons stated above, the Court will grant AmFam summary judgment on the majority of MJ's BOFD claims. However, the Court will delay ruling on the effect of the no-action clause until trial because a jury must determine whether MJ violated the Policy's Cooperation Clause. The Court will also delay its ruling on the admissibility of Finn's expert testimony. Therefore, AmFam's Motion for Summary Judgment on [MJ's] Counterclaim is **GRANTED IN PART.**

**SO ORDERED** this 21st day of July, 2022.

_____

**RICHARD W. STORY**
United States District Judge